UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KLEENIT, INC., | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| SENTRY INSURANCE COMPANY, | ) |
| ROYAL & SUN ALLIANCE, | ) |
| UTICA NATIONAL INSURANCE GROUP, and | ) |
| TRAVELERS PROPERTY AND CASUALTY, | ) |
| Defendants | ) |

CIVIL ACTION
NO. 04-10351-NG

### AFFIDAVIT OF RICHARD E. HEIFETZ, ESQUIRE

I, Richard E. Heifetz, hereby depose and state as follows:

1.      I am a member of the law firm Tucker, Heifetz & Saltzman, LLP, and counsel to Utica National Insurance Group and Graphic Arts Mutual Insurance Company (collectively "Utica"). I make this affidavit based on my personal knowledge and solely to authenticate documents relevant to Utica's Motion For Partial Summary Judgment which is presently before this Court.

2.      A true and accurate copy of the Notice of Responsibility ("NOR") relative to the Chelmsford site is attached as Exhibit 1.

3.      A true and accurate copy of the NOR relative to the Acton site is attached as Exhibit 2.

4.      True and accurate copies of the Tender Letters, dated September 25, 2002 are attached as Exhibit 3.

5.     A true and accurate copy of the Affidavit of Keith Crider, dated February 5, 2004 is attached as Exhibit 4.

6.     A true and accurate copy of the letter from Robert Fasanella, Esq. to Kristen Martin, dated January 10, 2003, enclosing NOR, is attached as Exhibit 5.

7.     True and accurate copies of the Reservation of Rights Letters dated October 28, 2002 from Kristen Martin to Robert Fasanella, Esq., are attached as Exhibit 6.

8.     A true and accurate copy of the letter from Richard E. Heifetz, Esq. to Robert Fasanella, Esq. dated January 14, 2003 is attached as Exhibit 7.

9.     True and accurate copies of the letters from Robert Fasanella, Esq. to the insurers dated March 11, 2003 and August 11, 2003, are attached as Exhibit 8.

10.     True and accurate copies of the letters dated July 16, 2003, September 10, 2003 and October 27, 2003, from the insurers to Robert Fasanella, Esq. stating the legal basis for refusal to pay pre-tender defense costs, are attached as Exhibit 9.

11.     A true and accurate copy of the letter from Travelers Property and Casualty on behalf of the insurers to Robert Fasanella, Esq., dated September 10, 2003, is attached as Exhibit 10.

Signed under the pains and penalties of perjury this 14th day of June 2004.

_____
Richard E. Heifetz

I hereby certify that I made service of the foregoing document in accordance with the provisions of Fed. R. Civ. P. 5.

*EXHIBIT  1*



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
Metropolitan Boston – Northeast Regional Office

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

JAN 2 - 2001

Acer u<sup>d</sup>
3/31/01

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Kleenit, Inc.
44 Park Street
Ayer, MA 01432

Attn: Mr. Keith Crider

RE:    CHELMSFORD–Care Cleaners, Inc.
28 Central Square
RTN #3-20316
RELEASE NOTIFICATION
NOTICE OF RESPONSIBILITY;
NOTICE OF NEED TO CONDUCT IRA;
DESIGNATION OF INTERIM DEADLINES
M.G.L. c. 21E & 310 CMR 40.0000

Dear Mr. Crider:

The Department of Environmental Protection (DEP) has determined that a release of hazardous materials has occurred at the subject site, which extends to the 34 Central Square property and Beaver Brook, and requires the initiation of one or more Immediate Response Actions as described in Section 310 CMR 40.0410 of the Massachusetts Contingency Plan (the MCP). DEP has also determined that Kleenit, Inc. is a Potentially Responsible Party (PRP) pursuant to Massachusetts General Law, Chapter 21E (M.G.L. c. 21E), and the MCP. Attached to this letter is a fact sheet discussing the liability provisions of M.G.L. c. 21E. Please refer to the statute for a complete discussion of these provisions. You may undertake the necessary Immediate Response Actions provided that you engage the services of a Licensed Site Professional to prepare and submit an Immediate Response Action Plan in accordance with 310 CMR 40.0410 and the provisions of this letter.

### BACKGROUND

Earliest records indicate that in 1979, the Town of Chelmsford's-Turnpike Road municipal supply well was sampled for the first time for volatile organic compound's (VOC's) by the Town's Water Department. At that time, the chlorinated VOC's trichloroethene (TCE) and perchloroethene (PCE) were detected in the supply well water at concentrations of 1.40 micrograms per liter (ug/l) and 0.40 ug/l, respectively. Since the 1979 VOC sampling round, PCE, TCE, and additional chlorinated VOCs have continued to be sporadically detected in the supply well water, similar to the 1979 levels. The Federal and State Safe Drinking Water Standards/Guidelines is 5.0 ug/l for both TCE and PCE.

This information is available in alternate formats by calling our ADA Coordinator at (617) 574-6872.

205A Lowell St. Wilmington, MA 01887 • Phone (978) 661-7600 • Fax (978) 661-7615 • TTD# (978) 661-7679
♻ Printed on Recycled Paper

CHELMSFORD-28 Central Square    Page 2
Need to Conduct Immediate Response Actions

In March 2000, DEP's Site Discovery group (DEP/SD) began conducting an investigation within the Turnpike Road wellfield in order to locate the source of the chlorinated VOC contamination. In August 2000, DEP/SD installed six driven wellpoints (DEP-11 through DEP-16) at locations along Beaver Brook to depths below the streambed. During that time, groundwater samples were collected from the wellpoints and screened for VOCs at DEP's Northeast Regional Office (NERO Lab). Results of the Beaver Brook sampling identified PCE in samples collected from wellpoints DEP-16 and DEP-12 at estimated concentrations of 246 ug/l and 2015 ug/l, respectively. Wellpoint DEP-16 is located to the northeast of the 34 Central Square property. Wellpoint DEP-12 is located approximately 300 feet southeast and downstream of DEP-16.¹ Follow-up surface water samples were also collected from Beaver Brook within the vicinity of the driven wellpoints and found to contain PCE as high as 2.8 ug/l and other chlorinated VOCs at similar levels: '

DEP/SD has also reviewed information on file for the Care Cleaners site (RTN: 3-2739). According to information on file, historic releases of chlorinated VOCs similar to those identified during DEP/SD's Beaver Brook investigation occurred at the Care Cleaners site. The site is located approximately 300 feet to the southwest and upgradient of wellpoint DEP-16. The most recent groundwater quality results on file with DEP for the site was from assessment work conducted in March 1997. At that time, PCE and the breakdown product TCE were reported in groundwater sampled from on-site monitoring wells at concentrations as high as 150 ug/l and 27 ug/l, respectively. Additional PCE breakdown products such as cis(1,2)-dichloroethene and vinyl chloride were also identified during this sampling round at concentrations as high as 1800 ug/l and 350 ug/l, respectively. A possible source of the chlorinated VOC contamination was previously identified as the former sanitary system. To date, DEP is not aware of any remedial response actions which have taken place at this portion of the site.

## NECESSARY RESPONSE ACTIONS

Based on the above information, DEP has determined that a Condition of Substantial Release Migration (SRM), as described in 310 CMR 40.0006, exists at the subject site. Pursuant to 310 CMR 40.0412(3), Immediate Response Actions shall be conducted at sites where a condition of SRM has been identified. You, as a Potentially Responsible Party for this release, may undertake the necessary Immediate Response Actions at this site in lieu of DEP provided that you submit to this Office, within sixty (60) days from the date of this letter:

1) a Release Notification Form pursuant to 310 CMR 40.0333,

2) an Immediate Response Action Plan prepared in accordance with 310 CMR 40.0424. At a minimum, the Immediate Response Action Plan must include details on assessment activities to be undertaken in determining the required mitigation and/or remedial actions regarding this SRM, and;

3) a timetable for the implementation of the Immediate Response Action.

If you intend to undertake the necessary Immediate Response Actions at this site, you must notify Mr. Kyle MacAfee of DEP's Northeast Regional Office [(978) 661-7690] of such an intent by no later than 5:00 p.m. on February 6, 2001 . If you fail to provide this notice and to voluntarily undertake the response action(s) necessary at the subject site within the time periods established herein, DEP

may perform such response actions and seek to recover its costs and/or may initiate other appropriate enforcement actions to ensure that such response actions are conducted.

DEP encourages parties with liabilities under M.G.L. c. 21E to take prompt action in response to releases and threats of release of oil and/or hazardous material. By taking prompt action, you may significantly lower your assessment and cleanup fees and avoid the imposition of, or reduce the amount of, certain permit and annual compliance fees for response actions payable under 310 CMR 4.00.

If you have any questions concerning the content of this letter, please contact Mr. Kyle MacAfee at the letterhead address or at (978) 661-7690. All future communications regarding this release must reference the Release Tracking Number provided in the subject heading of this letter.

Very truly yours,

Iris W. Davis
Section Chief
Permits/Risk Reduction


cc:    DEP/NERO/WS ,Attn: Mr. James Persky
DEP/BOSTON/BWSC SD  Attn: Mr. John Hamilton
DEP/NERO/BWSC RR Attn: Mr. Kyle MacAfee
Town of Chelmsford Water Department-Central Water District, 20 Watershed Lane,
        Chelmsford, MA 01824  Attn. Superintendant Robert Doak
Town Of Chelmsford-Board Of Health, Town Offices, 50 Billerica Road, Chelmsford, MA
        01824  Attn: Health Agent
Town of Chelmsford-Community Development Coordinator, Town Offices, 50 Billerica Road,
        Chelmsford, MA 01824 Attn: Andrew J. Sheehan
BR Trust c/o Ms. Sandra Jenkins, 15 Indian Ridge, West Newbury, MA 01985
D'Amore Associates, Inc., 148 Tonakin Road, Lancaster, MA 01523
        Attn: Mr. Dennis D'Amore

DEP data entry/file

Attachment: Release Notification Form; BWSC - 103

*EXHIBIT  2*



**COMMONWEALTH OF MASSACHUSETTS**
**EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
Central Regional Office, 627 Main Street, Worcester, MA 01608

JANE M. SWIFT
Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

<u>URGENT LEGAL MATTER: PROMPT ACTION NECESSARY</u>       DEC 30 2002

Kleenit, Inc.
d/b/a Dud's Cleaners & Launderers         RE: CRWSC-Acton
44 Park Street                                      293 Main Street
Ayer, MA 01432                                   Dud's Dry Cleaners

Attention:  Keith Crider
                    President                             RTN 2-14526

<u>NOTICE OF RESPONSIBILITY</u>
<u>120-DAY NOTIFICATION</u>
<u>M.G.L. C. 21E, 310 CMR 40.0000</u>

Dear Mr. Crider:

Thank you for submitting the Release Notification Form (RNF) to the Department of Environmental Protection, Bureau of Waste Site Cleanup (the Department) on October 29, 2002. Your submittal presents the Department with information that the property at 293 Main Street, Acton, MA, has been subject to a release of hazardous materials, Tetrachloroethylene or dry cleaning fluid also known by the common name, Perc. According to the RNF the release has resulted in the presence of Tetrachloroethylene in the soil at concentrations that exceed the applicable Reportable Concentrations (RC). Based on this information, the Department has determined that the property, or portions thereof, is a disposal site that requires a response action.

The Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E, which is implemented through regulations promulgated by the Department, governs the cleanup of disposal sites. These regulations are referred to as the Massachusetts Contingency Plan, (the MCP), and are codified at 310 CMR 40.0000. The Department wishes to ensure that you are aware of your rights and responsibilities under M.G.L. c. 21E and the MCP.

In your submittal, you (as used in this notice, "you" refers to Kleenit, Inc. d/b/a Dud's Cleaners & Launderers) identify yourself as the **operator** of Dud's Cleaners and Launderers and as a party with potential liability for response action costs and damages under M.G.L. c. 21E, §5. This notice and the attached summary are intended to provide you with information about

NOTICE OF RESPONSIBILTY          RTN 2-14526

2

liability under Chapter 21E to assist you in deciding what actions to take in response to the conditions that are present at this disposal site.

The Department has determined that there are two potentially responsible parties with respect to this release: 1) you, the operator of the property and, 2) E&A Northeast Limited Partnership, the property owner. The Department requests that the two parties determine amongst themselves how to allocate responsibility for the necessary response actions at the site.

You should be aware that you might have claims against third parties for damages, including claims for contribution or reimbursement for the costs of cleanup. Such claims do not exist indefinitely but are governed by laws that establish the time allowed for bringing litigation. The Department encourages you to take any action necessary to protect any such claims you may have against third parties.

## BACKGROUND

On October 29, 2002, the Department received a RNF from you for a release of Tetrachloroethylene or Perc to the property at 293 Main Street, Acton. The RNF reports the presence of Tetrachloroethylene in the soil at a concentration level that exceeds the applicable RC identified in the RNF. The concentration level reported in the RNF is summarized in parts million (ppm) and compared to the soil reportable concentrations below.

| OHM Released | SOIL Concentration (ppm) | RCS-1 (ppm) |
|---|---|---|
| Tetrachloroethylene | 160 | 0.5 |

The Department has assigned Release Tracking Number (RTN) 2-14526 to the disposal site. The Department has no information regarding further actions taken or proposed for this disposal site.

## NECESSARY RESPONSE ACTIONS AND APPLICABLE DEADLINES

October 29, 2002 is the date of release notification for RTN 2-14526. Unless otherwise stated, this date will be the baseline for calculating compliance of this disposal site with the deadlines contained in the MCP.

No disposal site will be deemed to have had all the necessary and required response actions taken for it unless and until all substantial hazards presented by the release and/or threat of release have been eliminated and a level of no significant risk exists or has been achieved in compliance with the MCP. The MCP requires persons undertaking response actions at a disposal site to submit to the Department a Response Action Outcome (RAO) Statement prepared by a Licensed Site Professional upon determining that a level of no significant risk exists or has been achieved at the disposal site. A fee of $750.00 is assessed if an RAO is filed 120 days after release notification, but before Tier Classification. Therefore, if all remediation work has been completed, you are encouraged to have the RAO submitted promptly to avoid the fee.

NOTICE OF RESPONSIBILTY          RTN 2-14526

3

Unless otherwise provided by the Department, responsible parties have one year from the initial date notice of a release or threat of release is provided to the Department pursuant to 310 CMR 40.0300 or from the date the Department issues a Notice of Responsibility, whichever occurs earlier, to file with the Department one of the following submittals: (1) a completed Tier Classification Submittal; or (2) a Response Action Outcome Statement. If required by the MCP, a completed Tier I Permit Application must also accompany a Tier Classification Submittal. Unless otherwise specified by the Department, the deadline for these submittals for this disposal site is **October 29, 2003.**

The MCP requires responsible parties and any other person undertaking response actions to perform Immediate Response Actions in response to sudden releases, Imminent Hazards and Conditions of Substantial Release Migration. Such persons must continue to evaluate the need for Immediate Response Actions and notify the Department immediately if such a need exists.

## PROCEDURES TO FOLLOW TO UNDERTAKE RESPONSE ACTIONS

The Department encourages parties having liability under M.G.L. c. 21E to take prompt action in response to releases and threats of release of oil and hazardous materials. By taking prompt action, liable parties may significantly lower cleanup costs and avoid the imposition of, or reduce the amount of, certain permit and/or annual compliance assurance fees payable under 310 CMR 4.00.

You must continue to employ or engage a Licensed Site Professional (LSP) to manage, supervise or perform all response actions that you intend to undertake at this disposal site. You may obtain a list of the names and addresses of LSPs by visiting www.mass.gov/lsp, by contacting the Board of Registration of Hazardous Waste Site Cleanup Professionals by telephone at (617) 556-1091, or in person or by mail at One Winter Street, 10th Floor, Boston, Massachusetts 02108.

NOTICE OF RESPONSIBILTY                    RTN 2-14526

4

   If you have any questions, please contact the Central Regional Office at the letterhead address or at 508-792-7653. <u>The Department requests that you inform your LSP of this Notice</u>. All future correspondence and communications regarding the disposal site should reference **RTN 2-14526**.

DEC 3 0 2002

                                        Sincerely,


                                        Frank Sciannameo
                                        Section Chief
                                        Bureau of Waste Site Cleanup

FS\PAS
[ NOR/ISSUED ]
Enclosure
La

cc:   Acton Board of Health
      Lisa Feagain, E&A Northeast Limited Partnership, 360 Newbury Street, Boston, MA 02115
      Mark Germano, LSP, Coler & Colantonio, Inc., 101 Accord Park Drive, Norwell, MA 02061
      Database Entry
      File

      C:\WINNT\NORs2002\2-14526ActonKleeitIncnoperatoror.doc

## SUMMARY OF LIABILITY UNDER CHAPTER 21E

As stated in the Notice of Responsibility accompanying this summary, the Department has reason to believe that you are a Potentially Responsible Party ("PRP") with potential liability under M.G.L. c. 21E, section 5, for response action costs and damages to natural resources caused by the release and/or threat of release. The Department has identified you as a PRP because it believes you fall within one or more of the following categories of persons made potentially liable by subsection 5(a):

- any current owner or operator of a site from or at which there is or has been a release or threat of release of oil and/or hazardous material;
- any person who owned or operated a site at the time hazardous material was stored or disposed of;
- any person who arranged for the transport, disposal, storage or treatment of hazardous material to or at a site;
- any person who transported hazardous material to a transport, disposal, storage or treatment site from which there is or has been a release or threat of release of such material; and
- any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material at a site.

For purposes of the MCP, you are considered a Responsible Party ("RP") with actual liability under Chapter 21E if you fall within one of these categories unless you (1) are entitled to a defense under section 5 or other applicable law, and (2) have reasonably incurred cleanup costs in an amount equal to or greater than any applicable cap on liability under subsection 5(d).

This liability is "strict," meaning it is not based on fault, but solely on your status as an owner, operator, generator, transporter or disposer. It is also joint and several, meaning that each person who falls within one of these categories may be held liable for all response action costs incurred at the site, regardless of the existence of any other liable parties.

Section 5 provides a few narrowly drawn defenses to liability, including a defense for releases and damages caused by an act of God, an act of war or an act by a third party other than an employee, agent or person with whom the party has a contractual relationship (see subsection 5(c)); a defense for certain owners of residential property at which the owner maintains a permanent residence (see subsection 5(h)); and a defense for certain public utilities and agencies of the Commonwealth which own a right-of-way that is a site (see subsection 5(j)).

You may voluntarily undertake response actions under the MCP without having your liability under Chapter 21E formally adjudicated by the Department. If you do not take the necessary response actions, or fail to perform them in an appropriate and timely manner, the Department is authorized by Chapter 21E to perform the necessary work.

By taking the necessary response actions, you can avoid liability for response action costs incurred by the Department in performing these actions. If you are an RP and you fail to perform necessary response actions at the site, you may be held liable for up to three (3) times all response action costs incurred by the Department and sanctions may be imposed on you for failure to perform response actions required by the MCP.

Response action costs include, without limitation, the cost of direct hours spent by Department employees arranging for response actions or overseeing work performed by persons other than the Department or its contractors, expenses incurred by the Department in support of those direct hours, and payments to the Department's contractors (for more detail on cost liability, see 310 CMR 40.1200: Cost Recovery). The Department may also assess interest on costs incurred at the rate of twelve percent (12%), compounded annually.

Any liability to the Commonwealth under Chapter 21E constitutes a debt to the Commonwealth. To secure payment of this debt, the Department may place liens on all of your property in the Commonwealth under M.G.L. c. 21E, section 13. To recover this debt, the Commonwealth may foreclose on these liens or the Attorney General may bring legal action against you.

In addition to your potential liability for response action costs and damages to natural resources caused by the release, civil and criminal liability may also be imposed by a court of competent jurisdiction under M.G.L. c. 21E, section 11, and civil administrative penalties may be assessed by the Department under M.G.L. c. 21A, section 16, for each violation of Chapter 21E, the MCP or any order, permit or approval issued thereunder.

If you are an RP and you have reason to believe that your performance of the necessary response actions is beyond your technical, financial or legal ability, you should promptly notify the Department in writing of your inability in accordance with Chapter 21E, subsection 5(e), and 310 CMR 40.0172. If you assert and demonstrate in compliance therewith that performing or paying for such response action is beyond your ability, subsection 5(e) provides you with a limited defense to an action by the Commonwealth for recovery of two to three times the Department's response action costs and 310 CMR 40.0172 provides you with a limited defense to the Department's assessment of civil administrative penalties.

*EXHIBIT 3*

# RUBIN AND RUDMAN LLP

### COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Robert A. Fasanella
Direct Dial: (617) 330-7018
E-mail: rfasanella@rubinrudman.com

September 25, 2002

**Certified Mail Return**
**Receipt Requested No.  7000 1670 0007 7745 3619**

Utica National Insurance Group
401 Edgewater Place – Suite 300
Wakefield, Massachusetts  01880-6255
Attention:  Claims Manager/Department

RE:    NOTICE OF CLAIM
       DEMAND FOR DEFENSE/COVERAGE
       Insured: Kleenit, Inc./Sudz-It/Duds Cleaners/Care Cleaners
       Claim Type:  Physical Loss/Property Damage/Hazardous Materials
       **Location: 293 and 295 Main Street, Acton, Massachusetts**
       Policy:  All Risks/Special Multi-Peril, Policy No. FMP 1946 (1982 – 1985)
               Umbrella Liability, Policy No. LV 6406 (1982-1985)

Dear Sir or Madam:

        Please be advised that this firm represents your insured, Kleenit, Inc. (a.k.a. Sudz-It,
Duds Cleaners and/or Care Cleaners) (collectively "Insured" or "Kleenit"), regarding its notice
of claim and request for defense and indemnification pertaining to a release of hazardous
materials, building and property damage, and third party claims at 293 and 295 Main Street,
Acton, Massachusetts ("Property"), and at locations outside of the Property's boundaries.  Please
report this claim to the appropriate representatives at Utica National Insurance Group (the
"Company").

        The Company provided coverage to the Insured at the Property under an "All Risk",
Special Multi-Peril Policy, Policy No. FMP 1946 ("SMP Policy"), and an Umbrella Policy,
Policy No. LV 6406 ("Umbrella Policy") (collectively "Policies") between approximately
October 1, 1982 and October 1, 1985.  (Attached as <u>Tab 1</u> is a copy of Kleenit's "Prepaid
Insurance" ledger from June 1984 proving the existence of the Policies.  Attached as <u>Tab 2</u> are
copies of the types of SMP Policy and Umbrella Policy that Kleenit believes were issued to it by
the Company.)

        Kleenit hereby requests defense and coverage for the foregoing claim under the Policies.
In addition, Kleenit requests that the Company approve the risk assessment, soil and

522488_1

## RUBIN and RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 2

groundwater assessment, and other response actions that are discussed herein. Kleenit also requests the Company to provide it with a complete copy of the Policies, Declaration Page(s) and any endorsements or riders. If the Company contends that the Policies, Declaration Page(s), endorsements and/or riders do not exist, the Company should fully explain the basis of its contention and also provide a copy of its "specimen policies" issued during the relevant time frame.

**Please respond in writing to me within 30 days of the date of this Notice of Claim.**

### Background of Hazardous Materials Release and Property and Building Damage

Since approximately 1962 Kleenit has leased building space and operated a dry cleaning business at 293 and 295 Main Street, Acton, Massachusetts ("Property"), which is located within the Acton Plaza shopping center. By letter dated August 14, 2002 Kleenit's landlord, E&A Northeast Limited Partnership ("E&A"), notified Kleenit of a release of hazardous materials beneath the Property and demanded that Kleenit cleanup the release pursuant to the Massachusetts "Superfund" statute, General Laws Chapter 21E, and its implementing regulations, 310 CMR 40.0000. (A copy of E&A's letter is attached as <u>Tab 3</u>) E&A claimed that vapors from the release could potentially pose a human health risk to employees, tenants and customers at the Property and Acton Plaza. E&A demanded that, <u>inter alia</u>, Kleenit report the release of perchloroethylene ("PCE") to the Massachusetts Department of Environmental Protection ("DEP") as required under Chapter 21E and 310 CMR 40.0000, by October 29, 2002. E&A also demanded that Kleenit take actions to respond to the release. Based upon DEP's practice under 310 CMR 40.0000, Kleenit expects that DEP will shortly issue a Notice of Responsibility ("NOR") to Kleenit and/or E&A under G.L. c. 21E, ordering Kleenit and/or E&A to assess and/or remediate the alleged release of hazardous materials.

In response to E&A's demand and Kleenit's potential obligations under Chapter 21E, 310 CMR 40.0000 and the lease, Kleenit has obtained proposals from two experienced environmental consultants to evaluate the potential human health risks from vapors generated by the release of PCE and to respond to the release in accordance with Chapter 21E and 310 CMR 40.0000. Enclosed herewith as <u>Tab 4</u> is a proposal from Risk Management Incorporated ("RMI"), dated September 3, 2002, pertaining to the human health risk assessment of the vapors. I also enclose as <u>Tab 5</u> a proposal from Coler & Colantonio ("C&C"), dated September 5, 2002, pertaining to the assessment of soil and groundwater conditions at the Property. On behalf of Kleenit we request that the Company approve forthwith the proposed scope of services for RMI and C&C as set forth in <u>Tabs 4</u> and <u>5</u>.

In addition, Kleenit requests the Company's approval to install an interior wall within part of its leased space, so that any potential vapors from the release of PCE can be sealed from other leased space within the building. Kleenit believes that it may be required to perform

522488_1

RUBIN and RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 3

additional response actions in the future pertaining to the release in accordance with Chapter 21E, 310 CMR 40.0000 and the lease, and a Notice of Responsibility ("NON") that Kleenit expects will be issued shortly to Kleenit and/or E&A by DEP under the statute and regulations. Kleenit requests that the Company agree to pay for all such future response actions. In addition, Kleenit requests that the Company agree to pay Kleenit's legal expenses in defense of E&A's demand and the requirements and responsibilities imposed by DEP, Chapter 21E and/or 310 CMR 40.0000.

## Request for Insurance Defense and Coverage

Based upon the foregoing, Kleenit requests that the Company provide defense and indemnification under the Policies for all matters related to or arising out of DEP's NOR and Notice to Conduct IRAs. The SMP Policy in effect at all relevant times provided coverage for damage to the building on the Insured's Property under Section I, Parts I and II, and for property damage liability on- and off-site under Section I, Parts IV and/or V. Damage to the Kleenit's Property was covered through, inter alia, Parts I and II of the SMP Policy, which insured against "all risks of physical loss" to buildings and additions and fixtures thereto, and personal property, and did not contain a so-called "pollution exclusion" or any other applicable exclusion. Further, coverage for property damage to others and "Off-Premises" coverage, with no applicable exclusions, existed under, inter alia, Parts IV and/or V under the Extensions of Coverage of the SMP Policy.

The "all risk" SMP Policy issued by the Company to Kleenit was intended to insure against a fortuitous event, casualty or accident, such as the release of contaminants discussed in DEP's NOR and Notice to Conduct IRAs. Mellon v. Hingham Mut. Fire Ins. Co., 19 Mass. App. Ct. 933 (1984) (coverage provided under an "all risk" policy for damage and loss caused by the discharge and migration of water from a broken pipe); Standard Elec. Supply Co. v. Norfolk & Dedham Mut. Fire Ins. Co., 1 Mass. App. Ct. 762 (1974) (coverage provided under an "all risk" policy for insured's loss caused by the discharge and migration of water from a broken pipe at the premises adjacent to the insured's property). "Moreover, such fortuities are insured against even if they are not specified in the policy." Mellon at 934. Although the Company in the present case "ha[d] the option to exclude from coverage certain risks" (see Mellon at 934), it chose not to do so. As a result, the Company is obligated to provide coverage as requested herein.

The Umbrella Policy obligates the Company to pay on behalf of Kleenit the ultimate loss which Kleenit is legally obligated to pay in the present matter as damages because of property damage or personal injury, including the defense of the claims discussed herein. The Pollution Policy similarly obligates the Company to pay on behalf of Kleenit all sums which Kleenit is obligated to pay as compensatory damages because of property damage or bodily injury, and to reimburse Kleenit for cleanup costs incurred to comply with the requirements of DEP's NOR

RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 4

and Notice to Conduct IRAs. All of these conditions are triggered here, and there are no applicable exclusions under the Policy.

The Massachusetts Supreme Judicial Court has held that "[t]he contamination of soil and groundwater by the release of hazardous material involves property damage" and loss. Hazen Paper Co. v. U.S. Fidelity and Guar. Co., 407 Mass. 689, 698 (1990) (emphasis added). In addition, insurance coverage is triggered by an enforcement letter issued by a government agency to an insured asserting that a release of contamination has occurred, such as the NOR and Notice to Conduct IRAs issued by DEP to Kleenit in this instance. Id. Accordingly, the Company should provide defense and indemnification under the Policies for all claims arising out of DEP's NOR and Notice to Conduct IRAs.

Because the property damage at issue here was neither expected nor intended from the standpoint of the Insured, and, according to DEP's claim, involves off-site contamination and/or impacts property and groundwater of another person if remediation is not undertaken, no exclusions, including the "owned property" exclusion, would apply. Massachusetts Courts consistently hold that the "owned property exclusion" does not bar recovery of costs of cleaning up environmental contamination which presents a threat to, or demonstrated contamination of, property of others and groundwater. See, e.g., Wasserman v. Commerce Insurance Co., Middlesex Superior Court C.A. No. 01-0619(B) (Sanders, J.) (July 9, 2002) ("[A]n insurer will be liable not only to defend an insured against an NOR but also to indemnify the insured for all cleanup costs, even with an 'owned property' exclusion, so long as there is a significant threat of off-site migration."); Rubenstein v. Royal Insurance Co. of America, 44 Mass. App. Ct. 842, 854 (1998) (An insurer's liability for all response costs is triggered "even if the contaminating substances are solely on the insured's land."); Hakim v. Massachusetts Insurer's Insolvency Fund, 424 Mass. 275 (1997).

Kleenit's defense in this case shall also include efforts to pursue any PRPs identified by DEP in its NOR and Notice to Conduct IRAs, and any fees included therefor. See, e.g., Wasserman at p. 15 ("The NOR placed the responsibility on [the insured] to pursue the other parties so that [the insured's] attempts to get their contribution so as to eliminate or diminish his own liability to DEP is thus inextricably intertwined with his defense to the NOR.")

Any purported arguments that the property damage and loss in this case did not occur in the Policies period would be rendered ineffective by Rubenstein, supra, and Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844 (1993), which hold that insurance coverage may be triggered during many time periods and not just when the damage manifests itself. As stated in Trustees of Tufts University,

522488_1

RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 5

[T]he three most common 'trigger theories' include: the exposure trigger (policies in effect during years claimant's property tortiously exposed to hazardous material triggered), the continuous (or multiple) trigger (property damage occurs during each year from the time of first hazardous exposure through manifestation), and the injury-in-fact (or actual injury) trigger requires inquiry into when property damage actually occurred).

415 Mass. at 854, n.9. In Klennit's case, DEP's NOR and Notice to Conduct IRAs make clear that the loss and damage occurred many years ago, during the Policies period. As a result, coverage is triggered under the Policies.

Finally, if there is any ambiguity in the Policies provisions or terms, the ambiguities are construed against the insurer in favor of the policyholder. See Cody v. Connecticut General Life Ins. Co., 387 Mass. 142, 146 (1982) and Camp, Dresser & McKee, Inc. v. The Home Ins. Co., 30 Mass. App. Ct. 318, 326 (1991).

In the present matter, Kleenit requires the assistance of environmental consultants and environmental counsel to provide a defense to the claims asserted by DEP, the PRPs, and other third parties. Please be advised that if the Company should delay or deny its defense or coverage obligations under the Policies, Kleenit will consider bringing a declaratory judgment action to seek full defense and coverage pursuant to the Policies and Massachusetts law. As you may be aware, the Supreme Judicial Court has held that an insured who is put to the expense of establishing an insurer's duty to defend under a policy through a declaratory judgment action is entitled to recover attorney's fees in prosecuting that action, regardless of whether the insurer acted in bad faith or unreasonably. See, e.g., Hanover Insurance Co. v. Golden, 436 Mass. 584 (2002).

**Please respond to me in writing within 30 days of the date of this Notice of Claim.**

Please contact me if you need to discuss this claim. Thank you for your cooperation and attention to this matter.

Very truly yours,

Robert A. Fasanella

Peter J. Feuerbach

RAF/PJF/jem
Enclosures
cc:    Kleenit, Inc. (with enclosures)

522488_1

# goulston&storrs
### counsellors at law

WRITER'S INFORMATION
nebelson@goulstonstorrs.com
617.574.4082 Tel
617.574.7562 Fax

August 14, 2002

### *By Facsimile And Overnight Courier*

Mr. Keith Crider
Kleenit, Inc.
d/b/a Dud's Cleaners and Launderers
44 Park Street
Ayer, MA 01432

   Re: 293 and 295 Main Street
      Acton Plaza
      Acton, MA

Dear Mr. Crider:

   This office represents E&A Northeast Limited Partnership ("EANLP"), which is the landlord of Kleenit, Inc. d/b/a Dud's Cleaners and Launderers ("Kleenit") at the two above-referenced locations (collectively, the "Premises") at Acton Plaza in Acton, Massachusetts (the "Property"). EANLP recently requested Sanborn Head & Associates, Inc. ("SHA") to perform certain site assessment work at a portion of the Premises. SHA performed that work on June 13, 2002 and forwarded a memorandum dated July 2, 2002 summarizing the data that resulted from that work. A copy of SHA's July 2, 2002 memorandum is attached.

   SHA's site assessment work identified the presence of tetrachloroethylene, also known as perchloroethylene ("PCE"), in soil at the Premises at concentrations that exceed the applicable Reportable Concentration (RCS-1) that is set forth in the Massachusetts Contingency Plan (the "MCP"), 310 CMR 40.0000 et seq. Specifically, SHA identified PCE above the applicable MCP Reportable Concentration in five of the six soil samples that were taken. As noted in the SHA memorandum, these data constitute a reportable condition under the MCP, with a 120 day reporting obligation trigger. Based on the July 2, 2002 date of the memorandum prepared by SHA, the 120 day reporting deadline expires on or about October 29, 2002.

   Kleenit is responsible to address the identified PCE contamination, both pursuant to the terms of that certain Agreement of Settlement and General Release dated as of October 19, 1993 between Acton Ventures I Limited Partnership ("Action Ventures"), the predecessor to EANLP, and Kleenit, as well as the two leases concerning the Premises, dated July 1, 1977 and August 28, 1980, respectively, as the same were amended by that certain Amendment to Leases dated as of October 19, 1993 between Acton Ventures and Kleenit.

Mr. Keith Crider
August 14, 2002
Page 2

---

EANLP requested SHA to prepare a Recommended Work Plan in response to the identified reportable PCE contamination at the Premises. A copy of that Recommended Work Plan dated August 13, 2002 is attached for your information and review. This Recommended Work Plan has been prepared to identify those follow up tasks that seem to make sense based on the data that are currently available. This Recommended Work Plan may need to be modified in the future if so warranted due to additional data that are obtained concerning the Premises and the Property. Accordingly, at present, we believe that the attached Recommended Work Plan should be implemented by Kleenit as soon as possible. We believe that doing so and moving forward promptly is in the best interests of both of the parties, both from an environmental perspective and from an economic perspective.

Please note that the demand in this letter is without prejudice to all other legal and equitable rights and remedies EANLP may have to recovery from Kleenit of all of EANLP's damages, including but not limited to Chapter 21E response costs, whether specified in this letter or not.

We look forward to your prompt response concerning the above and the enclosed information, and in any event within two weeks from your receipt of this letter.

Sincerely,

H. Edward Abelson

HEA:tmr

cc (w/enc.):   Messrs. Guilmette and Matelski

GSDocs-1146710-1

# SHA

## Sanborn, Head & Associates

*Consulting Engineers & Scientists*

August 13, 2002
File No. 2145

Mr. Larry Guilmette
Samuels & Associates
333 Newbury Street
Boston, MA 02115

Re:    Recommended Work Plan
       Dud's Cleaners, Main Street, Acton

Dear Larry:

Sanborn Head & Associates, Inc. (SHA) has prepared this letter to outline the plan of work we recommend for the Dud's Acton location. We understand that the tenant and operator of the dry cleaning facility will be taking the lead on these efforts. In that regard, what follows is how we believe the site needs to be managed given the recent discovery of PCE at concentrations that exceed the applicable Massachusetts Contingency Plan (MCP) RCS-1 Reportable Concentration.

We also understand that both you and the tenant wish to proceed with the lease area take back and releasing of the space along the south end of the building where we conducted the below the floor soil sampling. Therefore, we have suggested in the work task list below the steps which we believe will allow both (i) the take back space to be leased to a new tenant in the nearer term, and (ii) the MCP Response Actions that are necessary to be performed, which are likely to continue over an extended period.

Given that the GW-1 criteria do not apply to this location, the primary potential risk that will drive the decision on the potential need for remediation is the indoor air risk. Air within the dry cleaner itself is likely to contain some PCE and is managed for the on-site workers under the OSHA rules. Workers in the adjacent take back space, the nearby Middlesex Bank building, and Blockbuster Video store located downhill from the cleaners are the potential receptors who must be evaluated under the MCP.

### Tasks 1:    Submit Release Notification Form (RNF) to DEP.

SHA informed you on July 2, 2002 of the existence of an MCP Reportable Condition. Therefore, Kleenit as the operator must file an RNF with the Massachusetts Department of Environmental Protection (DEP) no later than 120 days after July 2, that is on or about October 29, 2002. This step can be completed by Kleenit or their LSP in approximately two days. You will want to review drafts of these materials before they are submitted to DEP.

*Paul M. Sanborn ■ Charles L. Head ■ Hethma A. DiPilato ■ Duncan W. Wood*
*Joseph G. Engels ■ R. Scott Stilldaber ■ Charles A. Crossitt ■ Daniel B. Carr*

Sanborn, Head & Associates, Inc.
239 Littleton Road, Suite 1C ■ Westford, Massachusetts 01886
e-mail: westford@sanbornhead.com ■ www.sanbornhead.com
Fax (978) 392-0687 ■ Phone (978) 392-0900



**Task 2:** Install Subdividing Wall and Modify HVAC

In order to lease out the take back space, it will be necessary to demonstrate that the PCE in the soils below that space is not causing an unsafe condition in the work space. Before taking any measurements of PCE in the newly separated space, it is appropriate to finish the proposed dividing wall and reconfigure the HVAC so that the tests will represent the isolated space, and will not include PCE in air that is directly off-gassed from the dry cleaning equipment. The dividing wall needs to be as air tight as possible. It is unclear to SHA whether the proposed wall was to carry to the roof decking or only as high as the suspended ceiling. I do not know how much effort is involved in the HVAC modifications. I expect that the construction could be completed in less than a month, after the Building Permit was issued.

**Task 3:** Conduct Indoor Air Sampling on Three Occasions

After the take back space is isolated, we recommend at least three rounds of indoor air sampling. The time of sampling should be varied and the weather conditions should be varied so that different heating and ventilating conditions are encountered. I would suggest a minimum of two weeks of time between each sampling round, so that this would take a month after the subdividing wall is completed.

**Task 4:** Compare to Risk Criteria and Prepare Data Summary for Tenants

Prepare a data summary and risk characterization summary for tenants for future MCP use. Assuming that the indoor air data do not identify a documented risk, we believe you will need to provide future tenants with knowledge of the PCE in soils below the floor and the potential for vapor migration. Providing the indoor air testing data as good faith due diligence to document the level of risk should help with the leasing of the space. We believe this could be completed within two weeks after the third round of air sampling data was obtained from the laboratory. You will want to review this documentation as a draft before the document is finalized.

**Task 5:** Evaluate Potential for Ongoing Release

This location was previously in the MCP based on PCE discovered at the rear of the building within and near the septic system. The working assumption made during the prior MCP work was that the primary release had been in rinse water that passed through the septic system. The presence of PCE in soils below the floor of the building indicates that there were other release conditions and locations. Before moving forward through the MCP it is important to take a hard look at the current dry cleaning operations taking place at the site, the equipment in use, and the procedures that are now being followed to add new PCE to the equipment and to remove the PCE waste from the still or filters. The objective of that hard look is to minimize the potential for any additional future releases. This is a short effort that could be completed concurrently with the indoor air sampling program. You should require that Kleenit submit a summary of their PCE handling procedures to you so that you can review their plan and provide oversight that they are implementing the plan consistently.



**SHA**

Task 6:    Conduct Exterior Soil Gas Investigation

Given that the groundwater below the building appears to be in bedrock, and that the primary risk pathway is likely to be through soil gas to confined spaces, we recommend that the primary investigation tool be an extended soil gas survey. We recommend that soil gas probes be installed in front of the building, at the rear of the building, adjacent to the south end of the building, adjacent to the Middlesex Bank building, and adjacent to the Blockbuster store. Two of the borings we installed inside the building can also be used for soil gas sampling prior to the placement of a new floor surface in the rear back space. This would involve two days of field work and a total time frame of approximately three weeks. You should review the scope of work for this effort before it is undertaken.

Task 7:    Resample Existing Monitoring Wells

SHA believes that there are still at least three of the former wells located at the rear of the building that could be re-sampled to obtain current groundwater data in the area that was previously found to be acceptable under the MCP. This is a one-day effort that could be done as part of the same field effort as the soil gas sampling, but would extend the effort by a day. You should review the scope of work for this effort before it is undertaken.

Task 8:    Prepare MCP Phase I and Tier Classification, and Phase II Scope of Work

We believe Tasks 3 and 5 though 7 would provide sufficient field data to prepare an MCP Phase I Report and to Tier Classify the site. During the preparation of the Phase I, Kleenit will also need to assess whether any interim remediation under a RAM is required or appropriate. The Phase I needs to be completed under the MCP within one year of the RNF, but could be accomplished within 4 to 5 months from the RNF submission. You should require that all submissions to the DEP be provided to you for review before they are finalized.

We believe the above scope of work responds to your current needs. Should you have any questions, please do not hesitate to call us.

Very truly yours,
SANBORN, HEAD & ASSOCIATES, INC.

Duncan W. Wood, PE, LSP
Principal

DWW:lmd

S:\DATA\21002145.00\081302WorkPlan.doc



NEW
EXIT

REMOVE
FIXTURES

REMOVE
WALL

SH-5

SH-4A

SH-4B

PROPOSED
NEW WALL

SH-1

DRY CLEANING
EQUIPMENT

SH-3

12'-3"

SH-2

NOTES:

SH-2
-⌀- = SOIL VAPOR WELL INSTALLED 6/13/02 BY ENVIRONMENTAL DRILLING.

SH-5
-⊕- = GEOPROBE SOIL BORING COMPLETED 6/13/02 BY ENVIRONMENTAL DRILLING

| DUD'S CLEANERS ACTON, MASSACHUSETTS | EXPLORATION LOCATION PLAN | | |
|---|---|---|---|
| SHA Sanborn, Head & Associates | SCALE: 1"=4' | DRAWN BY: CMA | FILE NO. 2145 |
| | DATE: JUNE 02 | CHECKED BY: DWW | FIGURE NO. 1 |



# SHA

# Sanborn, Head & Associates

*Consulting Engineers & Scientists*

July 2, 2002
File No. 2145

Larry Guilmette
Samuels & Associates
333 Newbury Street
Boston, MA 02115

Re:   Summary of Data from Interior Sampling
      Dud's Cleaners, Main Street, Acton

Dear Larry:

Sanborn, Head & Associates, Inc. (SHA) is pleased to provide you with this summary of the observations and soils data we collected during the interior sampling services completed at the Dud's Cleaners in Acton on June 13, 2002.

Given that a portion of the store is proposed to be separated out for "take back" by the land lord, and that area is located approximately five feet to the side of one of the current dry cleaning machines, we recommended that you investigate below the floor in the "take back" area to document the current status quo prior to the time of the transfer. After making arrangements with the operators of the store we conducted out investigation on the evening of June 13, 2002.

We intended to install five Geoprobe borings with three of the five finished as micro-wells. We encountered equipment refusal above the water table at all locations and thus we were not able to collect groundwater samples. We did install a 1-inch diameter well at two of the locations, which could serve as a soil vapor monitoring point in the future.

The locations of the borings we completed are shown on the attached Figure 1. The boring logs for the subsurface explorations are included as Attachment #1. We submitted six soil samples to Alpha Analytical Laboratories for Volatile Organic Compound testing by Method 8260B. The laboratory data report is included as Attachment #2.

The Duds store is located within 500 feet of properties that are used as residences. Therefore the RCS-1 Reportable Condition criteria apply under the Massachusetts Contingency Plan (MCP). Only perchloroethylene (PCE) was detected above the RCS-1. The RCS-1 concentration for PCE is 0.5 mg/kg. For your information the RCS-2 is 30 mg/kg. The data we obtained is as follows:

| Sample ID | 061302-S1 | 061302-S2 | 061302-S3 | 061302-S4 | 061302-S5 | 061302-S6 |
|---|---|---|---|---|---|---|
| Sampling Location | SH-1 | SH-1 | SH-2 | SH-3 | SH-4B | SH-5 |
| Sampling Depth | 4 ft bgs | 14 ft bgs | 9.5 ft bgs | 11 ft bgs | 14 ft bgs | 1 ft bgs |
| Concentration of PCE (mg/kg) | 0.74 | 1.2 | 160. | 1.7 | 0.072 | 1.5 |

Paul M. Sanborn ■ Charles L. Head ■ Mathew A. DiPilato
Duncan W. Wood ■ R. Scott Shillaber ■ Charles A. Crocetti ■ Daniel B. Carr

Sanborn, Head & Associates, Inc.
239 Littleton Road, Suite 1C ■ Westford, Massachusetts 01886
e-mail: westford@sanborn-head.com ■ www.sanborn-head.com
Fax (978) 392-0987 ■ Phone (978) 392-0900

**SHA**

SHA concludes that this data constitutes a reportable condition for PCE in soil, with a 120-day requirement for reporting.

Thank you for the opportunity to undertake this effort on your behalf. We will await your guidance on how you wish to proceed any further with this matter. Should you have any questions, please do not hesitate to call us.

Very truly yours,
SANBORN, HEAD & ASSOCIATES, INC.

Duncan W. Wood, PE, LSP
Principal

Attachments:    Figure
                Boring Logs
                Laboratory Data from Alpha Analytical

S:\DATA\2100\2145.00\070202Guilmette.data.sum.doc

# RUBIN AND RUDMAN LLP

COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Robert A. Fasanella
Direct Dial: (617) 330-7018
E-mail: rfasanella@rubinrudman.com

September 25, 2002

**Certified Mail Return**
**Receipt Requested No.  7000 1670 0007 7745 3695**

Utica National Insurance Group
401 Edgewater Place – Suite 300
Wakefield, Massachusetts 01880-6255
Attention: Claims Manager/Department

RE:    NOTICE OF CLAIM
         DEMAND FOR DEFENSE/COVERAGE
         Insured: Kleenit, Inc./Sudz-It/Duds Cleaners/Care Cleaners
         Claim Type: Physical Loss/Property Damage/Hazardous Materials
         **Location: 28 Central Square, Chelmsford, Massachusetts**
         Policy: All Risks/Special Multi-Peril, Policy No. FMP 1946 (1982 – 1985)
                   Umbrella Liability, Policy No. LV 6406 (1982-1985)

Dear Sir or Madam:

        Please be advised that this firm represents your insured, Kleenit, Inc. (a.k.a. Sudz-It,
Duds Cleaners and/or Care Cleaners) (collectively "Insured" or "Kleenit"), regarding its notice
of claim and request for defense and indemnification pertaining to a release of hazardous
materials, building and property damage, and third party claims at 28 Central Square,
Chelmsford, Massachusetts ("Property"), and at locations outside of the Property's boundaries.
Please report this claim to the appropriate representatives at Utica National Insurance Group (the
"Company").

        The Company provided coverage to the Insured at the Property under an "All Risk",
Special Multi-Peril Policy, Policy No. FMP 1946 ("SMP Policy"), and an Umbrella Policy,
Policy No. LV 6406 ("Umbrella Policy") (collectively "Policies") between approximately
October 1, 1982 and October 1, 1985.  (Attached as Tab 1 is a copy of Kleenit's "Prepaid
Insurance" ledger from June 1984 proving the existence of the Policies.  Attached as Tab 2 are
copies of the types of SMP Policy and Umbrella Policy that Kleenit believes were issued to it by
the Company.)

        Kleenit hereby requests defense and coverage for the foregoing claim under the Policies.

522162_1

RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 2

In addition, Kleenit requests that the Company approve the risk assessment, soil and groundwater assessment, and other response actions that are discussed herein. Kleenit also requests the Company to provide it with a complete copy of the Policies, Declaration Page(s) and any endorsements or riders. If the Company contends that the Policies, Declaration Page(s), endorsements and/or riders do not exist, the Company should fully explain the basis of its contention and also provide a copy of its "specimen policies" issued during the relevant time frame.

**Please respond in writing to me within 30 days of the date of this Notice of Claim.**

## Background of Hazardous Materials Release and Property and Building Damage

On or about January 28, 2001 the Massachusetts Department of Environmental Protection ("DEP") issued to Kleenit a "Release Notification – Notice of Responsibility – Notice of Need to Conduct Immediate Response Actions" ("Notice of Responsibility" or "NOR"), claiming that Kleenit was a Potentially Responsible Party ("PRP") under Massachusetts General Laws Chapter 21E for the release of oil and/or hazardous materials at the Property. (Attached at Tab 3 is a copy of the NOR). DEP claimed that Kleenit was responsible for the release of volatile organic compounds ("VOCs") at the Property and that the VOCs had migrated off of the Property and were detected at locations outside of the Property's boundaries.

The Property was first used as a dry cleaning facility in 1960 and the septic system, which is considered a potential source of contamination, was in use until approximately 1990. Based upon the migration and extent of contamination claimed by DEP, the release of hazardous materials and the property damage likely occurred many years ago and within the Policy period. The release of hazardous materials such as VOCs may have resulted from the sudden and accidental releases from the malfunctions of older equipment, spills and/or inadvertent releases from the disposal of perchloroethylene ("PCE") waste products in containers or bags discarded in former dumpsters stored on-site for routine pick-up and disposal prior to the enactment of G.L. c. 21E, which, along with other laws, required licensed hazardous waste contractors to pick-up, manifest and dispose of hazardous wastes at licensed facilities.

DEP further asserted in the NOR that the VOCs at the Property "extend[ed] to the 34 Central Square property and Beaver Brook." (See NOR, p. 1, emphasis added). The NOR stated that "DEP has determined that a Condition of Substantial Release Migration ("SRM"), as described in 310 CMR 40.0006, exists at the subject site." DEP has incurred response action costs related to the release that DEP may recover under M.G.L. c. 21E. If Kleenit did not perform the Immediate Response Actions ("IRAs") ordered by DEP, the NOR stated that DEP would perform such actions and "seek to recover its costs and/or may initiate other appropriate enforcement actions to ensure that such response actions are conducted."

## RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 3

On June 19, 2001 DEP issued a "Notice of Need to Conduct Immediate Response Actions" ("Notice to Conduct IRAs") to Kleenit, claiming that "contaminated groundwater at the subject site is discharging to Beaver Brook." (Attached at Tab 4 is a copy of the Notice to Conduct IRAs.) Beaver Brook is located outside of the Property's boundaries. The Notice to Conduct IRAs stated that,

"[C]hlorinated volatile organic compounds ("CVOCs") have been detected in a sump water sample collected from 34 Central Square in Chelmsford, which operates a day care facility. In addition, CVOCs in indoor air at this location [i.e., at 34 Central Square, not the Property] were also detected. This condition constitutes a Critical Exposure Pathway ("CEP") in accordance with 310 CMR 40.0006. Information available to DEP indicates that a releases [sic] of hazardous material (primarily CVOCs) has occurred at the site which extends to the 34 Central Square property and Beaver Brook, and requires the initiation of one or more IRAs as described in 310 CMR 40.0410." (emphasis and brackets added)

The NOR and Notice to Conduct IRAs required Kleenit to take certain actions to address the condition of Substantial Release Migration ("SRM") and the Critical Exposure Pathway ("CEP") described by DEP. Kleenit has at the outset retained environmental scientists, including a Licensed Site Professional ("LSP"), and environmental legal counsel to initiate its response and defense to DEP's NOR and Notice to Conduct IRAs. Kleenit and its LSP have prepared and filed with DEP certain preliminary environmental reports required by DEP. Kleenit has taken these efforts to address contamination at the Property, the alleged Substantial Release Migration off of the Property, and the potential indoor air impacts at the building located at 34 Central Square, which is beyond the Property's boundaries.

As of this date, Kleenit is required to complete additional requirements under DEP's NOR and Notice to Conduct IRAs and under Chapter 21E and the regulations promulgated thereunder. Kleenit has not resolved its alleged responsibility and liability for other potential damages or costs pertaining to the alleged release at or from the Property, 34 Central Square, Beaver Brook, or any other off-site locations. Kleenit has had discussions with representatives of other PRPs identified by DEP and to whom DEP has sent separate Notices of Responsibility, namely, Mobil Business Resources Corporation ("ExxonMobil") and Energy North, Inc. ("Energy North"), addressing potential liability, contribution and other issues related to the claims set forth in the NOR and Notice to Conduct IRAs.

Although Kleenit presently believes that it is minimally responsible, if at all, for the contamination alleged in EPA's NOR and Notice to Conduct IRA's, the Company should be aware that ExxonMobil has asserted that Kleenit should contribute a one-third share of ExxonMobil's past and future response action costs. ExxonMobil has claimed that its past and projected future costs total more than $250,000. As of this date, Kleenit has not agreed to pay

RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 4

any of ExxonMobil's alleged costs.

### Request for Insurance Defense and Coverage

Based upon the foregoing, Kleenit requests that the Company provide defense and indemnification under the Policies for all matters related to or arising out of DEP's NOR and Notice to Conduct IRAs. The SMP Policy in effect at all relevant times provided coverage for damage to the building on the Insured's Property under Section I, Parts I and II, and for property damage liability on- and off-site under Section I, Parts IV and/or V. Damage to the Kleenit's Property was covered through, inter alia, Parts I and II of the SMP Policy, which insured against "all risks of physical loss" to buildings and additions and fixtures thereto, and personal property, and did not contain a so-called "pollution exclusion" or any other applicable exclusion. Further, coverage for property damage to others and "Off-Premises" coverage, with no applicable exclusions, existed under, inter alia, Parts IV and/or V under the Extensions of Coverage of the SMP Policy.

The "all risk" SMP Policy issued by the Company to Kleenit was intended to insure against a fortuitous event, casualty or accident, such as the release of contaminants discussed in DEP's NOR and Notice to Conduct IRAs. Mellon v. Hingham Mut. Fire Ins. Co., 19 Mass. App. Ct. 933 (1984) (coverage provided under an "all risk" policy for damage and loss caused by the discharge and migration of water from a broken pipe); Standard Elec. Supply Co. v. Norfolk & Dedham Mut. Fire Ins. Co., 1 Mass. App. Ct. 762 (1974) (coverage provided under an "all risk" policy for insured's loss caused by the discharge and migration of water from a broken pipe *at the premises adjacent to the insured's property*). "Moreover, such fortuities are insured against even if they are not specified in the policy." Mellon at 934. Although the Company in the present case "ha[d] the option to exclude from coverage certain risks" (see Mellon at 934), it chose not to do so. As a result, the Company is obligated to provide coverage as requested herein.

The Umbrella Policy obligates the Company to pay on behalf of Kleenit the ultimate loss which Kleenit is legally obligated to pay in the present matter as damages because of property damage or personal injury, including the defense of the claims discussed herein. The Pollution Policy similarly obligates the Company to pay on behalf of Kleenit all sums which Kleenit is obligated to pay as compensatory damages because of property damage or bodily injury, and to reimburse Kleenit for cleanup costs incurred to comply with the requirements of DEP's NOR and Notice to Conduct IRAs. All of these conditions are triggered here, and there are no applicable exclusions under the Policy.

The Massachusetts Supreme Judicial Court has held that "[t]he contamination of soil and groundwater by the release of hazardous material involves property damage" and loss. Hazen Paper Co. v. U.S. Fidelity and Guar. Co., 407 Mass. 689, 698 (1990) (emphasis added). In

522162_1

RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 5

addition, insurance coverage is triggered by an enforcement letter issued by a government agency to an insured asserting that a release of contamination has occurred, such as the NOR and Notice to Conduct IRAs issued by DEP to Kleenit in this instance. <u>Id</u>. Accordingly, the Company should provide defense and indemnification under the Policies for all claims arising out of DEP's NOR and Notice to Conduct IRAs.

Because the property damage at issue here was neither expected nor intended from the standpoint of the Insured, and, according to DEP's claim, involves off-site contamination and/or impacts property and groundwater of another person if remediation is not undertaken, no exclusions, including the "owned property" exclusion, would apply. Massachusetts Courts consistently hold that the "owned property exclusion" does not bar recovery of costs of cleaning up environmental contamination which presents a threat to, or demonstrated contamination of, property of others and groundwater. <u>See</u>, <u>e.g.</u>, <u>Wasserman v. Commerce Insurance Co.</u>, Middlesex Superior Court C.A. No. 01-0619(B) (Sanders, J.) (July 9, 2002) ("[A]n insurer will be liable not only to defend an insured against an NOR but also to indemnify the insured for all cleanup costs, even with an 'owned property' exclusion, so long as there is a significant threat of off-site migration."); <u>Rubenstein v. Royal Insurance Co. of America</u>, 44 Mass. App. Ct. 842, 854 (1998) (An insurer's liability for all response costs is triggered "even if the contaminating substances are solely on the insured's land."); <u>Hakim v. Massachusetts Insurer's Insolvency Fund</u>, 424 Mass. 275 (1997).

Kleenit's defense in this case shall also include efforts to pursue any PRPs identified by DEP in its NOR and Notice to Conduct IRAs, and any fees included therefor. <u>See</u>, <u>e.g.</u>, <u>Wasserman</u> at p. 15 ("The NOR placed the responsibility on [the insured] to pursue the other parties so that [the insured's] attempts to get their contribution so as to eliminate or diminish his own liability to DEP is thus inextricably intertwined with his defense to the NOR.")

Any purported arguments that the property damage and loss in this case did not occur in the Policies period would be rendered ineffective by <u>Rubenstein</u>, <u>supra</u>., and <u>Trustees of Tufts Univ. v. Commercial Union Ins. Co.</u>, 415 Mass. 844 (1993), which hold that insurance coverage may be triggered during many time periods and not just when the damage manifests itself. As stated in <u>Trustees of Tufts University</u>,

[T]he three most common 'trigger theories' include: the exposure trigger (policies in effect during years claimant's property tortiously exposed to hazardous material triggered), the continuous (or multiple) trigger (property damage occurs during each year from the time of first hazardous exposure through manifestation), and the injury-in-fact (or actual injury) trigger requires inquiry into when property damage actually occurred).

415 Mass. at 854, n.9. In Klennit's case, DEP's NOR and Notice to Conduct IRAs make clear that the loss and damage occurred many years ago, during the Policies period. As a result,

RUBIN AND RUDMAN LLP

Utica National Insurance Group, Claims Manager/Department
September 25, 2002
Page 6

coverage is triggered under the Policies.

Finally, if there is any ambiguity in the Policies provisions or terms, the ambiguities are construed against the insurer in favor of the policyholder. See Cody v. Connecticut General Life Ins. Co., 387 Mass. 142, 146 (1982) and Camp, Dresser & McKee, Inc. v. The Home Ins. Co., 30 Mass. App. Ct. 318, 326 (1991).

In the present matter, Kleenit requires the assistance of environmental consultants and environmental counsel to provide a defense to the claims asserted by DEP, the PRPs, and other third parties. Please be advised that if the Company should delay or deny its defense or coverage obligations under the Policies, Kleenit will consider bringing a declaratory judgment action to seek full defense and coverage pursuant to the Policies and Massachusetts law. As you may be aware, the Supreme Judicial Court has held that an insured who is put to the expense of establishing an insurer's duty to defend under a policy through a declaratory judgment action is entitled to recover attorney's fees in prosecuting that action, regardless of whether the insurer acted in bad faith or unreasonably. See, e.g., Hanover Insurance Co. v. Golden, 436 Mass. 584 (2002).

**Please respond to me in writing within 30 days of the date of this Notice of Claim.**

Please contact me if you need to discuss this claim. Thank you for your cooperation and attention to this matter.

Very truly yours,

Robert A. Fagnella

Peter J. Feuerbach

RAF/PJF/jem
Enclosures
cc:    Kleenit, Inc. (with enclosures)

522162_1