UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KLEENIT, INC.<br><br>    Plaintiff,<br><br>v.<br><br>SENTRY INSURANCE COMPANY,<br>ROYAL & SUNALLIANCE, UTICA<br>NATIONAL INSURANCE GROUP, and<br>TRAVELERS PROPERTY AND<br>CASUALTY,<br><br>    Defendants. | CIVIL ACTION NO. 04-10351 (NG) |

**EXHIBITS TO THE AFFIDAVIT OF KARL S. VASILOFF IN SUPPORT OF DEFENDANTS GLOBE INDEMNITY COMPANY AND ROYAL INSURANCE COMPANY OF AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 22

# RUBIN AND RUDMAN LLP

COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Robert A. Fasanella
Direct Dial: (617) 330-7018
E-mail: rfasanella@rubinrudman.com

April 20, 2004

By Facsimile & First Class Mail

Catherine L. Kozyra
Travelers SLG-HOECU
One Tower Square, 5 MS
Hartford, CT 06183-6016

Richard E. Heifetz, Esquire
Tucker, Heifetz & Saltzman LLP
Three School Street
Boston, MA 02110

Karl A. Vasiloff, Esquire
Zelle, Hoffman, Voelbel, Mason & Gette LLP
950 Winter Street - Suite 1300
Waltham, MA 02451

Kevin S. Keyes
Environmental Claims Department
Royal Sun Alliance
9300 Arrow Point Boulevard
Charlotte, NC 28273

RE:  **Insured:** Kleenit, Inc.
     **Location:** 293 and 295 Main Street, Acton, Massachusetts
     **Additional Defense/Assessment Scope of Work Authorization**

Dear Ms. Kozyra, Mr. Vasiloff, Mr. Heifetz and Mr. Keyes:

Enclosed please find a Confidential Memo prepared by Mark Germano, LSP or Coler & Colantonio, Inc. ("C&C") for defense-related consulting services and expenses regarding the above-insured property. The Memo explains the background and status update of additional testing demanded by the DEP and Kleenit's landlord in the Acton matter needed to achieve a Response Action Outcome with or without an Activity Use and Limitation.

It appears that the additional testing will result in closure of this Site without any remediation if the levels remain within the Method 3 Risk Assessment previously completed at the Site. I have also attached a Project Change Notice Authorization from C&C, which has not been executed by Kleenit pending your review and authorization to proceed with the work described. Please provide written authorization with in the next two weeks or by May 4, 2004. If we do not receive any objection by that time we will assume we can proceed with this Scope of Work as additional defense related costs.

Please contact Mark Germano, LSP at C&C at 781-982-5400 or me immediately if you have any questions relative to the enclosed Memo or Scope of Work.

RUBIN AND RUDMAN LLP

April 20, 2004
Page 2

Thank you for your anticipated attention to expediting approval of this work.

Very truly yours,
Rubin and Rudman LLP

Robert A. Fasanella

Enclosure
cc: Keith Crider, Kleenit, Inc.
Mark A. Germano, Coler & Colantonio, Inc.
Peter J. Feuerbach, Esq.

**CONFIDENTIAL-SUBJECT TO ATTORNEY – CLIENT/WORK PRODUCT PRIVILEGE**

# Memorandum

Date: February, 26, 2004

To: Keith Crider, Kleenit, Inc.
Robert Fasanella, Esq. Rubin & Rudman LLP

cc: Ned Abelson, Esq., Goulston & Storrs, PC
Duncan Wood, LSP, Sanborn Head Associates
Peter Woodman, Ph.D., RMI Inc.

From: Mark Germano, LSP, Coler & Colantonio, Inc.

Re: Project Status/Additional Proposed Testing
Dud's Cleaners
293-295 Main Street
Acton, MA 01720

In October 2003 Coler & Colantonio, Inc. (C&C) prepared the Phase I/Tier Classification Package and submitted the report to the Department of Environmental Protection (DEP) within the required timeframes. The Site was classified as a Tier II. A Tier II Site will be assessed a fee of $2000 a year beginning on October 29, 2003. The next required report would be Phase II Comprehensive Site Assessment due on October 29, 2005.

The DEP visited the Site in December and reviewed and commented on the Phase I/Tier Classification. DEP requested that we place roadway box covers on MW-2 and MW-3 to prevent runoff infiltration to the monitoring wells and perform additional testing at the Site. Recent correspondence with Duncan Wood, LSP indicated that Sanborn Head Associates (SHA) is fixing the wells this week. We will check to confirm the well covers are fixed when we complete additional testing as recommended below.

In November 2003 Risk Management Incorporated (RMI) prepared a Method 3 Risk Characterization utilizing the data obtained by C&C in 2002, 2003 and SHA in 1998 and 2002. The Risk Assessment indicated that based on this data a level of "No Significant Risk" has been achieved and a Notice of Activity and Use Limitation is not necessary to maintain this level.

In December 2003 Duncan Wood, LSP of SHA, who represents your landlord prepared a memo responding to RMI's Risk Assessment. Mr. Wood indicated that he felt that vertical and horizontal extent of the contamination had not been adequately defined in order to submit a B-1 Response Action Outcome (RAO) to the DEP. Duncan Wood

587457_1

believes the B-1 RAO and Method 3 Risk Assessment would not pass DEP's scrutiny if reviewed, given the testing completed to date. Duncan Wood also believes an appropriate conceptual model had not been fully developed to properly prepare the Risk Assessment and more data needs to be obtained. Duncan Wood and DEP have also requested us to evaluate whether contamination may have migrated towards the bank and towards the Roche Bros. Building. Once these areas are better understood the Risk Assessment can be completed and the decision on implementing an AUL can be made. In addition Mr. Wood had several questions regarding Method 3 Risk Assessment. RMI subsequently responded to those questions in January 2004 in a Memo to you and is also attached to this document.

In February 2004 I discussed these issues with Duncan Wood. He reiterated his position that additional testing needs to be conducted to define the horizontal and vertical extent of contamination, the risk assessment needs to be updated, before an RAO can be submitted. We discussed potential drilling locations. The locations being considered are in front of the dry cleaning machine, behind the dry cleaning machine where there has been storage of PCE waste and on the south side of the building and on the downgradient edge near the Roche Bros. store.

In response to this request for additional testing by Duncan Wood and DEP, I sent a driller to the Site to examine these potential locations and to determine the accessibility of a drill rig. A drill rig cannot access the inside of the store. The door is not wide enough. Electric hand tools can be used. However there are limitations to utilizing this equipment. Based on our current knowledge of the soils it is unlikely that hole can be drilled deep enough to install a well. We probably can drill shallow test borings to obtain soil samples. This should be sufficient to determine if any spills occurred on the floor. I propose we drill in front of the machine and in the small hallway behind the machine. In addition using a truck mounted rig we will install a monitoring well behind the building where you are currently operating in order to obtain a groundwater sample as shown on the attached sketch.

I also propose to install a monitoring well on the south side of the building to address the potential migration of the contamination towards the bank. Soil and groundwater samples will be obtained at this location as shown on attached sketch. I also propose to obtain groundwater samples from MW-1, MW-6, MW-3 and MW-7, which had low levels of contaminants in 1998 but have not been sampled since (See attached sketch). MW-7 and MW-1 should address the horizontal extent issues.

The DEP noted on its site visit that MW-3 had the highest concentration in 1998 and had not been sampled since then. C&C has made several attempts in sampling MW-3, however it has always been dry or not enough groundwater to obtain a sample. C&C will again attempt to obtain a groundwater sample from MW-3. If a sample cannot be obtained C&C will replace this monitoring well with a deeper well and decommission MW-3. This will address the previous result, which exceeded the GW-2 standard and address the vertical extent of the contamination. Concurrently with this investigation

587457_1

C&C will sample the remaining monitoring wells to provide an up-to-date characterization of our conceptual model.

Subsequent to this subsurface investigation the results will be evaluated to determine if the horizontal and vertical extent of contamination has been better defined. Then the new data will be added to the Method 3 Risk Assessment to determine if a level of "No Significant Risk" exists and whether an AUL will need to be implemented. If the results indicate that the extent of contamination has been defined and are within acceptable concentrations as determined by the Method 3 Risk Assessment, we will then file an RAO in the near future with or without an AUL. If an AUL is required, we will again request approval from the property owner to impose reasonable AULs, which should not limit to any material extent the reasonable and foreseeable uses of the Property. It is my opinion that obtaining this additional testing information shortly will give us the ability to forecast our future budgets and approach. However more than likely this will give us enough data assuming none of its exceeds Method 3 Risk Assessment and support site specific standards to "close out" the site.

A Change Order has been prepared outlining the above costs and is attached for your review and authorization to proceed. This Change Order does not include additional costs associated with RMI's additional work needed to modify the Method 3 Risk Assessment. If you have any questions please call me 781-982-5429.

587457_1



# Project Change Notice

**Project Location & Number:** 1101079.01-Dud's Cleaners 293 Main Street Acton, MA

**Date:** 2/23/03

**Person/Entity requesting change:** Mark Germano

**Description of Change:**
1. LSP Consulting services: review of risk assessment and owner's LSP response, review of old reports to determine former extent of contamination and design subsurface investigation program, preparation of technical/compliance and budget memos, discussions w/DEP, client, risk assessor, client's attorney, owner's LSP, owner's attorney, driller, coordinate meeting w/DEP, driller's site visit, evaluate budget and provide breakdown for insurance company.

2. Conduct subsurface investigation per 2/20/04 Memo including: Labor, subcontractor, laboratory analyses, and report preparation.

**Impact to Schedule:**
In Progress

**Estimated Additional Cost:**
$9,500

Agreed to by:
Mr. Keith Crider
Kleenit, Inc.
44 Park Street
Ayer, MA 01432

_____     _____     _____ 2/23/04
Client                      Date        Coler & Colantonio, Inc   Date

**Copies to:** File,



 INTERNAL MEMORANDUM 

**CONFIDENTIAL – SUBJECT TO CLIENT/ATTORNEY PRIVILEGE**

| | |
|---|---|
| Date: | 19th December 2003 |
| To: | Keith Crider, Kleenit, Inc.; Robert Fasanella, Esq., Rubin & Rudman; Mark Germano, LSP, Coler & Colantonio, Inc. |
| From: | Peter Woodman, Risk Management Incorporated (RMI) |
| Subject: | MADEP Site Visit by Stephanie Kelley (508) 767-2841. Dud's Cleaners, Acton, MA |

**Personnel present:** Stephanie Kelley, MADEP, Central Region, Worcester, MA; Frank Murphy, Kleenit, Inc., Peter W. Woodman, Ph.D., RMI, Acton, MA.

**Meeting place, date and time:** Dud's Cleaners, 293-295 Main Street, Acton, MA. Friday 19th December 2003. 2.30 pm.

**Items discussed:**

1. Site Plan and sampling locations. Figure 2 in Phase I Report submitted to DEP by Coler & Colantonio (C&C). Ms. Kelley indicated that the site location is difficult to understand relative to the other stores in the strip mall and Main Street. RMI explained layout. Suggest C&C include aforementioned points of reference on Figure 2.

2. Ms. Kelley expressed concern for potential impact of Tetrachloroethylene (PCE) vapors on indoor air quality of "Take Back Area" at 293 Main Street, based on PCE groundwater concentrations detected in Monitoring Well CC-4 (outside and downgradient of building) (see Figure 2) that exceed MCP Method 1 GW-2 Groundwater Standards. Explained how the MCP Level 2 Soil Gas Evaluation was conducted by C&C beneath the floor slab of the "Take Back Area" and how the results were used by RMI to conservatively estimate potential indoor air concentrations of PCE and other Volatile Organic Compounds (VOCs) and to evaluate their impact on human health. Explained how RMI demonstrated that the estimated indoor concentrations of these VOCs were below MADEP Indoor Air Background Levels and posed "No Significant Risk" of harm to human health of both current building occupants (prior to erection of the dividing wall between 293 and 295 Main Street) and future foreseeable construction workers involved in subsurface activities below the floor slab at 293 Main Street.

27 STONEYMEADE WAY, ACTON, MA 01720-5676
VOICE: (978) 266-2878
FAX: (978) 263-0637
E-Mail: pww@riskmi.com

Dud's Site Visit by MADEP
19th December 2003
Page 2 of 2



RMI also explained the conservative recommendation for construction of the six inch dividing wall between 293 and 295 Main Street, extending it to the ceiling and sealing both the floor and ceiling joints to mitigate any potential significant exchange of vapors between the existing Kleenit operation and the proposed Supercuts tenant's space.

3. Ms. Kelley inquired whether conditions beneath the floor slab at 295 Main Street (space currently occupied by Duds) has been evaluated. We indicated that C&C was looking at this issue as part of the Phase II Assessment.

4. Ms. Kelley inspected the "Take Back Area," being admitted to the vacated space by Frank Murphy, Kleenit, Inc. Ms. Murphy verified the locations of the soil gas sampling points CC-1, CC-2, SH-2, and CC-3 and Monitoring Wells CC-5 and CC-6.

5. Ms. Kelley asked to view the locations of the Monitoring Wells behind 293 and 295 Main Street. She commented on the broken road box covers of MW-2 and MW-3 and the potential impact of runoff infiltrating the wells! She indicated that she will request C&C to repair the road box cover of MW-2. In the case of MW-3, it was apparent that the well was damaged and we informed her that the well has not been sampled since 3/31/98. Ms. Kelley was concerned because of the elevated PCE concentrations (1,200 µg/L) detected in the well at the time. It was pointed out to her that MW-3 was located in the vicinity of the former leach field, since abandoned when the mall was connected to the new sewer system in Acton. RMI received the impression that Ms. Kelley may ask for a replacement monitoring well in this area.

6. Ms. Kelley also raised concern about PCE migrating in groundwater down behind 293 and 295 Main Street and its vapors impacting the indoor air quality of the downgradient buildings (e.g., Roche Brothers, T.J. Max). She is also concerned about the impact of PCE in the bedrock and could ask for the installation of one or more bedrock Monitoring Wells downgradient of the Site. RMI explained to her that we did not think this was an issue since a number of qualified consultants, including Kurz Environmental, MyKroWaters, Sandborn, Head & Associates, as well as C&C, had already looked at this problem and had not considered it to be an issue in earlier evaluations of groundwater quality at 293-295 Main Street.

7. Ms. Kelley indicated that she would be in contact with Mark Germano, LSP, C&C to discuss the aforementioned issues.

 # INTERNAL MEMORANDUM 

**CONFIDENTIAL – SUBJECT TO CLIENT/ATTORNEY PRIVILEGE**

| | |
|---|---|
| Date: | 8th January 2004 |
| To: | Keith Crider, Kleenit, Inc.; Robert Fasanella, Esq., Rubin & Rudman; Mark Germano, LSP, Coler & Colantonio, Inc. |
| From: | Peter Woodman, Risk Management Incorporated (RMI) |
| Subject: | Response to Comments by Sanborn, Head & Associates on Draft MCP Method 3 Risk Characterization for Dud's Cleaners, Acton, MA |

RMI has received a copy of Duncan Woods, Sanborn, Head & Associates, Inc. (SHA) comments dated 23 December 2003 on the Draft MCP Method 3 Risk Characterization dated 4th November 2003 and has the following responses:

1. RMI agrees with SHA about the need to better delineate the horizontal and vertical extent of the OHM release, especially beneath the current area leased by Duds at 295 Main Street. This issue was discussed briefly with MADEP during the site visit on the 19th December 2003, where it was indicated that Coler & Colantonio, Inc. would be looking at this issue as part of the Phase II Assessment. In addition, RMI identified this data gap in its "Indoor Air Quality Assessment & Data Gap Analysis" Report to Kleenit, Inc, dated 30th October 2002. The pertinent section of which is reproduced below:

**Data Gaps:**

"To characterize .... 295 Main Street. At least one bedrock well should be installed downgradient of the existing dry cleaning machinery at 295 Main Street and the other upgradient of SH-2 in the Main Area at 293 Main Street. Data collected from these monitoring wells could then be used to establish: a) groundwater quality and the presence or absence of Tetrachloroethylene in groundwater beneath 293 and/or 295 Main Street; b) depth to groundwater and the applicability of the MCP GW-2 Groundwater Classification for the release; and c) to determine if there are one or more sources for the Tetrachloroethylene release (i.e., Duds Dry Cleaners and Launderers at 295 Main Street and/or former tenants at 293 Main Street). Depending on the outcome of this limited subsurface investigation, either additional characterization of the vertical and horizontal extent of the release(s) may be required or the results from the groundwater investigation and, if indicated, additional soil and soil gas data collected from beneath the floor slab at 295 Main Street, could be used in conjunction with an MCP Method 3 Risk Characterization to determine if a condition of "No Significant Risk" of harm to human health, public welfare and the environment exists and that a Permanent Solution is possible, with or without the need to implement an Activity and

27 STONEYMEADE WAY, ACTON, MA 01720-5676
VOICE: (978) 266-2878
FAX: (978) 263-0637
E-Mail: pww@riskmi.com

Dud's Site – Response to SHA
8th January 2004
Page 2 of 2



Use Limitation to maintain a condition of "No Significant Risk" of harm under future foreseeable site activities and uses."

2. In regards to SHA's comments on the derivation of Exposure Point Concentrations (EPCs) for Compounds of Potential Concern (COPCs), Section 5.8.2 of the MADEP Risk Characterization Guidance Document of 1995 guidance has been superceded by the 1999 changes to the MCP for Exposure Points at 310 CMR 40.0294(2)(b)(3) and EPCs at 310 CMR 40.0296(3)(b)(2)(a). RMI followed the latter requirements in the subject Risk Characterization to derive the MCP-Compliant EPCs for COPCs in soil, and therefore addressed any "hotspots." In regards to groundwater EPCs, consistent with the MADEP Risk Characterization Guidance Document of 1995 for dealing with a limited data set, RMI used maximum groundwater concentrations from the most recent round of groundwater monitoring as COPC EPCs. One or more additional rounds of groundwater monitoring across the Site, coupled with analytical data from any additional monitoring wells installed, should address any remaining uncertainty on the quality of groundwater.

3. In regards to the Johnson & Ettinger SG-ADV Model, RMI used *Version 1.0 03/01* available at the time the Indoor Air Risk Characterization was conducted; the report for this being filed with Kleenit Inc. 30th October 2002, which is before the release of *Version 2.0 dated 04/03*. Currently, RMI uses *Version 2. 04/03*, which was finalized 06/06/03 and released as Version 3.0 June 2003. In addition, RMI conducts parametric analysis of the input values in these models for critical factors (e.g., C $Q_{soil}/Q_B$; and $\theta_w$") (*Johnson 2002*). Whereas, RMI is prepared to update the Indoor Air Risk Characterization using the latest J& Models, subject to client and LSP approval, RMI has run one set of calculations using both the most recently available SG-Screening and SG-ADV Models for the maximum Tetrachloroethylene soil gas concentration (41.3 $\mu g/m^3$; sample S-4) detected below the slab in the Main Area at 293 Main Street.

For the SG-Screening Model Version *3.0*, default values for the slab-on-grade setting were used. Input values for the SG-ADV Model Version *3.0* remained the same as those for the Version *1.0* Model. The Infinite Source Building Concentrations ($C_{building}$ - indoor air concentrations) estimated by the Version *1.0* Model and Version *3.0* SG-Screening and SG-ADV Models were 0.0142 $\mu g/m^3$; 0.0042 $\mu g/m^3$ and 0.025 $\mu g/m^3$; respectively. $C_{building}$ values for the two SG-ADV models are very comparable and none of the estimated indoor air concentrations exceed the MADEP Background Concentration of 11.01 $\mu g/m^3$ for Tetrachloroethylene.

Please call me at (978) 266-2878, Ext.11, if you wish to discuss RMI's responses further. Thank you.

Reference:    Johnson PC. *Identification of Critical Parameters for the Johnson & Ettinger (1991) Vapor Intrusion Model.* American Petroleum Institute. No. 17. May 2002.