## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 04 10351 NG**

**KLEENIT, INC.,**
        **Plaintiffs**

**v.**

**SENTRY INSURANCE COMPANY,**
**ROYAL & SUN ALLIANCE, UTICA**
**NATIONAL INSURANCE GROUP, and**
**TRAVELERS PROPERTY AND**
**CASUALTY,**
        **Defendants**

## KLEENIT, INC.'S OPPOSITION TO SENTRY INSURANCE COMPANY'S, UTICA NATIONAL INSURANCE GROUP'S, GLOBE INDEMNITY COMPANY AND ROYAL INSURANCE COMPANY OF AMERICA'S, AND TRAVELERS INDEMNITY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.    INTRODUCTION

Pursuant to Fed.R.Civ.P. 56 and Local Rules 56.1 and 7.1(B)(2), the Plaintiff

Kleenit, Inc. ("Kleenit") hereby opposes the Motions for Partial Summary Judgment filed

by Sentry Insurance Company, Utica National Insurance Group, Globe Indemnity

Company and Royal Insurance Company of America, and Travelers Indemnity Company

(hereinafter collectively referred as "the Insurers"). The Insurer's seek partial summary

judgment in their favor regarding Kleenit's action to recover pre-tender costs incurred in

its defending third party claims and for damages under G.L. c. 93A and G.L. c. 176D.

This Court should deny the Insurer's Motions because, viewed in light most

favorable to Kleenit, as a matter of Massachusetts law, this court must rule that the

Insurers have failed to demonstrate the required showing of prejudice resulting from

Kleenit's incurrence of pre-tender costs. Consequently, due to the well-established law in

Masschusetts that insurers may not deny pre-tender costs unless prejudice is shown, the Insurers have engaged in unfair and deceptive insurance practices by denying pre-tender costs without even attempting to demonstrate prejudice, and therefore, each of their motions regarding these counts must be denied.

In support of its opposition, Kleenit provides the following Memorandum of Law and, pursuant to Local Rule 56.1, a Concise Statement of Material Facts, and the Affidavit of Donald P. Nagle, Esquire, with attached exhibits.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P 56(c).

All facts are to be viewed, and all inferences drawn, in the light most favorable to the nonmoving party. _Reich v. John Alden Life Ins. Co. ._, 126 F.3d 1, 6 (1st Cir.1997). The burden is on the moving party to establish both the absence of any triable issue and his entitlement to judgment in his favor. _Pederson v. Time, Inc.,_ 404 Mass. 14, 17 (1989).

## III.    ARGUMENT

The dispute among the parties is primarily a matter of interpretation of Massachusetts law bearing on the question of whether the Insurers are obligated to pay pre-tender costs incurred by Kleenit.  The Insurers boldly and erroneously assert that, _as a matter of Massachusetts law_, there is no obligation to pay the insureds pre-tender costs.

Each of the Insurers rely upon the same three cases to support their argument: *Hoppy's Oil Service v. Insurance Co. of North America*, 783 F.Supp. 1505 (D.Mass. 1992); *American Mut. Liab. Ins. Co. v. Beatrice Cos., Inc.*, 924 F. Supp. 861 (E.D. Ill. 1996), and, and *Managed Health Care Systems, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2001 U.S. Dist. LEXIS 18302 (D. Mass. decided September 28, 2001). (A copy of this unpublished decision is attached, as Exhibit A.) As discussed below, these cases pronounce outmoded tenets of Massachusetts law or misconstrue the applicable law requiring insurers to pay pre-tender costs, unless prejudice is demonstrated. This well established rule of law is codified under G.L. c. 175, § 112, and is best articulated in the Supreme Judicial Court's decision in *Sarnafil, Inc. v. Peerless Ins. Co.*, 418 Mass. 295, 304-305 (1994).

> ### A.  INSURER'S MISCOMPREHEND MASSACHUSETTS LAW BY FAILING TO RECOGNIZE THE NECESSITY OF SHOWING PREJUDICE AS A DEFENSE TO LIABILITY FOR INSURED'S PRE-TENDER DEFENSE COSTS

There is no dispute that Massachusetts law is applicable to the dispute among the parties. The Insurers has refused to pay any of the defense costs incurred by Kleenit before notice was forwarded to the Insurers. Surprisingly, the Insurers contend that, despite Massachusetts' statutory requirement that an insurance company seeking to deny coverage based on alleged late notice must show prejudice for the alleged delay, they have no obligation to demonstrate prejudice in support of their refusal to pay pre-tender costs.

3

The Massachusetts legislature has codified [1] the well-established prejudice standard for the late notice defense and Massachusetts courts repeatedly have held that an insured's violation of a policy condition, including late notice and "voluntary payments" condition, will relieve the insurer of coverage obligations *only* where it has suffered actual prejudice as a result of the violation. *See, e.g., Sarnafil, Inc. v. Peerless Ins. Co.,* 418 Mass. 295, 304-305 (1994) (prejudice requirement applied to "voluntary payments" clause); *Darcy v. Hartford Ins. Co.,* 407 Mass. 481, 484-92 (prejudice requirement applied to "notice of suit" and "cooperation" clauses); *MacInnis v. Aetna Life & Cas. Co.,* 403 Mass. 220, 223 (1988) (prejudice requirement applied to "consent-to-settlement" clause).

Since the insurers have not even alleged that they have been prejudiced in any way by Kleenit's payment of "pre-tender" defense expenses, the Insurers should be compelled to reimburse Kleenit for those costs.

The Insurers attempt to insulate themselves from the requirement to demonstrate prejudice by asserting that the prejudice requirement only applies if the insurer seeks to deny coverage for the underlying claim. There are no Massachusetts appellate decisions declaring or even suggesting that insurer refusals to pay "pre-tender costs" are exempt from the prejudice analysis Massachusetts courts otherwise apply to all insurer defenses based on alleged violations of policy conditions. Moreover, since none of the insurers to

---

[1] An insurance company shall not deny insurance coverage to an insured because of failure of an insured to seasonably notify an insurance company of an occurrence, incident, claim or of a suit founded upon an occurrence, incident or claim, which may give rise to liability insured against **unless the insurance company has the been prejudiced thereby.**

G.L. c. 175, § 112 (Emphasis added).

date have agreed to provide coverage of the underlying claim, their attempts to avoid the prejudice requirement are unavailing. The Insurers offer only two opinions of district court judges which even touch on this point, which otherwise misconstrue or ignore Massachusetts law on the obligation to pay pre-tender costs. Before analyzing these and the only other case the Insurers offer in support of their motion, it is instructive to first discusse *Sarnafil*, which is the most significant authority on this issue because it is most relevant opinion of the Supreme Judicial Court, to which the district court must look to determine Massachusetts law on the question of payment of pre-tender costs.

### 1.    The *Sarnafil* Case

*Sarnafil* was a dispute between a roofing manufacturer and its insurer over defense coverage for claims asserted against the manufacturer by an installer of its roofing products. 418 Mass. at 298. The insured manufacturer advised the insurer of the installer's claim when it first received a claim letter from the installer. *Id.* at 298-99. The insurer reserved rights and eventually advised the insured by letter that, although it did not believe the allegations in the installer's claim letter to be covered, it would review this position "as further developments . . . occur and more specific claims are made." *Id.* at 299-301. After the insurer had reserved rights, the insured filed an arbitration proceeding against the installer as a preemptive measure, in response to the installer's threat to file a lawsuit. *Id.* at 300. The installer promptly filed a counterclaim in the arbitration. *Id.* The insured then handled the entire arbitration proceeding, which involved twenty-six days of hearings, with its own counsel, and did not notify the insurer of the installer's arbitration counterclaim – the matter defended – until *after the proceedings were completed. Id.* at 301.

After the insurer refused to reimburse the costs its insured incurred in connection with the arbitration, the insured filed a coverage action seeking reimbursement of defense costs and asserting an additional claim based on an alleged misrepresentation by the insurer's agent. *Id.* at 296. The insurer moved for summary judgment, and a Superior Court judge allowed the motion. *Id.* The Appeals Court affirmed in part and reversed in part, 34 Mass. App. Ct. 248 (1993), and the Supreme Judicial Court granted further appellate review. *Id.* On further review, the Supreme Judicial Court affirmed the dismissal of the misrepresentation claim, but reversed the summary judgment on the defense costs issue and remanded the case for further proceedings, concluding that disputed issues of material fact required a trial on the questions of (i) whether the insurer's conduct in response to the insured's initial notice excused the insured's failure to comply with the "notice of suit" and "voluntary payments" conditions of the insurer's policies, and (ii) whether the insured's breaches of these provisions had resulted in actual prejudice to the insurer's interests. *Id.* at 302-307. It is, of course, the Court's treatment of the second of these two issues that is of interest here.

Initially, the Court made clear that it viewed its own precedents as establishing that a breach of a "voluntary payments" condition would not excuse an insurer's failure to pay defense costs in the absence of actual prejudice. *Id.* at 302. It noted its previous statement that "'the violation of a policy provision should bar coverage only where the breach frustrates the purpose underlying that provision.'" *Id.*, quoting *Augat, Inc. v. Liberty Mut. Ins. Co.*, 410 Mass. 117, 123 (1991).[2] The *Sarnafil* Court found that there

---

[2] In *Augat*, an insured failed to notify its insurer of a federal Superfund claim until after the insured had entered into a consent decree in which it assumed full responsibility for the costs of the cleanup. 410 Mass. at 123. In light of these circumstances, the Court excused the insurer from coverage, relying on the "voluntary payments" condition, and observing that, by the time it was notified, "[t]here was nothing left

were factual disputes over "whether [the insurer] actually suffered any prejudice as a result of [the insured's] actions," and thus whether the insured's "violations frustrated the purposes of the notice and voluntary payment provisions." *Id.* After discussing the potential for a finding that the insurer's conduct had resulted in a waiver of its right to be notified of the arbitration counterclaim, the Court again stated that, "apart from" these considerations, "before [the insurer] could be relieved of responsibility based on [the insured's] violations of insurance provisions, [the insurer] would have to show that it incurred actual prejudice." *Id.* at 305. It agreed with the Appeals Court that, in view of the agreement to arbitrate, the threat of litigation by the installer and "the successful result [the insured] achieved in the arbitration," there was an issue of fact with respect to prejudice. *Id.* at 305-306.

In assessing the significance of *Sarnafil* to the present case, it is important to recognize that *it was, in fact, a "pre-tender costs" case.* The arbitration defense costs at issue were incurred *before* the insured tendered the defense of the installer's counterclaim to the insurer. *Id.* at 301. Indeed, the *entire* amount sought by the insured constituted "pre-tender costs," since the entire twenty-six-day arbitration was complete before the insured notified the insurer of the counterclaim. *Id.* While the insured had notified the insurer of the installer's initial claim letter, the Insurers no doubt would agree (i) that the policy requirement for notice of "suit" is independent of, and additional to, the requirement for notice of a "claim," and (ii) there was no suit to "tender," or to defend,

---

for the insurer to do but issue a check." *Id.* On this basis, the *Augat* court concluded that "no showing of prejudice is required in this case." *Id.*

While insurers tended to cite *Augat* for the proposition that prejudice was *not* required to relieve an insurer of its obligations based on a breach of a voluntary payments provision, it is now well-established that this was a misreading of the case. *See Employers' Liab. Assur. Corp. v. Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 479-81 (1997) (observing that, "[i]n *Augat* the particular facts established prejudice without more," and citing *Sarnafil* as laying to rest the question whether an insurer must show prejudice to avoid coverage based on a breach of a "voluntary payments" condition).

until the arbitration counterclaim had been filed. In the instant case, Kleenit notified the

insurers on September 25, 2002 of a claim made by a third party regarding the Acton site,

anticipating receipt of a Notice of Responsibility from the Department of Environmental

Protection, which finally arrived on December 30, 2002. The defense costs incurred by

Kleenit from September 25, 2002 through January 13, 2002, when Kleenit tendered the

defense, are all "pre-tender" costs. Thus, *Sarnafil* controls the present case.

### 2.    District Court Decisions

#### a.    *Hoppy's Oil Serv. v. Insurance Co. of North America*

Each of the Insurers offers *Hoppy's Oil Service v. Insurance Co. of North

America,* 783 F.Supp. 1505 (D.Mass. 1992) for the proposition that no duty arises to

provide defense costs until notice is made. Although *Hoppy's Oil* contains statements

ostensibly supportive of the Insurers' position here, it is not the law of the land in light of

*Sarnafil*, which the Supreme Judicial Court issued after the district court judge's decision

in *Hoppy's Oil*. In *Hoppy's*, the court denied coverage on a basis wholly independent of

the issue of the timing of notice: specifically, it held that the insurer's policies were not

called into play because the plaintiff in the underlying claim did not acquire an interest in

the damaged property until after the insurer's last policy expired, and thus could not have

sustained damage to *its* property while the policies were in effect. 783 F.Supp. at 1507-

1509.[3] The Court rejected coverage for indemnity *or* defense on this basis, observing that

there was never any ambiguity on the question of ownership and thus that "no duty to

---

[3] This holding of *Hoppy's Oil* was repudiated by the Massachusetts Supreme Judicial Court in *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844 (1993), which held that the timing of the plaintiff's acquisition of an interest in damaged property is irrelevant to an insurer's coverage obligations arising from a claim based on such damage. *Id.* at 850.

defend . . . ever arose." *Id.* at 1509. In dicta, the court also said that no defense duty could have arisen until notice of the underlying claim was received by the insurer. *Id.*

Because the *Hoppy's* court found that no defense duty ever arose, it had no need to consider whether, if a defense duty had arisen at some point, the insured would have been entitled to reimbursement of any defense costs incurred pre-notice. Accordingly, the court's comment with respect to when a defense duty would have arisen is pure dictum. More fundamentally, the approach of the *Hoppy's* court – focusing on when a defense duty "arose" or was triggered – simply cannot be squared with the Supreme Judicial Court's subsequent decision in *Sarnafil*. By the logic of *Hoppy's*, in the circumstances of *Sarnafil*, no duty to defend the installer's arbitration counterclaim could have arisen until the insurer had received notice of the counterclaim. If that were so, however, there would have been no possibility of coverage in *Sarnafil*, and no reason to consider the prejudice issue, since the insurer did not receive notice of the counterclaim until after the conclusion of the arbitration. *Sarnafil*, 418 Mass. at 301. Treatment of the "pre- tender costs" issue as a "trigger" question thus is flatly at odds with *Sarnafil* – and indeed with the whole line of Massachusetts decisions rejecting outmoded "condition precedent" analysis of insurance policy conditions. *See Johnson Controls v. Bowes*, 381 Mass. 278, 282 (1980). The Insurers rest their entire defense for failure to pay pre-tender costs on this repudiated so-called "trigger" theory.

### b.   *American Mut. Liab. Ins. Co. v. Beatrice Cos., Inc.*

The second district court decision the Insurers attempt to use as a basis for denial of Kleenit's pre-tender costs under Massachusetts law was *American Mut. Liab. Ins. Co. v. Beatrice Cos., Inc.*, 924 F. Supp. 861 (E.D. Ill. 1996). The court there was presented,

not with a pure "pre-tender costs" issue, but rather with a late notice defense in which the insurers claimed prejudice based, in part, on the fact that some of the costs the insured sought to recover were incurred before notice was given. *Id.* at 870-73. The court ultimately held that the insurers had failed to prove prejudice, in part because, in its view, the insurers (i) were not liable for pre-notice costs, and (ii) had an opportunity for input with respect to post-notice costs. *Id.* at 872-74. The underpinnings for the first of these conclusions – that there was no coverage for pre-notice costs – were removed, however, by the Supreme Judicial Court's *Sarnafil* opinion.

At the outset of its analysis, the *Beatrice* court acknowledged the line of Massachusetts cases imposing a prejudice requirement in the context of notice, cooperation and consent-to-settlement conditions, but stated that "with respect to voluntary payments, Massachusetts courts do not seem to require the insurer to demonstrate prejudice." *Id.* at 871 n.13, citing *Augat*, 410 Mass. at 123. However, this misreading of *Augat* was put to rest by the Supreme Judicial Court's *Sarnafil* opinion and the Appeals Court's opinion in *Hoechst Celanese.* 43 Mass. App. Ct at 479-81. [4] This

---

[4] The 1997 *Celanese* decision removes any reasonable doubt that *Augat* and *Sarnafil* stand for the proposition that an insurer is required to prove prejudice:

**[T]he excess insurers appear from the start to be misreading *Augat*** itself when they suggest that, in the face of a violation by an insured of the express prohibition of voluntary payments in a primary policy, the insurer is forthwith discharged of responsibility without having to demonstrate prejudice. In *Augat* the particular facts established prejudice without more. Thus the court said, "We conclude that no showing of prejudice is required *in this case* " (emphasis supplied). The later case of *Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 636 N.E.2d 247 (1994),* involved a claimed breach of a voluntary payment provision, as well as a notice provision, in a primary policy. The court was clear (418 Mass. at 305, 636 N.E.2d 247) that "before Peerless could be relieved of responsibility based on Sarnafil's violations of insurance provisions, Peerless would have to show that it had incurred actual prejudice. *Augat, Inc. v. Liberty Mut. Ins. Co., [410 Mass.] at 122-123 [571 N.E.2d 357]. Darcy v. Hartford Ins. Co., 407 Mass. 481, 491 [554 N.E.2d 28] (1990)."* And again, "It may very well be that [the insurer] will prevail at trial based on ... a showing of prejudice ..." but **611** the issue could not be prejudged on summary judgment. *Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. at 306,*

alone undercuts the continued vitality of *Beatrice* on the "pre-tender costs" issue after *Sarnafil*.

Moreover, the *Beatrice* court grounded its analysis on the *Hoppy's* "trigger" approach, 924 F. Supp. at 872, which, as noted, also cannot survive the Supreme Judicial Court's *Sarnafil* opinion. Although the *Beatrice* decision was issued in 1996, the court either was unaware of, or simply ignored, the 1994 Supreme Judicial Court opinion in *Sarnafil*. This is evident not only because of the court's misreading of *Augat*, but also because the court discussed and purported to distinguish the *Appeals Court's* opinion in *Sarnafil*, without ever mentioning the Supreme Judicial Court's opinion on further appellate review. *Beatrice*, 924 F. Supp. at 873, citing *Sarnafil*, 34 Mass. App. Ct. 248 (1993). Moreover, the basis on which the *Beatrice* court purported to distinguish *Sarnafil* shows a misunderstanding of what triggers an insurer's duty to defend. Specifically, the *Beatrice* court mistakenly asserted that *Sarnafil* did not deal with the "pre-tender costs" issue because the insured in *Sarnafil* notified the insurer of the installer's claim letter. Standard liability policies such as those at issue here and those at issue in *Sarnafil* do not obligate insurers to defend mere "claims," however, but only "suits." *See Sarnafil*, 418 Mass. at 297 & n.1; Massachusetts courts have construed the term "suit" (when undefined) to extend only to lawsuits and formal notices of responsibility issued by a government agencies under the federal or state Superfund law. *See Hazen Paper Co. v.*

---

636 N.E.2d 247. See also *New England Extrusion, Inc. v. American Alliance Ins. Co.*, 874 F.Supp. 467, 471 (D.Mass.1995). For an analytical demonstration that an insured's breach of a voluntary payment provision (like breach of a notice provision) should not avail the insurer unless the insurer sustains the burden of proving that it has been prejudiced thereby, see *Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F.Supp. at 1516-1518, citing *Roberts Oil Co. v. Transamerica Ins. Co.*, 113 N.M. 745, 751, 833 P.2d 222 (1992).

Employers Liability Assur. Corp., Ltd. v. Hoechst Celanese Corp., 684 N.E.2d 600, 43 Mass App. Ct. at 481 (emphasis added).

*United States Fid. & Guar. Co.*, 407 Mass. 689, 693-97 (1990). No Massachusetts court ever has held that a mere claim letter constitutes a "suit" or triggers a duty to defend. Thus contrary to the analysis of the *Beatrice* court, a demand for "defense" in *Sarnafil* was meaningless before the arbitration counterclaim was filed, such that costs incurred before the insurer received notice of the counterclaim *were* "pre-tender costs."

It thus is apparent that the two earliest of the district court "pre-tender costs" cases – one issued pre-*Sarnafil*, the other apparently oblivious to the existence of the Supreme Judicial Court *Sarnafil* decision – are now of no precedential value.

      c.     **Managed Health Care Sys., Inc. v. St. Paul Fire & Marine Ins. Co.**

The third and only other case the Insurers were able to cite in support of their argument is *Managed Health Care Systems, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2001 U.S. Dist. LEXIS 18302 (D. Mass. decided September 28, 2001). In this case, the court was presented with a pure "pre-tender costs" issue: the insured delayed giving notice until a year after the underlying suit was filed, and the insurer, while agreeing to defend the case going forward, refused to reimburse "pre-tender costs." *Id.* at *2-3. The court sustained the insurer's position. *Id.* at *3-7.

The *Managed Health* court either ignored or was unaware of *Sarnafil* and instead found *Augat* instructive. *Managed Health*, 2001 U.S. Dist. LEXIS 18302, at *4. The court reasoned:

> By giving [the insurer] no notice during the first year of the suit, the [insured] left [the insurer] with no power to affect the course and cost of the litigation during that time. Under *Augat*, [the insurer] should not have to pay for the portion of the [underlying] suit it had no opportunity to influence.

*Id.* at \*5. The *Managed Health* court opined that a rule precluding recovery of "'pre-tender costs" simply "gives the insured the choice of defending some or all of a claim on its own.'" *Id.* at \*6, quoting *Beatrice*, 924 F. Supp. at 873.

The analysis of the *Managed Health* court was deeply flawed for at least two reasons. First, and foremost, it cannot be harmonized with *Sarnafil*. From the text of the opinion, it is unclear whether the court was even aware that a showing of prejudice *is* required to sustain a "voluntary payments" defense under Massachusetts law; from its reliance upon *Augat* it would appear that it may have been laboring under the now-discredited notion that prejudice is *not* required.

After *Sarnafil*, the mere fact that an insurer is denied an opportunity to affect the course of litigation (during the "pre-tender" period) is insufficient to defeat coverage. In *Sarnafil*, the insured, despite the insurer's request to be apprised when "more specific claims [were] made," did not receive notice of the arbitration counterclaim until after the arbitration was concluded – and thus had no opportunity to affect the course of the arbitration for the entire life of the counterclaim. *Sarnafil*, 418 Mass. at 301. Nevertheless, the *Sarnafil* court held that coverage for the costs of defense of the counterclaim would not be deemed to have been forfeited in the absence of prejudice. *Id.* at 305-306.

Second, the notion that a "no pre-tender costs" rule permits the insured to elect to "defend some or all of the claim on its own," *Managed Health*, 2001 U.S. Dist. LEXIS 18302, at \*6, is just wrong. No such judicially fashioned rule could override the language of the policy giving the insurer not merely the duty, but also the *right* to defend the insured in the event of a covered claim. As the Supreme Judicial Court recognized in

13

*Sarnafil*, there is no question that the insured's incurring and payment of costs without the insurer's consent *is* a breach of the "voluntary payments" provision; the question, rather, is whether that breach will excuse the insurer from reimbursing the insured in the absence of prejudice. And the Supreme Judicial Court has held that it does not. *Sarnafil*, 418 Mass. at 305-306.

The following addresses two subsequent district court decisions, never addressed by the Insurers, which provide additional certainty of the supremacy of the *Saranfil* decision as the definitive law of the land in Massachusetts regarding insurers obligations to pay pre-tender costs.

### d.    *Amtrol v. Tudor Ins. Co.*

In *Amtrol v. Tudor Ins. Co.*, 2002 U.S. Dist. LEXIS 18691 (D. Mass. decided September 10, 2002), the district court (Woodlock, J.) issued a decision properly applying *Sarnafil* that fully supports Kleenit's position in this case. (A copy of this unpublished decision is attached as Exhibit B.) In *Amtrol*, the insured, a manufacturer of hot water heaters, received numerous claims arising from leaks that developed in the heaters. *Id.* at *7-8. The insured took responsibility for the problem, and repaired water damage to affected properties and repaired and replaced hundreds of faulty heating units. *Id.* at *8, *17. Some three years later, the insured was sued by a class of purchasers and installers of the heating units. *Id.* at *8-9. The insured notified two of its insurers of the suit, and the insurers agreed to defend subject to reservations of rights to disclaim coverage. *Id.* at 9.

After examining numerous issues relating to the existence of covered property damage, coverage for mitigation costs, and the applicability of policy exclusions, the

court addressed the insurers' contention that a "voluntary payments" condition barred

recovery of repair costs incurred by the insured before the insurers were notified. The

court responded:

> In order for an insurer to deny coverage based on the
> voluntary payments provision, it must be able to establish
> that it was prejudiced. *Sarnafil, Inc. v. Peerless Ins. Co.*,
> 418 Mass. 295, 305 (1994) (citing *Augat, Inc. v. Liberty
> Mut. Ins. Co.*, 410 Mass. 117, 122-23 (1991)); *Employers'
> Liab. Assurance Corp. v. Hoechst Celanese Corp.*, 43
> Mass. App. Ct. 465, 481 (1997). In *Augat*, the SJC held
> that prejudice had been established on the facts of the case
> because the insured had entered into a settlement agreement
> without notifying the insurer, thus denying the insurer any
> ability to protect its interests. *Id.* (citing *Augat*, 410 Mass.
> at 122.) The facts here are different; the insurers must
> establish that [the insured's] payments and
> repair/replacement costs prior to notification in 1999
> actually caused them prejudice.

*Amtrol*, 2002 U.S. Dist. LEXIS 18691, at *35-36. The *Amtrol* court thus correctly read

*Sarnafil, Augat* and *Hoechst Celanese*, and held that the insurers could avoid liability for

covered "pre-tender costs" – only if their interests were actually prejudiced.

### e.    *Pacific Ins. Co., Ltd. v. Eaton Vance Mgmt.*

The most recent decision touching on the "pre-tender costs" issue (under

Massachusetts law) is *Pacific Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 260 F. Supp. 2d 334

(D. Mass. 2003). In *Eaton Vance*, an employer sought coverage under a Mutual Fund

Errors and Omissions ("E&O") Policy in connection with an ERISA claim. *Id.* at 337-

38. The employer retained ERISA counsel and admitted liability in accordance with

counsel's advice. *Id.* at 338. Then, nearly six weeks after admitting liability, the

employer notified the insurer, seeking to recover amounts expended to establish

retirement accounts for the claimants, as well as costs of defense and investigation. *Id.*

15

The insurer contended that it was not required to reimburse the employer for "pre-tender" defense costs, citing a policy provision stating that the insured "shall not incur any expenses in connection [with a claim] without the written consent of the [insurer]," and relying upon *Managed Health*, *Beatrice* and *Hoppy's Oil* for the proposition that a showing of prejudice was not required. *Id.* at 343-44. The employer argued that these cases were distinguishable because they were decided under policies allocating the duty to defend to the insurer, whereas the E&O policy allocated that duty to the insured – in consultation with the insurer. *Id.* at 343. The court agreed with the employer. *Id.* The court viewed the underlying rationale of cases such as *Managed Health* to be that "where the insurer has a duty to defend the insured, there is an inherent prejudice when an insured makes [pre-tender] decisions that impact the defense," but found this rationale inapplicable where the insured is responsible for the defense. *Id.* at 344. The court concluded that

> there is thus nothing unfair about requiring [the insurer] to pay for the Pre-Tender Costs where [the insurer] would have consented had it been asked. . . . **This court thus sees no reason to depart from the rule that, absent a showing of prejudice, an insurance company is not absolved of its obligation to pay litigation costs merely because of an insured's failure to timely notify the insurance company** of the claim.

*Id.* (Emphasis added.) The court ordered the insurer to reimburse the employer's "pre-tender" defense costs. *Id.*

While the court in *Eaton Vance* relied on the allocation of the duty to defend to distinguish cases such as *Managed Health*, it has already been shown that the "inherent prejudice" rationale of those cases is fatally inconsistent with *Sarnafil*, and thus with governing Massachusetts law. This being so, the matter of who is allocated the defense

duty – insurer or insured – is irrelevant: Massachusetts courts do *not* presume prejudice from an insurer's inability to influence the defense. Indeed, *Eaton Vance* strongly supports Kleenit's position because it implicitly rejects the "trigger" analysis of cases such as *Hoppy's Oil*. If no duty to pay (or, in the case of an E&O policy, to reimburse) defense costs could arise until the insurer is notified, then the employer in *Eaton Vance* could not have recovered its "pre-tender costs."

IV.   **INSURER'S SUMMARY JUDGMENT MOTION ON C. 93A AND c. 176D MUST FAIL BECAUSE OF THEIR DILATORY RESPONSE TO NOTICE AND REFUSAL TO ASSUME LIABILITY FOR PRE-TENDER COSTS WITHOUT EVEN ATTEMPTING TO DEMONSTRATE PREJUDICE, AS REQUIRED BY MASSACHUSETTS STATUTE AND CASE LAW**

Despite providing prompt notice of the NORs and the DEP and third party claims, none of the insurers promptly addressed the initial notices and claims to provide defense to Kleenit. Kleenit was required to retain environmental consultants and insurance defense and coverage counsel to represent its interest, defend claims, and pursue defense and coverage from the various insurers.

Counsel for Kleenit requested defense and indemnification for Kleenit in letters and supporting documents dated September 25, 2002, and November 8, 2002. For over three months, the Insurers failed to even acknowledge the existence of the policies, let alone confirm defense and coverage. The Insurers eventually responded, but refused to pay pre-tender costs, despite the clear legal obligation to do so and misrepresented pertinent facts or insurance policy provisions relating to coverages at issue, failed to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonable clear, and failed to provide promptly a reasonable explanation of the basis in

the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

The insurers' misrepresentation of and failure to acknowledge certain key facts in these claims, in addition to taking a legal position contrary to clear appellate caselaw, constitute violations of M.G.L. c. 176D, §3(9) and M.G.L. c. 93A.   Chapter 176D "requires insurers to a effectuate a prompt, fair and equitable settlement of claim in which liability has become reasonably clear, whether insurer's liability has become 'reasonably clear' is determined by an objective standard; whether reasonable person, with knowledge of the facts and the law, would probably have concluded, for good reason, that the insurer was liable to the insured. Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 649 N.E.2d 803 (1995).

Under Massachusetts law, business risk insurers' alleged conduct of failing to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear could support unfair trade practices claim by insured business entity. M. DeMatteo Const. Co. v. Century Indem. Co., D.Mass.2001, 182 F.Supp.2d 146.

The Insurers position on pre-tender costs is unreasonable and taken in bad faith in view of the Courts' clear language in *Sanrafil*, *Darcy*, *Atlas Tack* and *Augat*, and in the more recent district court decisions of *Amtrol* and *Eaton Vance*, which the Insurers did not even address in their Motions.   As discussed above, the Insurers repeatedly made arguments supporting their refusal to pay pre-tender costs which were based on old theories of insurance law that have been expressly rejected in Massachusetts.

The insurers' present position does not represent a good faith interpretation of unclear or unsettled law, but instead a purposeful and unreasonable repudiation of settled

law which has the effect of unfairly prolonging and settling the claims and compelling Kleenit to institute litigation to recover amounts due under its policies. Therefore, the Insurers Motions regarding c. 93A and c. 176D should be denied.

### IV. CONCLUSION

WHEREFORE, for all of the reasons discussed, Kleenit opposes the Insurers' Motion for Parital Summary Judgment and respectfully requests that this Court enter an Order denying their motions.

### REQUEST FOR ORAL ARGUMENT

Plaintiff, pursuant to Local Rule 7.1(d), requests a hearing on this motion on the grounds that oral argument may be of assistance the court in disposing of this motion.

Respectfully submitted,

KLEENIT, INC.

By its Attorney,

/s/  Donald P. Nagle
Donald P. Nagle, Esq. (BBO # 553544)
Law Office of Donald P. Nagle, P.C.
5 Main Street Extension, Suite 300
Plymouth, Massachusetts 02360
(508) 732-8970

Date: July 19, 2004

### CERTIFICATE OF SERVICE

I hereby certify that I made service of the foregoing document in accordance with the provisions of Fed.R.Civ.P.5.

/s/  Donald P. Nagle
Donald P. Nagle

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04 10351 NG

KLEENIT, INC.,
      **Plaintiffs**

v.

SENTRY INSURANCE COMPANY,
ROYAL & SUN ALLIANCE, UTICA
NATIONAL INSURANCE GROUP, and
TRAVELERS PROPERTY AND
CASUALTY,
      **Defendants**

**KLEENIT, INC.'S OPPOSITION TO SENTRY INSURANCE COMPANY'S, UTICA NATIONAL INSURANCE GROUP'S, GLOBE INDEMNITY COMPANY AND ROYAL INSURANCE COMPANY OF AMERICA'S, AND TRAVELERS INDEMNITY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
(Cite as: 2001 WL 34114949 (D.Mass.))

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.

MANAGED HEALTH CARE SYSTEMS, INC.
and Michael Ingoldsby, Plaintiff
v.
ST. PAUL FIRE & MARINE INSURANCE
COMPANY, Defendant

No. Civ.A.98CV10831GAO.

Sept. 28, 2001.

*MEMORANDUM & ORDER*

OTOOLE, J.

*1 The defendant has moved this court to grant
summary judgment in its favor. The plaintiffs,
Managed Health Care Systems, Inc. ("MHCS") and
Michael Ingoldsby, claim that St. Paul Fire &
Marine Insurance Company ("St.Paul"), their
liability insurance company, must reimburse them
for a year's worth of defense costs which they
incurred in a lawsuit filed against them by a former
MHCS employee. St. Paul has moved for summary
judgment, arguing that since it had no notice of the
suit during that year, it has no obligation to pay the
plaintiff's defense costs attributable to that period.

A. *Summary of Facts*

These facts are not in dispute. On February 27,
1996, Donald Foster, a former MHCS employee
filed a complaint against Ingoldsby and MHCS in
the Massachusetts Superior Court. The complaint
alleged that Ingoldsby and MHCS had committed
various wrongs against Foster when they terminated
his employment with MHCS. Ingoldsby and MHCS
defended against these claims and incurred over
$200,000 in attorney's fees as a result. St. Paul had
issued liability insurance to MHCS through a series

of six MHCS Professional Office Package policies.
The plaintiffs did not notify St. Paul that they were
in litigation against Foster and they made no claim
at the time that any policy issued by St. Paul
provided coverage for the Foster suit.

About a year later, on February 1, 1997, Foster
filed an amended complaint adding some new
claims. Ingoldsby and MHCS notified St. Paul of
the amended complaint, and requested that St. Paul
assume the defense. After reviewing Foster's claim
against MHCS and Ingoldsby, St. Paul determined
that it had no obligation to reimburse them for costs
incurred before the defense was tendered, but it
agreed to defend against the claims Foster asserted
in his amended complaint.

B. *St. Paul's Obligation to Pay Pre-Tender Costs*

An insured's failure to give its liability insurance
company timely notice of a claim against it does not
automatically excuse the insurance company from
its contractual obligations. *Johnson Controls, Inc. v.
Bowes,* 409 N.E.2d 185, 188 (Mass.1980). Instead,
in order for the insurance company to be relieved of
its obligations under the policy, it must "prove both
that the notice provision was in fact breached and
that the breach resulted in prejudice to its position."
*Id.* The Supreme Judicial Court reasoned that this
was a fair approach to notice provisions because
where "the insurance company's interests have not
been harmed by a late notice, ... the reason behind
the notice condition in the policy is lacking, and it
follows neither logic nor fairness to relieve the
insurance company of its obligations under the
policy in such a situation." *Id.* at 187-88. *See also
Darcy v. Hartford Ins. Co.,* 554 N.E.2d 28, 31
(Mass.1990) (holding that failure to give timely
notice "is not an independently sufficient basis for
an insurer to disclaim liability. Rather, the insurer
must prove that its interests have been prejudiced
by the insured's failure....").

*2 St. Paul does not argue that the plaintiffs' one
year delay in notice relieves it of any obligation to
indemnify the Foster suit. It accepted the tendered
defense of the amended complaint. Rather, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 34114949 (D.Mass.))

present suit focuses solely on the costs MHCS and Ingoldsby incurred in the year that the plaintiffs defended the suit on their own without telling St. Paul about it. The overall approach suggested by *Johnson Controls* remains applicable.

The Supreme Judicial Court's holding in *Augat, Inc. v. Liberty Mut. Ins. Co.*, 571 N.E.2d 357 (Mass.1991) is also instructive. In *Augat*, the insured entered into a consent judgment which obliged it to contribute to the clean-up costs of a contaminated site. *Id.* at 359-60. After agreeing to the consent judgment, the insured then requested reimbursement from its insurer for the clean-up costs. *Id.* at 358-59. The Supreme Judicial Court held that the insurance company was excused from its obligation to indemnify the insured because the insured had breached its promise in the policy not to "voluntarily make any payment, assume any obligation or incur any expense" except at its own cost. *Id.* at 359.

Here, MHCS's policy required it to give St. Paul notice of any claims against it, and when faced with a claim, the policy instructed MHCS not to "assume any financial obligation or pay out any money without [St. Paul's] consent." The plaintiffs breached these terms by waiting almost a year before notifying St. Paul of Foster's suit and by deciding to pay their attorney in excess of $200,000 to defend against the suit without St. Paul's approval. By giving St. Paul no notice during the first year of the suit, the plaintiff left St. Paul with no power to affect the course and cost of the litigation during that time. Under *Augat*, St. Paul should not have to pay for the portion of the Foster suit it had no opportunity to influence. *See also, Hoppy's Oil Serv., Inc. v. Insurance Co. of North America*, 783 F.Supp. 1505, 1509 (D.Mass.1992) (stating that "No duty to defend or to participate in a defense can arise before the insurer has notice of the suit against the insured, or at least of the underlying claim and the likelihood of suit."); *American Mut. Liab. Ins. Co. v. Beatrice Companies*, 924 F.Supp. 861, 874 (N. D.Ill.1996) (stating that under Massachusetts law "insurers are not liable for pre-notice defense costs"). The *American Mutual* court explained:

The prejudice requirement was adopted to prevent complete forfeiture based upon technical failure of the insured to provide timely notice. In contrast, enforcement of the rule that pre-tender

defense costs are not recoverable does not result in complete forfeiture of an insured's right to recover fees. Rather, the rule gives the insured the choice of defending some or all of a claim on its own.
*Id.* at 873.

### C. Conclusion

Under the circumstances of this case, the plaintiffs must bear the defense costs they incurred prior to giving St. Paul notice of the Foster litigation. St. Paul also did not violate Mass. Gen. Laws ch. 93A when it refused to pay such expenses. The defendant's motion for summary judgment is GRANTED.

*3 The plaintiff's motion for partial summary judgment is DENIED. The plaintiff's motion to file a substitute complaint is also DENIED as the amendment would not affect the grant of summary judgment for the defendant.

2001 WL 34114949 (D.Mass.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 04 10351 NG**

**KLEENIT, INC.,**
            **Plaintiffs**

**v.**

**SENTRY INSURANCE COMPANY,
ROYAL & SUN ALLIANCE, UTICA
NATIONAL INSURANCE GROUP, and
TRAVELERS PROPERTY AND
CASUALTY,**
            **Defendants**

**KLEENIT, INC.'S OPPOSITION TO SENTRY INSURANCE COMPANY'S,
UTICA NATIONAL INSURANCE GROUP'S, GLOBE INDEMNITY COMPANY
AND ROYAL INSURANCE COMPANY OF AMERICA'S, AND TRAVELERS
INDEMNITY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

**AMTROL**, INC., Plaintiff,
v.
**TUDOR** INSURANCE COMPANY, and
Employer's Insurance of Wausau, A Mutual
Company,
Defendants.

**No. Civ.A.01-10461-DPW.**

Sept. 10, 2002.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

*1 Plaintiff Amtrol, Inc. ("Amtrol") brings this
diversity action against its insurers, defendants
Tudor Insurance Co. ("Tudor") and Employer's
Insurance of Wausau ("Wausau"), alleging breach
of the respective insurance contracts (count I),
breach of the implied covenant of good faith and
fair dealing (count II), violations of Mass. Gen.
Laws ch. 93A §§ 9, 11 (counts III and IV), and
insurance bad faith (count V), in addition to its
request for a declaratory judgment against Tudor
(count VI). Amtrol's allegations are based on the
refusal of the defendants to reimburse it for its costs
of defense and settlement with respect to a class
action lawsuit brought by a class of Massachusetts
purchasers and installers of Amtrol Hot Water
Makers, as well as the costs of repair and
replacement of defective products that experienced
leaks. Tudor has filed six counterclaims seeking
declaratory judgments regarding Tudor's duties to
defend and/or indemnify Amtrol.

Before me are cross motions for summary
judgment. Plaintiff moves for summary judgment on
its breach of contract (count I) and Mass. Gen.

Laws ch. 93A (counts III and IV) claims. Tudor
moves for summary judgment with respect to
coverage under the policy (count I) and on its
counterclaims III and V. [FN1] Wausau moves for
summary judgment with respect to the breach of
contract claim (count I). [FN2]

> FN1. Tudor's third counterclaim seeks a
> declaration that Tudor is not required to
> reimburse Amtrol for the amounts paid in
> settlement of the underlying action.
> Tudor's fifth counterclaim seeks a
> declaration that it is not required to
> reimburse Amtrol for its costs claimed for
> repair and replacement of defective units.

> FN2. Although Wausau styles its motion as
> a motion for summary judgment, rather
> than for partial summary judgment, it does
> not mention any count other than the first.
> Therefore, I treat it as a motion for partial
> summary judgment with respect to count I.

I. BACKGROUND

Plaintiff Amtrol, a Rhode Island corporation with
its principal place of business in West Warwick, RI,
manufactures and sells residential water heaters
under the brand name Hot Water Maker®
("HWM"). Defendants Tudor and Wausau,
incorporated in New Hampshire and Wisconsin
respectively, are both insurance companies who
have issued commercial general liability ("CGL")
policies to Amtrol covering different periods at
issue in this action.

A. The Policies

Wausau issued Amtrol a CGL policy numbered
1526-06-060288, effective November 8, 1995
through December 23, 1996 ("the Wausau policy").
Tudor issued Amtrol two separate CGL policies.
The first, numbered GLO0001117, was effective
December 23, 1996--December 23, 1997; the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

Page 2

second, number GLO0001436, was effective December 23, 1997--December 23, 1999 ("the Tudor policies").

All three policies are standard form CGL policies written on an occurrence basis and are substantially similar in all relevant respects. [FN3] The policies provide coverage for liability incurred "because of 'bodily injury' or 'property damage.' ' Wausau policy, § I.A.1.a; Tudor policies, § I.A.1.a (collectively the "Policies") . [FN4] Coverage applies to "property damage" "only if (1) the ... 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and 2) the ... 'property damage' occurs during the policy period." Policies, § I.A.I.b. "Occurrence" is defined by the standard form policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Wausau policy, § V.9; Tudor policies, § V.11. Property damage is defined as "a. Physical injury to tangible property, including all resulting loss of use of that property .... or b. Loss of use of tangible property that is not physically injured." Wausau Policy, § V.12; Tudor policies, § V.15.

FN3. There are particular differences with respect to level of coverage, self-insured retention levels, etc. I will discuss those differences as they become relevant.

FN4. The Bodily Injury and Property Damage Liability coverage portion of the Wausau policy provides in relevant part:
I. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies ... But: (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III): and
b. This insurance applies to 'bodily injury' and 'property damage' only if:
(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' ... and
(2) The 'bodily injury' or property damage' occurs during the policy period.
Wausau policy, § I, Coverage A.I.

*2 The same coverage section contains a list of enumerated exclusions. Among those that defendants believe to be relevant to the instant case are the business risk exclusions of product damage and impaired property (Exclusions k and m, receptively) [FN5] and the voluntary withdrawal or sistership exclusion (Exclusion n). [FN6] Wausau and Tudor policies, § I.A.2.

FN5. The business risk exclusions provide:
This insurance does not apply to:
k. 'Property damage' to 'your product' arising out of it, or any part of it,
...
m. 'Property damage' to 'impaired property' or property that has not been physically injured, arising out of:
(1) A defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work';
...
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put into its intended use.
Wausau Policy, § I.A.2.

FN6. Exclusion n provides:
This insurance does not apply to:
n. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement adjustment, removal or disposal of:
a. 'Your product';
b. 'Your work'; or
c. 'Impaired property';
If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.
Wausau Policy, § I.A.2.n.

The Tudor policies include a self-insured retention endorsement, by which the insured is responsible for the first portion of liability up to a certain

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

amount per occurrence and the insurance policy covers liability in excess of that amount per occurrence up to the policy's limit of $1,000,000 per occurrence. Tudor policy, Self-Insured Retention Endorsement. The self-insurance retention amount was $100,000 in the first Tudor policy and $50,000 in the second. *Id.*

B. The Underlying Action

From approximately September 1995 through August 1996, Amtrol implemented design features and manufacturing processes for certain HWMs that it manufactured (the "Affected Units") that it had not employed previously nor did subsequently. In mid-1996, Amtrol began receiving complaints, a disproportionate number from individuals in Massachusetts, that certain of the Affected Units had developed leaks in various locations in their coil assemblies causing hot water to leak from the units. By the second half of 1996, Amtrol recognized a relationship between the leaks and the design features or manufacturing processes it had employed, and had already begun to modify those design features and manufacturing processes.

During this period, Amtrol provided a written warranty to all purchasers of its HWMs providing *inter alia* that the HWM tank assembly "shall be free of leaks during normal use and service for" at least five years. [FN7] Pursuant to the warranty, Amtrol undertook to repair and/or replace the relevant coil assembly or the entire HWM in the affected units in which leaks had developed. According to Amtrol's records, repair and replacement costs were incurred during each of the time periods covered by each of the policies. Amtrol reports repair or replacement of hundreds of faulty units.

> FN7. The waiver provides two different time periods for the waiver. For residential owners, the HWM is warrantied for as long as the original purchaser owns the home in which the HWM is installed. If the purchaser is a business or the HWM is used for a commercial, industrial, or residential rental property application, the warranty lasts for five years.

On February 16, 1999, Amtrol was served with a verified class action complaint in a case filed in Essex County Superior Court, entitled *Ken's Oil & Burner Service, Inc. et. al. v. Amtrol, Inc.*, No. 99-0265 (the "Underlying Action"). The complaint, brought by a class of Massachusetts purchasers and installers of Amtrol HWMs, alleged that Amtrol provided "defective" and "dangerous" products that had caused property damage and posed a risk of personal injury. Because a TRO hearing was scheduled for February 18, 1999 Amtrol promptly retained Foley, Hoag & Eliot LLP ("Foley Hoag") to defend the action.

After being notified of the claim by Amtrol, Wausau and Tudor agreed to defend under numerous reservations of rights to disclaim coverage. In a letter to Amtrol dated March 9, 1999, Wausau cited exclusions k and n as applicable and also disclaimed coverage of Counts IV through VII alleging violations of Massachusetts Consumer Protection Act (Mass. Gen. Laws chs. 93A, 231) relief assertedly because those counts entailed allegations of intentional acts.

*3 In a letter dated May 19, 1999, Tudor agreed to continued representation of Amtrol by Foley Hoag under the condition that it must reimburse Amtrol at a blended rate of $130/hr. with Amtrol responsible for the difference. [FN8] Tudor also disclaimed any costs of representation incurred prior to May 3, the date Tudor claims it received notification of the claim. [FN9] Finally, Tudor reserved its rights under several exclusions including: A (expected or intended injury), B (contractual liability), K (damage to your product), L (damage to your work), M (damage to impaired property or property not physically injured), N (recall of products), and R (punitive or exemplary damages). On that basis it completely disclaimed coverage of counts IV through VII as intentional acts, coverage of breach of warranty based on exclusion K, coverage of a recall based on exclusion N, and treble damages under exclusion R. (*Id.*)

> FN8. Amtrol contends that no such agreement was made and that Mike Daigle, the consultant who allegedly made the agreement on behalf of Amtrol, was not authorized to act on behalf of Amtrol.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

FN9. Amtrol contends that it notified AON, the insurance broker through which Amtrol purchased the disputed policies, of the claim and instructed it to notify all relevant carriers by letter dated February 17, 1999. *See* Geiger letter, 1/25/00, p. 2 (Stips.Ex. 10); Amtrol letter 2/17/99 (Stips.Ex. 7), Pickrel Aff. ¶ 6 (Stips.Ex. 3).

Amtrol filed an answer to the complaint on October 8, 1999. The parties to the Ken's Oil action reached a settlement which is memorialized in a confidential settlement agreement and final release. After completion of a stipulation of dismissal, the parties signed a letter of agreement dated March 27, 2000, thus finalizing the terms of the Settlement Agreement.

Counsel for Amtrol has made repeated demands to defendants Wausau and Tudor for indemnification and defense costs in connection with the underlying action. Defendants maintain that the Policies do not cover Amtrol's expenses to remedy the leaking units. To date, neither Wausau nor Tudor has paid Amtrol any sums of money in connection with its claims under the Policies nor have they reimbursed Amtrol for defense costs incurred in the underlying action. On December 12, 2000, Amtrol's counsel sent Wausau and Tudor formal demand letters pursuant to Mass. Gen. Laws ch. 93A, § 9 that set forth the legal and factual basis for the claims and notifying them of its allegation of unfair and deceptive settlement practices under Mass. Gen. Laws ch. 176D and 93A. Wausau and Tudor both replied to Amtrol asserting that they continued to dispute the basis for the claim and for the alleged 93A violation.

In early 2001, Tudor filed a declaratory judgment action against Amtrol and Wausau in the District of Rhode Island seeking a declaration of no-coverage for the underlying claims. That action was transferred to me after the Rhode Island court held it improperly filed, and I dismissed it as duplicative of the instant action.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). All facts are to be viewed, and all inferences drawn, in the light most favorable to the nonmoving party. *Reich v. John Alden Life Ins. Co .,* 126 F.3d 1, 6 (1st Cir.1997). On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn.... Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain ..." *Id.* at 6 (citations omitted).

\*4 The interpretation of an insurance policy is normally a question of law for the court. *Ruggiero Ambulance Service, Inc. v. Nat'l Grange Ins. Co.,* 430 Mass. 794, 797 (2000). When the relevant facts upon which coverage of a claim is premised are not in dispute, the application of the insurance policy to those facts is also a question of law that can be resolved on summary judgment. *Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.,* 260 F.3d 54, 61 (1st Cir.2001).

## III. CHOICE OF LAW

As a preliminary issue, I must determine whether there is a conflict between the substantive law of the interested jurisdictions. *Millipore Corp. v. Travelers Indemnity Co.,* 115 F.3d 21, 29 (1st Cir.1997). Tudor contends that there exists a conflict between Rhode Island and Massachusetts law with respect to the point in the chain of events at which causing property damage triggers coverage under the policy. Tudor argues that Rhode Island law should be controlling. Amtrol maintains that the conflict is irrelevant on the facts of the case, but that if a choice must be made, Massachusetts law should govern.

There does appear to be a conflict between Rhode Island and Massachusetts law over which trigger of coverage theory is applicable on the facts. The Rhode Island Supreme court, in answer to a certified question posed by the First Circuit concerning a particular policy, adopted the manifestation theory of trigger. [FN10] *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.,* 668 A.2d 647, 649 (RI 1995). "In other words, there can be no occurrence under the policy without property

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

damage that becomes apparent during the policy period, and property loss and compensable damages cannot be assessed unless the property damage is discovered or manifests itself." *Id.* Massachusetts, by contrast, has rejected the manifestation theory in the context of an environmental contamination case, concluding "that coverage may be triggered before discovery or manifestation of the damage." *Trustees of Tufts Univ. v. Comm. Union Ins. Co.,* 415 Mass. 844, 853-54 (1993). But the SJC has refrained from electing a single trigger of coverage theory, noting that "different triggers may be applied to different types of injuries and property damage." *Id.* at 855.

FN10. Amtrol argues that the Rhode Island "manifestation" cases do not necessarily establish a universal rule because of language in the policies defining occurrence as an event "which results, during the policy period, in personal injury [or] property damage." *Employers Mut. Cas. Co. v. PIC Contractors, Inc.,* 24 F.Supp.2d 212, 216 (D.R.I.1998) (quoting *CPC Int'l,* 668 A.2d at 649). While the policies at issue here do not so define "occurrence," they do contain the same temporal limitation elsewhere in the scope of coverage. *See* Tudor Policy, I.A.1.b. (Stips.Ex. 1A) ("[t]his insurance applies to "bodily injury" and "property damage" only if ... the 'bodily injury' or 'property damage' occurs during the policy period."). The court in *Employers Mut.* recognized that, although the parties did not make the argument, the manifestation rule may still apply to when the *injury* occurred, even if the occurrence is defined differently. Based on the language in the Tudor and Wausau policies, I find that Rhode Island law would look to when the property damage "manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." *CPC Int'l,* 668 A.2d at 650)

For purposes of summary judgment, I find that the theoretical conflict between Rhode Island and Massachusetts law is inconsequential. Whether the relevant date on which the property damage occurred for purposes of policy coverage is measured by the manifestation theory or one of the

three other major trigger theories identified by the SJC, [FN11] there is likely little difference between the trigger date here under any of the potential theories. Unlike environmental contamination which can take years before the property damage is discovered, the leaks in question were easily discoverable, causing whatever property damage to occur within short order.

FN11. The SJC identified "the three most common 'trigger theories," ' apart from the manifestation trigger, as: "the exposure trigger (policies in effect during years claimant's property tortiously exposed to hazardous material triggered), the continuous (or multiple) trigger (property damage occurs during each year from the time of first hazardous exposure through manifestation), and the injury-in-fact (or actual injury) trigger (requires inquiry into when property damage actually occurred)." *Trustees of Tufts Univ.,* 415 Mass. at 855 n. 9.

Moreover, Amtrol contends that all of the claims amount to a single occurrence, and therefore that the defendants are jointly and severally liable for the entire costs. Under plaintiff's theory, it only matters that some property damage occurred during each policy, thus triggering coverage of the entire claim by each defendant. Defendants do not dispute this theory.

*5 Therefore, I find that there was a single occurrence based on the fact that all of the claims share a single common cause, i.e. faulty design and construction in the HWM leading to leaks from the coil assembly. *See Colonial Gas Co. v. Aetna Cas & Sur. Co.,* 823 F.Supp. 975, 983 (D.Mass.1993). Because under each of the trigger theories, property damage in the form of water leakage occurred during each of the policy periods, coverage under each of the policies is potentially available. Therefore, the difference in trigger theories are irrelevant, and no conflict of law is presented. Accordingly, I will apply Massachusetts substantive law as the law of the forum.

IV. CONSTRUCTION OF POLICY

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                    Page 6
(Cite as: 2002 WL 31194863 (D.Mass.))

The heart of this dispute is over the meaning of "property damage" and the application of various exclusions to the costs incurred as a result of leaking HWMs. At issue is whether the policies provide coverage of the following costs: costs of settlement of underlying action, costs of repair and replacement of defective HWMs, costs of water damage to owners of property where HWMs were installed. I take up each of these issues within the respective sections on policy coverage below.

The initial burden lies with the insured to prove that the underlying facts state a claim for which the insurance policy provides coverage. *Highlands Ins. Co. v. Aerovox Inc.*, 424 Mass. 226, 230 (1997). Once the insured has met this burden, the burden shifts to the insurer to establish that an exclusion of coverage applies. *Id.* In Massachusetts, exclusion provisions are strictly construed, with any ambiguity taken against the insurer. *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 282 (1997).

In construing an insurance contract, I utilize the normal rules of contract interpretation. *Brasas Sporting Arms, Inc. v. American Enterprise Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir.2000). I look first to the language of the policy, affording each term its ordinary and usual meaning. *Hakim*, 424 Mass. at 280. In so doing, I consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." ' *Id.* at 282 (quoting *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844, 849 (1993)).

A. Direct Property Damage

Amtrol contends that the leakage of water from the HMWs itself constitutes property damage and therefore the cost of the repair and/or replacement of the leaking HMWs is covered as "those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies." Policies, § 1.A.1.a. The insurers argue that the mere presence of water leaking from the HMWs, without more, cannot constitute property damage. All parties agree that water damage to third party property constitutes property damage and is covered under the policies.

The standard form policy defines property damage

as "physical injury to tangible property." Policies, § V.15(a). The ordinary meaning of physical injury is a "harmful change in appearance, shape, composition, or some other physical dimension." *Eljer Manuf. Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 808-09 (7th Cir.1992) (J. Posner) (rejecting ordinary usage in favor of special contractual definition used "between sophisticated business entities"); *Traveler's Ins. Co. v. Eljer Manuf., Inc.*, 197 Ill.2d 278, 304 (2001) (rejecting Judge Posner's interpretation in favor of ordinary meaning).

*6 Amtrol argues that the unwanted presence of water within the home or building in which the HMW was installed is per se physically injurious. While Amtrol cites cases in which water damage in the form of rot or other damage to the home, its fixtures, and personal property is said to constitute property damage, *see Eljer Manuf.*, 972 F.2d at 809; *Traveler's Ins.*, 197 Ill.2d at 314, no case holds that the simple presence of water, absent other manifestation of injury, amounts to physical damage. In fact, in *Traveler's Ins.* the Illinois Supreme Court specifically acknowledged the possibility that one could have a water leak without corresponding physical damage when it overruled *Marathon Plastics, Inc. v. Int'l Ins. Co.*, 161 Ill.App.3d 452 (1987), 197 Ill.2d at 307-08.

The physical injury requirement in standard CGL policies exists to prevent recovery of mere economic loss. *Id.* at 312-14. In other words, CGL policies

are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.

*Id.* at 314 (quoting *Qualls v. Country Mut. Ins. Co.*, 123 Ill.App.3d 831, 833-34 (1984)).

Therefore, in order to meet the physical damage requirement, one must show that the water has somehow exacted a physical harm upon tangible property that required remediation or otherwise diminished the value of the property itself. *Id.* at 314. A leak that results in no damage beyond the mere presence of water that can be removed or

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31194863 (D.Mass.))**

Page 7

evaporates without harm does not constitute property damage. Thus, in order to seek coverage of costs based on direct property damage, Amtrol must show evidence of water damage caused by water leaked from each HWM it replaced or repaired for which it seeks recovery. Amtrol has not produced such evidence for the vast majority of the HWMs for which it claims coverage and therefore is not entitled to summary judgment on its theory of direct property damage.

B. Mitigation Costs

Amtrol argues that even if no property damage had yet occurred at the time of repair, it repaired and/or replaced the leaking HWMs in order to mitigate existing water damage and to prevent more extensive future damage. Citing a host of environmental cases, Amtrol contends that efforts to mitigate further property damage are covered by the policy as obligations incurred "because of ... 'property damage." ' Policies, § I.A.1.a.

Amtrol's argument is one of analogy. In the environmental cases, the question is when the costs of cleanup or other efforts to mitigate the impact of pollution on the property of the insured are covered by CGL policies and not excluded by the owned property exclusion. The answer provided by most courts, including those in Massachusetts, is that cleanup costs designed to remediate damage to third parties are fully covered even if the efforts occur exclusively on the insured's land. *See, e.g., Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Surety Co.,* 788 F.Supp. 846, 853 (D.N.J.1992) ("the owned property exclusion does not apply to remedial measures ... that are designed to correct injury or to prevent further injury to" third party property); *Allstate Ins. Co. v. Quinn Construction Co.,* 713 F.Supp. 35, 40-1 (D.Mass.1989), *vacated as a result of settlement,* 784 F.Supp. 927 (D.Mass.1990) ("owned property" exclusion does not bar recovery of environmental cleanup costs when contamination poses a "demonstrated danger to the property of another"); *Hakim,* 424 Mass. at 279-80 ("owned property exclusion not relieve the insurer of all liability for response costs incurred by the cleanup of the policyholder's own property ... if the cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off-site property."); *Rubenstein v. Royal Ins. Co. of Amer .,* 44 Mass.App.Ct. 842, 854 (1998) (all

cleanup costs designed to remediate contamination of third party property covered even if the contaminating substances are solely on the insured's land).

*7 The adage "an ounce of prevention is worth a pound of cure" underlies the reasoning in these cases. *See, e.g., Quinn,* 713 F. Supp at 41. Because of the nature of groundwater contamination, it is generally only a matter of time before contaminants buried on the insured's property spread to surrounding properties. Therefore, coverage of environmental cleanup costs necessary to prevent or mitigate harm to third parties is consistent with the underlying purpose of CGL insurance to cover damage to other people's property. *Id.* Cleanup efforts directed solely at remediating harm to the insured's property are not, however, covered. *Hakim,* 424 Mass. at 282.

The environmental cases are merely analogous because the parties are generally agreed that the contamination constitutes property damage, but disagree over whether it amounts to " 'property damage to property owned by the insured," ' which is excluded. *See id .* at 279 & n. 6 (quoting policy). The Massachusetts Appeals Court has held that efforts to prevent property damage on others' property is recoverable even if no such damage has yet occurred. *Rubenstein,* 44 Mass.App.Ct. at 854. [FN12] Thus, by analogy, Amtrol's repair or replacement of its leaking HWMs is covered because it was designed to prevent water (property) damage even though the damage had not yet occurred.

> FN12. The SJC did not have to address this issue in *Hakim* because it was undisputed that the contamination had spread to waterways adjacent to the insured's property. 424 Mass. at 280 n. 8.

Defendants attack the analogy on several fronts. First, they argue that contexts unique to environmental damage reflect the strong public policy favoring prevention of environmental contamination and consequently are inapplicable in the instant setting. *See Quinn Construction,* 713 F.Supp. at 41 ("In the unique context of environmental contamination, where prevention can

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

be far more economical than post-incident cure ..."). The potential impact on surrounding property and the public at large justifies policies strongly promoting prompt remediation of environmental contamination, including strict liability rules under CERCLA and a narrow interpretation of the owned property exclusion in standard CGL policies. No such important policy concerns are at issue with respect to leaking boilers.

Amtrol contends that the policy construction does not depend on the source or type of property damage. It notes that the Maryland Court of Special Appeals, while acknowledging "the special context of environmental pollution cases," found the environmental cases applicable to a case involving water damage to third party property emanating from the insured's condominium. *Aetna Ins. Co. v. Aaron,* 112 Md.App. 472, 500 (1996). [FN13] However, *Aetna* dealt with the owned property exclusion, rather than the definition of property damage itself. Absent the strong policy considerations found in environmental contamination cases, I am reluctant to expand the definition of property damage to include costs incurred solely for the prevention of property damage where none had yet occurred. *See Aetna,* 112 Md.App. at 40 (property damage is a prerequisite to coverage of remediation costs).

> FN13. In *Aetna,* however, the court did not hold that prevention efforts are covered regardless of whether damage had already affected the third party. Rather, noting *W.M. Schlosser Co. v. Ins. Co. of N. Amer.,* a Maryland Court of Appeals decision holding that a CGL policy did not cover the costs expended purely to prevent imminent property damage where none had yet occurred, the *Aetna* court held that "as a predicate to coverage under a liability policy for remediation expenses incurred in connection with the insured's own property, ... the insured's property must first have caused damage to property owned or controlled by a third party." 112 Md.App. at 490.

*8 Furthermore, defendants argue that many of the environmental cases are distinguishable because the

insurer was immediately notified of the claim and therefore was able to participate in the development of remediation efforts. *See McNeilab, Inc. v. N. River Ins. Co.,* 645 F.Supp. 525, 554, n. 31 (distinguishing *Leebov v. United States Fidelity & Guar. Co.,* 401 Pa. 477 (1960)); *Banker's Trust Co. v. Hartford Accident & Indem. Co.,* 518 F.Supp. 371, 373 (S.D.N.Y.1981), *vacated on other grounds,* 621 F.Supp. 685 (S.D.N.Y.1981). Here, the defendants weren't notified of Amtrol's claim until February 1999, even though Amtrol began repairing and replacing leaking units in April 1996. [FN14] This lack of notice highlights another distinction made by the defendants--that the costs of repair and replacement of faulty HWMs were incurred because of the plaintiff's warranty program and not directly because of an interest in mitigating property damage or reducing their liability. *See McNeilab,* 645 F.Supp. at 536. Although interpreting slightly different language, [FN15] the *McNeilab* court found that the insured's intent behind a remedial action "is crucial" for determining coverage. [FN16] *Id.* It is hard on these facts to say that Amtrol undertook the repair and/or replacement of leaking units because of its liability for property damage. Rather, Amtrol was under an independent duty under the warranty to repair or replace the unit if it leaked, regardless of whether the leak caused property damage. [FN17]

> FN14. The Policies provide that the insured "must see to it that [the insurer is] notified as soon as practicable of an 'occurrence' or an offense which may result in a 'claim." ' Policies, § IV.1. In order for an insurance company to avoid liability on the ground that the insured delayed in giving notice of a claim, the insurer must show that it was prejudiced by the delay. *See Johnson Controls, Inc. v. Bowes,* 381 Mass. 278, 282 (1980); Mass. Gen. Laws ch. 175, § 112.

> FN15. The CGL policy at issue in *McNeilab* provided that the insurer "agrees ... to indemnify the insured for all Sums which the shall be obligated by reason of the liability (a) imposed upon the insured by law, or (b) assumed under contract or agreement ... for damages on account

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

of—(i) Personal Injuries (ii) Property Damage (iii) Advertising Liability ..." 645 F.Supp. at 528.

FN16. *McNeilab* involved coverage of recall expenses following the Tylenol deaths in Chicago in the early 1980s. The court found that the insured's motivation for recall was not mitigation of existing liability but rather prevention of future deaths and reassurance of the public. 645 F.Supp. at 536

FN17. Of course, the fact that Amtrol had an independent warranty duty to repair the leaking HWMs does not mean that it did not also take these steps in the interest of reducing liability for water damage. Certainly, the prompt repair or replacement of the faulty HWMs limited Amtrol's exposure for water damage loss. However, the fact that Amtrol did not make a claim to its insurers for three years during which it was replacing faulty units under its warranty suggests that concern about liability for property damage was not Amtrol's principal motivation for action. *See McNeilab,* 645 F.Supp. at 536.

Finally, there is a competing interest in limiting the coverage under the CGL policy to its tort liability and not covering all of Amtrol's business risks. As discussed in part A, CGL policies are not designed to cover the costs of repair and replacement of poorly made products. Rather, CGL policies cover the potential liability of harm to property or person caused by a faulty product. *See Traveler's Ins.,* 197 Ill.2d at 314. The vast majority of the damages incurred by Amtrol were for repair and replacement costs, a form of first party liability that CGL policies are not designed to cover. *See id.* While reimbursement for such first party liability may be acceptable when the product causes actual third party damage, it stretches the analogy too far to allow coverage based on the prevention of potential property damage caused by a leaking HWM. *See McNeilab,* 645 F.Supp. at 538 (quoting *Alcorn Bank & Trust Co. v. United States Fid. & Guar. Co.,* 705 F .2d 128, 130, ("This distinction between first

party losses and third party damage claims is generally recognized").

For these reasons, I find that the policy covers only the costs associated with HWMs for which actual water damage can be shown. Therefore, the costs of repairing HWMs for the purpose of preventing future water damage are not covered.

C. Exclusions

Defendants claim that the repair and replacement costs to the HWMs are excluded under several policy exclusions, including (k) product damage exclusion, (m) impaired property exclusion, and (n) sistership exclusion.

**\*9** Exclusions such as k and m are known as "business risk" exclusions.
  These exclusions are all premised on the theory that liability policies are not intended to provide protection against the insured's own faulty workmanship or product, which are normal risks associated with the conduct of the insured's business. Rather the policies are meant to afford coverage to other property caused by the insured's work or product.
*United States Fidelity & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 81-82 (1991).
  Such "business risks" have been described as those "which management can should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and risks which relate to the repair or replacement of faulty work or products. These risks are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others."
*Dorchester Mut. Fire Ins. Co. v. First Kostas Corp., Inc.,* 49 Mass.App.Ct. 651, 654-55 (2000) (quoting *Sterilite Corp. v. Continental Cas. Co.,* 17 Mass.App.Ct. 316, 321-33 (1983)). *See Weedo v. Stone-E-Brick, Inc.,* 81 N.J. 233, 239-40 (1979) (discussing distinction between business risks and liability risks, noting the former are not covered by CGL policies).

I find that exclusion k applies to the costs of repair or replacement of the HWMs. Amtrol asserts that the leak in the HWM is not damage to the HWM

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 31194863 (D.Mass.))**

because it can continue to perform its essential function of heating the water. However, I view this characterization as perverse. The leak stems from a failure of the HWM's coil system. This failure, which is the subject of a specific warranty, constitutes damage to the HWM, at least insofar as the HWM has lost value due to the leak, but more so because its leakage constitutes a failure to function properly. "Repairing or replacing faulty products is a business expense, ordinarily to be borne by the insured...." *Commerce Ins. Co. v. Betty Caplete Builders, Inc.*, 420 Mass. 87, 92 (1997). "The purpose of the [products] exclusion is to prevent the insured from using its product liability coverage as a form of property insurance to cover the cost of repairing or replacing its own defective products or work." *Id.*

Amtrol argues that the product exclusion is not applicable where there is also damage to third party property. However, the case it cites, *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, stands only for the proposition that the health risks attendant to the use of asbestos insulation are not excluded as property damage resulting from failure of the product to perform as warranted. Here, as in *Wilkin,* damage to third party property or persons are covered, but the damage to or cost of repairing/replacing the product itself is not. This is consistent with the general proposition that CGL policies do not cover damages for breach of contract warranties. *See Weedo*, 81 N.J. at 239- 40. The repair of the HWMs is an economic loss and a business expense for Amtrol, one it incurred as the result of a contractual liability pursuant to its warranty obligations. *See id.; American Home Assurance Co. v. Libbey-Owens-Ford Co.,* 786 F.2d 22, 27 (1st Cir.1986) (dicta stating that product exclusion bars cost of repair of faulty windows notwithstanding coverage of consequential damages due to property damage); *Lowville Producer's Dairy Cooperative, Inc. v. Am. Motorists Ins. Co.,* 604 N.Y.S.2d 421, 422 (1993) (covering damage to other property while excluding damage to product itself). Thus, for individual claims where Amtrol can prove property damage, the costs of repair and replacement of the HWMs are excluded from coverage.

*\*10* I find the impaired property exclusion largely irrelevant. It excludes property damage including loss of use claims to impaired property defined as "tangible property other than 'your product' ... that cannot be used or is less useful because: a) it incorporates your product ... that is known or thought to be defective, deficient, inadequate or dangerous ..." Policies, §§ I.A.2.m, V.7(a). Amtrol does not allege recovery of damages based on the loss of use of property due to the malfunctioning of the HWMs.

I find that the sistership exclusion (n), though perhaps applicable, duplicative in its exclusion of the repair/replacement costs of HWMs. The sistership exclusion only applies " 'in cases where, because of the actual failure of the insured's product, similar products are withdrawn from use to prevent the failure of these other products, which have not yet failed but are suspected of containing the same defect." ' *Wilkin Insulation*, 144 Ill.2d at 81 (quoting *Honeycomb Systems, Inc. v. Admiral Ins. Co.,* 567 F.Supp. 1400, 1406 (D.Me.1983)). It does not apply when the product has already failed and caused property damage.

Amtrol asserts that it did not institute a general recall of the affected units and that only HWMs with leaks were repaired or replaced. However, defendants contend that eight non-leaking units were replaced along with eight leaking units at the Natick Housing Authority. Having determined that the costs of repair and replacement to faulty HWMs are not recoverable under exclusion k, I find that the cost of replacing any non-leaking HWMs due to the existence of other leaking HWMs to be excluded under the sistership exclusion.

Finally, defendants contend that coverage of costs prior to notification of the insurers is barred by the prohibition of voluntary payments provision. *See* Policies, § IV.2.d. [FN18] In order for an insurer to deny coverage based on the voluntary payments provision, it must be able to establish that it was prejudiced. *Sarnafil, Inc. v. Peerless Ins. Co.,* 418 Mass. 295, 305 (1994) (citing *Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 122-23 (1991)); *Employers' Liab. Assurance Corp. v. Hoechst Celanese Corp.,* 43 Mass.App.Ct. 465, 481 (1997). In *Augat,* the SJC held that prejudice had been established on the facts of the case because the insured had entered into a settlement agreement without notifying the insurer, thus denying the insurer any ability to protect its interests. *Id.* (citing *Augat,* 410 Mass. at 122). The facts here are

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

different; the insurers must establish that Amtrol's payments and repair/replacement costs prior to notification in 1999 actually caused them prejudice. Without more on this record, I find that the issue is a matter of disputed fact ripe for determination by a jury. *Id.*

> FN18. The provision provides: "No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### D. Settlement Costs

Tudor contends that none of the settlement costs are covered because they were not incurred because of property damage. I agree. The claims alleged in the complaint were for breach of warranty, negligence, and unfair and deceptive trade practices. There were no specific allegations in the complaint of property damage sustained by the named plaintiffs. Moreover, the terms of the settlement agreement include payments to the named plaintiffs who are installers rather than owners of HWMs, payments to an association of contractors, reimbursement of legal fees, and the institution of an extended warranty program through June 8, 2002 for Affected Units. None of these terms directly address property damage since the only damage payments go to contractors who spent time repairing HWMs, but did not directly suffer property damage nor were they required to make their repairs as a result of property damage caused by the HWMs. Therefore, I grant summary judgment on Tudor's third counterclaim declaring that it had no duty to indemnify Amtrol for its settlement costs.

### E. Defense Costs

**\*11** Amtrol seeks summary judgment that defendants have breached their insurance contracts by failure to pay their share of plaintiff's defense costs. Defendants do not dispute that they had a duty to defend Amtrol in the underlying action and that they have not made payment of any reimbursement for legal fees. However, there remain factual disputes as to the appropriate way to calculate the amount of defense costs owed by each

defendant. For example, there are factual disputes over the rate of hourly compensation, over whether Tudor is obligated to reimburse legal fees incurred prior to May 3, 1999, and over how to calculate the amount owed in light of Tudor's self-insured retention and Wausau's method of reimbursement. Therefore, summary judgment is not appropriate.

### V. Mass. Gen. Laws ch. 93A (Count III and IV)

Amtrol seeks summary judgment on counts III and IV contending that defendants violated Mass. Gen. Laws ch. 93A, §§ 9 and 11 by, among other things, refusing to provide reasonable explanation of the legal basis for their denial of coverage, *see* Mass. Gen. Laws ch. 176D, § 3(9)(n), and by failing to pay or credit undisputed costs, *see* Mass. Gen. Laws ch. 176D, § 3(9)(f).

Tudor argues that Ch. 93A, § 11 is not available as a cause of action because the underlying practice or act did not occur "primarily and substantially within the Commonwealth." Mass. Gen. Laws ch. 93A, § 11. In *Bushkin Assoc.*, the SJC determined that relief under ch. 93A was not available to the plaintiff, even though Massachusetts law applied to the dispute, because the alleged deceptive acts did not take place in Massachusetts. 393 Mass. at 638. In making this determination the court considered 1) where the deceptive statements were made, 2) where they were received, and 3) the site of the loss. *Id.* However, Massachusetts federal courts have since refined the *Bushkin Assoc.'* s "place of injury" test, and instead opted for either a "place of conduct" analysis or a "functional approach." *Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd.,* 870 F.Supp. 1153, 1166. (*Compare Goldstein Oil Co. v. C.K. Smith Co.,* 20 Mass.App.Ct. 243, 479 N.E.2d 728, 731 n. 7 (Mass.App.Ct.) ("place of conduct"), *with Makino, U.S.A. v. Metlife Capital Credit Corp.,* 25 Mass.App.Ct. 302, 518 N.E.2d 519, 523 (Mass.App.Ct., 1988) ("functional approach.")) Judge Stearns has elaborated the following ten factors as bearing on the "primarily and substantially analysis" in a ch. 93A case involving a contract:

> (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the domicile, residence, nationality, place of incorporation and place of business of the parties; (6) where the defendant

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 31194863 (D.Mass.))

Page 12

committed the alleged deceptive or unfair acts or practices; (7) the location of the plaintiff when the plaintiff acted upon the alleged deceptive or unfair statements; and (8) the situs of the plaintiff's loss ... and (9) whether the underlying contract is to be governed by and interpreted in accordance with Massachusetts law, and (10) whether the parties to the underlying contract agreed to submit all contract disputes to Massachusetts (state and federal) courts.
*12 *Citicorp North America v. Ogden Martin Sys.,* 8 F.Supp.2d 72, 81 (D.Mass.1998).

In the instant case, the allegedly deceptive practices include failure to provide a reasonable explanation of defendants' refusal to cover the claim and failure to effectuate a prompt settlement of undisputed claims. Applying the ten factors listed above, I note that fewer than half of the factors support finding that the actions took place primarily and substantially in Massachusetts. The insurance contracts were neither negotiated, signed, nor performed in Massachusetts. None of the parties are incorporated or reside in Massachusetts. The alleged unfair statements were made outside of Massachusetts as the agents of both defendants who were responsible for handling the claims were not located in Massachusetts. [FN19] Furthermore, any loss must have occurred in Rhode Island where Amtrol has its primary place of business. While the subject of the dispute is located primarily in Massachusetts, and Massachusetts law and courts are applicable in the dispute, these factors are insufficient to support a § 11 ch. 93A claim. I note that the plaintiff has made no compelling argument to support finding that the acts took place primarily in Massachusetts, and therefore deny summary judgment for plaintiff on its 93A claims.

> FN19. The Wausau agent is located in New York while the Tudor agent is located in New Jersey.

Plaintiff, however, alternatively asserts his claims pursuant to § 9 of Mass. Gen. Laws ch. 93A which does not contain the same location requirement. Defendant Wausau contends that this avenue is not available to a business entity because it is only "entitled to bring action under § 11 of this chapter." *See* Mass. Gen. Laws ch. 176D, § 9(1). The SJC has

not yet determined whether a person entitled to bring an action pursuant to § 11 of ch. 93A can also bring an action pursuant to § 9 based on a violation of ch. 176D, § 3(9), i.e. unfair settlement practices. *See Kiewit Constr. Co. v. Westchester Fire Ins. Co.,* 878 F.Supp. 298, 301 (D.Mass.1995). However, based on the plain language of the statute, I believe it is clear that entities which may bring a § 11 action are not precluded from bringing a § 9 action for unfair settlement practices. [FN20] The absence of the limiting phrase "other than a person entitled to bring action under section 11" following the second "any person" in § 9 makes clear that the people eligible to bring an unfair settlement practices claim under § 9 includes non-consumers.

> FN20. The relevant language of § 9 provides:
> Any person, other than a person entitled to bring action under § 11 of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful ... or *any person* whose rights are affected by another person violating the provisions of ch. 176D, § 9(3) may bring an action...." Mass. Gen. Laws ch. 176D, § 9(1) (emphasis supplied).

Amtrol's claim that the defendants failed to provide a reasonable explanation of its legal basis for denying coverage is, however, unavailing. Amtrol makes issue of the fact that defendants did not cite case law in support of their positions despite plaintiff's abundant inclusion of case law in its correspondence. I note, however, that both defendants promptly and thoroughly explained their positions with respect to coverage of the disputed claims, reimbursement of attorneys fees, and other issues. On this record, I am satisfied that defendants were not unreasonable as a matter of law in the substance of their explanation of their legal and factual position with respect to coverage under their respective policies.

*13 Amtrol's claim that the defendants failed to effectuate a prompt settlement of a claim when liability is undisputed also fails. Amtrol argues that with respect to the defendants' duty to defend the lawsuit at a blended rate of $130/hr. liability is clear

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

yet defendants have failed to make payment on this sum. Amtrol's presentation overlooks defendants' arguably valid objections to immediate payment. Wausau's October 17, 2000 letter to Amtrol's counsel suggests that there is a dispute over the application of annual reimbursement limits under the policy as well as the method for payment of legal expenses. (Stips.Ex. 16) I cannot say as a matter of law that these objections are meritless. With respect to Tudor, it has made an offer to reimburse legal expenses under the agreed upon structure subject to its position that it is not liable for fees pre-May 3, 1999 and that the self-insured retention obligation of $100,000 applies to its share of the legal expenses. (Tudor 9/21/00 letter, Stips. Ex. 24). In addition, Tudor offers to reimburse plaintiff at Foley Hoag's higher rates and to credit pre-May 3 expenses. (*Id.*) These offers of compromise appear to be in good faith and are sufficient to create a material issue of fact under ch. 176D.

### CONCLUSION

For the reasons set forth more fully above, I hereby DENY Plaintiff's motion for partial summary judgment. I GRANT Tudor's motion for summary judgment on its third and fifth counterclaims. I DENY Tudor's and Wausau's motion for summary judgment with respect to Count I (breach of contract) based on the existence of a disputed fact as to the amount of third party property damage, if any, for which the defendants are liable.

2002 WL 31194863 (D.Mass.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works