# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 04 10351 NG**

| |
|---|
| **KLEENIT, INC.,**<br>        **Plaintiffs**<br><br>**v.**<br><br>**SENTRY INSURANCE COMPANY,**<br>**ROYAL & SUN ALLIANCE, UTICA**<br>**NATIONAL INSURANCE GROUP, and**<br>**TRAVELERS PROPERTY AND**<br>**CASUALTY,**<br>        **Defendants** |

**EXHIBITS TO AFFIDAVIT OF DONALD P. NAGLE, ESQUIRE**
**IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

# TAB 1



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
Metropolitan Boston – Northeast Regional Office

ARGEO PAUL CELLUCCI
Governor

JANE SWIFT
Lieutenant Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

JAN 2 . 2001

Received
1/31/01

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Kleenit, Inc.
44 Park Street
Ayer, MA 01432

Attn: Mr. Keith Crider

RE:    CHELMSFORD-Care Cleaners, Inc.
28 Central Square
RTN #3-20316
RELEASE NOTIFICATION
NOTICE OF RESPONSIBILITY;
NOTICE OF NEED TO CONDUCT IRA;
DESIGNATION OF INTERIM DEADLINES
M.G.L. c. 21E & 310 CMR 40.0000

Dear Mr. Crider:

The Department of Environmental Protection (DEP) has determined that a release of hazardous materials has occurred at the subject site, which extends to the 34 Central Square property and Beaver Brook, and requires the initiation of one or more Immediate Response Actions as described in Section 310 CMR 40.0410 of the Massachusetts Contingency Plan (the MCP). DEP has also determined that Kleenit, Inc. is a Potentially Responsible Party (PRP) pursuant to Massachusetts General Law, Chapter 21E (M.G.L. c. 21E), and the MCP. Attached to this letter is a fact sheet discussing the liability provisions of M.G.L. c. 21E. Please refer to the statute for a complete discussion of these provisions. You may undertake the necessary Immediate Response Actions provided that you engage the services of a Licensed Site Professional to prepare and submit an Immediate Response Action Plan in accordance with 310 CMR 40.0410 and the provisions of this letter.

BACKGROUND

Earliest records indicate that in 1979, the Town of Chelmsford's Turnpike Road municipal supply well was sampled for the first time for volatile organic compound's (VOC's) by the Town's Water Department. At that time, the chlorinated VOC's trichloroethene (TCE) and perchloroethene (PCE) were detected in the supply well water at concentrations of 1.40 micrograms per liter (ug/l) and 0.40 ug/l, respectively. Since the 1979 VOC sampling round, PCE, TCE, and additional chlorinated VOCs have continued to be sporadically detected in the supply well water, similar to the 1979 levels. The Federal and State Safe Drinking Water Standards/Guidelines is 5.0 ug/l for both TCE and PCE.

This information is available in alternate format by calling our ADA Coordinator at (617) 574-6872.

205A Lowell St. Wilmington, MA 01887 • Phone (978) 661-7600 • Fax (978) 661-7615 • TTD# (978) 661-7679
♻ Printed on Recycled Paper

CHELMSFORD-28 Central Square
Need to Conduct Immediate Response Actions

In March 2000, DEP's Site Discovery group (DEP/SD) began conducting an investigation within the Turnpike Road wellfield in order to locate the source of the chlorinated VOC contamination. In August 2000, DEP/SD installed six driven wellpoints (DEP-11 through DEP-16) at locations along Beaver Brook to depths below the streambed. During that time, groundwater samples were collected from the wellpoints and screened for VOCs at DEP's Northeast Regional Office (NERO Lab). Results of the Beaver Brook sampling identified PCE in samples collected from wellpoints DEP-16 and DEP-12 at estimated concentrations of 246 ug/l and 2015 ug/l, respectively. Wellpoint DEP-16 is located to the northeast of the 34 Central Square property. Wellpoint DEP-12 is located approximately 300 feet southeast and downstream of DEP-16. Follow-up surface water samples were also collected from Beaver Brook within the vicinity of the driven wellpoints and found to contain PCE as high as 2.8 ug/l and other chlorinated VOCs at similar levels.

DEP/SD has also reviewed information on file for the Care Cleaners site (RTN: 3-2739). According to information on file, historic releases of chlorinated VOCs similar to those identified during DEP/SD's Beaver Brook investigation occurred at the Care Cleaners site. The site is located approximately 300 feet to the southwest and upgradient of wellpoint DEP-16. The most recent groundwater quality results on file with DEP for the site was from assessment work conducted in March 1997. At that time, PCE and the breakdown product TCE were reported in groundwater sampled from on-site monitoring wells at concentrations as high as 150 ug/l and 27 ug/l, respectively. Additional PCE breakdown products such as cis(1,2)-dichloroethene and vinyl chloride were also identified during this sampling round at concentrations as high as 1800 ug/l and 350 ug/l, respectively. A possible source of the chlorinated VOC contamination was previously identified as the former sanitary system. To date, DEP is not aware of any remedial response actions which have taken place at this portion of the site.

## NECESSARY RESPONSE ACTIONS

Based on the above information, DEP has determined that a Condition of Substantial Release Migration (SRM), as described in 310 CMR 40.0006, exists at the subject site. Pursuant to 310 CMR 40.0412(3), Immediate Response Actions shall be conducted at sites where a condition of SRM has been identified. You, as a Potentially Responsible Party for this release, may undertake the necessary Immediate Response Actions at this site in lieu of DEP provided that you submit to this Office, within sixty (60) days from the date of this letter:

1) a Release Notification Form pursuant to 310 CMR 40.0333,

2) an Immediate Response Action Plan prepared in accordance with 310 CMR 40.0424. At a minimum, the Immediate Response Action Plan must include details on assessment activities to be undertaken in determining the required mitigation and/or remedial actions regarding this SRM, and;

3) a timetable for the implementation of the Immediate Response Action.

If you intend to undertake the necessary Immediate Response Actions at this site, you must notify Mr. Kyle MacAfee of DEP's Northeast Regional Office [(978) 661-7690] of such an intent by no later than 5:00 p.m. on February 6, 2001 . If you fail to provide this notice and to voluntarily undertake the response action(s) necessary at the subject site within the time periods established herein, DEP

may perform such response actions and seek to recover its costs and/or may initiate other appropriate enforcement actions to ensure that such response actions are conducted.

DEP encourages parties with liabilities under M.G.L. c. 21E to take prompt action in response to releases and threats of release of oil and/or hazardous material. By taking prompt action, you may significantly lower your assessment and cleanup costs and avoid the imposition of, or reduce the amount of, certain permit and annual compliance fees for response actions payable under 310 CMR 4.00.

If you have any questions concerning the content of this letter, please contact Mr. Kyle MacAfee at the letterhead address or at (978) 661-7690. All future communications regarding this release must reference the Release Tracking Number provided in the subject heading of this letter.

Very truly yours,

Iris W. Davis
Section Chief
Permits/Risk Reduction

cc:    DEP/NERO/WS Attn: Mr. James Persky
       DEP/BOSTON/BWSC SD Attn: Mr. John Hamilton
       DEP/NERO/BWSC RR Attn: Mr. Kyle MacAfee
       Town of Chelmsford Water Department-Central Water District, 20 Watershed Lane,
            Chelmsford, MA 01824 Attn: Superintendant Robert Doak
       Town Of Chelmsford-Board Of Health, Town Offices, 50 Billerica Road, Chelmsford, MA
            01824 Attn: Health Agent
       Town of Chelmsford-Community Development Coordinator, Town Offices, 50 Billerica Road,
            Chelmsford, MA 01824 Attn: Andrew J. Sheehan
       BR Trust c/o Ms. Sandra Jenkins, 15 Indian Ridge, West Newbury, MA 01985
       D'Amore Associates, Inc., 148 Tonakin Road, Lancaster, MA 01523
            Attn: Mr. Dennis D'Amore

       DEP data entry/file

       Attachment: Release Notification Form; BWSC - 103

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 04 10351 NG**

**KLEENIT, INC.,**
    **Plaintiffs**

**v.**

**SENTRY INSURANCE COMPANY, ROYAL & SUN ALLIANCE, UTICA NATIONAL INSURANCE GROUP, and TRAVELERS PROPERTY AND CASUALTY,**
    **Defendants**

<u>**EXHIBITS TO AFFIDAVIT OF DONALD P. NAGLE, ESQUIRE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

# <u>TAB 2</u>



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
Central Regional Office. 627 Main Street. Worcester. MA 01608

JANE M. SWIFT
Governor

BOB DURAND
Secretary

LAUREN A. LISS
Commissioner

### URGENT LEGAL MATTER: PROMPT ACTION NECESSARY       DEC 30 2002

Kleenit, Inc.
d/b/a Dud's Cleaners & Launderers
44 Park Street
Ayer, MA 01432

RE: CRWSC-Acton
293 Main Street
Dud's Dry Cleaners

Attention:  Keith Crider
President

RTN 2-14526

### NOTICE OF RESPONSIBILITY
### 120-DAY NOTIFICATION
### M.G.L. C. 21E. 310 CMR 40.0000

Dear Mr. Crider:

Thank you for submitting the Release Notification Form (RNF) to the Department of Environmental Protection, Bureau of Waste Site Cleanup (the Department) on October 29, 2002. Your submittal presents the Department with information that the property at 293 Main Street, Acton, MA, has been subject to a release of hazardous materials, Tetrachloroethylene or dry cleaning fluid also known by the common name. Perc. According to the RNF the release has resulted in the presence of Tetrachloroethylene in the soil at concentrations that exceed the applicable Reportable Concentrations (RC). Based on this information, the Department has determined that the property, or portions thereof, is a disposal site that requires a response action.

The Massachusetts Oil and Hazardous Material Release Prevention and Response Act, M.G.L. c. 21E, which is implemented through regulations promulgated by the Department, governs the cleanup of disposal sites. These regulations are referred to as the Massachusetts Contingency Plan, (the MCP), and are codified at 310 CMR 40.0000. The Department wishes to ensure that you are aware of your rights and responsibilities under M.G.L. c. 21E and the MCP.

In your submittal, you (as used in this notice, "you" refers to Kleenit, Inc. d/b/a Dud's Cleaners & Launderers) identify yourself as the operator of Dud's Cleaners and Launderers and as a party with potential liability for response action costs and damages under M.G.L. c. 21E, §5. This notice and the attached summary are intended to provide you with information about

This information is available in alternate format. Call Aprel McCabe ADA Coordinator at (617) 556-2788

http://www.state.ma.us/dep • Phone (508) 792-7650 • Fax (508) 792-7621 • TDD # (508) 767-2788
Printed on Recycled P

NOTICE OF RESPONSIBILTY                    RTN 2-14526

2

liability under Chapter 21E to assist you in deciding what actions to take in response to the conditions that are present at this disposal site.

The Department has determined that there are two potentially responsible parties with respect to this release: 1) you, the operator of the property and, 2) E&A Northeast Limited Partnership, the property owner.  The Department requests that the two parties determine amongst themselves how to allocate responsibility for the necessary response actions at the site.

You should be aware that you might have claims against third parties for damages, including claims for contribution or reimbursement for the costs of cleanup.  Such claims do not exist indefinitely but are governed by laws that establish the time allowed for bringing litigation.  The Department encourages you to take any action necessary to protect any such claims you may have against third parties.

## BACKGROUND

On October 29, 2002, the Department received a RNF from you for a release of Tetrachloroethylene or Perc to the property at 293 Main Street, Acton.  The RNF reports the presence of Tetrachloroethylene in the soil at a concentration level that exceeds the applicable RC identified in the RNF.  The concentration level reported in the RNF is summarized in parts million (ppm) and compared to the soil reportable concentrations below.

| OHM Released | SOIL Concentration (ppm) | RCS-1 (ppm) |
|---|---|---|
| Tetrachloroethylene | 160 | 0.5 |

The Department has assigned Release Tracking Number (RTN) 2-14526 to the disposal site.  The Department has no information regarding further actions taken or proposed for this disposal site.

## NECESSARY RESPONSE ACTIONS AND APPLICABLE DEADLINES

October 29, 2002 is the date of release notification for RTN 2-14526.  Unless otherwise stated, this date will be the baseline for calculating compliance of this disposal site with the deadlines contained in the MCP.

No disposal site will be deemed to have had all the necessary and required response actions taken for it unless and until all substantial hazards presented by the release and/or threat of release have been eliminated and a level of no significant risk exists or has been achieved in compliance with the MCP. The MCP requires persons undertaking response actions at a disposal site to submit to the Department a Response Action Outcome (RAO) Statement prepared by a Licensed Site Professional upon determining that a level of no significant risk exists or has been achieved at the disposal site.  A fee of $750.00 is assessed if an RAO is filed 120 days after release notification, but before Tier Classification.  Therefore, if all remediation work has been completed, you are encouraged to have the RAO submitted promptly to avoid the fee.

NOTICE OF RESPONSIBILTY                    RTN 2-14526

3

Unless otherwise provided by the Department, responsible parties have one year from the initial date notice of a release or threat of release is provided to the Department pursuant to 310 CMR 40.0300 or from the date the Department issues a Notice of Responsibility, whichever occurs earlier, to file with the Department one of the following submittals: (1) a completed Tier Classification Submittal; or (2) a Response Action Outcome Statement. If required by the MCP, a completed Tier I Permit Application must also accompany a Tier Classification Submittal. Unless otherwise specified by the Department, the deadline for these submittals for this disposal site is October 29, 2003.

The MCP requires responsible parties and any other person undertaking response actions to perform Immediate Response Actions in response to sudden releases, Imminent Hazards and Conditions of Substantial Release Migration. Such persons must continue to evaluate the need for Immediate Response Actions and notify the Department immediately if such a need exists.

## PROCEDURES TO FOLLOW TO UNDERTAKE RESPONSE ACTIONS

The Department encourages parties having liability under M.G.L. c. 21E to take prompt action in response to releases and threats of release of oil and hazardous materials. By taking prompt action, liable parties may significantly lower cleanup costs and avoid the imposition of, or reduce the amount of, certain permit and/or annual compliance assurance fees payable under 310 CMR 4.00.

You must continue to employ or engage a Licensed Site Professional (LSP) to manage, supervise or perform all response actions that you intend to undertake at this disposal site. You may obtain a list of the names and addresses of LSPs by visiting www.mass.gov/lsp, by contacting the Board of Registration of Hazardous Waste Site Cleanup Professionals by telephone at (617) 556-1091, or in person or by mail at One Winter Street, 10th Floor, Boston, Massachusetts 02108.

NOTICE OF RESPONSIBILTY                    RTN 2-14526

4

If you have any questions, please contact the Central Regional Office at the letterhead address or at 508-792-7653. The Department requests that you inform your LSP of this Notice. All future correspondence and communications regarding the disposal site should reference RTN 2-14526.

Sincerely,

DEC 30 2002

Frank Sciannameo
Section Chief
Bureau of Waste Site Cleanup

FS\PAS
[ NOR/ISSUED ]
Enclosure
La

cc:    Acton Board of Health
       Lisa Feagain, E&A Northeast Limited Partnership, 360 Newbury Street, Boston, MA 02115
       Mark Germano, LSP, Coler & Colantonio, Inc., 101 Accord Park Drive, Norwell, MA 02061
       Database Entry
       File

       C:\WINNT\NORs2002\2-14526ActonKleeitIncnoperatoror.doc

NOTICE OF RESPONSIBILTY                    RTN 2-14526

5

## SUMMARY OF LIABILITY UNDER CHAPTER 21E

As stated in the Notice of Responsibility accompanying this summary, the Department has reason to believe that you are a Potentially Responsible Party ("PRP") with potential liability under M.G.L. c. 21E, section 5, for response action costs and damages to natural resources caused by the release and/or threat of release. The Department has identified you as a PRP because it believes you fall within one or more of the following categories of persons made potentially liable by subsection 5(a):

- any current owner or operator of a site from or at which there is or has been a release or threat of release of oil and/or hazardous material;
- any person who owned or operated a site at the time hazardous material was stored or disposed of;
- any person who arranged for the transport, disposal, storage or treatment of hazardous material to or at a site;
- any person who transported hazardous material to a transport, disposal, storage or treatment site from which there is or has been a release or threat of release of such material; and
- any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material at a site.

For purposes of the MCP, you are considered a Responsible Party ("RP") with actual liability under Chapter 21E if you fall within one of these categories unless you (1) are entitled to a defense under section 5 or other applicable law, and (2) have reasonably incurred cleanup costs in an amount equal to or greater than any applicable cap on liability under subsection 5(d).

This liability is "strict," meaning it is not based on fault, but solely on your status as an owner, operator, generator, transporter or disposer. It is also joint and several, meaning that each person who falls within one of these categories may be held liable for all response action costs incurred at the site, regardless of the existence of any other liable parties.

Section 5 provides a few narrowly drawn defenses to liability, including a defense for releases and damages caused by an act of God, an act of war or an act by a third party other than an employee, agent or person with whom the party has a contractual relationship (see subsection 5(c)); a defense for certain owners of residential property at which the owner maintains a permanent residence (see subsection 5(h)); and a defense for certain public utilities and agencies of the Commonwealth which own a right-of-way that is a site (see subsection 5(j)).

You may voluntarily undertake response actions under the MCP without having your liability under Chapter 21E formally adjudicated by the Department. If you do not take the necessary response actions, or fail to perform them in an appropriate and timely manner, the Department is authorized by Chapter 21E to perform the necessary work.

By taking the necessary response actions, you can avoid liability for response action costs incurred by the Department in performing these actions.. If you are an RP and you fail to perform necessary response actions at the site, you may be held liable for up to three (3) times all response action costs incurred by the Department and sanctions may be imposed on you for failure to perform response actions required by the MCP.

Response action costs include, without limitation, the cost of direct hours spent by Department employees arranging for response actions or overseeing work performed by persons other than the Department or its contractors, expenses incurred by the Department in support of those direct hours, and payments to the Department's contractors (for more detail on cost liability, see 310 CMR 40.1200: Cost Recovery). The Department may also assess interest on costs incurred at the rate of twelve percent (12%), compounded annually.

Any liability to the Commonwealth under Chapter 21E constitutes a debt to the Commonwealth. To secure payment of this debt, the Department may place liens on all of your property in the Commonwealth under M.G.L. c. 21E, section 13. To recover this debt, the Commonwealth may foreclose on these liens or the Attorney General may bring legal action against you.

In addition to your potential liability for response action costs and damages to natural resources caused by the release, civil and criminal liability may also be imposed by a court of competent jurisdiction under M.G.L. c. 21E, section 11, and civil administrative penalties may be assessed by the Department under M.G.L. c. 21A, section 16, for each violation of Chapter 21E, the MCP or any order, permit or approval issued thereunder.

If you are an RP and you have reason to believe that your performance of the necessary response actions is beyond your technical, financial or legal ability, you should promptly notify the Department in writing of your inability in accordance with Chapter ..., subsection 5(e), and 310 CMR 40.0172. If you assert and demonstrate in compliance therewith that performing or paying for such response action is beyond your ability, subsection 5(e) provides you with a limited defense to an action by the Commonwealth for recovery of two to three times the Department's response action costs and 310 CMR 40.0172 provides you with a limited defense to the Department's assessment of civil administrative penalties.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04 10351 NG

KLEENIT, INC.,
     **Plaintiffs**

v.

SENTRY INSURANCE COMPANY,
ROYAL & SUN ALLIANCE, UTICA
NATIONAL INSURANCE GROUP, and
TRAVELERS PROPERTY AND
CASUALTY,
     **Defendants**

### EXHIBITS TO AFFIDAVIT OF DONALD P. NAGLE, ESQUIRE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TAB 3

Prepaid Insurance                              JUN 3 0 1984

| | | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|---|
| 1 | Utica Mutual Ins Co. | FMP 4946 | P | Cal | SMP | Str up | 50700 |
| 2 | | | | | | end | 500 |
| 3 | | | | | | Blanket Boiler | |
| 4 | | | | | | Blanket Bldg | 900000 |
| 5 | | | | | | Furniture | 50000 |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | Ins Co. of NA. | 209582 | P | | 8/ | | |
| 12 | | | | | | | |
| 13 | Travelers Ins Co. | 366 8999 | P | | Blanket Boiler | | 250 |
| 14 | | | | | | | |
| 15 | Travelers Indemnity Co. | SAF569A166 | P | | Fleet | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | Utica Mutual Ins. Co. | LU 6406 | P | | Umbrella Liability | | |
| 19 | | | | | | | |
| 20 | Excelsior Ins Co. | 1754356 | P | | 42 Park St | | |
| 21 | | | | | | | |
| 22 | Globe Indemnity Co. | 1026243 | P | | Pollution Lib | | 1967 |
| 23 | | | | | | | |
| 24 | Utica Mutual Ins Co | 227161 | P | | W/C | DC 559700 X 3.91 | |
| 25 | | | | | | Str 164500 X 3.21 | |
| 26 | | | | | | Fire 79200 X 1.66 | |
| 27 | | | | | | Off 86700 X .24 | |
| 28 | | | | | | Exp Adj 17 | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | | | | |
| 34 | | | | | | | |
| 35 | | | | | | | 4040 |
| 36 | | | | | | | |
| 37 | | | | | | | |
| 38 | | | | | | | |
| 39 | | | | | | | |
| 40 | | | | | | | |

KLEENIT INC.
AYER. MASS.

Prepaid Insurance — JUN 29 1985

| Prepared By | |
|---|---|
| Approved By | |

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Globe Indemnity Co. | D364785 | Coll. Pol. | SMP | | | |
| Ins. Co. of NA | 2095582 | Ohio | 81 Quick | | 81 80 / Corp. | 250/500/2s 5s00 200 2s |
| Globe Indemnity Co. | 2295586 | P Coll. Pol. | Boiler (Jul 200) | rate 1.25 | | |
| Travelers Indemnity Co. | 569A 607R | EQ Hull | Fleet | | 81 80 Corp. 30 83 84 | 500/m 1s5 84 85 100/1000 |
| Globe Indemnity Co. | 102708 | P Coll. Pol. | Pollution Liab. (return to 1965) | | | 1000000 |
| Peerless Ins. Co. | 977858 | P EQ Hull | 1/2 Ded R. Fire EC Add'l (Del 100) | | | 60000 |
| Graphic Arts Mutual Ins Co. | 7302608S | Ohio | W/C | | Offer 86700   2s   BC 559700   307   Jan 104500   509   Feb 29200   172   170 +   Ind   Prem Dis 9 5/c prm   Ret   9907  +71697207 | 21   1701   531   591   23   2s84   65   1886   137   71   1761 |
| Globe Indemnity Co. | 1772703 | Coll. Pol. | Comp. catastrophe | | | 200000 |
| The Travelers Ins Co. | 366B 999 483 | P EQ Hull | Elect. Boiler illumination | | | 100000 |

Form MP-4
(Ed 7-77)

# SPECIAL MULTI-PERIL POLICY CONDITIONS AND DEFINITIONS
## GENERAL CONDITIONS

The following Conditions apply to Section I and II except as otherwise indicated. Additional Conditions or modifications of the following Conditions may appear in the specific coverage sections.

**1. Premium.** All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

If this policy is issued for a period in excess of one year with a specified expiration date and a premium is payable at each anniversary, such premium shall be determined annually on the basis of the rates in effect at the anniversary date.

If this policy is issued for a period without a specified expiration date, it may be continued by payment of the required premium for the succeeding annual period. Such premium must be paid to the Company prior to each anniversary date; if not so paid, this policy shall expire on the first anniversary date that the said premium has not been received by the Company.

**2. Time of Inception.** To the extent that coverage in this policy replaces coverage in other policies terminating noon standard time on the inception date of this policy, coverage under this policy shall not become effective until such other coverage has terminated.

**3. Cancellation.** This policy may be cancelled by the named insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the named insured at the mailing address shown in the Declarations, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the named insured or by the Company shall be equivalent to mailing.

If the named insured cancels, the Company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

Notice of cancellation addressed to the named insured and mailed to the mailing address shown in the Declarations shall be sufficient notice to effect cancellation of this policy.

**4. Concealment or Fraud.** This policy is void if any insured has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

**5. Assignment.** Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon. However, if the named insured shall die, this insurance shall apply:

(a) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such; or

(b) to the person having temporary custody of the property of the named insured but only until the appointment and qualification of the legal representative.

**6. Subrogation.**

(a) In the event of any payment under this policy, the Company shall be subrogated to all the insured's rights of recovery against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

(b) The Company shall not be bound to pay any loss if the insured has impaired any right of recovery for loss; however, it is agreed that the insured may:

(1) as respects property while on the premises of the insured, release others in writing from liability for loss prior to loss; and such release shall not affect the right of the insured to recover hereunder, and

(2) as respects property in transit, accept such bills of lading, receipts or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of such goods or merchandise.

**7. Inspection and Audit.** The Company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the named insured or others to determine or warrant that such property or operations are safe or healthful or are in compliance with any law, rule or regulation.

The Company may examine and audit the named insured's books and records at any time during the policy period and extensions and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**8. Liberalization Clause.** In the event any filing is submitted to the insurance supervisory authorities on behalf of the Company, and:

(a) the filing is approved or accepted by the insurance authorities to be effective while this policy is in force or within 45 days prior to its inception; and

(b) the filing includes insurance forms or other provisions that would extend or broaden this insurance by endorsement or substitution of form, without additional premium;

the benefit of such extended or broadened insurance shall inure to the benefit of the insured as though the endorsement or substitution of form had been made.

**9. Insurance Under More Than One Coverage, Part or Endorsement.** In the event that more than one coverage, part or endorsement of this policy insures the same loss, damage or claim, the Company shall not be liable for more than the actual loss or damage sustained by the insured.

**10. Waiver or Change of Provisions.** The terms of this insurance shall not be waived, changed or modified except by endorsement issued to form a part of this policy.

Form MP-4  (Ed 7-77)

## CONDITIONS APPLICABLE TO SECTION I

1. **Policy Period, Territory.** Section I of this policy applies only to loss to property during the policy period while such property is within or between the fifty states of the United States of America, the District of Columbia and Puerto Rico.

2. **Deductible.** Unless otherwise provided in the Declarations:

(a) The sum of $100 shall be deducted from the amount of loss to property in any one occurrence. This deductible shall apply:

(1) separately to each building, including personal property therein;

(2) separately to personal property in each building if no coverage is provided on the containing building; and

(3) separately to personal property in the open (including within vehicles).

(b) The aggregate amount of this deductible in any one occurrence shall not exceed $1,000.

3. **Coinsurance Clause.** The Company shall not be liable for a greater proportion of any loss to property covered than the limit of liability under this policy for such property bears to the amount produced by multiplying the actual cash value of such property at the time of the loss by the coinsurance percentage stated in the Declarations.

In the event that the aggregate claim for any loss is both less than $10,000 and less than 5% of the limit of liability for all contributing insurance applicable to the property involved at the time such loss occurs, no special inventory or appraisement of the undamaged property shall be required providing that nothing herein shall be construed to waive the application of the first paragraph of this clause.

If insurance under Section I of this policy is divided into separate limits of liability, the foregoing shall apply separately to the property covered under each such limit of liability.

4. **Removal.** This policy covers loss by removal of the property covered hereunder from premises endangered by the perils insured against, and the amount of insurance applies pro rata for five days at each proper place to which such property shall necessarily be removed for preservation.

5. **Debris Removal.** This policy covers expense incurred in the removal of debris of the property covered which may be occasioned by loss by any of the perils insured against in this policy. The total amount recoverable under this policy for both loss to property and debris removal expense shall not exceed the limit of liability applying to the property. Cost of removal of debris shall not be considered in the determination of actual cash value when applying the Coinsurance Clause.

6. **War Risk And Governmental Action Exclusion.** This policy under Section I shall not apply to loss caused, directly or indirectly, by or due to any act or condition incident to the following:

(a) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack (i) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or (ii) by military, naval or air forces; or (iii) by an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces;

(b) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence; seizure or destruction under quarantine or custom's regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

7. **Nuclear Clause And Nuclear Exclusion.**

(a) Nuclear Clause (Not Applicable in New York). The word "fire" in this policy is not intended to and does not embrace nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and loss by nuclear reaction or nuclear radiation or radioactive contamination is not intended to be and is not insured against by this policy, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by "fire" or any other perils insured against by this

policy. However, subject to the foregoing and all provisions of this policy, direct loss by "fire" resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this policy.

(b) Nuclear Clause (Applicable only in New York): This policy does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from an insured peril under this policy.

(c) Nuclear Exclusion (Not Applicable in New York): Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing is not insured against by this policy, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any of the perils insured against by this policy; and nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, is not "explosion" or "smoke". This clause applies to all perils insured against hereunder except the peril of fire, which is otherwise provided for in the nuclear clause above.

8. **Other Insurance.**

(a) If at the time of loss there is other insurance written in the name of the insured upon the same plan, terms, conditions and provisions as contained in this policy, herein referred to as Contributing Insurance, the Company shall be liable for no greater proportion of any loss than the limit of liability under this policy bears to the whole amount of insurance covering such loss.

(b) If at the time of loss there is other insurance other than that as described in (a) above, the Company shall not be liable for any loss hereunder until:

(1) the liability of such other insurance has been exhausted, and

(2) then for only such amount as may exceed the amount due from such other insurance, whether collectible or not.

9. **Duties Of The Named Insured After A Loss.** In case of loss the named insured shall:

(a) give immediate written notice of such loss to the Company;

(b) protect the building and personal property from further damage, make reasonable temporary repairs required to protect the property, and keep an accurate record of repair expenditures;

(c) prepare an inventory of damaged personal property showing in detail, quantity, description, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

(d) exhibit the remains of the damaged property as often as may be reasonably required by the Company and submit to examination under oath;

(e) submit to the Company within 60 days after requested a signed, sworn statement of loss that sets forth to the best of the named insured's knowledge and belief:

(1) the time and cause of loss;

(2) interest of the insured and all others in the property involved and all encumbrances on the property;

(3) other policies of insurance that may cover the loss;

(4) changes in title or occupancy of the property during the term of the policy;

(5) specifications of any damaged building and detailed estimates for repair of the damage;

(6) an inventory of damaged personal property described in (c) above;

(f) give notice of such loss to the proper police authority if loss is due to a violation of law.

10. **Appraisal.** If the named insured and the Company fail to agree on the amount of the loss, either can demand that the amount of loss be set by appraisal. If either party makes a written demand for appraisal, each shall select a competent independent appraiser. Each shall notify the other of the selected appraiser's identity within twenty (20) days of the receipt of the written demand.

Form MP-4 (Ed. 7 77)

The two appraisers shall select a competent, impartial umpire. If the appraisers are unable to agree upon an umpire within fifteen (15) days, the named insured or the Company may petition a judge of a Court of Record in the state where the insured premises is located to select an umpire.

The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to the Company, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of loss.

Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and compensation of the umpire shall be paid equally by the named insured and the Company.

**11. Company Options.** If the Company gives notice within thirty (30) days after it has received a signed, sworn statement of loss, it shall have the option to take all or any part of the property damaged at an agreed value, or to repair, rebuild or replace it with equivalent property.

**12. Abandonment Of Property.** The Company need not accept any property abandoned by an insured.

**13. Payment Of Loss.** The Company will pay all adjusted claims within thirty (30) days after presentation and acceptance of the proof of loss.

**14. Privilege To Adjust With Owner.**

(a) Except as provided in (b) below, or unless another payee is specifically named in the policy, loss, if any, shall be adjusted with and payable to the named insured.

(b) In the event claim is made for damage to property of others held by the insured, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Company and the receipt of payment by such owner or owners in satisfaction thereof shall be in full satisfaction of any claim of the insured for which such payment has been made.

If legal proceedings be taken to enforce a claim against the insured as respects any such loss or damage, the Company reserves the right at its option without expense to the insured to conduct and control the defense on behalf of and in the name of the insured. No action of the Company in such regard shall increase the liability of the Company under this policy, nor increase the limits of liability specified in the policy.

**15. Suit.** No suit shall be brought on this policy unless the insured has complied with all the policy provisions and has commenced the suit within one year after the loss occurs.

**16. Permits And Use.** Except as otherwise provided, permission is granted:

(a) to make alterations and repairs;

(b) in the event of loss hereunder, to make reasonable repairs, temporary or permanent, provided such repairs are confined solely to the protection of the property from further damage, and provided further that the insured shall keep an accurate record of such repair expenditures. The cost of any such repairs directly attributable to damage by any peril insured against shall be included in determining the amount of loss hereunder. Nothing herein contained is intended to modify the policy requirements applicable in case loss occurs, and in particular the requirement that, in case loss occurs, the insured shall protect the property from further damage.

**17. Vacancy, Unoccupancy and Increase of Hazard.**

(a) This Company shall not be liable for loss occurring while a described building, whether intended for occupancy by owner or tenant is vacant beyond a period of sixty consecutive days. "Vacant" or "Vacancy" means containing no contents pertaining to operations or activities customary to occupancy of the building, but a building in process of construction shall not be deemed vacant.

(b) Permission is granted for unoccupancy.

(c) Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring while the hazard is increased by any means within the control or knowledge of the insured.

**18. Protective Safeguards.** It is a condition of this insurance that the insured shall maintain so far as is within his control such protective safeguards as are set forth by endorsement hereto.

Failure to maintain such protective safeguards shall suspend this insurance only as respects the location or situation affected for the time of such discontinuance.

**19. Mortgage Clause—Applicable Only To Buildings.** This clause is effective if a mortgagee is named in the Declarations. The word "mortgagee" includes "trustee". Loss to buildings shall be payable to the named mortgagee as interest may appear, under all present or future mortgages on the buildings described in the Declarations in order of precedence or mortgages on them.

As it applies to the interest of any mortgagee designated in the Declarations, this insurance shall not be affected by any of the following:

(a) any act or neglect of the mortgagor or owner of the described buildings;

(b) any foreclosure or other proceedings or notice of sale relating to the property;

(c) any change in the title or ownership of the property;

(d) occupancy of the premises for purposes more hazardous than are permitted by this policy;

provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee shall, on demand, pay the premium.

The mortgagee shall notify the Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of mortgagee. Unless permitted by this policy, such change of ownership or occupancy or increase of hazard shall be noted on the policy and the mortgagee shall on demand pay the premium for the increased hazard for the term it existed under this policy. If such premium is not paid, this policy shall be null and void.

The Company reserves the right to cancel this policy at any time as provided by its terms. If so cancelled, this policy shall continue in force for the benefit only of the mortgagee for ten days after notice to the mortgagee of such cancellation and shall then cease. The Company shall have the right to cancel this agreement on ten days notice to the mortgagee.

When the Company shall pay the mortgagee any sum for loss under this policy, and shall claim that, as to the mortgagor or owner, no liability therefor existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the mortgagee to whom such payment shall have been made, under the mortgage debt. In lieu of taking such subrogation, the Company may, at its option, pay to the mortgagee the whole principal due or to grow due on the mortgage, with interest accrued and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities. However, no subrogation shall impair the right of the mortgagee to recover the full amount of said mortgagee's claim.

**20. Recoveries.** In the event the Company has made a payment for loss under the policy and a subsequent recovery is made of the lost or damaged property, the insured shall be entitled to all recoveries in excess of the amount paid by the Company, less only the actual cost of effecting such recoveries.

**21. Loss Clause.** Any loss hereunder shall not reduce the amount of this insurance.

**22. No Benefit To Bailee.** This insurance shall not inure directly or indirectly to the benefit of any carrier or other bailee.

**23. No Control.** This insurance shall not be prejudiced:

(a) by any act or neglect of the owner of any building if the insured is not the owner thereof, or by any act or neglect of any occupant (other than the insured) of any building when such act or neglect of the owner or occupant is not within the control of the insured, or

(b) by failure of the insured to comply with any warranty or condition contained in any endorsement attached to this policy with regard to any portion of the premises over which the insured has no control.

## CONDITIONS APPLICABLE TO SECTION II

1. **Supplementary Payments.** The Company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the Company, all costs taxed against the insured in any suit defended by the Company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon:

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the Company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the insured for first aid to others at the time of an accident, for bodily injury to which this policy applies;

(d) reasonable expenses incurred by the insured at the Company's request in assisting the Company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

2. **Premium.** Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the Declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the named insured shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the Company shall return to the named insured the unearned portion paid by the named insured.

The named Insured shall maintain records of such information as is necessary for premium computation and shall send copies of such records to the Company at the end of the policy period and at such times during the policy period as the Company may direct.

3. **Financial Responsibility Laws.** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The insured agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

4. **Insured's Duties in the Event of Occurrence, Claim or Suit.**

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof and the names and addresses of the injured and of available witnesses shall be given by or for the insured to the Company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

5. **Medical Reports; Proof and Payment of Claim.** As soon as practicable the injured person or someone on his behalf shall give to the Company written proof of claim, under oath if required, and shall, after each request from the Company, execute authorization to enable the Company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Company

when and as often as the Company may reasonably require. The Company may pay the injured person or any person or organization rendering the services and the payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the Company.

6. **Action Against Company.** No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full Compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Company as a party in any action against the insured to determine the insured's liability, nor shall the Company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the Company of any of its obligations hereunder.

7. **Other Insurance.** The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

8. **Annual Aggregate.** If this policy is issued for a period in excess of one year, any limit of the Company's liability stated in this policy as "aggregate" shall apply separately to each consecutive annual period.

9. **Nuclear Exclusion.**

I. This policy does not apply:

(a) Under any Liability Coverage, to bodily injury or property damage

(1) with respect to which an insured under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

(b) Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

(c) Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

(1) the nuclear material (i) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (ii) has been discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

II. As used in this exclusion

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation, in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility, included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

## DEFINITIONS APPLICABLE TO SECTION II

When used in the provisions applicable to Section II of this policy (including endorsements forming a part hereof):

"automobile" means a land motor vehicle, trailer or semitrailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

"bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"collapse hazard" includes "structural property damage" as defined herein and property damage to any other property at any time resulting therefrom. "Structural property damage" means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work, or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The collapse hazard does not include property damage (1) arising out of operations performed for the named insured by independent contractors, or (2) included within the completed operations hazard or the underground property damage hazard, or (3) for which liability is assumed by the insured under an incidental contract;

"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or, abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of

(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in the company's manual specifies "including completed operations";

"elevator" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an automobile servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"explosion hazard" includes property damage arising out of blasting or explosion. The explosion hazard does not include property damage (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the named insured by independent contractors, or (3) included within the completed operations hazard or the underground property damage hazard, or (4) for which liability is assumed by the insured under an incidental contract;

"incidental contract" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition

operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement;

"insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

"mobile equipment" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; aircompressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

"named insured" means the person or organization named in Item 1. of the declarations of this policy;

"named insured's products" means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but "named insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

"policy territory" means:

(1) the United States of America, its territories or possessions, or Canada; or

(2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"products hazard" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period;

"underground property damage hazard" includes underground property damage as defined herein and property damage to any other property at any time resulting therefrom. "Underground property damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving. The underground property damage hazard does not include property damage (1) arising out of operations performed for the named insured by independent contractors, or (2) included within the completed operations hazard, or (3) for which liability is assumed by the insured under an incidental contract.

COINSURANCE CONTRACT

Form MP-101
(Ed. 7-77)

## SPECIAL MULTI-PERIL POLICY
## SECTION I—SPECIAL BUILDING FORM

### I. PROPERTY COVERED

BUILDING(S): Building(s) or structure(s) shall include attached additions and extensions; fixtures, machinery and equipment constituting a permanent part of and pertaining to the service of the building(s); materials and supplies intended for use in construction, alteration or repair of the building(s) or structure(s); yard fixtures; personal property of the insured used for the maintenance or service of the building(s), including fire extinguishing apparatus, outdoor furniture, floor coverings and appliances for refrigerating, ventilating, cooking, dishwashing and laundering (but not including other personal property in apartments or rooms furnished by the named insured as landlord); all while at the designated premises.

### II. PROPERTY NOT COVERED

This policy does not cover:

A. Outdoor swimming pools; fences; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls not constituting a part of a building; walks, roadways and other paved surfaces.

B. The cost of excavations, grading or filling; foundations of buildings, machinery, boilers or engines whose foundations are below the undersurface of the lowest basement floor, or where there is no basement, below the surface of the ground; pilings, piers, pipes, flues and drains which are underground; pilings which are below the low water mark.

C. Outdoor signs, whether or not attached to a building or structure.

D. Lawns; outdoor trees, shrubs and plants, except as provided in the Extensions of Coverage.

E. Property which is more specifically covered in whole or in part by this or any other contract of insurance, except for the amount of loss which is in excess of the amount due from such more specific insurance.

### III. PROPERTY SUBJECT TO LIMITATIONS

The following property is subject to these additional limitations:

A. Plumbing, heating, air conditioning or other equipment or appliances (except fire protective systems) are not covered against loss caused by or resulting from freezing while the designated buildings are vacant or unoccupied, unless the insured shall have exercised due diligence with respect to maintaining heat in the buildings, or unless such equipment and appliances had been drained and the water supply shut off during such vacancy or unoccupancy.

B. Steam boilers, steam pipes, steam turbines or steam engines are not covered against loss caused by any condition or occurrence within such boilers, pipes, turbines or engines (except direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox, or combustion chamber, of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom).

C. Hot water boilers or other equipment for heating water are not covered against loss caused by any condition or occurrence within such boilers or equipment, other than an explosion.

D. Glass is not covered against loss for more than $50 per plate, pane, multiple plate, insulating unit, radiant heating panel, jalousie, louver or shutter, nor for more than $250 in any one occurrence, unless caused by fire, lightning, windstorm, hail, aircraft, vehicles, discharge from fire protection or building service equipment, explosion, riot or civil commotion, and then the Company shall be liable only to the extent that such perils are insured against in this policy.

E. Fences, pavements, outdoor swimming pools and related equipment, retaining walls, bulkheads, piers, wharves or docks, when covered under this policy, are not covered against loss caused by freezing or thawing, impact of watercraft, or by the pressure or weight of ice or water whether driven by wind or not.

F. Metal smokestacks and, when outside of buildings, (1) awnings of fabric or slat construction, canopies of fabric or slat construction, including their supports, and (2) radio or television antennas, including their lead-in wiring, masts or towers are not covered against loss caused by ice, snow or sleet, nor by windstorm or hail.

G. The interior of buildings is not covered against loss caused by rain, snow, sand or dust, whether driven by wind or not, unless (1) the buildings shall first sustain an actual damage to roof or walls by the direct action of wind or hail, and then the Company shall be liable for loss to the interior of the buildings as may be caused by rain, snow, sand or dust entering the buildings through openings in the roof or walls made by direct action of wind or hail; or (2) such loss results from fire, lightning, aircraft, vehicles, explosion, riot or civil commotion, vandalism or malicious mischief, weight of ice, snow or sleet, to the extent that such perils are insured against in this policy.

H. Buildings or structures in process of construction, including materials and supplies therefor; when covered under this policy, are not covered against loss unless caused by fire, lightning, windstorm, hail, aircraft, vehicles, smoke, explosion, riot or civil commotion, vandalism or malicious mischief, and then the Company shall be liable only to the extent that such perils are insured against in this policy.

I. Property undergoing alterations, repairs, installations or servicing is not covered against loss if such loss is directly attributable to the operations or work being performed thereon, unless a peril not excluded by this policy ensues, and then the Company shall be liable for only loss caused by such ensuing peril.



### IV. EXTENSIONS OF COVERAGE

Except with respect to Extension D, Replacement Cost:

(A) Each of the limits of liability specified for the following Extensions of Coverage applies as an additional amount of insurance.

(B) The Coinsurance Clause shall not apply to loss under the Extensions of Coverage.

The total amount recoverable under the Extensions of Coverage in this form and Extensions of Coverage in any other form made a part of this policy are not cumulative and shall not exceed the largest amount recoverable under any single form made a part of this policy.

When, in accordance with the Other Insurance condition, there is Contributing Insurance, the Company shall not be liable for more than its pro rata share of the limits set forth in the following Extensions of Coverage.

A. Newly Acquired Property: The insured may apply up to 25% of the limit of liability specified for Building(s), but not exceeding $100,000, to cover direct loss in any one occurrence by a peril not otherwise excluded to the following described property:

1. New buildings and new structures being constructed on the designated premises and intended for similar occupancy when not otherwise covered by insurance. This coverage shall cease 30 days from the date construction begins or on the date the values of new construction are reported to the Company, or on the expiration date of the policy, whichever occurs first.

2. Buildings acquired by the insured at any location, elsewhere than at the designated premises, within the territorial limits of this policy and used for similar occupancies or warehouse purposes. This coverage shall cease 30 days from the date of such acquisition or on the date values of the buildings are reported to the Company, or on the expiration date of the policy, whichever occurs first.

Additional premium shall be due and payable for values so reported from the date construction begins or the property is acquired.

B. Off-Premises: The insured may apply up to 2% of the limits of liability specified for Building(s), but not exceeding $5,000, at a described location to cover direct loss in any one occurrence by a peril not otherwise excluded to property covered under Building(s) while removed from designated premises for purposes of cleaning, repairing, reconstruction or restoration. This Extension of Coverage shall not apply to property in transit, nor to property on any premises owned, leased, operated or controlled by the insured.

C. Outdoor Trees, Shrubs and Plants: The insured may apply up to $1,000 to cover outdoor trees, shrubs and plants at the designated premises against direct loss in any one occurrence by the perils of fire, lightning, explosion, riot, civil commotion or aircraft, but only to the extent such perils are insured against herein. The Company shall not be liable for more than $250 on any one tree, shrub or plant, including expense incurred for removing debris thereof.

D. Replacement Cost: In the event of loss to a building structure covered under this policy, when the full cost of repair or replacement is less than $1,000, the coverage of this policy is extended to cover the full cost of repair or replacement (without deduction for depreciation). Coverage shall be applicable only to a building structure covered hereunder, but excluding outdoor furniture, outdoor equipment, floor coverings, awnings, and appliances for refrigerating, ventilating, cooking, dishwashing and laundering, all whether permanently attached to the building structure or not.

The Company shall not be liable under this Extension of Coverage unless the whole amount of insurance applicable to the building structure for which claim is made is equal to or in excess of the amount produced by multiplying by the co-insurance percentage applicable (specified in the Declarations) by the actual cash value of such property at the time of the loss.

## V. PERILS INSURED AGAINST

This policy insures against all risks of direct physical loss subject to the provisions and stipulations herein and in the policy of which this form is made a part.

## VI. EXCLUSIONS

This policy does not insure under this form against:

A. Loss occasioned directly or indirectly by enforcement of any ordinance or law regulating the use, construction, repair, or demolition of buildings or structures including debris removal expense.

B. Loss occasioned directly or indirectly by any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire is insured against ensues, and then this Company shall be liable for only loss caused by the ensuing fire.

C. Loss caused directly or indirectly by the interruption of power or other utility service furnished to the designated premises if the interruption takes place away from the designated premises. If a peril insured against ensues on the designated premises, this Company will pay only for loss caused by the ensuing peril.

D. Loss caused by, resulting from, contributed to or aggravated by any of the following:

　　1. earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising or shifting;

　　2. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;

　　3. water which backs up through sewers or drains; or

　　4. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows or any other openings in such sidewalks, driveways, foundations, walls or floors;

unless fire or explosion as insured against ensues, and then this Company shall be liable for only loss caused by the ensuing fire or explosion; but these exclusions shall not apply to loss arising from theft.

E. Loss caused by:

　　1. wear and tear, deterioration, rust or corrosion, mould, wet or dry rot; inherent or latent defect; smog; smoke, vapor or gas from agricultural or industrial operations; mechanical breakdown, including rupture or bursting caused by centrifugal force; settling, cracking, shrinkage, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings; animals, birds, vermin, termites or other insects; unless loss by a peril not otherwise excluded ensues and then the Company shall be liable for only such ensuing loss;

　　2. explosion of steam boilers, steam pipes, steam turbines or steam engines (except direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox, or combustion chamber, of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom) if owned by, leased by or operated under the control of the insured, or for any ensuing loss except by fire or explosion not otherwise excluded, and then the Company shall be liable for only such ensuing loss;

　　3. vandalism, malicious mischief, theft or attempted theft, if the building had been vacant or unoccupied beyond a period of 30 consecutive days immediately preceding the loss, unless loss by a peril not excluded in this policy ensues, and then the Company shall be liable for only such ensuing loss;

　　4. leakage or overflow from plumbing, heating, air conditioning or other equipment or appliances (except fire protective systems) caused by or resulting from freezing while the building is vacant or unoccupied, unless the insured shall have exercised due diligence with respect to maintaining heat in the buildings or unless such equipment and appliances had been drained and the water supply shut off during such vacancy or unoccupancy;

　　5. theft (including but not limited to burglary and robbery) of any property which at the time of loss is not an integral part of a building or structure (except direct loss by pillage and looting occurring during and at the immediate place of a riot or civil commotion), unless loss by a peril not excluded in this policy ensues from theft or attempted theft, and then the Company shall be liable for only such ensuing loss;

　　6. unexplained or mysterious disappearance of any property, or shortage disclosed on taking inventory, or caused by any willful or dishonest act or omission of the insured or any associate, employee or agent of any insured; or

　　7. continuous or repeated seepage or leakage of water or steam from within a plumbing, heating or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months or years.

## VII. VALUATION

The following bases are established for valuation of property:

All property at actual cash value at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, nor in any event for more than the interest of the named insured.

COINSURANCE CONTRACT

SPECIAL MULTI-PERIL POLICY

**Form MP-101A**
(Ed. 7-77)

SECTION I—SPECIAL PERSONAL PROPERTY FORM

## I. PROPERTY COVERED

**PERSONAL PROPERTY OF THE INSURED:** Business personal property owned by the insured and usual to the occupancy of the insured, including the insured's interest in personal property owned by others to the extent of the value of labor, materials and charges furnished, performed or incurred by the insured; all while (1) in or on the building(s), or (2) in the open (including within vehicles) on or within 100 feet of the designated premises.

This coverage shall also include Tenant's Improvements and Betterments, meaning the insured's use interest in fixtures, alterations, installations or additions constituting a part of the building(s) occupied but not owned by the insured and made or acquired at the expense of the insured exclusive of rent paid by the insured, but which are not legally subject to a removal by the insured.

**PERSONAL PROPERTY OF OTHERS:** This insurance shall cover for the account of the owner(s) (other than the named insured) personal property belonging to others in the care, custody or control of the insured, while (1) in or on the building(s), or (2) in the open (including within vehicles) on or within 100 feet of the designated premises.

Loss shall be adjusted with the named insured for the account of the owners of the property, except that the right to adjust any loss with the owners is reserved to the Company and the receipts of the owners in satisfaction thereof shall be in full satisfaction of any claim by the named insured for which payments have been made.

## II. PROPERTY NOT COVERED

This policy does not cover:

A. Property sold by the insured under conditional sale, trust agreement, installment payment or other deferred payment plan, after delivery to customers.

B. Aircraft, watercraft, including motors, equipment and accessories (except rowboats and canoes, while out of water and on the designated premises); and automobiles, trailers, semi-trailers or any self-propelled vehicles or machines, except such property not licensed for use on public thoroughfares and operated principally on the premises of the insured.

This provision does not apply to the following types of property when held for sale or sold but not delivered:

1. Watercraft (including motors, equipment and accessories) while not afloat;

2. Motorcycles, motorscooters and snowmobiles; or

3. Trailers designed for use with private passenger vehicles for general utility purposes or carrying boats.

This provision does not apply to the following types of property when manufactured, processed or warehoused by the insured.

1. Aircraft;

2. Watercraft, including motors, equipment and accessories, while not afloat; or

3. Automobiles, trailers, semi-trailers or any self-propelled vehicles or machines.

C. Personal property while waterborne.

D. Household and personal effects contained in living quarters occupied by the insured, any officer, director, stockholder or partner of the insured or relatives of any of the foregoing, except as provided in the Extensions of Coverage.

E. Accounts, bills, currency, deeds, evidences of debt, money and securities.

F. Outdoor signs, whether or not attached to a building or structure.

G. Growing crops and lawns.

H. Property which is more specifically covered in whole or in part by this or any other contract of insurance, except for the amount of loss which is in excess of the amount due from such more specific insurance.

## III. PROPERTY SUBJECT TO LIMITATIONS

The following property is subject to these additional limitations:

1. Except for loss caused by the "specified perils":

(a) Fur and fur garments are covered for not exceeding loss in the aggregate of $1,000 in any one occurrence for all contributing insurance.

(b) Jewelry and watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals are covered for not exceeding loss in the aggregate of $1,000 in any one occurrence for all contributing insurance. This limitation shall not apply to jewelry and watches valued at $25 or less per item.

(c) Patterns, dies, molds, models and forms are covered for not exceeding loss in the aggregate of $1,000 in any one occurrence for all contributing insurance.

(d) Stamps, tickets and letters of credit are covered for not exceeding loss in aggregate of $250 in any one occurrence for all contributing insurance.

2. Valuable papers and records meaning books of account, manuscripts, abstracts, drawings, card index systems and other records including film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing, are covered only against loss caused by the "specified perils".

3. Animals and pets are not covered, except when held for sale or sold but not delivered, and then only against death or destruction directly resulting from or made necessary by the "specified perils".

4. Outdoor trees, shrubs and plants are not covered, except when held for sale or sold but not delivered, and then only against direct loss by the "specified perils".

5. Glass, glassware, statuary, marbles, bric-a-brac, porcelains and other articles of a fragile or brittle nature are covered against loss by breakage only if directly caused by the "specified perils". This limitation shall not apply to bottles or similar containers of property for sale, or sold but not delivered, nor to lenses of photographic or scientific instruments.

6. Steam boilers, steam pipes, steam turbines and steam engines are not covered against loss caused by bursting, rupture, cracking or explosion originating therein (other than explosion of accumulated gases or unconsumed fuel within a fire box or combustion chamber).

7. Machines and machinery are not covered against loss caused by rupture, bursting or disintegration of their rotating or moving parts resulting from centrifugal or reciprocating force.

The term "specified perils" shall mean direct loss by fire, lightning, aircraft, explosion, riot, civil commotion, smoke, vehicles, windstorm or hail to property contained in any building, vandalism and malicious mischief, leakage or accidental discharge from automatic fire protective systems.

## IV. EXTENSIONS OF COVERAGE

Each of the limits of liability specified for the following Extensions of Coverage applies as an additional amount of insurance. The Coinsurance Clause shall not apply to loss under the Extensions of Coverage.

The total amount recoverable under the Extensions of Coverage in this form and Extensions of Coverage in any other form made a part of this policy are not cumulative and shall not exceed the largest amount recoverable under any single form made a part of this policy.

When, in accordance with the Other Insurance condition, there is Contributing Insurance, the Company shall not be liable for more than its pro rata share of the limits set forth in the following Extensions of Coverage.

A. Property at Newly Acquired Locations: The insured may apply up to 10% of the limit of liability specified for Personal Property of the Insured, but not exceeding $10,000, to cover direct loss in any one occurrence by a peril not otherwise excluded to such property at any location (except fairs and exhibitions) acquired by the insured for similar occupancies or warehousing purposes, elsewhere than at the designated premises within the territorial limits of this policy. This coverage shall cease 30 days from the date of such acquisition or on the date values at such locations are reported to the Company, or on the expiration date of the policy, whichever occurs first. Additional premium shall be due and payable for values so reported from the date the property is acquired.

B. Personal Effects: The insured may apply up to $500 to cover direct loss in any one occurrence by the perils not otherwise excluded to personal effects while located on the designated premises, belonging to the insured, officers, partners or employees thereof, and limited to $100 on personal effects owned by any one individual. This Extension of Coverage does not apply if the loss is covered by any other insurance, whether collectible or not, or which would have been covered by such other insurance in the absence of this policy. At the option of the Company, loss under this Extension of Coverage may be adjusted with and payable to the insured.

C. Valuable Papers and Records: The insured may apply up to $500 to cover direct loss in any one occurrence by a peril not otherwise excluded to valuable papers and records consisting of books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing, and other records, all the property of the insured at designated premises. This Extension of Coverage covers only the cost of research and other expense necessarily incurred by the insured to reproduce, replace or restore such valuable papers and records. The total amount payable in any one occurrence under this Extension of Coverage shall not exceed the limit specified above, regardless of the number of premises designated in the Declarations.

D. Extra Expense: The insured may apply up to $1,000 to cover the necessary extra expense incurred by the insured in order to continue as nearly as practicable the normal operations of the insured's business immediately following damage by a peril not otherwise excluded under this form to the buildings or personal property situated at the designated premises.

"Extra expense" means the excess of the total cost incurred during the period of restoration chargeable to the operations of the insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss occurred. Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

"Period of restoration" means that period of time, commencing with the date of damage and not limited by the date of expiration of this policy, as would be required with the exercise of due diligence and dispatch to repair, rebuild or replace such part of said buildings or personal property as have been damaged.

The Company shall not be liable under this Extension of Coverage for:

    1. loss of income;

    2. the cost of repairing or replacing any of the described property, or the cost of research or other expense necessary to replace or restore books of account, manuscripts, abstracts, drawings, card index systems, film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing, and other records that have been damaged by a peril not otherwise excluded, except cost in excess of the normal cost of such repair, replacement or restoration necessarily incurred for the purpose of reducing the total amount of extra expense. In no event shall such excess exceed the amount by which the total extra expense otherwise payable under this Extension of Coverage is reduced; or

    3. any other consequential or remote loss.

E. Damage to Buildings from Theft, Burglary or Robbery: This policy includes loss (except by fires or explosion) to that part of the building occupied by the insured and containing property covered, and to equipment therein pertaining to the service of the building but not building property or equipment removed from premises, directly resulting from theft, burglary or robbery (including attempt thereat), provided the insured is the owner of such building or equipment or is liable for such damage, but in no event shall this coverage apply to glass (other than glass building blocks) or to any lettering or ornamentation thereon.

F. Transportation: The insured may apply up to $1,000 to cover insured personal property (other than property in the care, custody or control of salesmen) during transportation by motor vehicles owned, leased or operated by the insured for loss in any one occurrence caused by:

    1. fire, lightning, windstorm and hail, explosion, smoke, riot, riot attending a strike and civil commotion, vandalism and malicious mischief; or

    2. collision, overturning or upset of the vehicle; meaning thereby the violent and accidental contact of the vehicle conveying the property described herein with any other vehicle or object excluding any loss or damage done by coming in contact with any portion of the road bed or by means other than as expressly indicated; or

    3. theft of an entire shipping bale, case or package from a vehicle while such property is contained in a fully enclosed and securely locked body or compartment and theft results from forcible entry, evidenced by visible marks upon such body or compartment.

G. Non-Owned Personal Property: The insured may apply at each location up to 2% of the limit of liability specified for Personal Property of the insured at such location, but not exceeding $2,000, as an additional amount of insurance, to cover for the account of the owners thereof (other than the named insured) direct loss by a peril not otherwise insured against to personal property, similar to that covered by this policy, belonging to others while in the care, custody or control of the named insured and all while (1) in or on the building(s), or (2) in the open (including within vehicles) on or within 100 feet of the designated premises.

Loss shall be adjusted with the named insured for the account of the owners of the property, except that the right to adjust any loss with the owners is reserved to the Company and the receipts of the owners in satisfaction thereof shall be in full satisfaction of any claim by the named insured for which payments have been made. As respects personal property belonging to others, this provision shall replace any loss payable provision of this policy.

## V. PERILS INSURED AGAINST

This policy insures against all risks of direct physical loss subject to the provisions and stipulations herein and in the policy of which this form is made a part.

Form MP-101A (Ed. 7-77)

## VI. EXCLUSIONS

A. This policy does not insure under this form against loss caused by:

1. enforcement of any ordinance or law regulating the use, construction, repair, or demolition of property, including debris removal expense;

2. unexplained or mysterious disappearance of property, or shortage of property disclosed on taking inventory;

3. actual work upon, installation or testing of property covered, failure, breakdown or derangement of machines or machinery, error, omission or deficiency in design, specifications, workmanship or materials; unless loss by fire or explosion not otherwise excluded ensues and then the Company shall be liable for only such ensuing loss;

4. any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire as insured against ensues, and then this Company shall be liable for only loss caused by the ensuing fire;

5. leakage or overflow from plumbing, heating, air conditioning or other equipment or appliances (except fire protective systems) caused by or resulting from freezing while the described building is vacant or unoccupied, unless the insured shall have exercised due diligence with respect to maintaining heat in the buildings or unless such equipment and appliances had been drained and the water supply shut off during such vacancy or unoccupancy;

6. delay, loss of market, interruption of business, nor consequential loss of any nature;

7.  (a) wear and tear, marring or scratching;

(b) deterioration, inherent vice, latent defect;

(c) rust, mold, wet or dry rot, contamination;

(d) dampness or dryness of atmosphere, changes in or extremes of temperature;

(e) smog, smoke from agricultural smudging or industrial operations; or

(f) birds, vermin, rodents, insects or animals;

unless loss by fire, smoke (other than smoke from agricultural smudging or industrial operations), explosion, collapse of a building, glass breakage or water not otherwise excluded ensues, then this policy shall cover only such ensuing loss.

If loss by water not otherwise excluded ensues, this policy shall also cover the cost of tearing out and replacing of any part of the building covered required to effect repairs to the plumbing, heating or air conditioning system or domestic appliance but excluding loss to the system or appliance from which the water escapes;

8. explosion of steam boilers, steam pipes, steam turbines or steam engines (except direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox, or combustion chamber, of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom) if owned by, leased by or operated under the control of the insured, or for any ensuing loss except by fire or explosion not otherwise excluded, and then the Company shall be liable for only such ensuing loss;

9. voluntary parting with title or possession of any property by the insured or others to whom the property may be entrusted if induced to do so by any fraudulent scheme, trick, device or false pretense;

10. any fraudulent, dishonest or criminal act done by or at the instigation of any insured, partner or joint adventurer in or of any insured, an officer, director or trustee of any insured; pilferage, appropriation or concealment of any property covered due to any fraudulent, dishonest or criminal act of any employee while working or otherwise, or agent of any insured, or any person to whom the property covered may be entrusted;

11. continuous or repeated seepage or leakage of water or steam from within a plumbing, heating or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months or years; or

12. rain, snow or sleet to property in the open.

B. This policy does not insure under this form against loss caused directly or indirectly by the interruption of power or other utility service furnished to the designated premises if the interruption takes place away from the designated premises. If a peril insured against ensues on the designated premises, this Company will pay only for loss caused by the ensuing peril.

C. This policy does not insure under this form against loss caused by, resulting from or contributed to or aggravated by any of the following:

1. earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising or shifting;

2. flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;

3. water which backs up through sewers or drains; or

4. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows or any other openings in such sidewalks, driveways, foundations, walls or floors;

unless fire or explosion as insured against ensues, and then this Company shall be liable for only loss caused by the ensuing fire or explosion; but these exclusions shall not apply to loss arising from theft.

## VII. VALUATION

The following bases are established for valuation of property:

A. The value of all stock actually sold but not delivered shall be the price at which it was sold, less all discounts and unincurred expenses.

B. Tenants' Improvements and Betterments:

1. If repaired or replaced at the expense of the named insured within a reasonable time after loss, the actual cash value of the damaged or destroyed improvements and betterments.

2. If not repaired or replaced within a reasonable time after loss, that proportion of the original cost at time of installation of the damaged or destroyed property which the unexpired term of the lease or rental agreement, whether written or oral, in effect at the time of loss bears to the periods from the dates such improvements or betterments were made to the expiration date of the lease.

3. If repaired or replaced at the expense of others for the use of the named insured, there shall be no liability hereunder.

C. Valuable Papers and Records:

1. Books of account, manuscripts, abstracts, drawings, card index systems and other records (except film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing) for not exceeding the cost of blank books, cards or other blank material plus the cost of labor incurred by the named insured for transcribing or copying such records.

2. Film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing for not exceeding the cost of such media in unexposed or blank form.

D. All other property at actual cash value at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, nor in any event for more than the interest of the named insured.

INSURANCE SERVICES OFFICE    Case 1:04-cv-10351-RBC    Document 43-21A    Filed 07/10/2007    (used by PLIA Insurance Company and Others)    Page 25 of 63

GL 00 29
(Ed. 10/81)

-1-

BLANK INSURANCE COMPANY
(A _____ insurance company, herein called the company)[4]

Pollution Liability Insurance

[THIS IS A CLAIMS MADE POLICY – PLEASE READ CAREFULLY][1]

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof, and subject to all terms of this policy, the company agrees with the named insured as follows:

I.   POLLUTION LIABILITY COVERAGE

A.   The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as compensatory damages because of bodily injury or property damage to which this insurance applies, provided that:

(1)   such bodily injury or property damage is caused by a pollution incident which commences subsequent to the retroactive date shown in the declarations of this policy; and

(2)   the claim for such damages is first made against the insured during the policy period and reported to the company during the policy period or within fifteen days after its termination.

A claim shall be deemed to have been made only when suit is brought or written notice of such claim is received by either the insured or the company.

All claims for damages because of bodily injury or property damage sustained by any one person or organization as a result of any one pollution incident shall be deemed to have been made at the time the first of those claims is made.

The company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent. The company may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

B.   The company will reimburse the insured for reasonable and necessary clean-up costs incurred by the insured in the discharge of a legal obligation validly imposed through governmental action which is initiated during the policy period, provided that:

Copyright, Insurance Services Office, 1981

-2-

(1) such clean-up costs are incurred because of environmental damage to which this insurance applies; and

(2) the environmental damage is caused by a pollution incident which commences subsequent to the retroactive date shown in the declarations of this policy.

The company shall have the right, but not the duty, to participate at its expense in any proceeding seeking to impose legal obligations because of such environmental damage.

The company will also reimburse the insured for other clean-up costs which the insured incurs, provided that:

(1) the clean-up costs are reasonable and necessary; and

(2) during the policy period, the company grants the insured prior written consent to undertake the clean-up. The company will grant its consent when, in its sole discretion, a pollution incident which commences subsequent to the retroactive date shown in the declarations of this policy or the threat of a pollution incident presents an imminent and substantial danger of bodily injury, property damage, or environmental damage to which this insurance applies.


EXCLUSIONS

This insurance does not apply:

(a) to bodily injury, property damage, or environmental damage which is expected or intended from the standpoint of the insured;

(b) to liability assumed by the insured under any contract or agreement, but this exclusion does not apply to liability that the insured would have in the absence of such contract or agreement;

(c) to any obligation for which the insured or any carrier as his insurer may be held liable under any workers' compensation, unemployment compensation, or disability benefits law, or under any similar law;

(d) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury;

(e) to property damage or environmental damage to

(1) an insured site, or

(2) property owned or occupied by or rented to the insured, or

Copyright, Insurance Services Office, 1981

-3-

(3)  property used by the insured, or

(4)  property in the care, custody, or control of the insured or as to which the insured is for any purpose exercising physical control;

(f)  to property damage or environmental damage to premises alienated by the named insured arising out of such premises or any part thereof;

(g)  to bodily injury, property damage, or environmental damage included within the completed operations hazard or the products hazard, and arising out of an emission, discharge, release, or escape which takes place away from any insured site owned by, rented or loaned to a named insured;

(h)  to bodily injury, property damage, or environmental damage arising out of the ownership or operation of any "offshore facility" as defined in the Outer Continental Shelf Lands Act Amendment of 1978 or the Clean Water Act of 1977 as amended 1978, or any "deepwater port" as defined in the Deepwater Port Act of 1974, as amended or as may be amended;

(i)  to bodily injury, property damage, or environmental damage arising out of any pollution incident emanating from a site used for the storage, disposal, processing, or treatment of any waste material, if the pollution incident occurs after the site is no longer in active use because of sealing off, abandonment, alienation, or closure, whether or not in compliance with the requirements of any statute, regulation, ordinance, directive, or order promulgated by any governmental body;

(j)  to bodily injury, property damage, or environmental damage arising out of the ownership, maintenance, operation, use, loading, or unloading of

(1)  any aircraft, automobile, rolling stock, or watercraft owned or operated by or rented or loaned to any insured, or

(2)  any other aircraft, automobile, rolling stock, or watercraft operated by any person in the course of employment by any insured;

(k)  to bodily injury, property damage, or environmental damage arising out of the emission, discharge, release, or escape of drilling fluid, oil, gas, or other fluids from any oil, gas, mineral, water, or geothermal well;

Copyright, Insurance Services Office, 1981

-4-

(1) to bodily injury, property damage, or environmental damage arising
out of a pollution incident which results from or is directly or
indirectly attributable to failure to comply with any applicable
statute, regulation, ordinance, directive, or order relating to the
protection of the environment and promulgated by any governmental
body, provided that failure to comply is a willful or deliberate
act or omission of

   (1) the insured, or

   (2) any named insured, or any member, partner, or executive
      officer thereof;

(m) to bodily injury, property damage, or environmental damage arising
out of acid rain;

(n) to environmental damage outside the United States of America, its
territories or possesions, Puerto Rico, or Canada;

(o) 1. to bodily injury, property damage, or environmental damage

   (a) with respect to which an insured under the policy is
      also an insured under a nuclear energy liability policy
      issued by Nuclear Energy Liability Insurance Association,
      Mutual Atomic Energy Liability Underwriters, or Nuclear
      Insurance Association of Canada, or would be an insured
      under any such policy but for its termination upon
      exhaustion of its limit of liability; or

   (b) resulting from the hazardous properties of nuclear
      material and with respect to which (1) any person
      or organization is required to maintain financial
      protection pursuant to the Atomic Energy Act of 1954,
      or any law amendatory thereof, or (2) the insured is,
      or had this policy not been issued would be, entitled
      to indemnity from the United States of America, or
      any agency thereof, under any agreement entered into
      by the United States of America, or any agency thereof,
      with any person or organization;

  2. under the Supplementary Payments provision relating to first
    aid, to expenses incurred with respect to bodily injury result-
    ing from the hazardous properties of nuclear material and arising
    out of the operation of a nuclear facility by any person or
    organization;

  3. to bodily injury, property damage, or environmental damage
    resulting from the hazardous properties of nuclear material,
    if

   (a) the nuclear material (1) is at any nuclear facility
      owned by, or operated by or on behalf of, an insured
      or (2) has been discharged or dispersed therefrom;

Copyright, Insurance Services Office, 1981

-5-

   (b)  the nuclear material is contained in spent fuel
or waste at any time possessed, handled, used,
processed, stored, transported, or disposed of by
or on behalf of an insured; or

   (c)  the bodily injury, property damage, or environmental
damage arises out of the furnishing by an insured of
services, materials, parts, or equipment in connection
with the planning, construction, maintenance, operation,
or use of any nuclear facility, but if such facility
is located within the United States of America, its
territories or possessions, or Canada, this exclusion
(c) applies only to property damage to such nuclear
facility and any property thereat.

As used in this exclusion:

"hazardous properties" include radioactive, toxic, or explosive
properties;

"nuclear material" means source material, special nuclear material,
or byproduct material;

"source material", "special nuclear material", and "byproduct material"
have the meanings given them in the Atomic Energy Act of 1954 or in
any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or
liquid, which has been used or exposed to radiation in a nuclear
reactor;

"waste" means any waste material (a) containing by-product material
other than the tailings or wastes produced by the extraction or
concentration of uranium or thorium from any ore processed primarily
for its source material content, and (b) resulting from the operation
by any person or organization of any nuclear facility included under
the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means

(a)  any nuclear reactor,

(b)  any equipment or device designed or used for (1) separat-
     ing the isotopes of uranium or plutonium, (2) processing
     or utilizing spent fuel, or (3) handling, processing, or
     packaging waste,

Copyright, Insurance Services Office, 1981

-6-

(c)  any equipment or device used for the processing, fabricating,
     or alloying of special nuclear material if at any time the
     total amount of such material in the custody of the insured
     at the premises where such equipment or device is located
     consists of or contains more than 25 grams of plutonium or
     uranium 233 or any combination thereof, or more than 250
     grams of uranium 235,

(d)  any structure, basin, excavation, premises, or place prepared
     or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all opera-
tions conducted on such site, and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear
fission in a self-supporting chain reaction or to contain a critical mass
of fissionable material;

"property damage" includes all forms of radioactive contamination of
property.

## SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limit of liability:

(a)  all expenses incurred by the company, all costs taxed against the insured
     in any suit defended by the company, and all interest on the entire
     amount of any judgment therein which accrues after entry of the judgment
     and before the company has paid or tendered or deposited in court that
     part of the judgment which does not exceed the limit of the company's
     liability thereon;

(b)  premiums on appeal bonds required in any such suit and premiums on
     bonds to release attachments in any such suit for an amount not in excess
     of the applicable limit of liability of this policy, but the company shall
     have no obligation to apply for or furnish any such bonds;

(c)  expenses incurred by the insured for first aid to others at the time of
     any accident, for bodily injury to which this policy applies;

(d)  reasonable expenses incurred by the insured at the company's request in
     assisting the company in the investigation or defense of any claim or
     suit, including actual loss of earnings not to exceed $25 per day.

Copyright, Insurance Services Office, 1981

-7-

## II. PERSONS INSURED

Each of the following is an <u>insured</u> under this policy to the extent set forth below:

(a) if the <u>named insured</u> is designated in the declarations as an individual, the person so designated, but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the <u>named insured</u> with respect to the conduct of such a business;

(b) if the <u>named insured</u> is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof, but only with respect to his liability as such;

(c) if the <u>named insured</u> is designated in the declarations as other than an individual, partnership, or joint venture, the organization so designated and any executive officer, director, or stockholder thereof while acting within the scope of his duties as such;

(d) any employee of the <u>named insured</u>, other than an executive officer, while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply:

   (1) to <u>bodily injury</u> to (a) another employee of the <u>named insured</u> arising out of or in the course of his employment, or (b) the <u>named insured</u>, or, if the <u>named insured</u> is a partnership or joint venture, any partner or member thereof;

   (2) to <u>property damage</u> or <u>environmental damage</u> to property owned, occupied or used by, rented to, in the care, custody, or control of, or over which physical control is being exercised for any purpose by (a) another employee of the <u>named insured</u> or (b) the <u>named insured</u>, or, if the <u>named insured</u> is a partnership or joint venture, any partner or member thereof.

This insurance does not apply to <u>bodily injury</u>, <u>property damage</u>, or <u>environmental damage</u> arising out of the conduct of any partnership or joint venture of which the <u>insured</u> is or was a partner or member and which is not designated in this policy as a <u>named insured</u>.

Copyright, Insurance Services Office, 1981

-8-

III. LIMITS OF LIABILITY AND DEDUCTIBLE PROVISIONS

Regardless of the number of insureds under this policy, the number of claims made or suits brought, or the amount of clean-up costs incurred, the company's liability is limited as follows:

(a) The total liability of the company for all damages because of all bodily injury and property damage to which this insurance applies and all clean-up costs incurred because of all environmental damage to which this insurance applies shall not exceed the limit of liability stated in the declarations as "aggregate".

(b) Subject to the above provision with respect to "aggregate", the total liability of the company in any one pollution incident for all damages because of all bodily injury and property damage and all clean-up costs incurred because of all environmental damage shall not exceed the lesser of:

(1) the limit of liability stated in the declarations as "each pollution incident" reduced by the deductible amount, if any, shown therein, or

(2) the combined amount of such damages and clean-up costs in excess of any such deductible amount.

The company may, or will if required by law, pay part or all of the deductible amount to effect settlement of any claim or suit; and upon notification of the action taken, the named insured shall promptly reimburse the company for such part of the deductible amount as has been paid by the company.

IV. POLICY TERRITORY

This insurance applies only to bodily injury, property damage, or environmental damage caused by a pollution incident emanating from an insured site in the United States of America, its territories or possessions, Puerto Rico, or Canada, but not to any such bodily injury or property damage for which original suit for damages is brought _____ elsewhere.

V. EXTENDED REPORTING PERIOD OPTION

If, for any reason other than non-payment of premium, the company cancels or refuses to renew this policy, the named insured may:

(1) by giving written notice to the company on or before the effective date of the cancellation, or no later than ten days after the effective date of non-renewal; and

Copyright, Insurance Services Office, 1981

-9-

    (2)  by paying promptly when due an additional premium of not
          more than 50% of the annual premium developed under this
          policy,

have an endorsement issued providing an extended reporting period of one
year following the effective date of the cancellation or non-renewal.
Any claims for damages because of bodily injury or property damage first
made against the insured and reported to the company during that extended
reporting period shall be deemed to be so made and reported during the
policy period, but only if the bodily injury or property damage occurred
prior to the effective date of the cancellation or non-renewal. All other
provisions of this policy, including those relating to the company's limit
of liability, shall be unchanged by this provision.

For the purpose of this provision, failure of the company to offer to
renew this policy at the same rates or with the same form shall not con-
stitute cancellation or non-renewal by the company.

VI.  DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

    "automobile" means a land motor vehicle, trailer, or semitrailer
designed for travel on public roads (including any machinery or
apparatus attached thereto), but does not include mobile equipment;

    "bodily injury" means bodily injury, sickness, or disease sustained by
any person, including death at any time resulting therefrom;

    "clean-up costs" means expenses for the removal or neutralization of
contaminants, irritants, or pollutants;

    "completed operations hazard" includes bodily injury, property damage,
and environmental damage arising out of operations or reliance upon a
representation or warranty made at any time with respect thereto, but
only if the bodily injury, property damage, or environmental damage
occurs after such operations have been completed or abandoned and
occurs away from premises owned by or rented to the named insured.
"Operations" include materials, parts, or equipment furnished in
connection therewith.  Operations shall be deemed completed at the
earliest of the following times:

Copyright, Insurance Services Office, 1981

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed, or

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair, or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury, property damage, or environmental damage arising out of:

(1) operations in connection with the transportation of property unless the bodily injury, property damage, or environmental damage arises out of a condition in or on a vehicle created by the loading or unloading thereof, or

(2) the existence of tools, uninstalled equipment, or abandoned or unused materials;

"environmental damage" means the injurious presence in or upon land, the atmosphere, or any watercourse or body of water of solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants;

"insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of this policy. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

"insured site" means

(1) the specific location or part thereof specified as such in the declarations of this policy, or

(2) any site to which waste materials were legally consigned or delivered by a named insured for storage, disposal, processing, or treatment, provided that the site

Copyright, Insurance Services Office, 1981

-11-

    (a)  is not and was never owned by, operated by, rented or
         loaned to a named insured; and

    (b)  was duly authorized for such storage, disposal,
         processing, or treatment under a permit issued by
         state or federal authority and in force at the
         time of all such consignment or delivery.

The coverage with respect to an "insured site" under part (2) of this
definition shall be excess insurance over any other valid and collectible
insurance available to the insured;

"mobile equipment" means a land vehicle (including any machinery or
apparatus attached thereto), whether or not self propelled, (1) not
subject to motor vehicle registration, or (2) maintained for use
exclusively on premises owned by or rented to the named insured, including
the ways immediately adjoining, or (3) designed for use principally off
public roads, or (4) designed or maintained for the sole purpose of
affording mobility to equipment of the following types forming an integral
part of or permanently attached to such vehicle: power cranes, shovels,
loaders, diggers, and drills; concrete mixers (other than the mix-in-transit
type); graders, scrapers, rollers, and other road construction or repair
equipment; air-compressors, pumps, and generators, including spraying,
welding, and building cleaning equipment; and geophysical exploration and
well servicing equipment;

"named insured" means the person or organization named in Item 1 of the
declarations of this policy;

"named insured's products" means goods or products manufactured, sold,
handled, or distributed by the named insured or by others trading under
his name, including any container therefor (other than a vehicle); but
"named insured's products" shall not include a vending machine or any
property other than such container rented to or located for use of others
but not sold;

"pollution incident" means emission, discharge, release, or escape of any
solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants
directly from the insured site into or upon land, the atmosphere, or any
watercourse or body of water, provided that such emission, discharge,
release, or escape results in environmental damage.  The entirety of any
sudden or gradual emission, discharge, release, or escape from an insured
site shall be deemed to be one "pollution incident";

Copyright, Insurance Services Office, 1981

-12-

"products hazard" includes <u>bodily injury, property damage,</u> and <u>environmental damage</u> arising out of the <u>named insured's products</u> or reliance upon representation or warranty made at any time with respect thereto, but only if the <u>bodily injury, property damage,</u> or <u>environmental damage</u> occurs away from premises owned by or rented to the <u>named insured</u> and after physical possession of such products has been relinquished to others;

"property damage" means (1) physical injury to, destruction of, or contamination of tangible property, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured, destroyed, or contaminated but has been evacuated, withdrawn from use, or rendered inaccessible because of a <u>pollution incident</u>.

## VII. CONDITIONS

### 1.  PREMIUM

All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums, and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the end of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period, the earned premium shall be computed for such period and, upon notice thereof to the <u>named insured,</u> shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the company shall return to the <u>named insured</u> the unearned portion paid by the <u>named insured.</u>

The <u>named insured</u> shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

### 2.  INSPECTION AND AUDIT

The company shall be permitted but not obligated to inspect the <u>named insured's</u> property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the <u>named insured</u> or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule, or regulation.

Copyright, Insurance Services Office, 1981

-13-

The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

3.  ASSISTANCE AND COOPERATION OF INSURED

The insured shall give written notice to the company as soon as practicable of:

(1) any claim made against the insured; or

(2) any action or proceeding to impose an obligation on the insured for clean-up costs.

The notice shall identify the insured and contain reasonably obtainable information with respect to the time, place, circumstances, and nature of the incident, injury, or damage, including the names and addresses of any persons or organizations sustaining injury or damage and of available witnesses. If a claim is made, a suit is brought, or an action is initiated against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by the insured or the insured's representatives.

The insured and each of its employees shall cooperate with the company and, upon the company's request, assist in (a) making settlements, (b) the conduct of suits or proceedings, and (c) enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured, and any of its members, partners, officers, directors, administrators, stockholders, and employees that the company deems necessary, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at the insured's own cost, voluntarily make any payment, assume any obligation, or incur any expense.

4.  ACTION AGAINST COMPANY

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance

Copyright, Insurance Services Office, 1981

–14–

afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

5.    OTHER INSURANCE

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess, or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a)    Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid; and, with respect to any amount of loss not so paid, the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b)    Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

6.    SUBROGATION

In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

Copyright, Insurance Services Office, 1981

-15-

7. **CHANGES**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

8. **ASSIGNMENT**

Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, but only until the appointment and qualification of the legal representative.

9. **CANCELLATION**

This policy may be cancelled by the named insured by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured, at the address shown in this policy, written notice stating when not less than thirty days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice.

The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If this policy is issued to comply with any law or regulation which requires notice of cancellation to any governmental body, cancellation may not be effected until the required notice has been provided by the named insured or the company.

If the company cancels, earned premium shall be computed pro rata. If the named insured cancels, the earned premium shall be the pro rata earned premium plus 10% of the pro rata unearned premium. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

10. **DECLARATIONS**

By acceptance of this policy, the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

Copyright, Insurance Services Office, 1981

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 04 10351 NG**

KLEENIT, INC.,
      **Plaintiffs**

v.

SENTRY INSURANCE COMPANY,
ROYAL & SUN ALLIANCE, UTICA
NATIONAL INSURANCE GROUP, and
TRAVELERS PROPERTY AND
CASUALTY,
      **Defendants**

## EXHIBITS TO AFFIDAVIT OF DONALD P. NAGLE, ESQUIRE
## IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

# TAB 4

# RUBIN and RUDMAN LLP

COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Robert A. Fasanella
Direct Dial: (617) 330-7018
E-mail: rfasanella@rubinrudman.com

September 25, 2002

Certified Mail Return
Receipt Requested No.  7000 1670 0007 7745 3664

Globe Indemnity Company
9300 Arrowpoint Boulevard
P. O. Box 1000
Charlotte, North Carolina  28201-1000
Attention:  Claims Manager/Department

Certified Mail Return
Receipt Requested No.  7000 1670 0007 7745-3657

Globe Indemnity Company
Royal & Sun Alliance
25 New Chardon Street
P. O. Box 8808
Boston, Massachusetts  02114
Attention:  Claims Manager/Department

RE:    NOTICE OF CLAIM AND REQUEST FOR DEFENSE/COVERAGE
        Insured: Kleenit, Inc./Sudz-It/Duds Cleaners/Care Cleaners
        Claim Type:  Physical Loss/Property Damage/Hazardous Materials
        **Location: 28 Central Square, Chelmsford, Massachusetts**
        Policies:  All Risks/Special Multi-Peril, Policy No. YAD36485/D36485 (1983-1985)
                    Pollution Liability, Policy No. GLZ102708/102708 (1983-1985)
                    Umbrella Liability, Policy No. GLZ102708/102708 (1983-1985)

Dear Sir or Madam:

Please be advised that this firm represents your insured, Kleenit, Inc. (a.k.a. Sudz-It,
Duds Cleaners and/or Care Cleaners) (collectively "Insured" or "Kleenit"), regarding its notice
of claim and request for defense and indemnification pertaining to a release of hazardous
materials, building and property damage, and third party claims at 28 Central Square,
Chelmsford, Massachusetts ("Property"), and at locations outside of the Property's boundaries.
Please report this claim to the appropriate representatives at Globe Indemnity Company (the
"Company").

522164_1

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 2

The Company provided coverage to the Insured at the Property under an "All Risk", Special Multi-Peril Policy, Policy No. YAD36485 or D36485 ("SMP Policy"), a Pollution Liability, Policy No. GLZ102708 or 102708 ("Pollution Policy"), and an Umbrella Liability Policy, Policy No. GLZ102708 or 102708 ("Umbrella Policy") (collectively "Policies") between approximately December 20, 1983 and December 20, 1985. (Attached as Tab 1 are copies of Kleenit's "Prepaid Insurance" ledgers from June 1984 and June 1985, proving the existence of the Policies. Attached as Tab 2 are copies of the types of SMP Policy and Pollution Policy that Kleenit believes were issued to it by the Company.)

Kleenit hereby requests defense and coverage for the foregoing claim under the Policies. In addition, Kleenit requests that the Company approve the risk assessment, soil and groundwater assessment, and other response actions that are discussed herein. Kleenit also requests the Company to provide it with a complete copy of the Policies, Declaration Page(s) and any endorsements or riders. If the Company contends that the Policies, Declaration Page(s), endorsements and/or riders do not exist, the Company should fully explain the basis of its contention and also provide a copy of its "specimen policies" issued during the relevant time frame.

Please respond in writing to me within 30 days of the date of this Notice of Claim.

## Background of Hazardous Materials Release and Property and Building Damage

On or about January 28, 2001 the Massachusetts Department of Environmental Protection ("DEP") issued to Kleenit a "Release Notification – Notice of Responsibility – Notice of Need to Conduct Immediate Response Actions" ("Notice of Responsibility" or "NOR"), claiming that Kleenit was a Potentially Responsible Party ("PRP") under Massachusetts General Laws Chapter 21E for the release of oil and/or hazardous materials at the Property. (Attached at Tab 3 is a copy of the NOR). DEP claimed that Kleenit was responsible for the release of volatile organic compounds ("VOCs") at the Property and that the VOCs had migrated off of the Property and were detected at locations outside of the Property's boundaries.

The Property was first used as a dry cleaning facility in 1960 and the septic system, which is considered a potential source of contamination, was in use until approximately 1990. Based upon the migration and extent of contamination claimed by DEP, the release of hazardous materials and the property damage likely occurred many years ago and within the Policy period. The release of hazardous materials such as VOCs may have resulted from the sudden and accidental releases from the malfunctions of older equipment, spills and/or inadvertent releases from the disposal of perchloroethylene ("PCE") waste products in containers or bags discarded in former dumpsters stored on-site for routine pick-up and disposal prior to the enactment of G.L. c. 21E, which, along with other laws, required licensed hazardous waste contractors to pick-up, manifest and dispose of hazardous wastes at licensed facilities.

522164_1

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 3

DEP further asserted in the NOR that the VOCs at the Property "extend[ed] to the 34 Central Square property and Beaver Brook." (See NOR, p. 1, emphasis added). The NOR stated that "DEP has determined that a Condition of Substantial Release Migration ("SRM"), as described in 310 CMR 40.0006, exists at the subject site." DEP has incurred response action costs related to the release that DEP may recover under M.G.L. c. 21E. If Kleenit did not perform the Immediate Response Actions ("IRAs") ordered by DEP, the NOR stated that DEP would perform such actions and "seek to recover its costs and/or may initiate other appropriate enforcement actions to ensure that such response actions are conducted."

On June 19, 2001 DEP issued a "Notice of Need to Conduct Immediate Response Actions" ("Notice to Conduct IRAs") to Kleenit, claiming that "contaminated groundwater at the subject site is discharging to Beaver Brook." (Attached at Tab 4 is a copy of the Notice to Conduct IRAs.) Beaver Brook is located outside of the Property's boundaries. The Notice to Conduct IRAs stated that,

"[C]hlorinated volatile organic compounds ("CVOCs") have been detected in a sump water sample collected from 34 Central Square in Chelmsford, which operates a day care facility. In addition, CVOCs in indoor air at this location [i.e., at 34 Central Square, not the Property] were also detected. This condition constitutes a Critical Exposure Pathway ("CEP") in accordance with 310 CMR 40.0006. Information available to DEP indicates that a releases [sic] of hazardous material (primarily CVOCs) has occurred at the site which extends to the 34 Central Square property and Beaver Brook, and requires the initiation of one or more IRAs as described in 310 CMR 40.0410." (emphasis and brackets added)

The NOR and Notice to Conduct IRAs required Kleenit to take certain actions to address the condition of Substantial Release Migration ("SRM") and the Critical Exposure Pathway ("CEP") described by DEP. Kleenit has at the outset retained environmental scientists, including a Licensed Site Professional ("LSP"), and environmental legal counsel to initiate its response and defense to DEP's NOR and Notice to Conduct IRAs. Kleenit and its LSP have prepared and filed with DEP certain preliminary environmental reports required by DEP. Kleenit has taken these efforts to address contamination at the Property, the alleged Substantial Release Migration off of the Property, and the potential indoor air impacts at the building located at 34 Central Square, which is beyond the Property's boundaries.

As of this date, Kleenit is required to complete additional requirements under DEP's NOR and Notice to Conduct IRAs and under Chapter 21E and the regulations promulgated thereunder. Kleenit has not resolved its alleged responsibility and liability for other potential damages or costs pertaining to the alleged release at or from the Property, 34 Central Square, Beaver Brook, or any other off-site locations. Kleenit has had discussions with representatives of other PRPs identified by DEP and to whom DEP has sent separate Notices of Responsibility,

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 4

namely, Mobil Business Resources Corporation ("ExxonMobil") and Energy North, Inc. ("Energy North"), addressing potential liability, contribution and other issues related to the claims set forth in the NOR and Notice to Conduct IRAs.

Although Kleenit presently believes that it is minimally responsible, if at all, for the contamination alleged in EP's NOR and Notice to Conduct IRA's, the Company should be aware that ExxonMobil has asserted that Kleenit should contribute a one-third share of ExxonMobil's past and future response action costs. ExxonMobil has claimed that its past and projected future costs total more than $250,000. As of this date, Kleenit has not agreed to pay any of ExxonMobil's alleged costs.

## Request for Insurance Defense and Coverage

Based upon the foregoing, Kleenit requests that the Company provide defense and indemnification under the Policies for all matters related to or arising out of DEP's NOR and Notice to Conduct IRAs. The SMP Policy in effect at all relevant times provided coverage for damage to the building on the Insured's Property under Section I, Parts I and II, and for property damage liability on- and off-site under Section I, Parts IV and/or V. Damage to the Kleenit's Property was covered through, inter alia, Parts I and II of the SMP Policy, which insured against "all risks of physical loss" to buildings and additions and fixtures thereto, and personal property, and did not contain a so-called "pollution exclusion" or any other applicable exclusion. Further, coverage for property damage to others and "Off-Premises" coverage, with no applicable exclusions, existed under, inter alia, Parts IV and/or V under the Extensions of Coverage of the SMP Policy.

The "all risk" SMP Policy issued by the Company to Kleenit was intended to insure against a fortuitous event, casualty or accident, such as the release of contaminants discussed in DEP's NOR and Notice to Conduct IRAs. Mellon v. Hingham Mut. Fire Ins. Co., 19 Mass. App. Ct. 933 (1984) (coverage provided under an "all risk" policy for damage and loss caused by the discharge and migration of water from a broken pipe); Standard Elec. Supply Co. v. Norfolk & Dedham Mut. Fire Ins. Co., 1 Mass. App. Ct. 762 (1974) (coverage provided under an "all risk" policy for insured's loss caused by the discharge and migration of water from a broken pipe *at the premises adjacent to the insured's property*). "Moreover, such fortuities are insured against even if they are not specified in the policy." Mellon at 934. Although the Company in the present case "ha[d] the option to exclude from coverage certain risks" (see Mellon at 934), it chose not to do so. As a result, the Company is obligated to provide coverage as requested herein.

The Umbrella Policy obligates the Company to pay on behalf of Kleenit the ultimate loss which Kleenit is legally obligated to pay in the present matter as damages because of property damage or personal injury, including the defense of the claims discussed herein. The Pollution Policy similarly obligates the Company to pay on behalf of Kleenit all sums which Kleenit is

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 5

obligated to pay as compensatory damages because of property damage or bodily injury, and to reimburse Kleenit for cleanup costs incurred to comply with the requirements of DEP's NOR and Notice to Conduct IRAs. All of these conditions are triggered here, and there are no applicable exclusions under the Policy.

The Massachusetts Supreme Judicial Court has held that "[t]he contamination of soil and groundwater by the release of hazardous material involves property damage" and loss. Hazen Paper Co. v. U.S. Fidelity and Guar. Co., 407 Mass. 689, 698 (1990) (emphasis added). In addition, insurance coverage is triggered by an enforcement letter issued by a government agency to an insured asserting that a release of contamination has occurred, such as the NOR and Notice to Conduct IRAs issued by DEP to Kleenit in this instance. Id. Accordingly, the Company should provide defense and indemnification under the Policies for all claims arising out of DEP's NOR and Notice to Conduct IRAs.

Because the property damage at issue here was neither expected nor intended from the standpoint of the Insured, and, according to DEP's claim, involves off-site contamination and/or impacts property and groundwater of another person if remediation is not undertaken, no exclusions, including the "owned property" exclusion, would apply. Massachusetts Courts consistently hold that the "owned property exclusion" does not bar recovery of costs of cleaning up environmental contamination which presents a threat to, or demonstrated contamination of, property of others and groundwater. See, e.g., Wasserman v. Commerce Insurance Co., Middlesex Superior Court C.A. No. 01-0619(B) (Sanders, J.) (July 9, 2002) ("[A]n insurer will be liable not only to defend an insured against an NOR but also to indemnify the insured for all cleanup costs, even with an 'owned property' exclusion, so long as there is a significant threat of off-site migration."); Rubenstein v. Royal Insurance Co. of America, 44 Mass. App. Ct. 842, 854 (1998) (An insurer's liability for all response costs is triggered "even if the contaminating substances are solely on the insured's land."); Hakim v. Massachusetts Insurer's Insolvency Fund, 424 Mass. 275 (1997).

Kleenit's defense in this case shall also include efforts to pursue any PRPs identified by DEP in its NOR and Notice to Conduct IRAs, and any fees included therefor. See, e.g., Wasserman at p. 15 ("The NOR placed the responsibility on [the insured] to pursue the other parties so that [the insured's] attempts to get their contribution so as to eliminate or diminish his own liability to DEP is thus inextricably intertwined with his defense to the NOR.")

Any purported arguments that the property damage and loss in this case did not occur in the Policies period would be rendered ineffective by Rubenstein, supra., and Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844 (1993), which hold that insurance coverage may be triggered during many time periods and not just when the damage manifests itself. As stated in Trustees of Tufts University,

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 6

[T]he three most common 'trigger theories' include: the exposure trigger (policies in effect during years claimant's property tortiously exposed to hazardous material triggered), the continuous (or multiple) trigger (property damage occurs during each year from the time of first hazardous exposure through manifestation), and the injury-in-fact (or actual injury) trigger requires inquiry into when property damage actually occurred).

415 Mass. at 854, n.9. In Klennit's case, DEP's NOR and Notice to Conduct IRAs make clear that the loss and damage occurred many years ago, during the Policies period. As a result, coverage is triggered under the Policies.

Finally, if there is any ambiguity in the Policies provisions or terms, the ambiguities are construed against the insurer in favor of the policyholder. See Cody v. Connecticut General Life Ins. Co., 387 Mass. 142, 146 (1982) and Camp, Dresser & McKee, Inc. v. The Home Ins. Co., 30 Mass. App. Ct. 318, 326 (1991).

In the present matter, Kleenit requires the assistance of environmental consultants and environmental counsel to provide a defense to the claims asserted by DEP, the PRPs, and other third parties. Please be advised that if the Company should delay or deny its defense or coverage obligations under the Policies, Kleenit will consider bringing a declaratory judgment action to seek full defense and coverage pursuant to the Policies and Massachusetts law. As you may be aware, the Supreme Judicial Court has held that an insured who is put to the expense of establishing an insurer's duty to defend under a policy through a declaratory judgment action is entitled to recover attorney's fees in prosecuting that action, regardless of whether the insurer acted in bad faith or unreasonably. See, e.g., Hanover Insurance Co. v. Golden, 436 Mass. 584 (2002).

Please respond to me in writing within 30 days of the date of this Notice of Claim.

Please contact me if you need to discuss this claim. Thank you for your cooperation and attention to this matter.

Very truly yours,

Robert A. Fasanella

Peter J. Feuerbach

RAF/PJF/jem
Enclosures
cc:   Kleenit, Inc. (with enclosures)

522164_1



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

7000 1670 0007 7745 3657

RTFOfficenit L888562o2 U S E

Postage $ 3.85

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $ 6.16

EASTPOINT STA BOSTON MA 02205
SEP 25 2002 USPS

Sent To
Globe Indemnity Company - Claims Mgr.
Street, Apt. No.; or PO Box No.
Royal Sun Alliance, 25 New Chardon St
City, State, ZIP+4
P.O. Box 8808 - Boston, MA 02114

PS Form 3800, May 2000        See Reverse for Instructions

## Certified Mail Provides:
- A mailing receipt
- A unique identifier for your mailpiece
- A signature upon delivery
- A record of delivery kept by the Postal Service for two years

*Important Reminders:*
- Certified Mail may ONLY be combined with First-Class Mail or Priority Mail.
- Certified Mail is *not* available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement "*Restricted Delivery*".
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**

PS Form 3800, May 2000 (*Reverse*)                      102595-99-M-2087

**SENDER: COMPLETE THIS SECTION**

- Complete Items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) | B. Date of Delivery

C. Signature
X _____  ☐ Agent  ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Globe Indemnity Company
Royal & Sun Alliance
25 New Chardon Street
P.O. Box 8808
Boston, MA 02114

Attn: Claims Mgr / Dept.

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)
   7000 1670 0007 7745 3657

PS Form 3811, July 1999    Domestic Return Receipt    102595-00-M-0952

UNITED STATES POSTAL SERVICE



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Peter J. Feuerbach, Esquire

**RUBIN AND RUDMAN LLP**
**50 ROWES WHARF 3rd FL.**
**BOSTON, MA  02110**

Kleenit - 88560002

23

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 04 10351 NG

**KLEENIT, INC.,**
      **Plaintiffs**

**v.**

**SENTRY INSURANCE COMPANY,
ROYAL & SUN ALLIANCE, UTICA
NATIONAL INSURANCE GROUP, and
TRAVELERS PROPERTY AND
CASUALTY,**
      **Defendants**

## EXHIBITS TO AFFIDAVIT OF DONALD P. NAGLE, ESQUIRE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TAB 5

FILE COPY

# RUBIN AND RUDMAN LLP

### COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Robert A. Fasanella
Direct Dial: (617) 330-7018
E-mail: rfasanella@rubinrudman.com

September 25, 2002

**Certified Mail Return**
**Receipt Requested No. 70001670 0007 7745 3640**

Globe Indemnity Company
9300 Arrowpoint Boulevard
P. O. Box 1000
Charlotte, North Carolina 28201-1000
Attention: Claims Manager/Department

**Certified Mail Return**
**Receipt Requested No. 7000 1670 0007 7745 3596**

Globe Indemnity Company
Royal & Sun Alliance
25 New Chardon Street
P. O. Box 8808
Boston, Massachusetts 02114
Attention: Claims Manager/Department

RE:    NOTICE OF CLAIM AND REQUEST FOR DEFENSE/COVERAGE
       Insured: Kleenit, Inc./Sudz-It/Duds Cleaners/Care Cleaners
       Claim Type: Physical Loss/Property Damage/Hazardous Materials
       **Location: 293 and 295 Main Street, Acton, Massachusetts**
       Policies: All Risks/Special Multi-Peril, Policy No. YAD36485/D36485 (1983-1985)
               Pollution Liability, Policy No. GLZ102708/102708 (1983-1985)
               Umbrella Liability, Policy No. GLZ102708/102708 (1983-1985)

Dear Sir or Madam:

Please be advised that this firm represents your insured, Kleenit, Inc. (a.k.a. Sudz-It, Duds Cleaners and/or Care Cleaners) (collectively "Insured" or "Kleenit"), regarding its notice of claim and request for defense and indemnification pertaining to a release of hazardous materials, building and property damage, and third party claims at 293 and 295 Main Street, Acton, Massachusetts ("Property"), and at locations outside of the Property's boundaries. Please report this claim to the appropriate representatives at Globe Indemnity Company (the "Company").

522485_1

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 2

The Company provided coverage to the Insured at the Property under an "All Risk", Special Multi-Peril Policy, Policy No. YAD36485 or D36485 ("SMP Policy"), a Pollution Liability, Policy No. GLZ102708 or 102708 ("Pollution Policy"), and an Umbrella Liability Policy, Policy No. GLZ102708 or 102708 ("Umbrella Policy") (collectively "Policies") between approximately December 20, 1983 and December 20, 1985. (Attached as Tab 1 are copies of Kleenit's "Prepaid Insurance" ledgers from June 1984 and June 1985, proving the existence of the Policies. Attached as Tab 2 are copies of the types of SMP Policy and Pollution Policy that Kleenit believes were issued to it by the Company.)

Kleenit hereby requests defense and coverage for the foregoing claim under the Policies. In addition, Kleenit requests that the Company approve the risk assessment, soil and groundwater assessment, and other response actions that are discussed herein. Kleenit also requests the Company to provide it with a complete copy of the Policies, Declaration Page(s) and any endorsements or riders. If the Company contends that the Policies, Declaration Page(s), endorsements and/or riders do not exist, the Company should fully explain the basis of its contention and also provide a copy of its "specimen policies" issued during the relevant time frame.

**Please respond in writing to me within 30 days of the date of this Notice of Claim.**

## Background of Hazardous Materials Release and Property and Building Damage

Since approximately 1962 Kleenit has leased building space and operated a dry cleaning business at 293 and 295 Main Street, Acton, Massachusetts ("Property"), which is located within the Acton Plaza shopping center. By letter dated August 14, 2002 Kleenit's landlord, E&A Northeast Limited Partnership ("E&A"), notified Kleenit of a release of hazardous materials beneath the Property and demanded that Kleenit cleanup the release pursuant to the Massachusetts "Superfund" statute, General Laws Chapter 21E, and its implementing regulations, 310 CMR 40.0000. (A copy of E&A's letter is attached as Tab 3) E&A claimed that vapors from the release could potentially pose a human health risk to employees, tenants and customers at the Property and Acton Plaza. E&A demanded that, inter alia, Kleenit report the release of perchloroethylene ("PCE") to the Massachusetts Department of Environmental Protection ("DEP") as required under Chapter 21E and 310 CMR 40.0000, by October 29, 2002. E&A also demanded that Kleenit take actions to respond to the release. Based upon DEP's practice under 310 CMR 40.0000, Kleenit expects that DEP will shortly issue a Notice of Responsibility ("NOR") to Kleenit and/or E&A under G.L. c. 21E, ordering Kleenit and/or E&A to assess and/or remediate the alleged release of hazardous materials.

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 3

In response to E&A's demand and Kleenit's potential obligations under Chapter 21E, 310 CMR 40.0000 and the lease, Kleenit has obtained proposals from two experienced environmental consultants to evaluate the potential human health risks from vapors generated by the release of PCE and to respond to the release in accordance with Chapter 21E and 310 CMR 40.0000. Enclosed herewith as Tab 4 is a proposal from Risk Management Incorporated ("RMI"), dated September 3, 2002, pertaining to the human health risk assessment of the vapors. I also enclose as Tab 5 a proposal from Coler & Colantonio ("C&C"), dated September 5, 2002, pertaining to the assessment of soil and groundwater conditions at the Property. On behalf of Kleenit we request that the Company approve forthwith the proposed scope of services for RMI and C&C as set forth in Tabs 4 and 5.

In addition, Kleenit requests the Company's approval to install an interior wall within part of its leased space, so that any potential vapors from the release of PCE can be sealed from other leased space within the building. Kleenit believes that it may be required to perform additional response actions in the future pertaining to the release in accordance with Chapter 21E, 310 CMR 40.0000 and the lease, and a Notice of Responsibility ("NON") that Kleenit expects will be issued shortly to Kleenit and/or E&A by DEP under the statute and regulations. Kleenit requests that the Company agree to pay for all such future response actions. In addition, Kleenit requests that the Company agree to pay Kleenit's legal expenses in defense of E&A's demand and the requirements and responsibilities imposed by DEP, Chapter 21E and/or 310 CMR 40.0000.

## Request for Insurance Defense and Coverage

Based upon the foregoing, Kleenit requests that the Company provide defense and indemnification under the Policies for all matters related to or arising out of DEP's NOR and Notice to Conduct IRAs. The SMP Policy in effect at all relevant times provided coverage for damage to the building on the Insured's Property under Section I, Parts I and II, and for property damage liability on- and off-site under Section I, Parts IV and/or V. Damage to the Kleenit's Property was covered through, inter alia, Parts I and II of the SMP Policy, which insured against "all risks of physical loss" to buildings and additions and fixtures thereto, and personal property, and did not contain a so-called "pollution exclusion" or any other applicable exclusion. Further, coverage for property damage to others and "Off-Premises" coverage, with no applicable exclusions, existed under, inter alia, Parts IV and/or V under the Extensions of Coverage of the SMP Policy.

The "all risk" SMP Policy issued by the Company to Kleenit was intended to insure against a fortuitous event, casualty or accident, such as the release of contaminants discussed in DEP's NOR and Notice to Conduct IRAs. Mellon v. Hingham Mut. Fire Ins. Co., 19 Mass. App. Ct. 933 (1984) (coverage provided under an "all risk" policy for damage and loss caused by the discharge and migration of water from a broken pipe); Standard Elec. Supply Co. v. Norfolk &

RUBIN and RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 4

Dedham Mut. Fire Ins. Co., 1 Mass. App. Ct. 762 (1974) (coverage provided under an "all risk" policy for insured's loss caused by the discharge and migration of water from a broken pipe *at the premises adjacent to the insured's property*). "Moreover, such fortuities are insured against even if they are not specified in the policy." Mellon at 934. Although the Company in the present case "ha[d] the option to exclude from coverage certain risks" (see Mellon at 934), it chose not to do so. As a result, the Company is obligated to provide coverage as requested herein.

The Umbrella Policy obligates the Company to pay on behalf of Kleenit the ultimate loss which Kleenit is legally obligated to pay in the present matter as damages because of property damage or personal injury, including the defense of the claims discussed herein. The Pollution Policy similarly obligates the Company to pay on behalf of Kleenit all sums which Kleenit is obligated to pay as compensatory damages because of property damage or bodily injury, and to reimburse Kleenit for cleanup costs incurred to comply with the requirements of DEP's NOR and Notice to Conduct IRAs. All of these conditions are triggered here, and there are no applicable exclusions under the Policy.

The Massachusetts Supreme Judicial Court has held that "[t]he contamination of soil and groundwater by the release of hazardous material involves property damage" and loss. Hazen Paper Co. v. U.S. Fidelity and Guar. Co., 407 Mass. 689, 698 (1990) (emphasis added). In addition, insurance coverage is triggered by an enforcement letter issued by a government agency to an insured asserting that a release of contamination has occurred, such as the NOR and Notice to Conduct IRAs issued by DEP to Kleenit in this instance. Id. Accordingly, the Company should provide defense and indemnification under the Policies for all claims arising out of DEP's NOR and Notice to Conduct IRAs.

Because the property damage at issue here was neither expected nor intended from the standpoint of the Insured, and, according to DEP's claim, involves off-site contamination and/or impacts property and groundwater of another person if remediation is not undertaken, no exclusions, including the "owned property" exclusion, would apply. Massachusetts Courts consistently hold that the "owned property exclusion" does not bar recovery of costs of cleaning up environmental contamination which presents a threat to, or demonstrated contamination of, property of others and groundwater. See, e.g., Wasserman v. Commerce Insurance Co., Middlesex Superior Court C.A. No. 01-0619(B) (Sanders, J.) (July 9, 2002) ("[A]n insurer will be liable not only to defend an insured against an NOR but also to indemnify the insured for all cleanup costs, even with an 'owned property' exclusion, so long as there is a significant threat of off-site migration."); Rubenstein v. Royal Insurance Co. of America, 44 Mass. App. Ct. 842, 854 (1998) (An insurer's liability for all response costs is triggered "even if the contaminating substances are solely on the insured's land."); Hakim v. Massachusetts Insurer's Insolvency Fund, 424 Mass. 275 (1997).

522485_1

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 5

Kleenit's defense in this case shall also include efforts to pursue any PRPs identified by DEP in its NOR and Notice to Conduct IRAs, and any fees included therefor. See, e.g., Wasserman at p. 15 ("The NOR placed the responsibility on [the insured] to pursue the other parties so that [the insured's] attempts to get their contribution so as to eliminate or diminish his own liability to DEP is thus inextricably intertwined with his defense to the NOR.")

Any purported arguments that the property damage and loss in this case did not occur in the Policies period would be rendered ineffective by Rubenstein, supra., and Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844 (1993), which hold that insurance coverage may be triggered during many time periods and not just when the damage manifests itself. As stated in Trustees of Tufts University,

[T]he three most common 'trigger theories' include: the exposure trigger (policies in effect during years claimant's property tortiously exposed to hazardous material triggered), the continuous (or multiple) trigger (property damage occurs during each year from the time of first hazardous exposure through manifestation), and the injury-in-fact (or actual injury) trigger requires inquiry into when property damage actually occurred).

415 Mass. at 854, n.9. In Klennit's case, DEP's NOR and Notice to Conduct IRAs make clear that the loss and damage occurred many years ago, during the Policies period. As a result, coverage is triggered under the Policies.

Finally, if there is any ambiguity in the Policies provisions or terms, the ambiguities are construed against the insurer in favor of the policyholder. See Cody v. Connecticut General Life Ins. Co., 387 Mass. 142, 146 (1982) and Camp, Dresser & McKee, Inc. v. The Home Ins. Co., 30 Mass. App. Ct. 318, 326 (1991).

In the present matter, Kleenit requires the assistance of environmental consultants and environmental counsel to provide a defense to the claims asserted by DEP, the PRPs, and other third parties. Please be advised that if the Company should delay or deny its defense or coverage obligations under the Policies, Kleenit will consider bringing a declaratory judgment action to seek full defense and coverage pursuant to the Policies and Massachusetts law. As you may be aware, the Supreme Judicial Court has held that an insured who is put to the expense of establishing an insurer's duty to defend under a policy through a declaratory judgment action is entitled to recover attorney's fees in prosecuting that action, regardless of whether the insurer acted in bad faith or unreasonably. See, e.g., Hanover Insurance Co. v. Golden, 436 Mass. 584 (2002).

RUBIN AND RUDMAN LLP

Globe Indemnity Company, Claims Manager/Department
September 25, 2002
Page 6


**Please respond to me in writing within 30 days of the date of this Notice of Claim.**

Please contact me if you need to discuss this claim.  Thank you for your cooperation and attention to this matter.

Very truly yours,

Robert A. Fasanella

Peter J. Feuerbach

RAF/PJF/jem
Enclosures
cc:    Kleenit, Inc. (with enclosures)