# EXHIBIT "G"

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

NO. 04-10351 (NG)

```
* * * * * * * * * * * * * * * * *
                                 *
                                 *
                                 *
KLEENIT, INC.,                   *
     Plaintiff                   *
                                 *
     vs.                         *
                                 *
SENTRY INSURANCE COMPANY, ROYAL  *
AND SUN ALLIANCE, UTICA NATIONAL *
INSURANCE GROUP AND TRAVELERS    *
PROPERTY AND CASUALTY,           *
     Defendants                  *
                                 *
* * * * * * * * * * * * * * * * *
```

     DEPOSITION OF FRANCIS X. MURPHY, a witness called on Behalf of the Defendant, Travelers Property and Casualty, pursuant to Massachusetts Rules of Civil Procedure, before Diane M. Durette, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Tucker, Heifetz & Saltzman, 3 School Street, Boston, Massachusetts on Wednesday, August 10, 2005, commencing at 10:05 a.m.

Page 10

1  A. Well, the accounting aspect is something
2     that I've done more recently. Mr. Crider is
3     not versed in computers so he basically ran
4     a paperwork system, and I've transferred it
5     over to computers so that's been much more
6     recent. Payroll, I took over about five
7     years ago. My wife's grandmother became ill
8     so things have shifted a bit. It's not been
9     steady. The general manager is kind of a
10    catch-all kind of a position.
11 Q. How would you describe Mr. Crider's role at
12    this time?
13 A. At this time?
14 Q. Yes.
15 A. Basically in mentoring me to take over the
16    company.
17 Q. What does he do on a day-to-day basis with
18    the company now?
19 A. Right now, we're in the midst of
20    reorganizing, evaluating different store
21    locations and he is also, he keeps his own
22    set of accounting records. He does that on
23    a daily basis. Again, a lot of the same
24    things I do as far as customer service. He

Page 11

1     deals more with landlords than I do or ever
2     have. You know, again, sometimes it just
3     depends on who answers the phone as who will
4     take whatever problem arises.
5  Q. Now, before you started becoming the general
6     manager in 1995, how would you describe Mr.
7     Crider's role?
8  A. He was the president. He was in charge of
9     all corporate matters.
10 Q. Who was acting as general manager at that
11    time?
12 A. No one.
13 Q. Who was handling the day-to-day operational
14    decisions?
15 A. Well, most of the locations pretty much ran
16    themselves. I was, I guess, brought in to
17    oversee them and the idea was to train me at
18    a location to learn how the business worked
19    and then to grow into the supervisor
20    position.
21 Q. How often say in 1995 would you say Mr.
22    Crider was going out to the individual
23    locations on a weekly basis?
24 A. On a weekly basis, no. It never happened on

Page 12

1     a weekly basis.
2  Q. How often would he go on a monthly basis?
3  A. I can only say for the location I was at if
4     I saw him twice a year down there I would
5     say that would be a lot.
6  Q. Do you think that was consistent with all of
7     the locations?
8  A. Yes. Actually, he probably came to that
9     location more than others because it was one
10    of the more important ones.
11 Q. Now, other than Mr. Crider and you as
12    general manager, are there any other
13    officers of the corporation?
14 A. Yes, my mother-in-law.
15 Q. What is her position?
16 A. She is the treasurer of the company.
17 Q. Does she have any active role in operating
18    the company?
19 A. She goes around to the different locations
20    and evaluates them, usually for personnel,
21    you know, rating personnel and also for the
22    physical appearance of the stores.
23 Q. How often in a month does she do that?
24 A. I would say she probably visits a couple of

Page 13

1     stores a week.
2  Q. And how long has she been doing that?
3  A. That, I'm not sure.
4  Q. Has her role changed since you joined the
5     company?
6  A. No.
7  Q. Was she ever a manager of any of the stores?
8  A. Not that I'm aware of, no. I'm also
9     certain, no.
10 Q. To the best of your knowledge, did she ever
11    participate with the clean up of the
12    hazardous waste that has been found on the
13    sites?
14 A. No.
15 Q. Did she ever have any dealings with the LSP?
16 A. No.
17 Q. Now, besides your mother-in-law. Any other
18    officers?
19 A. I believe my wife's grandmother, my
20    mother-in-law's mother is still technically
21    the secretary of the company.
22 Q. And is she involved actively at this time?
23 A. No.
24 Q. When is the last time she was actively

Page 14

1  involved in the corporation?
2  A. I think when she was doing the payroll and
3     that was probably about five years, four or
4     five years ago.
5  Q. And did she ever have any role other than
6     payroll?
7  A. I've always been told that she was like a
8     right-hand person but since I've known her
9     she only ever did the payroll.
10 Q. When did you first meet her?
11 A. I guess it would have been back in probably
12    around when I -- 1988, I guess.
13 Q. Have you ever talked to her about whether
14    there was any releases of Perc on the sites?
15 A. No, no.
16 Q. Are there any other family members that are
17    affiliated with the company at this time?
18 A. No.
19 Q. How about in the past?
20 A. In the past my brother-in-law was employed
21    with the company as a manager.
22 Q. And which site was he managing?
23 A. He was at the Chelmsford site.
24 Q. What is his name?

Page 15

1  A. Jeffrey.
2  Q. That's Jeffrey Crider?
3  A. Yes.
4  Q. Is he the one that's living in Arizona at
5     this time?
6  A. Yes, that's correct.
7  Q. And do you know what years he was at the
8     Chelmsford site?
9  A. I would say probably, I would guess around
10    2000 to 2003. Somewhere along those lines.
11 Q. Do you know if he had any experience with
12    the company prior to 2000?
13 A. Not that I'm aware of. I think he probably
14    held summer jobs but I don't know what they
15    would have been.
16 Q. Now, have you talked to him about whether he
17    knows of any releases of hazardous waste?
18 A. When I was general manager, yes, I did.
19 Q. And when did you have that discussion with
20    him?
21 A. I can't say exactly. I mean, I just know
22    that I've asked him if he had ever known of
23    anything happening. He told me no, there
24    was nothing that ever happened while he was

Page 16

1  managing the store.
2  Q. Did you inquire any further as to whether he
3     had heard of any releases other than
4     actually having seen one?
5  A. No, I did not.
6  Q. How many conversations did you have with him
7     about that issue?
8  A. I would say one or two probably.
9  Q. And what is the most recent conversation you
10    had with him about this issue?
11 A. My assumption is that it was around when we
12    were digging out the back of the store so
13    that would have been in, I guess it was early
14    2002, late 2001.
15 Q. Now, who would you describe as the
16    decisionmakers for Kleenit Incorporated?
17 A. I would guess a combination of myself, Mr.
18    Crider and Mrs. Crider, at this point.
19 Q. And how long has that been in effect; do you
20    believe?
21 A. That is probably more recently, within the
22    past couple of years. Before that it was,
23    either it was the board pretty much or Mr.
24    Crider on a day-to-day basis.

Page 17

1  Q. When you talk about the board, who was on
2     the board?
3  A. The board was Mr. Crider, Mrs. Crider,
4     Esther Munroe and I believe Mr. Nason was on
5     the board as well for awhile.
6  Q. Who is Mr. Nason?
7  A. He was the company accountant. He has since
8     passed away since our last deposition.
9  Q. Oh, really?
10 A. Yes.
11 Q. When did he pass away?
12 A. Within the past couple of weeks, two or
13    three weeks.
14 Q. Now, you're obviously familiar with this
15    lawsuit?
16 A. Yes.
17 Q. Can you tell what substance it is that has
18    apparently been released by Kleenit
19    incorporated?
20 A. Well, Perchlorethelene, Tetrachlorethelene
21    is the technical name.
22 Q. Can we agree we'll call that Perc, because I
23    can't pronounce that, during the course of
24    this deposition?

Page 18

1  A. Yes, that's fine.
2  Q. So if I say Perc you'll understand what I'm
3     referring to?
4  A. Yes.
5  Q. Now, while you have been involved with
6     Kleenit, have you ever personally witnessed
7     a release of Perc at one of the sites?
8  A. I've seen small releases, drips coming out
9     of, you know, say a pump that's being
10    repaired.
11 Q. And do you have any recollection
12    specifically of when those small releases
13    occurred?
14 A. I would guess when I was -- not
15    specifically, no, I don't. I really don't.
16 Q. Just as far as volume, what do you think
17    we're talking about as far as the largest
18    release that you've personally witnessed?
19 A. I would say a half a cup maybe, which would
20    have been obviously wiped up right away and
21    the cloth would have been thrown back into
22    the cleaning machine.
23 Q. How many times do you think you've seen
24    those types of releases?

Page 19

1  A. Maybe, I don't know, less than a half a
2     dozen times, I would say.
3  Q. Which sites were those? At which site were
4     those releases that you witnessed?
5  A. One was at Acton, one would have been at the
6     main plant. Where else? I think there was
7     one at Drum Hill.
8  Q. The one at Acton, do you remember which
9     location or which piece of machinery was
10    being repaired?
11 A. It was one of the pumps that we were working
12    on.
13 Q. And a pump to what; do you remember?
14 A. It's a solvent pump on the drycleaning
15    machine.
16 Q. Did you ever witness any releases at the
17    Chelmsford site?
18 A. No.
19 Q. What about the Wayland site?
20 A. No.
21 Q. Can you tell me, are there any requirements
22    for reporting a small release like what you
23    just described?
24 A. I believe it's a gallon. I'm not sure but I

Page 20

1     believe that's what it is in order to report
2     it. I have never seen anything even
3     approaching that amount.
4  Q. So you've never had to make any governmental
5     reports?
6  A. That's correct.
7  Q. On releases?
8  A. Correct.
9  Q. And you just tell me, Perc, is that a
10    corrosive substance; do you know?
11 A. Not that I'm aware of, no.
12 Q. Have you personally been involved in any
13    clean ups of the Perc that you've seen
14    released?
15 A. Oh, yes. As I said, when we were working, I
16    recall that time working on the pump and as
17    the pump was taken off, some dribbled out of
18    the end of it, and it was wiped up
19    immediately and put into the cleaning
20    machine.
21 Q. Was that the only one you saw at Acton, the
22    only release you saw at Acton?
23 A. That's one that I specifically remember and
24    so I don't recall any others so I would

Page 21

1     guess that that's the only one.
2  Q. Now, is there an official policy or
3     procedure that Kleenit has in place to deal
4     with spills of Perc?
5  A. I guess it would be related to the OSHA
6     regulations, workplace regulations, exposure
7     levels. Basically, if anything happens it's
8     cleaned up immediately.
9  Q. Is there a formal policy telling employees
10    how to either report a Perc release?
11 A. No.
12 Q. Or how to clean up a Perc release?
13 A. You mean a written policy?
14 Q. Yes, a written policy?
15 A. No.
16 Q. Have you ever conducted any training for
17    employees to inform them how they should
18    report a Perc release or how they should
19    clean up a Perc release?
20 A. Yes.
21 Q. And when did you do that?
22 A. It's been ongoing, I guess, as new
23    drycleaners come and go, as new ones come on
24    to be told how to properly run the plant,

6 (Pages 18 to 21)

Page 26

1  Q. And was he still at the site when you first
2     started?
3  A. Yes.
4  Q. Did he train you?
5  A. Yes, briefly.
6  Q. Do you know where Mr. Lingo is?
7  A. No, I don't, no.
8  Q. Do you know if he's still alive?
9  A. I believe so.
10 Q. Do you know if he lives in Massachusetts?
11 A. I'm pretty sure he does not. The last I
12    knew he was in Vermont somewhere but I've
13    heard he moved from there as well so I don't
14    know where he is.
15 Q. Do you know anyone who would know where he's
16    located?
17 A. I would guess his mother does.
18 Q. Do you know her?
19 A. Yes, I do.
20 Q. And where is she located?
21 A. She's in Ayer, Massachusetts.
22 Q. How old is Mr. Lingo; if you know?
23 A. I don't know. He's older than I am. I'm
24    not sure. I believe he's older than I am.

Page 27

1  Q. Now, have you ever spoken to Mr. Lingo about
2     whether he's aware of any Perc spills?
3  A. No, I have not.
4  Q. And when was the last time you spoke to him?
5  A. I can't remember. He stopped in once after
6     that, into Keith's office and it was just a
7     social call, just seeing how things were.
8  Q. You mean once after he left the company?
9  A. Yes, right.
10 Q. That was approximately '89?
11 A. He left in the spring of '89, yes.
12 Q. And have you ever had a chance to yourself
13    have a discussion with Mr. Crothers about
14    the Perc releases which he witnessed?
15 A. Not really, no. I mean I just, I guess
16    after I saw his affidavit I discussed, you
17    know, just to see if there were any other
18    times that he recalled.
19 Q. Did he have any recollection of anything
20    else?
21 A. No.
22 Q. Did he, to the best of your knowledge did he
23    give you any additional information that's
24    not reflected in the affidavit?

Page 28

1  A. No.
2  Q. To the best of your knowledge, was that the
3     extent of his recollection of the Perc
4     releases on the site?
5  A. I guess to the best of my knowledge that's
6     what he knows, yes.
7  Q. When was the last time you had a
8     conversation with him about this issue of
9     the Perc releases?
10 A. Mr. Crothers?
11 Q. Yes.
12 A. The last time I spoke to him was after his
13    deposition here. I mean, I think there may
14    have been a time or two just getting out
15    spots at work, but I have not discussed the
16    clean up issues with him at all.
17 Q. Have you discussed with him whether he knows
18    of any other employees that may know of Perc
19    releases?
20 A. No.
21 Q. Do you know if the company has records of
22    the employees that were employed at the
23    Acton site during '70 or '71?
24 A. No, they don't exist, no.

Page 29

1  Q. What about 1978?
2  A. No.
3  Q. How far back do the records go indicating
4     employees of Kleenit?
5  A. I would guess maybe into the '90s, if that.
6  Q. Mid '90s?
7  A. No. I mean, I don't know really, to be
8     honest with you but it's just they're
9     basically purged out of ADP on a six month
10    basis so at that point, they're pretty much
11    gone from the computer records and whether
12    or not we have any other records it's
13    usually they're just too much to keep
14    around.
15 Q. Do you keep personnel files?
16 A. Yes.
17 Q. And does Kleenit have a policy of how long
18    they retain those personnel files?
19 A. No, we don't. It's just a clean them out
20    whenever it comes up. Whenever there's some
21    time that the office manager doesn't have
22    anything to do, she can do something like
23    that.
24 Q. And who makes the decision as to which ones

Page 30

1  or how often you're going to clean out the
2  personnel files?
3  A. I guess I would but it hasn't been made, you
4    know, in the past -- I can't remember the
5    last time I specifically told anyone to
6    clean out the personnel files. I think the
7    last office manager we had was more on top
8    of that, and she would do it on a more
9    regular basis.
10 Q. And when was the change over in office
11    managers?
12 A. It was about two years ago now, I think.
13 Q. So you don't have a computerized list of
14    former employees?
15 A. No, nothing that dates back to name. Maybe
16    a couple of years but that's about it.
17 Q. And you mentioned ADP?
18 A. ADP.
19 Q. And what is that, is that a payroll
20    processing company?
21 A. Yes, it is.
22 Q. And do you know when Kleenit began using
23    ADP?
24 A. I don't know when. I know we were, I've

Page 31

1  been told we were one of their first
2  customers.
3  Q. And were you already, was Kleenit using ADP
4    before you started to, joined the firm?
5  A. Yes.
6  Q. Now, do you know a Dave Walker?
7  A. Yes, I do.
8  Q. Who is he?
9  A. He's our head of maintenance.
10 Q. And how long has he been head of
11    maintenance?
12 A. Longer than I've been around.
13 Q. So he pre-dated you?
14 A. Yes.
15 Q. As head of maintenance what are his
16    responsibilities?
17 A. Basically, keeping the trucks in running
18    order, keeping the machinery, pressing
19    equipment in running order. He currently
20    is, he services our laundromats, both for
21    the machinery and also for the coin. That
22    takes up a fair amount of his time during
23    the week basically pulling the coin out of
24    the machines. What else does he do? That

Page 32

1  pretty much fills his week.
2  Q. So he basically takes on a mechanic's role?
3  A. Yes.
4  Q. So he's not simply an individual that cleans
5    the sites?
6  A. No.
7  Q. He actually repairs machinery?
8  A. Yes.
9  Q. Does this include the drycleaning machinery?
10 A. It has from time to time but generally
11    speaking, you know, for most complex things
12    we would get a third party in.
13 Q. When you say from time to time, what are the
14    situations where he would actually fix or
15    repair a drycleaning machine?
16 A. I think that anything that doesn't have to
17    do with electronics and things like that. A
18    lot of machines right now are heavily
19    computerized, and he's not versed in that
20    but if it's something, you know -- I can't
21    recall anything recently that he's been
22    doing on them. Most of his time is spent
23    with the washing machines at the laundromats
24    and at our laundry.

Page 33

1  Q. Now, for example, earlier you had mentioned
2    replacing a pump on the drycleaning machine?
3  A. Not replacing it, just clearing it out.
4  Q. Cleaning it so it pumps the Perc?
5  A. Yes.
6  Q. Is that also what he would undertake?
7  A. Yes.
8  Q. So when you witnessed that small release of
9    Perc, was Mr. Walker the one doing the work?
10 A. Yes.
11 Q. Now, have you had any discussions with Mr.
12    Walker as to his knowledge of Perc releases?
13 A. I don't believe so, no.
14 Q. Do you know if Mr. Crider has talked to Mr.
15    Walker about his knowledge of Perc releases?
16 A. I don't know.
17 Q. Now, would Mr. Walker also be the one that
18    would work on and repair the stills?
19 A. I would guess so.
20 Q. Have you ever witnessed him repairing a
21    still?
22 A. Well, no, I can't say I have because they
23    haven't been around since I've been there.
24    Nowadays, they're self-contained on the

9 (Pages 30 to 33)

Page 74

1  A. I would guess so.
2  Q. Do you know with whom?
3  A. As far as the operations and how things
4     worked, yes.
5  Q. Do you have a recollection of with whom you
6     spoke?
7  A. At this location?
8  Q. Yes.
9  A. That would be Mark Germano, yes, from Coler
10    and Colantonio.
11 Q. Did you speak with anyone from, what is it,
12    Sanborn Head?
13 A. I've met Duncan Wood. I can't remember the
14    last time I saw him though.
15 Q. Did you talk to him about operational
16    procedures at the site?
17 A. I would assume I did but I can't recall, you
18    know, our specific conversation. I've
19    spoken to a few different people about the
20    operations there.
21 Q. So Mr. Germano you said?
22 A. Yes.
23 Q. And who from Sanborn Head?
24 A. Duncan Wood.

Page 75

1  Q. You said, you indicated you had spoken to
2     other people. Except for your attorney can
3     you identify who those other people are that
4     you may have spoken to about the operational
5     aspects?
6  A. It was mainly, I believe, it was
7     representatives of the landlord, the
8     property manager.
9  Q. And do you remember specifically who those
10    individuals were?
11 A. I remember the name Joe Polazati (phonetic)
12    but I don't know if I spoke to him
13    specifically. He came, there was like a
14    district manager and there was a property
15    manager and then there was a lease manager
16    and various different people came in at
17    different times. So I did speak with them
18    but I don't know specifically who I spoke to
19    about what.
20 Q. And was this in relationship to the lawsuit
21    or subsequent to the lawsuit?
22 A. Mainly in regards to when they were, we were
23    giving back this space and they wanted to do
24    what they call a walk through of the

Page 76

1     property at that point and then during that
2     time we discussed the operations in the
3     store.
4  Q. Was that in relationship to the possibility
5     of contamination from Perc?
6  A. You would have to ask them about that but I
7     would guess so.
8  Q. Did they ask you about spills?
9  A. I don't think so. I think mainly just about
10    what was going on. A lot of people have no
11    idea what drycleaning is about so I don't
12    even know if they would have thought to ask
13    about that.
14 Q. Now, when did you give up the space?
15 A. I'm not great with dates. I believe it was
16    June of 2002. Whenever the last lease term
17    expired we gave them, you know, the six
18    months notice and we were out by June.
19    We're three years into it now so either 2002
20    or 3. Maybe 2003. It must have been. It
21    was a whole, long, drawn out process because
22    of the issues.
23 Q. Well, let's just use, for the purposes of my
24    next question let's just use late 2002 for

Page 77

1     that. During that period of time since you
2     joined the company in late '88 through 2002,
3     was there any changes in the use and layout
4     of the lease, additional lease space that
5     you gave back in 2002?
6  A. I'm sorry, what was the time period again?
7  Q. When you joined the company?
8  A. Yes.
9  Q. In late 1988?
10 A. Yes.
11 Q. Until you give that space back, was there
12    any changes in the use or the equipment used
13    in that space?
14 A. No.
15 Q. At any time since you joined the company,
16    have the drycleaning units ever been located
17    in any other spot for even a temporary time
18    period?
19 A. Never.
20 Q. What about the still?
21 A. Never. Not since I've been there. There's
22    a circle on the floor to this day where the
23    still was. That's how I know where it was.
24 Q. Was there ever a change in the actual still

20 (Pages 74 to 77)

Page 90

1  Q. And potentially remediation up to a hundred
2  thousand dollars, I believe, is that
3  correct?
4  A. I remember that figure being thrown around,
5  yes.
6  Q. What was your involvement in that case on
7  behalf of Kleenit?
8  A. The only thing I really recall was meeting
9  with Duncan Wood at one point and then
10  another time with the landlord and then the
11  deposition that I went through.
12  Q. And can you recall who took the deposition?
13  A. That would have been Mr. D'Agostino.
14  Q. Have you retained a copy of that deposition
15  transcript?
16  A. I don't have one, no. I never had one.
17  Q. Do you know who might have a copy?
18  A. If one exists I would guess Mr. Lordan, Jack
19  Lordan had it.
20  Q. Can you give us your best recollection of
21  what year that deposition was taken?
22  A. In the early '90s at some point but I don't
23  know.
24  Q. And when you say that you didn't have a

Page 91

1  copy, are you speaking for Kleenit, also?
2  A. I would guess, yeah. I mean, I've never
3  seen a copy of it or if I did, I don't
4  recall anyone having it in their possession
5  as far as here it is, no.
6  Q. So you don't know if Mr. Crider has retained
7  a copy in his files?
8  A. I've never seen one so I can only guess that
9  he does not.
10  Q. Now, you said the attorney taking the
11  deposition was Mr. D'Agostino?
12  A. Yes.
13  Q. Now, were you involved in the decision to
14  enter into the settlement agreement with the
15  landlord in that case?
16  A. No.
17  Q. Who made that --
18  A. I was -- again, I was deposed so I was
19  somewhat involved but as far as, I was there
20  but I was not really, I didn't make any
21  decisions on it, no.
22  Q. Who made those decisions, the decision to
23  enter into that settlement agreement; to the
24  best of your knowledge?

Page 92

1  A. It would have been Mr. Crider.
2  Q. Now, were you responsible for working with
3  the LSP on the monitoring and compliance
4  with that settlement agreement?
5  A. No.
6  Q. Who was acting as the liaison between
7  Kleenit and the LSP?
8  A. Mr. Crider.
9  Q. Did he fulfill that function throughout that
10  phase, through I believe it was 1998?
11  A. For whatever negotiations or whatever
12  discussions there were between Kleenit and
13  the LSP, I guess through around 1998, sure,
14  that would have been him.
15  Q. Were you ever interviewed by the LSP in
16  relationship to that monitoring situation?
17  A. Our LSP?
18  Q. Yes, your LSP.
19  A. I don't think -- I don't know if I ever met
20  David Lang or not. I don't think so.
21  Q. How about the landlord's LSP, have you had
22  any communications with him?
23  A. As I said, I met with Duncan Wood.
24  Q. Was Duncan Wood the LSP?

Page 93

1  A. Yes. As far as I'm aware, I would assume he
2  was. He was their environmental consultant
3  or whatever they call him so I assume he was
4  the LSP as well.
5  Q. And when did you learn of subsequent issues
6  relating to Perc releases?
7  A. I guess that would have been when we tried
8  to give back the, after the walk through and
9  the evaluation of the site. Sanborn Head
10  came in and drilled these wells, and it was
11  after the results from those wells came
12  back.
13  Q. And as a result of either one of these
14  learning of these potential releases did
15  Kleenit do any internal investigations as to
16  how the releases may have occurred?
17  A. No.
18  Q. No interviews of employees?
19  A. No. I mean, I just assumed it happened so
20  long ago that we didn't do it, no.
21  Q. And who made that decision not to interview
22  former employees?
23  A. Well, I don't know that it ever came up as
24  something to do so it was never, it wasn't

24 (Pages 90 to 93)

**Page 102**

1  the wet side. Perc is on the dry side. It
2  contains no water. So the spotting process
3  is used to remove food and beverage stains,
4  anything that's water soluble. So Perc
5  would be useless on it so you wouldn't use
6  it.
7  Q. Other than yourself in September of '89, do
8  you have a recollection of any other
9  employees being interviewed by Kurz
10  Associates?
11  A. No, I don't.
12  Q. Do you know if Mr. Crider was interviewed by
13  Kurz Associates?
14  A. I don't know. I mean, I'm sure -- well, I
15  don't know. I think he may have talked to
16  them but I don't know about interviewed,
17  meaning regarding the processes at that
18  location. I would doubt it.
19  Q. Now, do you know Michael Stuart?
20  A. I think I met Mike once.
21  Q. When did you meet him?
22  A. He came in to do some spotting training at
23  the Duds location.
24  Q. Was he doing the training, or was he a

**Page 103**

1  recipient of the training?
2  A. He was doing the training.
3  Q. And when was that; do you know?
4  A. That was within the first year that I was
5  there.
6  Q. So 1988, 1989?
7  A. Most likely in '89 sometime. Maybe late '88
8  or sometime in 1989.
9  Q. And when did he quit working for Kleenit?
10  A. I'm not sure. It was well before I was
11  there.
12  Q. It was well before it?
13  A. Yes.
14  Q. So he was actually at his competing location
15  when he came in to do the spotting training?
16  A. No, I think he was actually even retired at
17  that point.
18  Q. Now, have you spoken to Mr. Stuart since he
19  came in to do that spotting training?
20  A. No.
21  Q. Did you speak to him in regards to this
22  lawsuit?
23  A. No. I haven't spoken to the gentleman since
24  that day he was training me.

**Page 104**

1  Q. Okay. Have you spoken to anyone else, any
2  employees or former employees of Kleenit
3  that are familiar with the alleged Perc
4  releases as stated by Michael Stuart?
5  A. At the Acton site?
6  Q. At the Chelmsford site, I'm sorry.
7  A. I'm sorry.
8  Q. Have you spoken to anyone else that can
9  confirm the Perc release that Mr. Stuart
10  alleges occurred?
11  A. No. He was employed so long ago I wouldn't
12  know who to talk to.
13  Q. And have you sought out a list of employees
14  that worked there at the time?
15  A. No.
16  Q. Do you know if Mr. Crider has attempted to
17  create a list of employees that worked there
18  at the time?
19  A. I don't know. I doubt he tried to write
20  figures down but he probably tried to rack
21  his brains to remember who else was there
22  but that's as far as I know.
23  Q. Do you know if Mr. Walker was working for
24  Kleenit in the 1960s?

**Page 105**

1  A. I don't think so, no.
2  Q. Do you know who was there at the time doing
3  maintenance?
4  A. No. It may have been Mr. Munroe in the
5  beginning.
6  Q. Mr. Munroe is the original owner?
7  A. Yes.
8  Q. Mr. Crider's father-in-law?
9  A. Yes.
10  Q. Let me show you two more diagrams. These
11  are of the Chelmsford location. Would you
12  agree with me that that's what those are
13  diagrams of?
14  A. Yes.
15  Q. And one has been marked as Exhibit 17 in the
16  Crider deposition?
17  A. Yes.
18  Q. The other one was marked Exhibit 17 and 29
19  in the Crider deposition?
20  A. Yes.
21  Q. Are you familiar with these diagrams?
22  A. Yes.
23  Q. And do they accurately represent the
24  building and the lot at the Chelmsford

Page 138

1   MR. DOWELL: Why don't we go ahead
2   and mark the last exhibit?
3   (Exhibit No. 7 marked for
4   identification.)
5   CROSS-EXAMINATION
6   BY MR. HEIFETZ:
7   Q. Mr. Murphy, I only have a few questions. I
8   just want to take it one by one. In terms
9   of Chelmsford, your current duty is
10  basically overseeing that facility?
11  A. Yes.
12  Q. That facility doesn't do drycleaning
13  anymore?
14  A. That's correct.
15  Q. You have another facility in Chelmsford?
16  A. Yes.
17  Q. And that does drycleaning?
18  A. Yes.
19  Q. Exhibit 7 is Mr. Stuart's affidavit. Do you
20  have any knowledge of the quantity of Perc
21  that he's attesting to that was released in
22  either of these incidents?
23  A. No, I do not.
24  Q. Does anyone that you know of have any

Page 139

1   information concerning the quantity of Perc
2   that was released in any of these instances?
3   A. I would guess the only person would be Mr.
4   Stuart because he was the only one there who
5   is currently alive and you know, around.
6   Q. Have you spoken to Mr. Stuart about this
7   affidavit?
8   A. No, I have not.
9   Q. Do you have any plans on speaking to Mr.
10  Stuart about this affidavit?
11  A. I do not, no.
12  Q. Do you know if anyone in the organization of
13  Kleenit has any plans to speak to Mr. Stuart
14  about this affidavit?
15  A. I know of nobody who has plans to. I don't
16  know why they would at this point.
17  Q. Other than the incidents that are enumerated
18  in this affidavit, Exhibit 7, do you know of
19  any other releases at the Chelmsford site?
20  A. No, I do not.
21  Q. Do you have any information that the release
22  of Perc that's detailed in Mr. Stuart's
23  affidavit, Exhibit 7, was released to the
24  outside of the demised premises?

Page 140

1   A. You mean that these releases went outside?
2   Q. Yes.
3   A. The only thing I can think of is the floor
4   drain that would have led outside.
5   Q. Do you have any information that these
6   releases were in the area of the floor
7   drain?
8   A. In the area, I would guess that they're
9   pretty close to where the drain was.
10  Q. Do you know the specific location by way of
11  diagrams that we've put into evidence as to
12  where these releases were in Chelmsford?
13  A. Well, as far as where the button trap on the
14  machine was, from my recollection of where
15  the machine was, yes.
16  Q. So looking at Exhibit 17 from Mr. Crider?
17  A. Yes.
18  Q. Well, let's deal with your exhibits. This
19  one shows the drains.
20  MR. DOWELL: We're looking at your
21  Exhibit No. 4.
22  A. Yes.
23  Q. So you have knowledge as to where the old
24  machine was?

Page 141

1   A. As far as I can recall, yes.
2   Q. The machine in 1965, was that around in 1988
3   when you started?
4   A. Yes, it was. Well, actually, I'm not -- I'm
5   assuming it was the same machine. I do not
6   know for sure.
7   Q. You don't know for sure?
8   A. Not the one from '65.
9   Q. How do you know that the drain was open in
10  1965?
11  A. I don't know that.
12  Q. So you're speculating that the drain was
13  open?
14  A. Yes.
15  Q. How do you know where the drain ended up?
16  A. I don't know that.
17  Q. So you're speculating that it went outside?
18  A. Yes, I'm speculating that it went into the
19  ground, yes.
20  Q. Other than the incidents that are enumerated
21  in Mr. Stuart's affidavit, Exhibit No. 7, do
22  you have any information about any other
23  releases at Chelmsford Care Cleaners?
24  A. No.

Page 142

1  Q. Is the other cleaners in Chelmsford called
2     Care, too?
3  A. Yes. We call it Care I.
4  Q. Let's call it Care I. So as to Care I you
5     don't know of any other releases?
6  A. No, I do not.
7  Q. You're not planning to conduct any further
8     investigation?
9  A. Investigation, I don't think so at this
10    point. There are possible plans for
11    remediation.
12 Q. But investigation as to historical?
13 A. As far as historical, no, no.
14 Q. And you were here during Mr. Crothers'
15    deposition?
16 A. Yes.
17 Q. Mr. Crothers testified to Acton --
18 A. Yes.
19 Q. And he testified to some releases in Acton?
20 A. Yes, he did.
21 Q. Do you have any information concerning any
22    other releases at Acton other than the ones
23    Mr. Crothers testified to and the half a cup
24    in the pump that you testified to?

Page 143

1  A. No, but that's what I know of.
2  Q. That's it?
3  A. Yes.
4  Q. Okay. Do you know of anyone who has any
5     other information concerning any other
6     releases at Acton?
7  A. I don't know of anyone who does.
8  Q. And do you have any information that leads
9     you to believe that Mr. Crothers was
10    incorrect when he testified that relative to
11    the two releases that he witnessed that all
12    of the Perc was picked up and recycled?
13 A. Yeah, just my knowledge of how Perc works, I
14    consider it highly doubtful that all of it
15    was picked up.
16 Q. Why is that?
17 A. Because it's a fast sinker and it can go,
18    I've been told it can go right through even
19    solid concrete, much less a floor that might
20    have a crack in it.
21 Q. And you've been told that by whom?
22 A. I can't say exactly, you know, whether or
23    not I read it in an industry publication or
24    in talking with other drycleaners in the

Page 144

1     industry associations but you know, it's
2     just one of those things you pick up, I
3     guess.
4  Q. Do you remember talking to Mr. Germano about
5     that?
6  A. No.
7  Q. Or Mr. D'Amore?
8  A. You mean as far as me telling them?
9  Q. No, about just having discussions with them
10    about the fact that, I will use your term,
11    that Perc is a sinker?
12 A. Right. I don't believe so, no.
13 Q. But somewhere you obtained some information
14    that Perc upon release can go through porous
15    substances, is that what you're saying?
16 A. Or even through concrete. I believe, now
17    that I think of it, it was probably a
18    gentleman who was trying to sell us a vacuum
19    extraction system for the Acton location.
20 Q. Do you remember his name?
21 A. I do not, no. And it was probably at a
22    demonstration that he was giving at one of
23    our industry groups.
24 Q. Is it fair to say that you haven't or had

Page 145

1     anyone on your behalf calculated any
2     absorption factors of Perc relative to the
3     concrete that was on the floor at Acton?
4  A. That's correct, yes.
5  Q. But nonetheless, other than what Mr.
6     Crothers testified to and the half cup that
7     Mr. Walker dropped while he was working on
8     the pump --
9  A. I don't know if he did it or I did it.
10 Q. Well, we'll lay it on him. If you want to
11    take the blame, you can. Other than those
12    incidents, you don't know of any other
13    incidents?
14 A. Those are what I remember, yes.
15 Q. What did you have to do with Wayland?
16 A. I would go down there from time to time
17    just, you know, to check on it, see how
18    things were done and I think, I don't know,
19    I can't remember if I ran the store when she
20    went on vacation or not. I may have run it
21    for or a day or something like that if she
22    was out. "She" being the manager.
23 Q. The manager?
24 A. Yes.

Page 146

1  Q. So you were general manager at the time that
2     Wayland was owned by Kleenit for at least
3     part of the time?
4  A. Yes.
5  Q. That was during the time when you were
6     phasing in your duties?
7  A. Correct.
8  Q. And as I understand it, according to Mr.
9     Crider, when you purchased Wayland it
10    already had a dry to dry machine?
11 A. Yes.
12 Q. So during your ownership there was never a
13    transfer unit there?
14 A. That's right.
15 Q. Do you know of any releases of Perc during
16    your ownership at Wayland?
17 A. No.
18 Q. Have you discussed it with anyone?
19 A. No, we got rid of the store before we even
20    found out about this. We were no longer a
21    tenant there so anyone who would have is
22    gone.
23 Q. So as far as you know during the pendency of
24    Kleenit's ownership, whatever form Kleenit

Page 147

1     took to own that particular franchise, there
2     was never any release of Perc?
3  A. I do not know of any release down there.
4  Q. I don't have any other questions
5              CROSS-EXAMINATION
6  BY MR. JACKSON:
7  Q. I think I'm fine here. I only have a few,
8     too.
9         Mr. Murphy, my name is Seth
10    Jackson. I represent Royal. I have a few
11    questions also. If you take a look at
12    Crider Exhibit No. 6, the Kurz report, I
13    think you still have it there in front of
14    you?
15 A. Yes.
16 Q. On the first page, the December 20, 1990
17    letter?
18 A. Yes.
19 Q. The last paragraph on that page starts out
20    the presence of chlorinated compound
21    contamination is likely the result of
22    numerous minor releases of solvent in the
23    vicinity of a drycleaning operation located
24    at the site. Do you have any idea what

Page 148

1     those numerous minor releases of solvent
2     were or what they're referring to in this
3     report?
4  A. I do not.
5  Q. And are you aware of any of the Kurz
6     documents that Kleenit received regarding
7     the Acton site?
8  A. I'm not. I was not in the office at that
9     point.
10 Q. And if you could look at Crider Exhibit No.
11    11, it's November 2, '02 letter from Coler
12    and Colantonio and on that first page the
13    second paragraph under background, the last
14    sentence the word release is crossed out and
15    discovery was written under that. Do you
16    see that?
17 A. Yes.
18 Q. Is that your handwriting?
19 A. It looks like it.
20 Q. It is your handwriting?
21 A. I'm not -- no, I'm not saying that. I'm
22    saying it looks like my handwriting.
23 Q. Do you remember marking that location?
24 A. I do not, no.

Page 149

1  Q. Do you have any idea why the word discovery
2     would be written in? If you want to take a
3     second to read over that sentence or
4     paragraph.
5  A. I guess just to clarify the sentence.
6  Q. And if you turn to page 8 of that same
7     exhibit, 8 of 16, in the fifth paragraph
8     down starting with screen filters?
9  A. Yes.
10 Q. The second sentence says debris recovered
11    from this cleaning operation is essentially
12    dry lint and is discarded with regular
13    trash?
14 A. Yes.
15 Q. The essentially dry lint, is there something
16    else that would be recovered from the screen
17    filters?
18 A. No. And I would disagree with even the word
19    essentially in that paragraph. It's as dry
20    as the clothing is coming out of the
21    machine, if not drier because it's hot or it
22    was hot.
23 Q. Now, turning to the Chelmsford site, do you
24    know of or have you ever worked with an

Page 150

1    Angelo Rubito?
2  A. Now, Angelo, I can't say I've worked with
3    him. He worked as the manager there.
4  Q. Have you ever talked to him about any
5    releases that could have occurred at the
6    Chelmsford site?
7  A. No, I have not.
8  Q. You haven't talked to him about this case?
9  A. No.
10 Q. Do you have any idea where he is at this
11   point, where he lives?
12 A. He lives in Florida the last I knew. I'm
13   not sure of his address though. He last
14   worked for us several summers ago. He
15   filled in as summer help.
16 Q. That's all I have.
17           CROSS-EXAMINATION
18 BY MR. AYLWARD:
19 Q. Mr. Murphy, my name is Michael Aylward. I
20   represent Sentry insurance. I actually have
21   just a few questions. To your knowledge,
22   has Kleenit ever received a worker's
23   compensation claim from an employee for
24   inhalation or exposure of solvents?

Page 151

1  A. No, I don't believe so.
2  Q. At any of the various plants?
3  A. No, no.
4  Q. You mentioned that Safety-Kleen is
5    responsible for removing hazardous waste
6    from the facilities?
7  A. They were. They were the first hazardous
8    waste that we used. They're not currently
9    the one that we use.
10 Q. Who do you use?
11 A. We use Cycle Solve out of Cranston, Rhode
12   Island.
13 Q. Do you know how far back the contract with
14   Safety-Kleen went?
15 A. I don't know if there was ever a contract
16   but --
17 Q. Let me ask it differently then. Do you know
18   when they began servicing the facility?
19 A. I believe it was 1979 but I'm not certain
20   about that. I think I've seen that date
21   around. Either then or the very early '80s.
22 Q. And during that period of time, do you know
23   if Safety-Kleen was paid on a flat fee
24   basis, or did it depend on the amount of

Page 152

1    waste that they were removing?
2  A. It was usually by the amount of waste that
3    they were removing; if I recall their
4    invoicing correctly. But they would, they
5    would charge us -- one reason we changed was
6    even if we gave them a half a barrel they
7    would count it at the full barrel's weight
8    and amount, even though it was not full. If
9    there were three and a half barrels they
10   would charge us for four and it would appear
11   on the invoice also and on the shipping
12   manifest for the DEP as four full barrels.
13 Q. During the period you've been involved in
14   Kleenit, has there been a lot of turnover in
15   the work force?
16 A. I don't know. I think you have to break it
17   down by department almost. At the counter
18   level, especially the afternoon help, we
19   tend to hire school, high school workers and
20   so at that level there is a fair amount of
21   turnover. In the pressing department, I
22   would say a regular amount of turnover in
23   that department considering the conditions
24   under which they work, pretty difficult.

Page 153

1    And in the other departments I would say
2    it's no more than -- probably better than a
3    regular rate of turnover.
4  Q. What would you estimate is the average
5    tenure of the length of employment of
6    pressers at Kleenit?
7  A. The pressers, it's really hard to say. I
8    would, we would measure it in years.
9    Probably five to ten years, I would guess
10   something like that. I've got some pressers
11   who are working for me now who have been
12   with us for decades and others for a couple
13   of decades.
14 Q. Would the same be longer for managers of the
15   different facilities?
16 A. I would guess it would be about the same,
17   maybe a little bit longer.
18 Q. Now, you mentioned before the lunch break
19   that to your knowledge no one had
20   interviewed employees about possible
21   discharges at the plant, pollutant
22   discharges at the plant; do you recall that
23   testimony?
24 A. I believe so, yes.

39 (Pages 150 to 153)

G&M Court Reporters, Ltd.
617-338-0030

Page 154

1  Q. Were you instructed not to undertake any
2     such interviews?
3  A. No.
4  Q. Do you know if your attorneys conducted any
5     such interviews?
6  A. I do not know. I don't believe so.
7  Q. Where does Kleenit buy its Perchlorethelene
8     from?
9  A. Currently, we're buying, nowadays we buy
10    some from Cycle Solve. We buy it from them
11    and we buy it from Package Chemical
12    Incorporated.
13 Q. Has that been true historically?
14 A. They've changed. Cycle Solve is one of the
15    newer suppliers. They basically give us
16    recycled Perc as it's a little bit cheaper.
17    Package Chemical has been, they've been
18    supplying us now for a number of years but
19    there have been others before them. And we
20    try to have at least two suppliers at any
21    given point, basically to keep them honest.
22 Q. If you buy pure product from something like
23    Package Chemical, does it come with a
24    material safety data sheet?

Page 155

1  A. Not on each delivery but we make sure that
2     we have them.
3  Q. Has that been true through the period of
4     time that you've worked with Kleenit?
5  A. Since right around when I started is when we
6     instituted that program.
7  Q. And are there other warnings that you
8     receive from the product supplier about
9     handling these materials other than the
10    MSDS?
11 A. Yes, I've gotten it not from the supplier
12    but from the manufacturer. I think R.R.
13    Street is one and maybe Dow Chemical is
14    another that has sent out different flyers
15    or brochures or something to that effect,
16    safe handling of Perc.
17 Q. Did Kleenit have a procedure FOR
18    communicating those warnings to employees?
19 A. Basically, we train employeeS as to how to
20    handle Perc as they're hired, if they're
21    working within the range of Perc, if they're
22    responsible for Perc handling.
23 Q. Forgive me for using a mundane example but
24    often in restaurants you seen signs in wash

Page 156

1     rooms that employees must wash hands before
2     returning to work. Is there anything at
3     Kleenit, are there signs or warnings posted
4     not to flush things down toilets or sinks?
5  A. I would guess that they're on those posters
6     that the chemical companies have given to
7     us. I don't know specifically that it says
8     do not flush down the toilet but I know that
9     we have had posters up instructing employees
10    on how to handle Perc.
11 Q. Do you know for a fact, you testified this
12    morning that there was training you did of
13    employees, that that's part of the training
14    that you tell them, specifically instruct
15    them not to dispose of waste material down
16    sinkS or toilets?
17 A. Yes, absolutely.
18 Q. That's all I have, thank you, sir.
19       (The deposition concluded at 2:15
20    p.m.)

Page 157

1  DEPONENT'S ERRATA SHEET
2  AND SIGNATURE INSTRUCTIONS

4     The original of the Errata Sheet has
5  been delivered to Donald P. Nagle, Esq.
6     When the Errata Sheet has been
7  completed by the deponent and signed, a copy
8  thereof should be delivered to each party of
9  record and the ORIGINAL delivered to Rodney
10 Dowell, Esq. to whom the original deposition
11 transcript was delivered.

13     INSTRUCTIONS TO DEPONENT

15     After reading this volume of your
   deposition, indicate any corrections or
16 changes to your testimony and the reasons
   therefor on the Errata Sheet supplied to you
17 and sign it. DO NOT make marks or notations
   on the transcript volume itself.

20 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
21 COMPLETED AND SIGNED ERRATA SHEET WHEN
22 RECEIVED.

40 (Pages 154 to 157)