# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
NO. 04-10351 (NG)

* * * * * * * * * * * * * * * * * *

ORIGINAL

KLEENIT, INC.,
      Plaintiff

      vs.

SENTRY INSURANCE COMPANY, ROYAL
AND SUN ALLIANCE, UTICA NATIONAL
INSURANCE GROUP AND TRAVELERS
PROPERTY AND CASUALTY,
      Defendants

* * * * * * * * * * * * * * * * * *


      DEPOSITION OF KEITH CRIDER, a
witness called on Behalf of the Defendant,
Utica National Insurance Group, pursuant to
Massachusetts Rules of Civil Procedure,
before Diane M. Durette, a Registered
Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts,
at the Offices of Tucker, Heifetz &
Saltzman, 3 School Street, Boston,
Massachusetts on Wednesday, June 15, 2005,
commencing at 10:15 a.m.

Page 4

1                    P R O C E E D I N G S

2                         KEITH CRIDER,

3        having first been duly sworn, was examined

4        and testified as follows:

5                    MR. HEIFETZ:  Usual stipulations?

6        Reserve all objections except as to form.

7        Reserve motions to strike until the time of

8        trial?

9                    MR. NAGLE:  Yes.

10                    MR. VASILOFF:  Yes.

11                    MS. BOLAND:  Yes.

12                    MR. BERMAN:  Yes.

13                    MR. HEIFETZ:  I would like him to

14       read and sign the deposition but we can

15       waive the notary.  Is that okay with

16       everyone?

17                    MR. NAGLE:  Yes.

18                    MR. VASILOFF:  Yes.

19                    MS. BOLAND:  Yes.

20                    MR. BERMAN:  Yes

21                    DIRECT EXAMINATION

22       BY MR. HEIFETZ:

23    Q.  Mr. Crider, my name is Rick Heifetz.  I

24       represent Utica National Insurance Group in

Page 58

1   Q.   Is it your understanding they were agents

2        for the Travelers?

3   A.   They were agents for other people, but I

4        know that they handled Travelers, yes.

5   Q.   When you came on board, would you be the

6        person who would pay the insurance bills?

7   A.   Yes.

8   Q.   So you would see invoices from EJ Wells?

9   A.   Yes.

10  Q.   What about the insurance policies, would

11       they come to you as part of your business

12       management?

13  A.   Yes.

14  Q.   What would you do with them?

15  A.   Well, we stored them for awhile but our

16       accountant kept very fastidious records.

17       Mr. Harry Nason in Boston was our accountant

18       from probably late 1950s through 2001 or 2,

19       he got ill but he kept every policy number

20       that we ever had.

21  Q.   Can you spell Nason?

22  A.   N A S O N.  In fact --

23  Q.   Did Mr. Nason work for a company?

24  A.   He was his own individual practitioner.

Page 59

1    Q.   So he worked alone?

2    A.   That's correct.

3    Q.   Where was his office?

4    A.   294 Washington Street, right across the

5         street.

6    Q.   Kleenit used him from the 1950s to just a

7         few years ago?

8    A.   That's correct.

9    Q.   Is he still alive?

10   A.   Yes.  He's in nursing home now.

11   Q.   Did he sell his practice?

12   A.   He just closed it.

13   Q.   Who is your CPA now?

14   A.   I'm trying to think of the name of it.  Ron

15        Gacciccie is our CPA.  He works for a firm

16        out in Braintree, I believe.

17   Q.   Do you know the name of it?

18   A.   It just escapes my mind right now.  I'll

19        think of it later.

20   Q.   Can you spell Gacciccie?

21   A.   G A C C I C C I E, I think.

22   Q.   He's in Braintree?

23   A.   Yes.

24   Q.   Do you know if the records from Mr. Nason

Page 60

1    were transferred to his office?

2  A.  They were transferred to me.  Basically, I

3       picked up all the books from 1960 right to

4       current from his office when he closed it.

5  Q.  Who did you deal with?  In other words, when

6       Mr. Nason got sick were you contacted by his

7       lawyer?

8  A.  You mean --

9  Q.  To pick up his books?

10  A.  No, his sister worked for him so we picked

11       up, I went down to his office and picked

12       them up.

13  Q.  Do you know his sister's name?

14  A.  Evelyn Astorian, A S T O R I A N but I just

15       understand she had a stroke.

16  Q.  Just so I can understand, Mr. Nason kept

17       records of the insurance issued to Kleenit?

18  A.  Well, the statements of insurance.  Like, if

19       you're doing an audit.

20  Q.  Sure.

21  A.  You keep a list of all the prepaid insurance

22       and he took it even one step further.  He

23       had all the policy numbers, the companies

24       listed, everything in detail, the umbrella

Page 63

1        of June 30, 1984.  Do you see that?

2   A.   Right.

3   Q.   This is the ledger sheet that was taken from

4        Mr. Nason's work that was transferred to you

5        in 2002?

6   A.   Yes, I would say so.

7   Q.   Now, this is a specific ledger for June 30,

8        1984 but is it your testimony that from the

9        1960s to whenever Mr. Nason stopped doing

10       his work for Kleenit that there was an entry

11       for every policy that would have been paid

12       for from let's say the 1960s to whenever

13       that work stopped?

14  A.   Well, I would say he did everything -- as I

15       say, he was very fastidious.  He went

16       through the entire, the voucher register.

17       He recorded everything manually.  He had

18       everything manually recorded.  I know that

19       he was very accurate, and he kept fastidious

20       records on everything on this so I don't

21       know.

22  Q.   There are topic headings on the ledger where

23       it says things like SMP.  Do you know what

24       that stands for?

Page 64

1  A.  That's your standard policy.  The SMP is the

2      overall general policy.

3  Q.  That's a type of policy?

4  A.  Right, right.

5  Q.  And is it your understanding that this

6      column would have been ledgered amounts for

7      these types of policies, SMPs?

8  A.  I would guess so.  This is the first time I

9      looked at that particular entry.

10 Q.  Did you have any occasion to sit down with

11     Mr. Nason during the course of your work and

12     go over any of these ledgers before he

13     stopped working?

14 A.  Not really.

15 Q.  You said he also would ledger or have some

16     kind of record concerning policy numbers; do

17     you remember that?

18 A.  Yes, we had a list of all the policy numbers

19     but I think it was on a spreadsheet that

20     probably this, that probably backs up this

21     particular schedule (pointing), the schedule

22     of pre-paid insurance.

23 Q.  Well, let's go to the next page.

24 A.  Yes.

Page 65

1    Q.    The ninth page in is the second ledger
2          sheet; do you see that?
3    A.    Yes.
4    Q.    And on the left-hand side column there are
5          actually names of insurance companies?
6    A.    That's correct.
7    Q.    And what I'm asking you, this particular
8          record that's attached to Exhibit 3 is for
9          June 30, 1984?
10   A.    Right.
11   Q.    What I'm asking you is are there similar
12         ledgers for each and every year from
13         whenever Mr. Nason's records start to
14         whenever they end?
15   A.    I don't know.
16   Q.    Okay.  Have you ever sat down and looked
17         through them in their entirety?
18   A.    (No response).
19   Q.    Can you answer that, Mr. Crider?
20   A.    Well, I can't say that I have.
21   Q.    Well, let me ask you this:  At some point in
22         time, and I don't want to ask you about any
23         conversations you had with Mr. Fasanella but
24         before you actually turned these records

Page 74

1   A.   No, I think that we discussed basically

2        insurance, different things, general

3        coverage.  I can't remember really.  I wish

4        I could but I can't.  I had a senior moment,

5        and I couldn't remember a manager that we

6        had.

7   Q.   Do you know why the switch was made from

8        Sentry to Utica?

9   A.   Yes.  What happened was we got into '76 and

10       we got a huge bill from them.  They raised

11       their Bailey rate to some ungodly figure,

12       and we had to pay a whole lot of money on it

13       and so we thought we had been, you know,

14       deluded.  And so we -- I had a friend of

15       mine who was an insurance agent, lived in

16       Chelmsford, Rhodes Johnson and he directed

17       me right to Graphic Arts.  I remember we met

18       in Burlington, and he went to bat for me and

19       we switched.

20  Q.   What was the name of the agent?

21  A.   Henry Johnson.  And I dealt with Rhodes

22       Johnson, his son.

23  Q.   One of the insurance agencies in Lowell?

24  A.   In Lowell.

Page 78

 1      then at that time we didn't have the

 2      military to rely on.  And again, his family

 3      was very good customers of mine so I went

 4      back with Rory.

 5   Q.  Did you normally deal solely, in terms of

 6      insurance matters when you were dealing with

 7      insurance matters and not Mr. Munro, did you

 8      normally deal with one insurance agent as an

 9      exclusive agent?

10   A.  No, not necessarily.

11   Q.  You would use multiple agents if you could

12      get better deals?

13   A.  We might use one with trucks, one with

14      workers' comp and one with SMP just to

15      spread it around.

16   Q.  In terms of an insurance program, are

17      those -- in terms of property and casualty

18      insurance, are those the three major

19      insurances that you would get?

20   A.  Yes.

21   Q.  So that would be worker's comp for your

22      employees?

23   A.  Right.

24   Q.  You owned vehicles?

Page 79

1   A.   Yes.

2   Q.   I assume they did pickups and things of that

3        nature?

4   A.   Yes.

5   Q.   And plus the vehicles you used between the

6        shops; is that fair?

7   A.   Right, that's correct.

8   Q.   And also your property and casualty

9        policies; is that correct?

10  A.   That's right.

11  Q.   Any other kind of policies that you were

12       buying during this time period from the

13       1960s to 1994?

14  A.   Not that I'm aware of.

15  Q.   Do you recollect purchasing any pollution

16       policies?

17  A.   I think we purchased from Wayne Slattery a

18       policy.  It was a claims made policy in '91.

19       That was from Royal Sun.

20  Q.   Do you presently buy pollution insurance?

21  A.   No.

22  Q.   Other than Mr. Nason's records, did you have

23       any other records to review when you were

24       looking for insurance policies prior to

Page 80

1       bringing this lawsuit?

2   A.  No.

3   Q.  It was solely Mr. Nason's records that you

4       were relying on?

5   A.  Yes.

6   Q.  There are no independent records such as

7       places where you kept old policies?

8   A.  No.

9   Q.  What about checks?  Did you look through

10      checks at all?

11  A.  No.

12  Q.  Other than Mr. Nason's ledgers, did you do

13      your own bookkeeping?

14  A.  No, Mr. Nason did everything.

15  Q.  So there was no inhouse bookkeeping at

16      Kleenit?

17  A.  Yes, we had a voucher register that we kept

18      with the entries that we made as far as, you

19      know, accounts payable and so forth but Mr.

20      Nason conveyed these to a general ledger and

21      schedules and then prepared the tax returns

22      for us.

23  Q.  So you had no individual ledger, let's say

24      that an inhouse bookkeeper would keep?

Page 83

1      talking about?

2    A.  Yes.

3    Q.  So, there was no inhouse bookkeeping in

4        terms of a separate ledger; is that correct?

5    A.  Well, yes, we had the voucher register.

6    Q.  Right.

7    A.  Then Mr. Nason transferred this to a general

8        ledger.  He did all the write up work.

9        That's the way it was.

10   Q.  Now, what did you do with the One Write

11       stuff?  What did you do with it?

12   A.  Well --

13   Q.  Would you keep it for a period of years and

14       then throw it away?

15   A.  Yes, I would say five to seven years,

16       probably like that but most of the stuff

17       would be gone, you know, at this point, I

18       would say.  I don't know.  I would have to

19       check that.  I think most of it would be

20       gone.

21   Q.  Have you now told me about all the P & C

22       agents, by that I mean property and casualty

23       agents, that you used from say '65 to '94?

24   A.  Right.

Page 97

1    that point we will suspend the deposition to

2    an agreeable second day so that we can take

3    the deposition of Mr. Crothers, and he won't

4    have to come back again, is that acceptable

5    to everyone?

6           MR. BERMAN:  Yes.

7           MS. BOLAND:  Yes.

8           MR. VASILOFF:  Yes.

9           MR. NAGLE:  Yes.

10           CROSS-EXAMINATION

11    BY MR. VASILOFF:

12  Q.  We've met once or twice actually at the

13    courthouse, I think but let me introduce

14    myself again.  Karl Vasiloff on behalf of

15    Royal and Sun Alliance in this matter.  As

16    Mr. Heifetz indicated, I have a couple of

17    questions I would like to ask you, several

18    questions about documents, document

19    retention, document storage and search and

20    the like.

21           First of all, with respect to

22    insurance policies I think you testified

23    earlier that you actually received the

24    physical policies at your office in Ayer; is

Page 98

1      that correct?

2   A.  Yes.

3   Q.  And once you got a policy, what did you do

4       with it?  Where did you keep it?

5   A.  We kept it in our file under different

6       categories, worker's comp, Bailey policy and

7       so forth and I think we kept them for maybe

8       five or six years maybe.

9   Q.  This is a physical file, like a cabinet of

10      some type?

11  A.  No, just a regular file cabinet.

12  Q.  This is in your office in Ayer?

13  A.  Yes.

14  Q.  And what is the basis of your testimony that

15      you kept the policies for five to seven

16      years?

17  A.  What is the --

18  Q.  Did you throw them out yourself?

19  A.  No, no, I didn't.

20  Q.  Again, I'm going to ask you what is the

21      basis for your understanding that the

22      policies were kept five to seven years?

23  A.  Well, we just kept them until the files were

24      full, and we let them go after a period of

Page 100

1    Q.   Getting back to the hard copies of the

2         policies that were received and kept in the

3         file cabinet, you said they were I think let

4         go after five to seven years or something

5         along those lines; is that correct?

6    A.   Probably.

7    Q.   Who duty was it to, quote, unquote let them

8         go?  Who did that?

9    A.   I think our file clerk.  After a number of

10        years when our files became full I think

11        that we just let them go.  We just, we had

12        no previous precedent for needing them like

13        this.  I mean, we had no idea.

14   Q.   I'm just trying to understand.  Who is the

15        file clerk?

16   A.   Well, we've had a lot of them over the

17        years.

18   Q.   Say in the 1960s who was your file clerk?

19   A.   I think she is dead now.  Mrs. Little.  She

20        is dead.

21   Q.   What about through the 1970s?

22   A.   I'll take the hit on that.  I think that

23        perhaps it was my decision, I would have to

24        give the approval but in many cases they

Page 114

1                  C E R T I F I C A T E

2

3        STATE OF MASSACHUSETTS)

4        COUNTY OF SUFFOLK)

5

6             I, Diane M. Durette, Registered

7        Professional Reporter and Notary Public,

8        certify that I was authorized to and did

9        stenographically report the deposition of

10       Keith Crider; that a review of the

11       transcript was requested; and that the

12       transcript is a true and complete record of

13       my stenographic notes.

14             I further certify that I am not a

15       relative, employee, attorney, or counsel of

16       any of the parties, nor am I a relative or

17       employee of any of the parties' attorneys or

18       counsel connected with the action, nor am I

19       financially interested in the action.

20             DATED this 28th day of June, 2005.

21

22

23                      Diane M. Durette, RPR

24

Page 115

ORIGINAL

VOL. II

PAGES 115-293

EXHIBITS See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NO. 04-10351 (NG)

*********************************************

KLEENIT, INC.,

   Plaintiff,

         vs

SENTRY INSURANCE COMPANY, ROYAL AND SUN
ALLIANCE, UTICA NATIONAL INSURANCE GROUP,
AND TRAVELERS PROPERTY AND CASUALTY,

   Defendants.

*********************************************

        CONTINUED DEPOSITION OF KEITH
CRIDER, a witness called on behalf of the
Defendant Utica National Insurance Group,
pursuant to the Federal Rules of Civil
Procedure before Carol L. Howley, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the
offices of Tucker, Heifetz & Saltzman, LLP,
Three School Street, Boston, Massachusetts,
on Thursday, July 7, 2005, commencing at
10:10 a.m.

G&M Court Reporters, Ltd.
617-338-0030

Page 119

1                    KEITH CRIDER, a witness called on

2          behalf of the Defendant Utica National

3          Insurance Group, having been identified by

4          the production of his Massachusetts driver's

5          license and having been previously sworn, on

6          oath deposes and says as follows:

7

8          EXAMINATION BY MR. HEIFETZ

9

10   Q.    Mr. Crider, good morning.  This is the

11         continuation of your deposition that we

12         started on June 15th.  You understand that

13         you're still under oath.

14   A.    That's correct.

15   Q.    I think when we last met we were talking

16         about Acton, and I'd like to get back to

17         that.  In 1990 or around 1990 there was a

18         lawsuit brought by your landlord in Acton.

19         I think we marked as Exhibit 4 the agreement

20         that settled that lawsuit, is that correct?

21   A.    Yes.

22   Q.    And at that time I had asked you about the

23         lawsuit, and I believe you said to me that

24         it was basically about money.  And correct

Page 128

1        portions of each policy including Utica

2        National Insurance policy all risk/special

3        multiperil policy number FMP1946 coverage

4        from 1982 through 1985, and umbrella

5        liability policy number LV6406 coverage from

6        1982 through 1985, end quote.  Did I read

7        that correctly?

8    A.  Yes.

9    Q.  When you say signed copies of all policies,

10       what do you mean by signed?

11   A.  I'd have to consult with my attorney on

12       this.  If you're talking about original

13       policies, I think we had generic policies.

14       Mr. Fasanella has all that and I really

15       don't know.

16   Q.  So he had sample policies.

17   A.  Similar to what we would have been issued,

18       that's right.

19   Q.  So you do not have in your possession the

20       actual copies of these policies that were

21       issued to Kleenit.

22   A.  I would say that the actual original

23       policies, no.  But we had all the numbers of

24       the policies.

Page 129

1   Q.   And as I understand it, the numbers you

2        obtained through Mr. Nason's records.

3   A.   That's correct.

4   Q.   Mr. Nason was your accountant, and he kept

5        ledgers.

6   A.   Yes.

7   Q.   And on those ledgers he actually noted the

8        policy numbers.

9   A.   Yes.

10  Q.   And that's where you derived the policy

11       numbers and the years of each coverage.

12  A.   Yes.

13  Q.   Did Mr. Nason actually pay the premiums, or

14       was that done by Kleenit?

15  A.   Kleenit paid the premiums.

16  Q.   Mr. Nason didn't have access to the

17       checkbook.

18  A.   No.

19  Q.   Can you turn to the affidavit that's

20       attached.  Why don't you go to the first

21       one.  Exhibit A is the affidavit of Carl

22       Crothers, correct?

23  A.   Yes.

24  Q.   And Mr. Crothers was the gentleman who was

Page 291

1                      C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    COUNTY OF NORFOLK, ss.

5

6         I, Carol L. Howley, a Court Reporter

7    and Notary Public in and for the

8    Commonwealth of Massachusetts, do hereby

9    certify that the foregoing transcript of the

10   deposition of KEITH CRIDER, having been

11   previously sworn, on Thursday, July 7, 2005,

12   is true and accurate to the best of my

13   knowledge, skill and ability.

14        IN WITNESS WHEREOF, I have hereunto

15   set my hand and seal this        day of

16        July      , 2005.

17

18

19

20                   Carol L. Howley

21                   Notary Public

22

23

24   My commission expires:  April 12, 2007

G&M Court Reporters, Ltd.
617-338-0030