# EXHIBIT "B"

Page 60

were transferred to his office?

A.  They were transferred to me.  Basically, I
picked up all the books from 1960 right to
current from his office when he closed it.

Q.  Who did you deal with?  In other words, when
Mr. Nason got sick were you contacted by his
lawyer?

A.  You mean --

Q.  To pick up his books?

A.  No, his sister worked for him so we picked
up, I went down to his office and picked
them up.

Q.  Do you know his sister's name?

A.  Evelyn Astorian, A S T O R I A N but I just
understand she had a stroke.

Q.  Just so I can understand, Mr. Nason, kept
records of the insurance issued to Kleenit?

A.  Well, the statements of insurance.  Like, if
you're doing an audit.

Q.  Sure.

A.  You keep a list of all the prepaid insurance
and he took it even one step further.  He
had all the policy numbers, the companies
listed, everything in detail, the umbrella

policy numbers.  We had everything.  And he

kept those records, you know, time

immemorial.  He was very fastidious.

Everything was handwritten but it was there.

Q.  Did he keep it on a ledger of some kind?

A.  In his working papers or ledgers.

Q.  You picked up these working papers when?

A.  I would say mid, late 2002, maybe.

Q.  These papers went back to the '60s?

A.  Yes.

Q.  Where are these papers now?

A.  They're in my office.

Q.  And they have all the insurance policies

issued to Kleenit in terms of the company,

the policy number and the amount paid?

A.  Yes, yes, they do, for the most part.

          MR. HEIFETZ:  Don, I'm going to ask

you for those records.

A.  Well, I think that we gave all the records,

we gave all the records to Bob Fasanella

when the initial notices went out to the

insurance companies.  This is what

promulgated these things.  Everything that

you got from Bob Fasanella would have been

EXHIBIT "C"

Page 5

1          (Documents marked Exhibit Nos. 1 to 3 for

2              identification.

3    Q    Just so I'm clear, Mr. Crider, you weren't at

4         the mediation, but we were provided this by your

5         attorney.  This is, I'm showing you Exhibit No.

6         2.  This is a document that lists all of the

7         alleged policies, although one policy it's now

8         been alleged it's not on there.

9              So looking at Utica, we have '78-'79,

10        '79-'82 and '82-'85.  And then there was an

11        umbrella from '84 to '85, and I can --

12   A    '83 to '84.

13   Q    We're getting to that.  '84 to '85 on Exhibit

14        No. 2.

15   A    Okay.

16   Q    And let me show you Exhibit No. 3, and I've

17        taken the liberty of highlighting that just

18        because it's easier.  This is a ledger from July

19        of '83 and July of '84.  And it's a ledger for

20        policy LU6406.  It says Utica Mutual, but I

21        believe the checks that we have are issued to

22        Henrick Johnson Insurance Agency for an umbrella

23        policy.

24   A    Um hmm.

Page 6

1  Q    Is that a yes?

2  A    Yes.

3  Q    The checks were issued to Henrick Johnson.  You

4       never issued a check directly to Utica.

5  A    No.  In that time period there was no direct

6       billing.  All payments went to the agent.

7  Q    Everything was what we called agency billed.

8  A    That's correct.

9  Q    And I understand these were, this is some kind

10      of prepaid insurance.

11 A    Correct.

12 Q    So that it was actually paid before the

13      insurance was due?  Exactly how does that

14      prepaid insurance work?  What's your

15      understanding?

16 A    Well, the package policy ran from October 1

17      through September 30th of every year, and so

18      generally, we would receive a billing sometime,

19      it could be November, December, on the package

20      policy, the umbrella; they were paid in full.

21      But for accounting purposes, we had to, because

22      we were on a fiscal year basis, our fiscal year

23      ended June 30th, so we have to write off each

24      period, the 750 amount, and that has to be

Page 7

1       amortized, and at the end of the year, probably

2       there would be 437.50 left in prepaid insurance

3       from this amount because this would be running

4       from October 1 through June 30th.

5    Q   Okay.

6    A   Okay.

7    Q   This actually ran through February.  But using

8       your example, as I understand it, the policy

9       would incept around October.  Let's just say

10       October.

11   A   That's correct.

12   Q   You'd get the bill probably November.

13   A   November, December.  Could even be after the

14       first of the year.

15   Q   You paid in full.

16   A   Right.

17   Q   So let's say that's a hundred dollars.

18   A   Right.

19   Q   But because your fiscal year ended in June,

20       you'd allocate whatever you had to the end of

21       your fiscal year.  Then there would be some

22       money left over.

23   A   Right.

24   Q   In this last column, for example, the 437 of the

1  750, would that be the so-called money left over

2  for the next fiscal year?

3  A  For the next fiscal year, I'd say yes, yes.

4  Q  So that's what that column was?

5  A  Right.  Right.

6  Q  Who actually wrote the checks?  I'm just -- was

7  it --

8  A  I wrote some of them.  I think -- I wrote a lot

9  of them.  I think I had my secretary write it,

10  but I did hand write, we had a One Write system

11  in those days, and I wrote most of the checks.

12  Q  Nason didn't write the checks?

13  A  No, he did not.

14  Q  So would you just give him your One Write?  In

15  other words --

16  A  No, he would audit everything.  In other words,

17  when he went through, he would go through the

18  cash book, you know.  In other words, we had

19  double entry accounting that would be entered

20  into the voucher register and then paid, and

21  then he would pick up his prepaid schedule from

22  our voucher register.  It was the complete two

23  double entry system again.

24  Q  When you say the "voucher register," is that the

1       check register or a separate register?

2   A   That would be a separate entry where we would

3       enter the liability, and then in the general

4       ledger section, we would have a prepaid

5       insurance column, and then when we wrote in the

6       cash book, it would be debiting cash and

7       crediting -- sorry, debiting cash, reducing

8       cash, and then reducing the accounts payable

9       which would be a debit to that particular entry.

10  Q   And that's a separate book?

11  A   Well, we -- well, it would be a separate,

12      separate entry, yes.  But Mr. Nason picked all

13      these entries up from the cash entry.

14  Q   Okay.  So he didn't pick it up from the One

15      Write system?

16  A   Yes, he would.  He would pick it up from the One

17      Write system as well to indicate that was

18      entered and paid.  That was the main thing.

19  Q   Let's just stop for second.  Just so -- I'm

20      trying to remember.  You know, before there were

21      computers, the One Write system, as I recall,

22      was an actual duplicate of the check.

23  A   Yes.  Yes.

24  Q   So you'd write a check.  You take off the check

1       and there would be a dupe under it.

2   A   Right.

3   Q   And then there would be --

4   A   No, no, we didn't do it that way.  We didn't

5       have a duplicate.  It was a One Write system

6       where it would write Henrick Johnson Insurance.

7       $750 would be debited to cash, actually,

8       credited to cash and debit to the accounts

9       payable.  That's the way the entry ran, and that

10      would erase the entry in the voucher register,

11      get rid of the liability, because you have to

12      keep track of your liabilities, which accounts

13      payable or credit, so you have to get it off

14      your books so you're cashing your double entry

15      system.

16  Q   What happened to those books?

17  A   Pardon me?

18  Q   Where are those?

19  A   We have some of them.  Some of them are missing.

20      Some we have.  Yes.  Yes.

21  Q   And you call them cash books?

22  A   No, they're voucher registers.

23  Q   And is that where Nason would get his

24      information when he did his ledgers?

Page 11

1   A   That's correct.   That's correct.

2   Q   So this is basically a duplicate of your work?

3   A   That's correct.

4   Q   On an audited basis.

5   A   Yes, it is.

6   Q   Now, deposits, for example where you got a check

7       as opposed to spend a check.

8   A   Um hmm.

9   Q   Would they be ledgered?

10  A   Deposits, what do you mean, deposits from

11      stores, you mean?

12  Q   Not only deposits from stores.   Let's say you

13      got a return premium.

14  A   They would --

15  Q   How would that be ledgered, let's say, in

16      Mr. Nason's or in your cash book?

17  A   In a cash book, it would be a debit to cash, and

18      then I think the entry would be other income, or

19      credit to prepaid insurance, because it's a

20      reduction, you know, in the amount of insurance

21      that would be expended for.   So it would be a

22      contra expense account.

23  Q   Would there be a listing of who wrote the check,

24      who the payor was?

Page 14

1   Q   I just have to check.

2   A   Yeah, you have to check. But one thing that

3       stands out in this ledger thing, that Utica,

4       you'll see the LU policy, the P stands for

5       personally examined the policy. This is, Harry

6       put this ledger on all his things, that anything

7       he put a P on, you see the P down here, the P,

8       he personally examined the policies.

9   Q   Is that what the P means?

10  A   P stands for personally looked at the policies.

11      Personally examined. That was his ledger thing

12      and that was his -- it was footnotes as a CPA.

13  Q   Would he do an audited financial? Would you get

14      an audited financial at the end of the year?

15  A   We did.

16  Q   Do you still have those?

17  A   I don't think so. I don't think so.

18  Q   So the columns, let's just go over Exhibit 3 for

19      a second just so I understand this, and if I

20      have to see these again, I'll get it. The first

21      column is the payee.

22  A   Correct.

23  Q   Okay. That's the person we paid the money to.

24  A   Right.

Page 15

1    Q    The second column is a reference, and in this

2         case it's a reference to policy number.

3    A    Policy number.

4    Q    The third column is, if it's blank, he didn't

5         see the policy.  If there's a P, he personally

6         reviewed the policy.

7    A    Yes.

8    Q    Were there any other abbreviations or codes that

9         Mr. Nason used other than P?

10   A    Not that I am aware of.

11   Q    Okay.  And the next column is what?

12   A    Johnson.  That's the person who, Henrick

13        Johnson, the insurance agency, and this was the

14        description.

15   Q    Okay.

16   A    Of course, these were the dates in which they --

17   Q    Let's go column by column.

18   A    Yeah.

19   Q    So next is the type of policy, right?

20   A    Yeah.

21   Q    Then we skip over to here, right?

22   A    Right.

23   Q    And what are these columns?

24   A    Well, this would have been from the, this was a

EXHIBIT "D"

Page 58

1    Q.   Is it your understanding they were agents

2         for the Travelers?

3    A.   They were agents for other people, but I

4         know that they handled Travelers, yes.

5    Q.   When you came on board, would you be the

6         person who would pay the insurance bills?

7    A.   Yes.

8    Q.   So you would see invoices from EJ Wells?

9    A.   Yes.

10   Q.   What about the insurance policies, would

11        they come to you as part of your business

12        management?

13   A.   Yes.

14   Q.   What would you do with them?

15   A.   Well, we stored them for awhile but our

16        accountant kept very fastidious records.

17        Mr. Harry Nason in Boston was our accountant

18        from probably late 1950s through 2001 or 2,

19        he got ill but he kept every policy number

20        that we ever had.

21   Q.   Can you spell Nason?

22   A.   N A S O N.  In fact --

23   Q.   Did Mr. Nason work for a company?

24   A.   He was his own individual practitioner.

Page 59

1   Q.   So he worked alone?

2   A.   That's correct.

3   Q.   Where was his office?

4   A.   294 Washington Street, right across the

5        street.

6   Q.   Kleenit used him from the 1950s to just a

7        few years ago?

8   A.   That's correct.

9   Q.   Is he still alive?

10  A.   Yes.   He's in nursing home now.

11  Q.   Did he sell his practice?

12  A.   He just closed it.

13  Q.   Who is your CPA now?

14  A.   I'm trying to think of the name of it.   Ron

15       Gacciccie is our CPA.   He works for a firm

16       out in Braintree, I believe.

17  Q.   Do you know the name of it?

18  A.   It just escapes my mind right now.   I'll

19       think of it later.

20  Q.   Can you spell Gacciccie?

21  A.   G A C C I C C I E, I think.

22  Q.   He's in Braintree?

23  A.   Yes.

24  Q.   Do you know if the records from Mr. Nason

Page 60

1    were transferred to his office?

2  A.  They were transferred to me.  Basically, I

3      picked up all the books from 1960 right to

4      current from his office when he closed it.

5  Q.  Who did you deal with?  In other words, when

6      Mr. Nason got sick were you contacted by his

7      lawyer?

8  A.  You mean --

9  Q.  To pick up his books?

10 A.  No, his sister worked for him so we picked

11     up, I went down to his office and picked

12     them up.

13 Q.  Do you know his sister's name?

14 A.  Evelyn Astorian, A S T O R I A N but I just

15     understand she had a stroke.

16 Q.  Just so I can understand, Mr. Nason kept

17     records of the insurance issued to Kleenit?

18 A.  Well, the statements of insurance.  Like, if

19     you're doing an audit.

20 Q.  Sure.

21 A.  You keep a list of all the prepaid insurance

22     and he took it even one step further.  He

23     had all the policy numbers, the companies

24     listed, everything in detail, the umbrella

G&M COURT REPORTERS, LTD.
(617) 338-0030

1       policy numbers.  We had everything.  And he

2       kept those records, you know, time

3       immemorial.  He was very fastidious.

4       Everything was handwritten but it was there.

5  Q.  Did he keep it on a ledger of some kind?

6  A.  In his working papers or ledgers.

7  Q.  You picked up these working papers when?

8  A.  I would say mid, late 2002, maybe.

9  Q.  These papers went back to the '60s?

10  A.  Yes.

11  Q.  Where are these papers now?

12  A.  They're in my office.

13  Q.  And they have all the insurance policies

14      issued to Kleenit in terms of the company,

15      the policy number and the amount paid?

16  A.  Yes, yes, they do, for the most part.

17        MR. HEIFETZ:  Don, I'm going to ask

18      you for those records.

19  A.  Well, I think that we gave all the records,

20      we gave all the records to Bob Fasanella

21      when the initial notices went out to the

22      insurance companies.  This is what

23      promulgated these things.  Everything that

24      you got from Bob Fasanella would have been

Page 62

1    transferred to these particular forms.

2    That's how we notified you folks in

3    September of 2002 on all that.  I mean, in

4    other words, this was individually taken

5    from Bob Fasanella from Mr. Nason's original

6    work that I gave him.

7            MR. HEIFETZ:  Okay, hold on one

8    second.

9            (Off the record.)

10           (Exhibit No.  3 marked for

11   identification.)

12   Q.  Let me show you a document that we've marked

13   as Exhibit 3.  It is a letter from Robert

14   Fasanella with some attachments to the Utica

15   Insurance Group.

16   A.  I am familiar with this.  I am familiar with

17   this.

18   Q.  Have you seen that letter before?

19   A.  Yes, I have.  We get copies of all these.

20   Q.  On this letter marked as Exhibit 1 appears

21   to be a ledger and that's the eighth page in

22   to Exhibit 3.  Do you recognize that ledger?

23   A.  Yes, it would be Mr. Nason's work, yes.

24   Q.  So this photocopy of the ledger has a stamp

Page 63

1    of June 30, 1984.  Do you see that?

2  A.  Right.

3  Q.  This is the ledger sheet that was taken from

4      Mr. Nason's work that was transferred to you

5      in 2002?

6  A.  Yes, I would say so.

7  Q.  Now, this is a specific ledger for June 30,

8      1984 but is it your testimony that from the

9      1960s to whenever Mr. Nason stopped doing

10     his work for Kleenit that there was an entry

11     for every policy that would have been paid

12     for from let's say the 1960s to whenever

13     that work stopped?

14  A.  Well, I would say he did everything -- as I

15      say, he was very fastidious.  He went

16      through the entire, the voucher register.

17      He recorded everything manually.  He had

18      everything manually recorded.  I know that

19      he was very accurate, and he kept fastidious

20      records on everything on this so I don't

21      know.

22  Q.  There are topic headings on the ledger where

23      it says things like SMP.  Do you know what

24      that stands for?

# EXHIBIT "E"

Q.  When you talk about the board, who was on the board?

A.  The board was Mr. Crider, Mrs. Crider, Esther Munroe and I believe Mr. Nason was on the board as well for awhile.

Q.  Who is Mr. Nason?

A.  He was the company accountant.  He has since passed away since our last deposition.

Q.  Oh, really?

A.  Yes.

Q.  When did he pass away?

A.  Within the past couple of weeks, two or three weeks.

Q.  Now, you're obviously familiar with this lawsuit?

A.  Yes.

Q.  Can you tell what substance it is that has apparently been released by Kleenit incorporated?

A.  Well, Perchlorethelene, Tetrachlorethelene is the technical name.

Q.  Can we agree we'll call that Perc, because I can't pronounce that, during the course of this deposition?

EXHIBIT "F"

1      bringing this lawsuit?

2  A.   No.

3  Q.   It was solely Mr. Nason's records that you

4       were relying on?

5  A.   Yes.

6  Q.   There are no independent records such as

7       places where you kept old policies?

8  A.   No.

9  Q.   What about checks?  Did you look through

10      checks at all?

11 A.   No.

12 Q.   Other than Mr. Nason's ledgers, did you do

13      your own bookkeeping?

14 A.   No, Mr. Nason did everything.

15 Q.   So there was no inhouse bookkeeping at

16      Kleenit?

17 A.   Yes, we had a voucher register that we kept

18      with the entries that we made as far as, you

19      know, accounts payable and so forth but Mr.

20      Nason conveyed these to a general ledger and

21      schedules and then prepared the tax returns

22      for us.

23 Q.   So you had no individual ledger, let's say

24      that an inhouse bookkeeper would keep?

1   A.  Well, we recorded all the bills, all the

2       bills and they were paid, okay, but then Mr.

3       Nason would extrapolate everything for an

4       annual report and a tax return.

5   Q.  I guess what I'm asking you is when you paid

6       the bills?

7   A.  Yes.

8   Q.  Did you record them in a checkbook ledger?

9   A.  Oh, yes.

10  Q.  Or did you have a separate ledger such as

11      what is shown on page 8 and 9 of Exhibit 3

12      where an inhouse bookkeeper would actually

13      ledger them?

14  A.  No, Mr. Nason extrapolated everything from

15      our voucher register onto a work paper.

16      That's what he did.  That's the way Mr.

17      Munro had it done.

    Q.  So when you say voucher register, that is

       the register from the checkbook?

    A.  No, voucher register, double entry

       accounting record.  Up to recently -- we

       went to Quick Books but up to recently we

       recorded everything manually so the credit

       would be to accounts payable and debit would

1    be to prepaid insurance on the voucher

2    register.  Then when we did the entry in the

3    cash book it would be credit cash debit

4    accounts payable to wipe that liability

5    off.  Basically, we did the One Write check

6    system for many years, the Safeguard check

7    system and now we're with Quick Books.  We

8    do some manually and some that are

9    automated.

10   Q.  The Safeguard checkbook?

11   A.  Would have been the One Write system.

12   Q.  It has like a duplicate?

13   A.  That's right, that's correct.

14   Q.  And a duplicate would be turned over to

     Nason?

15   A.  Yes, he would review everything.

16   Q.  And Nason would then ledger it in the ledger

     that's shown?

17   A.  You're right.  That's correct.

18   Q.  Now, at some point in time you went to a

     computer ledger?

19   A.  That was just done probably six months to a

     year ago we just instituted that.

20   Q.  That's well after any of the events we're

Page 83

1    talking about?

2  A.  Yes.

3  Q.  So, there was no inhouse bookkeeping in

4      terms of a separate ledger; is that correct?

5  A.  Well, yes, we had the voucher register.

6  Q.  Right.

7  A.  Then Mr. Nason transferred this to a general

8      ledger.  He did all the write up work.

9      That's the way it was.

   Q.  Now, what did you do with the One Write

       stuff?  What did you do with it?

   A.  Well --

   Q.  Would you keep it for a period of years and

       then throw it away?

   A.  Yes, I would say five to seven years,

       probably like that but most of the stuff

       would be gone, you know, at this point, I

       would say.  I don't know.  I would have to

       check that.  I think most of it would be

       gone.

   Q.  Have you now told me about all the P & C

       agents, by that I mean property and casualty

       agents, that you used from say '65 to '94?

   A.  Right.

EXHIBIT "G"

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 04 10351 - RBC

| | |
|---|---|
| KLEENIT, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SENTRY INSURANCE COMPANY, | ) |
| ROYAL & SUN ALLIANCE, | ) |
| UTICA NATIONAL INSURANCE GROUP, and | ) |
| TRAVELERS PROPERTY AND CASUALTY | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AFFIDAVIT OF FRANCIS X. MURPHY

I, Francis X. Murphy, hereby depose and state the following:

1.       I am 48 years old and reside at 39 Britt Lane, Groton, Massachusetts.  I have been employed by Kleenit, Inc. ("Kleenit") since 1989.  I have within this year become President of Kleenit.  Prior to that, I held the position of General Manager for about twelve years.

2.       During the pendency of the current lawsuit, I have served, along with Kleenit's past President, Keith Crider, as a contact for consultants and attorneys assisting Kleenit in addressing environmental liabilities that have arisen at the Chelmsford, Acton, and Wayland sites and pursuing insurance coverage.

3.       Efforts to assist the pursuit of insurance coverage, which commenced in 2002, has included an exhaustive search of historical documents evidencing insurance coverage by the several insurance companies from with Kleenit had purchased coverage,

including Utica Insurance Company and Travelers Insurance Company.

4.     This effort to identify documentation of insurance coverage, in coordination with advice of counsel, included contacting current and past insurance carriers, agents, and brokers who had a role in providing Kleenit insurance.

5.     Although the period of coverage, from the early 1960's through the mid-1980's, was prior to my employment with Kleenit, I worked with Keith Crider to locate relevant documents still in the possession of Kleenit and also to determine who had knowledge of historical knowledge of any such coverage.

6.     We searched the primary facility in Ayer and other locations where historical documents were likely to be stored.  Our efforts were unsuccessful in locating originals or even copies of policies.  I understand that the policies had been stored in the Boston office of our accountant, Harry Nason.  However, at the time of our search, Mr. Nason had become ill and was in a nursing home. His office had closed down and documents were apparently thrown away by relatives of Mr. Nason.

7.     However, after an exhaustive search of Kleenit's facility, we discovered ledger books that Mr. Nason had apparently delivered to the Ayer location.  These ledgers provided comprehensive documentation of all insurance carried by Kleenit and the material terms of the policies.  These documents were provided to Kleenit's attorneys to present to the insurance companies identified in the ledgers.

8.     Much later, in late 2005, after Kleenit initiated the current lawsuit, and during the process of consolidating our laundry operations, I found multiple cancelled checks from the 70's and 80's that were payments on our liability insurance policies and expense reimbursements to employees, including a former employee, Robert Kinney.

9.     Kleenit's consolidation effort included combining two separate operations in Ayer into a single facility at our main Ayer plant. This involved the renovation of two vaults that had been used for "storage" into productive space. (We act as a "closet" for our customers to store off-season clothing and furs.) In addition to storing the clothing and furs, the vaults located in the basement of the facility had become a catch-all space for other items including unclaimed clothing orders, lighting fixtures, scales, Keith Crider's skis and baseball trophies, and—as we later discovered—old office paperwork.

10.     On November 8, 2005 I hired a new Office Manager. A few days before the first mediation hearing in Worcester, she was tasked with categorizing and moving all furs from the vaults into a new storage "PODS". During this process, and wanting to help in further readying the vault space, she asked me to determine which of the boxes she had come across in the vault should be shredded and which needed to be kept. Mr. Crider and I were unaware we had been keeping these boxes. I can only assume former office personnel had put them there not knowing what else to do with them.

11.     Since I had been prepping for our mediation hearing on December 12th, I knew—from having found Mr. Nason's ledgers,—the dates and check numbers of the checks we wrote to Sentry Insurance Company. With my Office Manager's discovery fresh in my mind, I decided to check if any of the boxes contained old corporate checks.

12.     Most of the boxes found in the vault contained old paid invoices, old daily cash collection envelopes, and old cancelled payroll checks. However, I found one box containing old cancelled corporate checks from the '70's and '80's. Within 10 minutes of finding this box I had found the first check written to Henrick Johnson—agent for Utica--for the $1,000,000 umbrella policy. The check was dated June 27, 1984 and

corresponded with ledger information previously discovered. My discovery of this check was on Dec. 14, 2005, coincidently, the eve of first mediation hearing.

13.    After the first mediation hearing attorneys Nagle and Fasanella instructed me to fully search the box for other cancelled checks written to the insurers. Since there were approximately 100 months worth of monthly reconciles, and we didn't have any specific check/date to search for, and since I had limited manpower for the task—only my wife, Keith, and I knew what to look for (Keith was away for most of January)—it took some time to search all the checks.

14.    After finding all the Bobby Kinney expense checks, it was decided we needed to supply the insurers with all employee expense checks. This necessitated another search of the 100-odd monthly packets.

15.    After a complete review of all documents contained in boxes found in the basement vault, I discovered another check issued to Henrick Johnson, dated March 2, 1983. This check also coincided with a Harry Nason ledger entry for a million dollar umbrella policy. The check included a notation in Keith Crider's hand: "Umbrella Policy."

Signed under the pains and penalties of perjury, this 22nd day of September, 2006,

Francis X. Murphy

# EXHIBIT "H"

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT
C.A. NO. MICV2003-4677

|  |  |
|---|---|
| KLEENIT, INC. | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SENTRY INSURANCE COMPANY, | ) |
| ROYAL & SUN ALLIANCE, | ) |
| UTICA NATIONAL INSURANCE GROUP, and | ) |
| TRAVELERS PROPERTY AND CASUALTY | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AFFIDAVIT OF KEITH CRIDER

I, Keith Crider, hereby depose and state the following:

1.    My name is Keith Crider, President of Kleenit, Inc. ("Kleenit"). I have been the Chief Financial Officer of Kleenit, Inc. for 37 years. Kleenit is a small, closely held family corporation based presently in Ayer, Massachusetts. As President and Chief Financial Officer of Kleenit I am familiar with the assets and liabilities of the corporation

2.    Kleenit has incurred severe financial hardship over the past two years, which at times has threatened the very existence of the business, as a result of extraordinary expenses associated with the defense, site assessment and clean-up obligations it has incurred as a result of the receipt of three Notices of Responsibility (NORs) sent by the Department of Environmental Protection (DEP) to Kleenit for its facilities located in Chelmsford, Acton and Wayland, Massachusetts.

3.     Kleenit has incurred approximately $149,586.74 in defense related expenses,

$53,356.14 in claim related expenses, $22,352.44 in indemnity (clean-up) related expenses, for a

total of $225,205.11 in expenses associated with the Chelmsford and Acton sites as further detailed

in the attached spreadsheet of Chelmsford and Acton's costs (See Attachment No. 1).

4.     With the Wayland site included, Kleenit has incurred approximately $166,242.46 in

Case 1:04-cv-10351-RBC     Document 99     Filed 08/24/2006     Page 3 of 5

defense, 22,352.44 in claim costs and $56,598.67 in indemnification and clean-up costs for a total of

$245,103.36 (See Attachment No. 2).

5.     In contrast, Kleenit's insurance companies have only reimbursed $18,590.77, or

merely 12%, of Kleenit's defense costs at the Chelmsford and Acton sites, and no payment for

clean-up, indemnification or claims.

6.     Kleenit timely put its insurance carriers on notice once it became aware of each

NOR and the need for defense and reimbursement of defense related expenses associated with these

NORs. At first Kleenit believed that it could handle the costs associated with the initial NOR

relating to the Chelmsford facility as an ordinary operating expense.  However, as a result of the

claims made by other third parties, including the DEP, ExxonMobil and a day care facility, Kleenit

realized that the costs and liabilities associated with defense alone of this matter could financially

bankrupt the corporation.

7.     Upon realization of the severe financial consequences of these claims, Kleenit made

diligent efforts to investigate, locate and notify any and all insurers of its facilities, some of which

dated back to the 1960s.

8.     Unfortunately, some of Kleenit's former insurance agents lost older insurance policy

records and it was extremely difficult and burdensome to reconstruct its insurance records, which

possibly have been archived and/or lost. Kleenit pursued all reasonable sources to recover its

records, including contacting former agents, accountants and the insurance companies directly.

9.    Despite providing timely notice of the DEP and third party claims, none of the

insurers promptly responded to initial notices and claims to provide defense to Kleenit. Kleenit was

required to retain environmental consultants and insurance defense and coverage counsel to

Case 1:04-cv-10351-RBC    Document 99    Filed 08/24/2006    Page 4 of 5

represent its interest, defend claims, and pursue defense and coverage from the various insurers.

10.    Kleenit will suffer irreparable financial and fiscal harm if it is not reimbursed for all

outstanding defense costs at the Chelmsford and Acton sites, or if it is obligated to pay defense and

coverage for claims made by various third parties in these three matters.

11.    Kleenit cannot afford to pay for defense and indemnity (clean-up) related expenses

at the Chelmsford and Acton sites. As a result of the insurers' unreasonable delay and refusal to pay

Kleenit's defense costs, Kleenit has been forced to concentrate its limited financial resources on

only defense-related expenses. Thus irreparable harm may likely occur to third parties and/or the

environment if Kleenit becomes financially unable to implement cost effective site assessment and

clean-up (response actions). For example, irreparable harm may result to downgradient property

owners and occupants of the day care facility in Chelmsford and other sensitive environmental

receptors, if Kleenit lacks the financial resources to participate in a clean-up. Exxon has threatened

to sue Kleenit if it fails to participate equally in response actions in the vicinity of the Chelmsford

site.

12.    Kleenit requires immediate equitable relief from the Court to order full payment of

all defense related costs incurred by Kleenit at the Chelmsford and Acton sites so that Kleenit can

fund necessary defense and response action costs and so that Kleenit can avoid having to downsize

its operations, sell off company facilities and assets, lay off employees and/or file for bankruptcy protection from its creditors.

13.     In an effort to avoid laying off employees and irreparable financial harm to the corporation, I have taken little, if any, financial compensation for 2 years and have had to exercise other extreme austerity measures. For example, I have had to extend business credits and loans, for which I have had to personally guarantee payment.

14.     Kleenit's business reputation with its vendors has been disrupted, and also its reputation with environmental defense consultants has also been irreparably damaged, since some will not provide further services without promissory notes and personal guarantees.

I swear under the pains and penalties of perjury the above statements of fact are true and accurate to the best of my personal knowledge.

Keith Crider

Keith Crider, President
Kleenit, Inc.

Dated:  February 5, 2004

584800_1

# EXHIBIT "I"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KLEENIT, INC. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 04-10351 (NG) |
| | ) | |
| v. | ) | |
| SENTRY INSURANCE COMPANY, | ) | |
| ROYAL AND SUNALLIANCE, UTICA | ) | |
| NATIONAL INSURANCE GROUP, and | ) | |
| TRAVELERS PROPERTY AND | ) | |
| CASUALTY | ) | |
| | ) | |
| Defendants | ) | |

PLAINTIFF'S FIRST REQUEST FOR PRODUCTION

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local

Rules of the United States District Court for the District of Massachusetts, the plaintiff

hereby requests the defendant, **Utica National Insurance Group**, to produce for

inspection and copying within thirty (30) days hereof the following documents and

things:

1.  All documents and things identified in defendant's answers to Plaintiff's

    First Set of Interrogatories.

2.  All documents and things defendant intends to offer as evidence at trial.

3.  All policies of insurance, binders, and declarations issued by the defendant

    or its predecessors to the plaintiff, including forms, endorsements and

    attachments.

4.  All correspondence and other documents between the defendant and the plaintiff concerning the plaintiff's claims that are the subject of this case.

5.  All correspondence and other documents between the defendant and other insurers concerning the claims that are the subject of this case.

6.  All correspondence and other documents between the defendant and the Massachusetts Department of Environmental Protection concerning the releases of hazardous materials described in the plaintiff's claims.

7.  All documents and things that the defendant contends support or tend to support any of the defendant's denial(s) in its Answer and its Amended Answer of any allegation(s) set forth in plaintiff's Complaint and Amended Complaint.

8.  All documents and things that the defendant contends support or tend to support any of the defendant's affirmative defenses.

9.  All documents and things that the defendant contends support or tend to support any of the defendant's counterclaims.

                    KLEENIT, INC.
                    Plaintiff

                    BY ITS ATTORNEY

                    Donald P. Nagle, Esq. (BBO 553544)
                    5 Main Street Ext., Suite 300
                    Plymouth, Massachusetts 02360
                    (508) 732-8970

## CERTIFICATE OF SERVICE

I, Donald P. Nagle, hereby certify that I caused to be served the foregoing on all counsel of record by first-class mail, postage prepaid, this 18th day of January 2005.

Donald P. Nagle