# EXHIBIT "A"

1        Main Street -- Central Square?

2    A.  Central Square, that's correct.

3    Q.  Okay.  Before we go back to all that, we're

4        going to go back to each store, let me ask

5        you a little bit about some insurance.

6        Before Mr. Munro died in 1985, did he take

7        care of the insurance?

8    A.  He had a very, very -- up to a certain

9        point, yes but from 19 -- well, probably

10       1940 to, let's put it in the mid '70s he had

11       a very close relationship with the Travelers

12       and the fellow that had, that sold mostly

13       Travelers in Groton, Mass, the EJ Wells

14       insurance company.

15   Q.  He had a close relationship with the EJ

16       Wells?

17   A.  Yes, Milt Esterbrook.  In fact, he was at

18       the grand opening -- I remember his picture

19       being at the grand opening at Care Cleaners

20       in 1960.  I wasn't there but --

21   Q.  So it's your understanding from 1940 to the

22       mid '70s Mr. Munro dealt exclusively with EJ

23       Wells insurance agency?

24   A.  That's correct.

1   Q.   Is it your understanding they were agents

2        for the Travelers?

3   A.   They were agents for other people, but I

4        know that they handled Travelers, yes.

5   Q.   When you came on board, would you be the

6        person who would pay the insurance bills?

7   A.   Yes.

8   Q.   So you would see invoices from EJ Wells?

9   A.   Yes.

10  Q.   What about the insurance policies, would

11       they come to you as part of your business

12       management?

13  A.   Yes.

14  Q.   What would you do with them?

15  A.   Well, we stored them for awhile but our

16       accountant kept very fastidious records.

17       Mr. Harry Nason in Boston was our accountant

18       from probably late 1950s through 2001 or 2,

19       he got ill but he kept every policy number

20       that we ever had.

21  Q.   Can you spell Nason?

22  A.   N A S O N.  In fact --

23  Q.   Did Mr. Nason work for a company?

24  A.   He was his own individual practitioner.

# EXHIBIT "B"

1      over to Mr. Fasanella, did you sit down and

2      look through the records and look for

3      insurance companies?

4  A.  No, no.

5  Q.  Or did you just take the records and give

6      them to Mr. Fasanella?

7  A.  No, I reviewed a good part of these because

8      I knew the sequence of years that related

9      to, you know, to the various sites.  And so

10     I had a pretty good idea of what policy

11     generally speaking, you know, went -- the

12     policies went from Travelers, we had Sentry

13     for three years and then we went over to

14     Utica and then the last one, Royal Sun.  We

15     had Royal Sun for nine years I think right

16     up to 1994.  So I mean, I had a pretty good

17     idea how the sequence ran after I got

18     involved with the insurance part.

19 Q.  Did you have a good idea from your own

20     experience as the business manager of who

21     was the insurer?

22 A.  Yes, I had a pretty good idea, yes.  All the

23     ones that I dealt with I can remember, even

24     the agents.

Page 67

Q. When did Kleenit stop dealing with EJ Wells?

A. It was around 1973, '74. What happened was Henry Barry, who was an adjuster with Travelers became the new owner of, several years before that became the new owner of EJ Wells insurance agency and we had a falling out over an issue. And at that time John McDonald from Sentry, New England Fabric Care was pushing for Sentry to be, you know -- in other words, they were recommending that company for coverage to drycleaners.

Q. Can I stop you there just for one second? Because I really want to get a chronology of this.

A. Yes.

Q. When EJ Wells was owned by Milt Esterbrook?

A. Right.

Q. Were the dealings with Esterbrook and Munro?

A. Yes.

Q. Is it your best memory that from the period at least when you started in the late '60s to the sale of EJ Wells the insurance was with Travelers?

Page 68

1        MR. BERMAN:  Objection.

2        MR. HEIFETZ:  Just ignore him.

3   A.  I would say a good deal of it was with

4       Travelers but that's strictly -- in other

5       words, I would assume that.  Mr. Munro did

6       not make changes.  In other words, generally

7       speaking, he was very loyal to people and

8       Mr. Esterbrook so I don't know exactly how

9       to answer that question.

10  Q.  But around 1973 Mr. Esterbrook sold the

11      business?

12  A.  No, it was before that.  It was about 1969

13      or '70 because we have a Travelers policy,

14      1970 policy with Henry Barry on it.  We got

15      a physical policy.  So he had that policy in

16      1970.

17  Q.  Is it B E R R Y?

18  A.  B A R R Y.  He died also in '85.  He's dead.

19  Q.  Did Mr. Barry change the name of the agency?

20  A.  No, he did not.

21  Q.  How do you know Henry Barry was on it?  Did

22      he countersign the policy?

23  A.  Yes, it was stamped on the policy, Henry

24      Barry insurance agency.  I mean Henry Barry

# EXHIBIT "C"

Page 58

Q.   Is it your understanding they were agents
     for the Travelers?

A.   They were agents for other people, but I
     know that they handled Travelers, yes.

Q.   When you came on board, would you be the
     person who would pay the insurance bills?

A.   Yes.

Q.   So you would see invoices from EJ Wells?

A.   Yes.

Q.   What about the insurance policies, would
     they come to you as part of your business
     management?

A.   Yes.

Q.   What would you do with them?

A.   Well, we stored them for awhile but our
     accountant kept very fastidious records.
     Mr. Harry Nason in Boston was our accountant
     from probably late 1950s through 2001 or 2,
     he got ill but he kept every policy number
     that we ever had.

Q.   Can you spell Nason?

A.   N A S O N.  In fact --

Q.   Did Mr. Nason work for a company?

A.   He was his own individual practitioner.

1    Q.   So he worked alone?

2    A.   That's correct.

3    Q.   Where was his office?

4    A.   294 Washington Street, right across the

5         street.

6    Q.   Kleenit used him from the 1950s to just a

7         few years ago?

8    A.   That's correct.

9    Q.   Is he still alive?

10   A.   Yes.  He's in nursing home now.

11   Q.   Did he sell his practice?

12   A.   He just closed it.

13   Q.   Who is your CPA now?

14   A.   I'm trying to think of the name of it.  Ron

15        Gacciccie is our CPA.  He works for a firm

16        out in Braintree, I believe.

17   Q.   Do you know the name of it?

18   A.   It just escapes my mind right now.  I'll

19        think of it later.

20   Q.   Can you spell Gacciccie?

21   A.   G A C C I C C I E, I think.

22   Q.   He's in Braintree?

23   A.   Yes.

24   Q.   Do you know if the records from Mr. Nason

Page 60

1   Q   Now, there's no other indication as to what that

2       entry means other than the words "Milton

3       Estabrook," correct?

4   A   Correct.

5   Q   You don't have any way of knowing whether that

6       entry was for a liability policy issued to

7       Travelers; do you?

8           MR. NAGLE:   Objection.

9   A   All my recollection is that Mr. Monro had

10      everything with Travelers from many, many years

11      on, and I have pretty much proof, I mean, that

12      this was the case.

13  Q   Let me ask you this:   When you say pretty much

14      everything, you mean all of -- it's your

15      testimony that from what your understanding is,

16      and this would have been in approximately 1965,

17      that Kleenit bought all of its insurance from

18      Milton Estabrook?

19  A   That's correct.   And I would further that along,

20      that I think it was before 1965, even up to -- I

21      know from 1960 on he had with Travelers.   And I

22      have even visual evidence of that.

23  Q   What's that visual evidence?

24  A   This is the Grand Opening of Care Cleaners in

1    19 -- September 10.  I have the date here, 1960.

2    September 10, 1960.  This was the opening, and

3    it had all the people listed on the -- from left

4    to right, okay.  And this fellow here is Mil

5    Estabrook standing right here with his 10 cent:

6    Where is the business?  I want my premium.

7         This gentleman here is Frank Geray from,

8    was a safety inspector from Travelers, and I

9    don't think they'd be there if, you know, these

10   guys would be there if that were not the case.

11   I got a more -- that was a glossy.  This is the

12   print.

13        MR. HEIFETZ:  Want to mark this?

14        MR. DAY:  Yes, will you please have that

15   marked.

16        (Black and white photograph marked

17         Exhibit No. 11 for identification.)

18   Q  Sorry, what was the name of the gentleman from

19      Travelers?

20   A  Frank.  He's died now.  I hope I got the

21      spelling right, G E R A Y, Frank Geray.

22   Q  And his title was safety?

23   A  Yeah, safety, something of that nature.  I can't

24      remember.  Obviously, I wasn't there.  I met him

Page 62

1    later, you know, later at a later date, but

2    Mr. Estabrook is, you know, that's him.  I was

3    in Rotary with him.

4  Q  Well, when you say that Mr. Estabrook placed all

5    of the insurance, does that include like

6    automobile insurance coverage?

7  A  He had everything, for my knowledge.  When I got

8    there, everything was Travelers; the

9    automobiles, the boiler insurance, the SMP was

10    always Travelers until 1973, from all the years

11    that I was there.

12  Q  And worker's compensation?

13  A  Worker's comp.  I'm not -- I would say yes.

14    Yes.  I'm not -- I mean, I don't know exactly

15    what -- you know, from 1967 on, I know that that

16    was the case, but I think they had the whole

17    package.

18  Q  But if we go back to Exhibit 7 and that line 18

19    that I had pointed out a moment ago, it shows,

20    "Purchased from Milton Estabrook."  Do you have

21    any way of determining whether that, what type

22    of insurance, if it was insurance, that payment

23    was for?

24  A  Well, obviously I don't.  But the only thing is,

# EXHIBIT "E"



T. Jill Donan
Associate Account Executive
Special Liability Coverage Unit

Three Farm Glen Boulevard
Farmington, CT 06032-1970

Telephone: (860) 954-5040
Facsimile: (860) 954-5857

Via Facsimile Transmission (508) 732-8971
and
Certified Mail/RRR (#7099 3400 0015 9498 7999)

January 17, 2003

Donald P. Nagle, Esq.
5 Main Street Extension, Suite 300
Plymouth, Massachusetts 02360

> Policyholder:  Kleenit, Inc. ("Kleenit")
>
> Site 1:  28 Central Square and Beaver Brook, Chelmsford, Massachusetts
> Re:  Massachusetts Department of Environmental Protection ("MA-DEP")
> Notice of Responsibility ("NOR") letter dated January 28, 2001
>
> Site 2:  293 and 295 Main Street, Acton, Massachusetts
> Re:  Massachusetts Department of Environmental Protection ("MA-DEP")
> Notice of Responsibility ("NOR") letter dated December 30, 2002

Dear Mr. Nagle:

I am in receipt of your January 13, 2003 correspondences. I understand that your firm has taken ove
the handling of the coverage aspect of these matters from Rubin and Rudman ("R&R"). As you may
know, I am a member of Travelers Special Liability Coverage Unit ("SLCU"). The SLCU has revie
these letters with counsel, and believes that your claim that Kleenit is entitled to multiple damages a
attorney's fees in accordance with M.G.L. c. 93A is incorrect. A detailed response will follow by a
separate letter. However, as set forth in this letter, Travelers is willing to participate in Kleenit's def
of the captioned NORs, subject to the following reservation of rights.

## SUMMARY OF POLICIES

Travelers policy research has been unable to locate in our records copies of any Commercial General
Liability ("CGL") policies which were issued to Kleenit. The copy of the policy which Kleenit's former
counsel, R&R, provided to the SLCU appears to be a policy issued by The Travelers Indemnity
Company:

Donald P. Nagle, Esq.
January 17, 2003
Page 2

<table>
<tr><td>Policy Number</td><td>Policy Period</td></tr>
<tr><td>ND 9087145</td><td>August 28, 1970 to August 28, 1973</td></tr>
</table>

Because Travelers has been unable to locate a copy in its records of the policy provided by R&R, Travelers reserves its rights should any other evidence of policy content come to light.

Additionally, Travelers research has located reference in its records to the following policy (the "Alleged Policy"), but has been unable to locate a copy of this policy:

<table>
<tr><td>Policy Number</td><td>Policy Period</td></tr>
<tr><td>ND 3873892</td><td>August 1, 1967 to August 1, 1970</td></tr>
</table>

Please be aware that because this Alleged Policy has not been located, Travelers is unable to confirm the terms, limits and conditions of the Alleged Policy. Please provide us with any information you have regarding the Alleged Policy.

Please note that R&R previously alleged that Travelers issued policies to Kleenit from 1962 through 1973. However, Travelers has searched exhaustively through all available records and finds no evidence of any other CGL policies than the above two.

## LATE NOTICE / PRE-TENDER COSTS

We have reviewed with our counsel the case law related to late notice and pre-tender costs referenced by R&R in previous correspondence and found it to be unpersuasive. A detailed response will follow by a separate letter. Travelers has no obligation to reimburse Kleenit for any costs it incurred in connection with the Chelmsford NOR prior to tender, i.e., prior to September 27, 2002. In addition, Travelers may have no potential defense or indemnity obligations for the Chelmsford matter to the extent that Kleenit did not provide timely and adequate notice of the Chelmsford matter to Travelers, and/or to the extent that Kleenit voluntarily incurred costs or obligations without Travelers knowledge and consent, and/or to the extent that Kleenit has violated any other conditions precedent to coverage under the policy. Please note that the policy issued to Kleenit contains the following pertinent provisions:

## GENERAL CONDITIONS

. . .

3.    Insured's Duties in the Event of Loss, Accident or Occurrence

    a.    Sections II and III -

        (1)    In the event of an accident or occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information respecting time, place and circumstances thereof, and the

Donald P. Nagle, Esq.
January 17, 2003
Page 3

names and addresses of the injured and of available witnesses, shall be given by or on behalf of the Insured to The Travelers or any of its authorized agents as soon as practicable.

(2)    If a claim is made or suit is brought against the Insured, the Insured shall immediately forward to The Travelers every demand, notice, summons or other process received by him or his representative.

(3)    Coverages D, F, and G- The insured shall cooperate with The Travelers and, upon The Travelers request, attend hearings and trials and assist in making settlements, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of any legal proceedings in connection with the subject matter of this insurance. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident.

Based on the information you have provided the SLCU, it is apparent that Kleenit has been aware of the Chelmsford matter since at least January, 2001. Kleenit was aware of its alleged liability for a period of over two (2) years prior to its notice to Travelers. Therefore, it appears that Travelers may have no defense or indemnity obligation because Kleenit did not "notify Travelers of an 'occurrence' which might result in a claim as soon as practicable," nor did it "immediately forward to Travelers copies of the demands, notices, summonses or other process received by it regarding the Chelmsford NOR immediately." In addition, all defense and indemnification costs that were paid by Kleenit prior to Kleenit's September 27, 2002 tender of the Chelmsford NOR to Travelers, as well as all defense and indemnification costs which Kleenit has agreed or committed to pay prior to September 27, 2002, are not covered under any policy issued to Kleenit by Travelers.

Nevertheless, without waiver of Travelers position that it has or may have no defense or indemnity obligations to Kleenit, and explicitly reserving Travelers right to decline all coverage for these matters, Travelers is willing to further consider these matters as set forth below. However, consistent with Massachusetts law, although Travelers agrees to defend Kleenit under the policy, to the extent that any costs related to the Chelmsford matter that you tender to Travelers for payment are for costs associated with the fulfillment of work previously agreed to be completed at that site, those costs are not reimbursable. Augat, Inc. v. Liberty Mutual Insurance Company, 410 Mass. 117, 121-123, 571 N.E.2d 357 (1991).

Donald P. Nagle, Esq.
January 17, 2003
Page 4

## OFFER OF DEFENSE

Please be advised that Travelers will participate in Kleenit's defense of the Chelmsford and Acton NORs under the policy in effect from August 28, 1970 to August 28, 1973, subject to the complete reservation of rights set forth in this letter, which includes, but is not limited to, the right to seek recoupment of defense costs should it be determined that there is no potential indemnity coverage for these matters.

Pursuant to this offer of defense, Travelers will contribute to the reasonable and necessary defense-related counsel fees and expenses billed by an appropriately qualified law firm of Kleenit's choice and incurred subsequent to the tender of the Chelmsford and Acton NORs to Travelers by Kleenit on September 27, 2002. Please note that "defense-related counsel fees and expenses" do not include certain costs relating to the relief that the MA-DEP is attempting to obtain from Kleenit by the NORs. Such costs, which may include the expense of conducting studies to determine the nature and extent of contamination at or around the captioned Site, and/or medical monitoring costs, or to plan or undertake containment, abatement or other remedial measures at or around the Site, or otherwise to implement measures designed to bring the Site or its environs into compliance with governmental regulations, will only be considered for payment as "defense-related expenses" if they clearly relate to the resolution of a question of Kleenit's liability at issue in this matter, and if resolving such issue is necessary to Kleenit's defense. Otherwise, these costs will be considered for indemnity coverage, should Travelers determine that it may have an indemnity obligation to Kleenit.

## RESERVATION OF RIGHTS

The policy contains conditions, exclusions and other language which may limit or preclude coverage for this matter. Therefore, Travelers investigation of this matter is not intended to be, and should not be deemed or construed as: an admission that any defense or indemnity coverage is available for this matter; an expansion of any obligation that Travelers may subsequently acknowledge (if any); a waiver of any right or defense to coverage available to Travelers, whether under the policy or at law or in equity; or a course of performance. Travelers reservation of rights includes, but is not limited to, the following specific reservations:

1) Coverage applies only to sums which the insured is legally obligated to pay as damages because of property damage.

2) Except as required by policy provisions or applicable and controlling law, coverage does not apply to punitive or exemplary damages, fines or penalties sought or recovered in the captioned matter.

3) Coverage does not apply to any alleged damage or injury which does not constitute property damage as defined in the policy.

Donald P. Nagle, Esq.
January 17, 2003
Page 5

4)      Any property damage which takes place prior and/or subsequent to the dates during which
        Travelers provided liability insurance to Kleenit is not covered by the policy issued by Travelers,
        and thus, Travelers is under no obligation to defend lawsuits or pay claims, settlements or
        judgments for any such property damage.

5)      Coverage does not apply to any alleged damage or injury unless caused by an accident or
        occurrence as defined in the policy.

6)      Coverage does not apply to property damage arising out of any emission, discharge, seepage,
        release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission,
        discharge, seepage, release or escape is either expected or intended from the standpoint of any
        insured or any person or organization for whose acts or omissions any insured is liable.

7)      Coverage does not apply to property damage arising out of any emission, discharge, seepage,
        release or escape of any liquid, solid, gaseous or thermal waste or pollutant resulting from or
        contributed to by any condition in violation of or non-compliance with any governmental rule,
        regulation or law applicable thereto.

8)      Coverage does not apply to property damage arising out of any emission, discharge, seepage,
        release or escape of petroleum or petroleum derivatives into any body of water.

9)      Coverage does not apply if the insured failed or fails to provide notice to or cooperate with
        Travelers, or impairs Travelers contribution or subrogation or other insurance rights (if any), in
        accordance with the conditions of the policy and with applicable law.

10)     Coverage does not apply to any payment made, obligation assumed or expense incurred
        voluntarily by the insured or without Travelers knowledge and consent (other than for first aid to
        others at the time of any occurrence) in accordance with the conditions of the policy, nor to any
        pre-tender costs.

11)     For the purpose of determining the limit of Travelers liability under the policy (if any), all
        property damage arising out of continuous or repeated exposure to substantially the same general
        conditions shall be considered arising out of one occurrence.

12)     Any payments that might be made by Travelers in this case are subject to the applicable limits of
        liability and/or deductibles as contained in (or as otherwise applicable to) the policy.

13)     In accordance with the assignment condition of the policy, coverage is not afforded for any
        person or entity whose interest in the policy is secured without the written consent of Travelers.

In addition to the foregoing, Travelers specifically reserves its right to withdraw its participation in
Kleenit's defense of the Chelmsford and Acton NORs, and to seek recoupment of any defense costs or
other sums paid to Kleenit or on its behalf. Travelers also reserves all rights and defenses to coverage
which might arise under any other policies of insurance which it may subsequently confirm that it issued
to Kleenit (if any).

Donald P. Nagle, Esq.
January 17, 2003
Page 6

Travelers also expressly reserves the right to contest the adequacy of your purported demand letter of January 13, 2002 as a sufficient ad proper demand under Chapters 93A and/or 176D and Travelers specifically denies that its conduct in response to Kleenit's demands for coverage of these matters has in any way been violative of the provisions of Chapters 93A and/or 176D.

Further, should Travelers coverage position be litigated and should a court of appropriate jurisdiction reject any right or defense to coverage asserted by Travelers with respect to the Chelmsford and Acton NORs, whether specifically enumerated above, or otherwise reserved by this or any other communication from the SLCU, Travelers will provide coverage only to the extent mandated by such court (subject to its right to pursue reconsideration, review or appeal, etc.), and will seek recoupment of any payments made other than in accordance with the theory of coverage adopted by such court.

As these matters develop further, you will be advised of any additional legal principles or policy provisions which might limit or preclude any obligations which Travelers has undertaken or may undertake, if any.

As previously stated, the SLCU's role in these matters will be limited to determining Travelers defense and/or indemnity obligations, if any. A staff member from Travelers Special Liability Group – Home Office Environmental Claims Unit ("SLG-HOECU") located in Farmington, Connecticut may also be in touch with you. That individual will not be involved in the investigation and resolution of the coverage issues but will be available to assist Kleenit with regard to defense of the Chelmsford and Acton matters, and will be your contact person for the review and payment of defense bills consistent with the parameters set forth in this letter. Information Kleenit provides to the SLG-HOECU with regard to the liability issues raised by these matters will <u>not</u> be forwarded to the SLCU without Kleenit's express, written permission. If you wish to avoid potentially duplicative requests for information, please advise me in writing that you have no objection to the SLG-HOECU sharing such information it receives from Kleenit with the SLCU.

Please note that the SLCU, not the SLG-HOECU, will determine Travelers share of Kleenit's post-tender defense costs relative to the shares borne by Kleenit's other carriers. Please inform us of the identity, policy number and period, address and phone number, and claim representative name for all other carriers to which Kleenit has tendered this matter, so we may contact them to arrange cost-sharing.

Kleenit should forward all liability related correspondence and bills for defense related costs to:

    Mr. Jonathan P. Metz
    Travelers Special Liability Group
    Home Office Environmental Claims Unit
    One Farm Glen Blvd.
    Farmington, Connecticut 06032

Donald P. Nagle, Esq.
January 17, 2003
Page 7

Please reference file numbers ANU2983 (the Chelmsford matter) and ANU3053 (the Acton matter) on all communication and submissions to SLG–HOECU. Please be advised that the SLG–HOECU's availability and assistance is not, and shall not be construed as: an admission of coverage; a waiver of Travelers right to decline coverage; grounds for any claim of estoppel against Travelers; or a course of performance. Travelers coverage position with regard to the captioned matter will be conveyed to Kleenit only by a member of the SLCU.

Please be aware that it is Kleenit's burden to provide evidence that third-party property damage occurred during Travelers policy period and was caused by an occurrence. Therefore, in order to assist the SLCU with its investigation of this matter, please provide the following information, if and when it becomes available:

Please provide all available information regarding the source and timing of pollutant releases at or from the site, including all documentation of the handling of dry cleaning chemicals (PCE, etc.) or other pollutants, and the identity and last known address of all individuals who worked at the sites prior to and/or during Travelers policy period or who may otherwise have any knowledge regarding the storage, handling, use, disposal or other release of any pollutants at the sites.

Any additional information you believe would facilitate the SLCU's coverage analysis should be forwarded to my attention for review and consideration.

Please contact me at the direct dial number above if you have any questions regarding this letter. If it is more convenient, you may leave a message for me at our toll-free number (1-800-954-9633), and I will return your call as soon as possible. If I am unavailable at the time of your telephone call, you may contact Mr. Robert Harris at (860) 954-2959 for assistance.

Sincerely,

T. Jill Donan / PJH

T. Jill Donan
Associate Account Executive

cc:    SLG – HOECU
       File No.: ANU2983 – Chelmsford
       File No.: ANU3053 – Acton

tjd497

# EXHIBIT "F"

Q.   When you talk about the board, who was on
     the board?

A.   The board was Mr. Crider, Mrs. Crider,
     Esther Munroe and I believe Mr. Nason was on
     the board as well for awhile.

Q.   Who is Mr. Nason?

A.   He was the company accountant.  He has since
     passed away since our last deposition.

Q.   Oh, really?

A.   Yes.

Q.   When did he pass away?

A.   Within the past couple of weeks, two or
     three weeks.

Q.   Now, you're obviously familiar with this
     lawsuit?

A.   Yes.

Q.   Can you tell what substance it is that has
     apparently been released by Kleenit
     incorporated?

A.   Well, Perchlorethelene, Tetrachlorethelene
     is the technical name.

Q.   Can we agree we'll call that Perc, because I
     can't pronounce that, during the course of
     this deposition?

# EXHIBIT "G"

1     bringing this lawsuit?

2  A.  No.

3  Q.  It was solely Mr. Nason's records that you

4      were relying on?

5  A.  Yes.

6  Q.  There are no independent records such as

7      places where you kept old policies?

8  A.  No.

9  Q.  What about checks?  Did you look through

10     checks at all?

11 A.  No.

12 Q.  Other than Mr. Nason's ledgers, did you do

13     your own bookkeeping?

14 A.  No, Mr. Nason did everything.

15 Q.  So there was no inhouse bookkeeping at

16     Kleenit?

17 A.  Yes, we had a voucher register that we kept

18     with the entries that we made as far as, you

19     know, accounts payable and so forth but Mr.

20     Nason conveyed these to a general ledger and

21     schedules and then prepared the tax returns

22     for us.

23 Q.  So you had no individual ledger, let's say

24     that an inhouse bookkeeper would keep?

1    A.    Well, we recorded all the bills, all the

2          bills and they were paid, okay, but then Mr.

3          Nason would extrapolate everything for an

4          annual report and a tax return.

5    Q.    I guess what I'm asking you is when you paid

6          the bills?

7    A.    Yes.

8    Q.    Did you record them in a checkbook ledger?

9    A.    Oh, yes.

10   Q.    Or did you have a separate ledger such as

11         what is shown on page 8 and 9 of Exhibit 3

12         where an inhouse bookkeeper would actually

13         ledger them?

14   A.    No, Mr. Nason extrapolated everything from

15         our voucher register onto a work paper.

16         That's what he did.  That's the way Mr.

17         Munro had it done.

18   Q.    So when you say voucher register, that is

19         the register from the checkbook?

20   A.    No, voucher register, double entry

21         accounting record.  Up to recently -- we

22         went to Quick Books but up to recently we

23         recorded everything manually so the credit

24         would be to accounts payable and debit would

1    be to prepaid insurance on the voucher

2    register.  Then when we did the entry in the

3    cash book it would be credit cash debit

4    accounts payable to wipe that liability

5    off.  Basically, we did the One Write check

6    system for many years, the Safeguard check

7    system and now we're with Quick Books.  We

8    do some manually and some that are

9    automated.

10   Q.  The Safeguard checkbook?

11   A.  Would have been the One Write system.

12   Q.  It has like a duplicate?

13   A.  That's right, that's correct.

14   Q.  And a duplicate would be turned over to

     Nason?

     A.  Yes, he would review everything.

     Q.  And Nason would then ledger it in the ledger

     that's shown?

     A.  You're right.  That's correct.

     Q.  Now, at some point in time you went to a

     computer ledger?

     A.  That was just done probably six months to a

     year ago we just instituted that.

     Q.  That's well after any of the events we're

1      talking about?

2    A.  Yes.

3    Q.  So, there was no inhouse bookkeeping in

4        terms of a separate ledger; is that correct?

5    A.  Well, yes, we had the voucher register.

6    Q.  Right.

7    A.  Then Mr. Nason transferred this to a general

8        ledger.  He did all the write up work.

9        That's the way it was.

10   Q.  Now, what did you do with the One Write

11       stuff?  What did you do with it?

12   A.  Well --

13   Q.  Would you keep it for a period of years and

14       then throw it away?

15   A.  Yes, I would say five to seven years,

16       probably like that but most of the stuff

17       would be gone, you know, at this point, I

18       would say.  I don't know.  I would have to

19       check that.  I think most of it would be

20       gone.

21   Q.  Have you now told me about all the P & C

22       agents, by that I mean property and casualty

23       agents, that you used from say '65 to '94?

24   A.  Right.

# EXHIBIT "H"

Page 8

1    750, would that be the so-called money left over

2    for the next fiscal year?

3  A  For the next fiscal year, I'd say yes, yes.

4  Q  So that's what that column was?

5  A  Right.  Right.

6  Q  Who actually wrote the checks?  I'm just -- was

7    it --

8  A  I wrote some of them.  I think -- I wrote a lot

9    of them.  I think I had my secretary write it,

10    but I did hand write, we had a One Write system

11    in those days, and I wrote most of the checks.

12  Q  Nason didn't write the checks?

13  A  No, he did not.

14  Q  So would you just give him your One Write?  In

15    other words --

16  A  No, he would audit everything.  In other words,

17    when he went through, he would go through the

18    cash book, you know.  In other words, we had

19    double entry accounting that would be entered

20    into the voucher register and then paid, and

21    then he would pick up his prepaid schedule from

22    our voucher register.  It was the complete two

23    double entry system again.

24  Q  When you say the "voucher register," is that the

Page 58

1  Q.  Is it your understanding they were agents

2      for the Travelers?

3  A.  They were agents for other people, but I

4      know that they handled Travelers, yes.

5  Q.  When you came on board, would you be the

6      person who would pay the insurance bills?

7  A.  Yes.

8  Q.  So you would see invoices from EJ Wells?

9  A.  Yes.

10  Q.  What about the insurance policies, would

11      they come to you as part of your business

12      management?

13  A.  Yes.

14  Q.  What would you do with them?

15  A.  Well, we stored them for awhile but our

16      accountant kept very fastidious records.

17      Mr. Harry Nason in Boston was our accountant

18      from probably late 1950s through 2001 or 2,

19      he got ill but he kept every policy number

20      that we ever had.

21  Q.  Can you spell Nason?

22  A.  N A S O N.  In fact --

23  Q.  Did Mr. Nason work for a company?

24  A.  He was his own individual practitioner.

# EXHIBIT "I"

bringing this lawsuit?

A.   No.

Q.   It was solely Mr. Nason's records that you
     were relying on?

A.   Yes.

Q.   There are no independent records such as
     places where you kept old policies?

A.   No.

Q.   What about checks?  Did you look through
     checks at all?

A.   No.

Q.   Other than Mr. Nason's ledgers, did you do
     your own bookkeeping?

A.   No, Mr. Nason did everything.

Q.   So there was no inhouse bookkeeping at
     Kleenit?

A.   Yes, we had a voucher register that we kept
     with the entries that we made as far as, you
     know, accounts payable and so forth but Mr.
     Nason conveyed these to a general ledger and
     schedules and then prepared the tax returns
     for us.

Q.   So you had no individual ledger, let's say
     that an inhouse bookkeeper would keep?

A.   Well, we recorded all the bills, all the
     bills and they were paid, okay, but then Mr.
     Nason would extrapolate everything for an
     annual report and a tax return.

Q.   I guess what I'm asking you is when you paid
     the bills?

A.   Yes.

Q.   Did you record them in a checkbook ledger?

A.   Oh, yes.

Q.   Or did you have a separate ledger such as
     what is shown on page 8 and 9 of Exhibit 3
     where an inhouse bookkeeper would actually
     ledger them?

A.   No, Mr. Nason extrapolated everything from
     our voucher register onto a work paper.
     That's what he did.  That's the way Mr.
     Munro had it done.

Q.   So when you say voucher register, that is
     the register from the checkbook?

A.   No, voucher register, double entry
     accounting record.  Up to recently -- we
     went to Quick Books but up to recently we
     recorded everything manually so the credit
     would be to accounts payable and debit would

1    be to prepaid insurance on the voucher

2    register.  Then when we did the entry in the

3    cash book it would be credit cash debit

4    accounts payable to wipe that liability

5    off.  Basically, we did the One Write check

6    system for many years, the Safeguard check

7    system and now we're with Quick Books.  We

8    do some manually and some that are

9    automated.

10   Q.  The Safeguard checkbook?

11   A.  Would have been the One Write system.

12   Q.  It has like a duplicate?

13   A.  That's right, that's correct.

14   Q.  And a duplicate would be turned over to

15       Nason?

16   A.  Yes, he would review everything.

17   Q.  And Nason would then ledger it in the ledger

18       that's shown?

19   A.  You're right.  That's correct.

20   Q.  Now, at some point in time you went to a

21       computer ledger?

22   A.  That was just done probably six months to a

23       year ago we just instituted that.

24   Q.  That's well after any of the events we're

1     talking about?

2  A.  Yes.

3  Q.  So, there was no inhouse bookkeeping in

4     terms of a separate ledger; is that correct?

5  A.  Well, yes, we had the voucher register.

6  Q.  Right.

7  A.  Then Mr. Nason transferred this to a general

8     ledger.  He did all the write up work.

9     That's the way it was.

10  Q.  Now, what did you do with the One Write

11     stuff?  What did you do with it?

12  A.  Well --

13  Q.  Would you keep it for a period of years and

14     then throw it away?

15  A.  Yes, I would say five to seven years,

16     probably like that but most of the stuff

17     would be gone, you know, at this point, I

18     would say.  I don't know.  I would have to

19     check that.  I think most of it would be

20     gone.

21  Q.  Have you now told me about all the P & C

22     agents, by that I mean property and casualty

23     agents, that you used from say '65 to '94?

24  A.  Right.

# EXHIBIT "J"

Page 5

1          (Documents marked Exhibit Nos. 1 to 3 for

2          identification.

3    Q    Just so I'm clear, Mr. Crider, you weren't at

4          the mediation, but we were provided this by your

5          attorney.  This is, I'm showing you Exhibit No.

6          2.  This is a document that lists all of the

7          alleged policies, although one policy it's now

8          been alleged it's not on there.

9               So looking at Utica, we have '78-'79,

10         '79-'82 and '82-'85.  And then there was an

11         umbrella from '84 to '85, and I can --

12   A    '83 to '84.

13   Q    We're getting to that.  '84 to '85 on Exhibit

14         No. 2.

15   A    Okay.

16   Q    And let me show you Exhibit No. 3, and I've

17         taken the liberty of highlighting that just

18         because it's easier.  This is a ledger from July

19         of '83 and July of '84.  And it's a ledger for

20         policy LU6406.  It says Utica Mutual, but I

21         believe the checks that we have are issued to

22         Henrick Johnson Insurance Agency for an umbrella

23         policy.

24   A    Um hmm.

Page 6

```
 1    Q    Is that a yes?

 2    A    Yes.

 3    Q    The checks were issued to Henrick Johnson.  You

 4         never issued a check directly to Utica.

 5    A    No.  In that time period there was no direct

 6         billing.  All payments went to the agent.

 7    Q    Everything was what we called agency billed.

 8    A    That's correct.

 9    Q    And I understand these were, this is some kind

10         of prepaid insurance.

11    A    Correct.

12    Q    So that it was actually paid before the

13         insurance was due?  Exactly how does that

14         prepaid insurance work?  What's your

15         understanding?

16    A    Well, the package policy ran from October 1

17         through September 30th of every year, and so

18         generally, we would receive a billing sometime,

19         it could be November, December, on the package

20         policy, the umbrella; they were paid in full.

21         But for accounting purposes, we had to, because

22         we were on a fiscal year basis, our fiscal year

23         ended June 30th, so we have to write off each

24         period, the 750 amount, and that has to be
```

1    amortized, and at the end of the year, probably

2    there would be 437.50 left in prepaid insurance

3    from this amount because this would be running

4    from October 1 through June 30th.

5  Q   Okay.

6  A   Okay.

7  Q   This actually ran through February.  But using

8    your example, as I understand it, the policy

9    would incept around October.  Let's just say

10    October.

11  A   That's correct.

12  Q   You'd get the bill probably November.

13  A   November, December.  Could even be after the

14    first of the year.

15  Q   You paid in full.

16  A   Right.

17  Q   So let's say that's a hundred dollars.

18  A   Right.

19  Q   But because your fiscal year ended in June,

20    you'd allocate whatever you had to the end of

21    your fiscal year.  Then there would be some

22    money left over.

23  A   Right.

24  Q   In this last column, for example, the 437 of the

Page 8

1    750, would that be the so-called money left over

2    for the next fiscal year?

3  A  For the next fiscal year, I'd say yes, yes.

4  Q  So that's what that column was?

5  A  Right.  Right.

6  Q  Who actually wrote the checks?  I'm just -- was

7    it --

8  A  I wrote some of them.  I think -- I wrote a lot

9    of them.  I think I had my secretary write it,

10   but I did hand write, we had a One Write system

11   in those days, and I wrote most of the checks.

12 Q  Nason didn't write the checks?

13 A  No, he did not.

14 Q  So would you just give him your One Write?  In

15   other words --

16 A  No, he would audit everything.  In other words,

17   when he went through, he would go through the

18   cash book, you know.  In other words, we had

19   double entry accounting that would be entered

20   into the voucher register and then paid, and

21   then he would pick up his prepaid schedule from

22   our voucher register.  It was the complete two

23   double entry system again.

24 Q  When you say the "voucher register," is that the

1       check register or a separate register?

2    A  That would be a separate entry where we would

3       enter the liability, and then in the general

4       ledger section, we would have a prepaid

5       insurance column, and then when we wrote in the

6       cash book, it would be debiting cash and

7       crediting -- sorry, debiting cash, reducing

8       cash, and then reducing the accounts payable

9       which would be a debit to that particular entry.

10   Q  And that's a separate book?

11   A  Well, we -- well, it would be a separate,

12      separate entry, yes.  But Mr. Nason picked all

13      these entries up from the cash entry.

14   Q  Okay.  So he didn't pick it up from the One

15      Write system?

16   A  Yes, he would.  He would pick it up from the One

17      Write system as well to indicate that was

18      entered and paid.  That was the main thing.

19   Q  Let's just stop for second.  Just so -- I'm

20      trying to remember.  You know, before there were

21      computers, the One Write system, as I recall,

22      was an actual duplicate of the check.

23   A  Yes.  Yes.

24   Q  So you'd write a check.  You take off the check

1     and there would be a dupe under it.

2  A  Right.

3  Q  And then there would be --

4  A  No, no, we didn't do it that way. We didn't

5     have a duplicate. It was a One Write system

6     where it would write Henrick Johnson Insurance.

7     $750 would be debited to cash, actually,

8     credited to cash and debit to the accounts

9     payable. That's the way the entry ran, and that

10    would erase the entry in the voucher register,

11    get rid of the liability, because you have to

12    keep track of your liabilities, which accounts

13    payable or credit, so you have to get it off

14    your books so you're cashing your double entry

15    system.

16  Q  What happened to those books?

17  A  Pardon me?

18  Q  Where are those?

19  A  We have some of them. Some of them are missing.

20    Some we have. Yes. Yes.

21  Q  And you call them cash books?

22  A  No, they're voucher registers.

23  Q  And is that where Nason would get his

24    information when he did his ledgers?

1    A    That's correct.   That's correct.

2    Q    So this is basically a duplicate of your work?

3    A    That's correct.

4    Q    On an audited basis.

5    A    Yes, it is.

6    Q    Now, deposits, for example where you got a check

7         as opposed to spend a check.

8    A    Um hmm.

9    Q    Would they be ledgered?

10   A    Deposits, what do you mean, deposits from

11        stores, you mean?

12   Q    Not only deposits from stores.   Let's say you

13        got a return premium.

14   A    They would --

15   Q    How would that be ledgered, let's say, in

16        Mr. Nason's or in your cash book?

17   A    In a cash book, it would be a debit to cash, and

18        then I think the entry would be other income, or

19        credit to prepaid insurance, because it's a

20        reduction, you know, in the amount of insurance

21        that would be expended for.   So it would be a

22        contra expense account.

23   Q    Would there be a listing of who wrote the check,

24        who the payor was?

Page 14

1    Q    I just have to check.

2    A    Yeah, you have to check.  But one thing that

3         stands out in this ledger thing, that Utica,

4         you'll see the LU policy, the P stands for

5         personally examined the policy.  This is, Harry

6         put this ledger on all his things, that anything

7         he put a P on, you see the P down here, the P,

8         he personally examined the policies.

9    Q    Is that what the P means?

10   A    P stands for personally looked at the policies.

11        Personally examined.  That was his ledger thing

12        and that was his -- it was footnotes as a CPA.

13   Q    Would he do an audited financial?  Would you get

14        an audited financial at the end of the year?

15   A    We did.

16   Q    Do you still have those?

17   A    I don't think so.  I don't think so.

18   Q    So the columns, let's just go over Exhibit 3 for

19        a second just so I understand this, and if I

20        have to see these again, I'll get it.  The first

21        column is the payee.

22   A    Correct.

23   Q    Okay.  That's the person we paid the money to.

24   A    Right.

1  Q   The second column is a reference, and in this

2      case it's a reference to policy number.

3  A   Policy number.

4  Q   The third column is, if it's blank, he didn't

5      see the policy.  If there's a P, he personally

6      reviewed the policy.

7  A   Yes.

8  Q   Were there any other abbreviations or codes that

9      Mr. Nason used other than P?

10 A   Not that I am aware of.

11 Q   Okay.  And the next column is what?

12 A   Johnson.  That's the person who, Henrick

13     Johnson, the insurance agency, and this was the

14     description.

15 Q   Okay.

16 A   Of course, these were the dates in which they --

17 Q   Let's go column by column.

18 A   Yeah.

19 Q   So next is the type of policy, right?

20 A   Yeah.

21 Q   Then we skip over to here, right?

22 A   Right.

23 Q   And what are these columns?

24 A   Well, this would have been from the, this was a