# PHASE II – COMPREHENSIVE SITE ASSESSMENT & PHASE III – IDENTIFICATION, EVALUATION AND SELECTION OF COMPREHENSIVE REMEDIAL ACTION ALTERNATIVES

**Duds Dry Cleaners**
**293-295 Main Street**
**Acton, Massachusetts**

**RTN 2-14526**

**December 12, 2005**

*Prepared for:*

**Kleenit, Inc.**
**44 Park Street**
**Ayer, Massachusetts  01432**

*Prepared by:*

**Coler & Colantonio, Inc.**
**101 Accord Park Drive**
**Norwell, Massachusetts  02061-1685**
**(781)-982-5400**

Prepared By:

**Glen A. Cote**
**Project Scientist**

Reviewed By:

**Mark A. Germano, LSP**
**Division Manager –**
**Environmental Services**

**Project # 11-1079.01**

# PHASE II - COMPREHENSIVE SITE ASSESSMENT REPORT

## AND

# PHASE III – IDENTIFICATION, EVALUATION, AND SELECTION OF COMPREHENSIVE REMEDIAL ACTION ALTERNATIVE REPORT

1.0    INTRODUCTION ........................................................................................1

2.0    BACKGROUND .........................................................................................2

3.0    GENERAL SITE INFORMATION ..........................................................2

4.0    SITE HISTORY ..........................................................................................3

    4.1    OWNERSHIP AND USE ..............................................................................4
    4.2    RELEASE HISTORY AND RESPONSE ACTIONS ........................................4
    4.3    OIL AND HAZARDOUS MATERIAL USE AND STORAGE HISTORY ...........4

5.0    SITE HYDROGEOLOGICAL CHARACTERISTICS ...........................5

6.0    SITE ASSESSMENT ACTIVITIES – POST 1995 ....................................6

    6.1    SHA SOIL & GROUNDWATER EVALUATION – 1998 .............................6
    6.2    SHA SOIL & GROUNDWATER EVALUATION - 2002 .............................7
    6.3    C&C SOIL & GROUNDWATER EVALUATION – OCTOBER 2002 ............7
    6.4    C&C INDOOR AIR EVALUATION – OCTOBER 2002 .............................7
        *6.4.1    Indoor Air Quality Assessment and Risk Characterization* ..................8
    6.5    C&C SOIL & GROUNDWATER EVALUATION - NOVEMBER 2002 ...........9
    6.6    C&C SOIL & GROUNDWATER EVALUATION - SEPTEMBER 2003 ...........10
    6.7    ADDITIONAL ASSESSMENT ACTIVITIES-MARCH AND APRIL 2005 ...........10

7.0    NATURE AND EXTENT OF CONTAMINATION ................................13

    7.1    SOURCE EVALUATION ...........................................................................13
    7.2    EXTENT OF CONTAMINATED SOILS ......................................................13
    7.3    EXTENT OF CONTAMINATED GROUNDWATER ......................................14

8.0    METHOD 1 RISK ASSESSMENT ..........................................................14

    8.1    GROUNDWATER CATEGORIES ...............................................................15
    8.2    SOIL CATEGORIES ................................................................................15
    8.3    RECEPTOR TYPE ...................................................................................16
        *8.3.1    Frequency of Use* ..............................................................................16
        *8.3.2    Intensity of Use* ................................................................................16
        *8.3.3    Accessibility* .....................................................................................16
    8.4    METHOD 1 STANDARDS ........................................................................16
    8.5    ENVIRONMENTAL FATE AND TRANSPORT ............................................17
        *8.5.1    Characteristics Of Compounds Of Concern* ...................................17
        *8.5.2    Exposure Assessment* ........................................................................17
        *8.5.3    Migration Pathways* ...........................................................................17

8.5.4    *Soil Pathway* ...................................................................................................... *18*
8.5.5    *Groundwater Pathway* .................................................................................... *18*
8.5.6    *Air Pathway* ..................................................................................................... *18*
8.5.7    *Surface Water Pathway* ................................................................................. *19*
8.6    HUMAN EXPOSURE POTENTIAL ................................................................................ 19
8.7    ENVIRONMENTAL EXPOSURE POTENTIAL .............................................................. 19
8.8    EXPOSURE POINT CONCENTRATIONS ...................................................................... 20
8.9    CONCLUSION OF METHOD 1 RISK CHARACTERIZATION ....................................... 20

9.0    **QUALITY ASSURANCE - QUALITY CONTROL** ........................................... **20**

10.0    **CONCLUSIONS** ............................................................................................... **22**

11.0    **PHASE III - IDENTIFICATION, EVALUATION AND SELECTION OF
COMPREHENSIVE REMEDIAL ACTION ALTERNATIVE** ........................... **23**

11.1    REMEDIAL STRATEGY ............................................................................................... 23
11.2    SITE SPECIFIC RISK ASSESSMENT ........................................................................... 24

12.0    **REMEDIAL ACTION ALTERNATIVES** ........................................................... **24**

12.1    ALTERNATIVE 1 – EXCAVATION OF THE "HOT SPOT" ........................................... 24
12.1.1    *Alternative 2 – Excavate Most PCE Soil Contamination Below Method 1 S-1/GW-
2/GW-3 Cleanup* ...................................................................................................... 26
12.2    ALTERNATIVE 3 - VAPOR EXTRACTION SYSTEM .................................................. 28
12.3    ALTERNATIVE 4 - OXIDIZER INJECTIONS OF ENTIRE CONTAMINATED AREA ................. 29
12.4    ALTERNATIVE 5 – OXIDATION OF "HOT SPOT" AREA ........................................... 31
12.5    ALTERNATIVE OPTIONS ............................................................................................. 32
12.5.1    *Monitored Natural Attenuation* ..................................................................... 32

13.0    **ALTERNATIVE COMPARISON AND EVALUATION** ..................................... **32**

14.0    **ALTERNATIVE SELECTION** ........................................................................... **33**

15.0    **SCHEDULE OF PHASE IV ACTIVITIES** ....................................................... **34**

16.0    **STATEMENT OF LIMITATIONS** .................................................................... **36**

Figure 1      Locus Map

Figure 2      Site Plan

Figure 3      GIS Resource Map

Figure 4      Detailed Site Plan

Figure 5      Extent of Soil and Groundwater Contamination

Figure 6      Proposed Phase III Alternatives


TABLES

Table 1      Summary of Groundwater Analytical Data

Table 2      Summary of Soil Analytical Data

Table 3      Summary of Indoor Air Analytical Data

Table 4      Summary of Exposure Point Concentrations – > 3 Feet BGS

Table 5      Summary of Exposure Point Concentrations – 3 Feet to 15 Feet BGS

Table 6      Summary of Exposure Point Concentrations – > 15 Feet BGS


APPENDICES

Appendix A    BWSC 108 Transmittal Form

Appendix B    Site Plans prepared by Sanborn, Head, & Associates dated June 1998

Appendix C    Summary of Groundwater Characteristics for Acton Plaza, dated December 29 and
              31, 1992

Appendix D    Soil Boring & Monitoring Well Construction Logs – SHA

Appendix E    Soil Boring & Monitoring Well Construction Logs - C&C

Appendix F    Laboratory Analytical Data

Appendix G    Municipal Letters

**1.0        INTRODUCTION**

On behalf of Kleenit, Inc. of Ayer, Massachusetts, Coler & Colantonio, Inc. (C&C) of Norwell, Massachusetts has prepared this Phase II - Comprehensive Site Assessment Report (Phase II) in accordance with 310 CMR 40.0830 and Phase III – Identification, Evaluation, and Selection of Comprehensive Remedial Action Alternative Report (Phase III) in accordance with 310 CMR 40.0850 of the Massachusetts Contingency Plan (MCP) to the Massachusetts Department of Environmental Protection (DEP) regarding the historic release of chlorinated volatile organic compounds (CVOCs) that occurred at the property located at 293-295 Main Street in Acton, Massachusetts (the "Site").    A Site Locus and Site Plan are presented as Figures 1 and 2, respectively.  The Site is part of a strip mall that consists of addresses 291 through 305 Main Street. The space currently located at the 293 Main Street address is occupied by Supercuts Hair Salon (Supercuts) and the 295 Main Street address is currently occupied by Dud's Dry Cleaners (Duds). In an effort to evaluate the extent of the soil and groundwater contamination underlying the Site, C&C performed several Phase II activities at the Site which consisted of the advancement of soil borings, the installation of monitoring wells, an indoor air evaluation, and review of previous assessments performed at the Site and abutting properties.   The original Bureau of Waste Site Cleanup (BWSC) Comprehensive Response Action Transmittal Form (BWSC-108) is included as Appendix A.

For many years Duds operated a retail dry cleaning operation that occupied both spaces located at 293-295 Main Street.  In 2002, the space was subdivided to reduce the area leased by Duds and to accommodate a new additional tenant in the 293 Main Street space.   In an effort to evaluate the subsurface conditions at the 293 Main Street portion of the Site building and to determine if any release of oil and/or hazardous material (OHMs) associated with the former use of this area was present in the soil and groundwater underlying the space before a new tenant occupied the space, the then and present landlord/property owner, E&A Northeast Limited Partnership (E&A), and the former landlord/property owner retained a consultant, Sanborn, Head & Associates, Inc., (SHA) of Westford, Massachusetts..  As a result of this evaluation performed by SHA on behalf of the landlord, tetrachloroethylene (PCE) was identified in soil samples obtained from below this portion of the concrete slab on July 2, 2002.  Therefore, on behalf of Kleenit, C&C further evaluated SHA's findings to determine if the PCE release was reportable and if the release required further assessment and/or response actions in accordance with the MCP.  Based on C&C's evaluation, the release of PCE was a 120 day reportable release condition per 310 CMR 40.0315 of the MCP. Therefore, on October 29, 2002, C&C notified the DEP and the DEP assigned Release Tracking Number (RTN) 2-14526 for this release.

In an effort to determine if the PCE concentrations posed a risk to future occupants in the 293 Main Street space, Kleenit retained C&C in 2002.  C&C performed several assessment activities at the Site that included evaluating the soil, groundwater, and soil gas at the Site.  Based on the evaluation activities, C&C submitted a Phase I – Environmental Site Assessment Report (Phase I) and a Tier Classification dated October 29, 2003 to the DEP.  Based on the Phase I Report, the Site was classified as a Tier II disposal site.  As part of the Phase I activities, an indoor air risk assessment

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                          Page 1 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

was performed inside the Site building. According to the Phase I report, there is No Significant Risk of harm to human health regarding the potential migration of vapors emitting from the VOCs present under the concrete floor at the Site. However, PCE concentrations are present in the soil and groundwater at the Site above the applicable Method 1 cleanup standards that apply to the Site, and a Permanent Solution has not yet been achieved for the Site in accordance with the MCP.

## 2.0    BACKGROUND

The Site includes the building spaces located at 293 Main Street (now occupied by Supercuts) and 295 Main Street (Dud's). The two spaces were both occupied by Duds until they were sub-divided in 2002. According to a Phase I Environmental Site Assessment dated September 19, 1989 and prepared by Kurz Associates, Inc. of Bridgewater, Massachusetts, for the prior owner of the "Shopping Plaza" located on the corner block of Main Street (Rt. 27) and Massachusetts Avenue (Rt. 111), it was determined that a limited release of hazardous materials, particularly chlorinated solvents including PCE, had impacted the area including the Site. Refer to Appendix B for a copy of the Site Plans prepared by SHA and dated June 1998. It should be noted that the Site is depicted as the "Upper Plaza" in the Kurz report.

These chlorinated compounds found by Kurz were detected in the samples of groundwater collected from four monitoring wells installed by Kurz. However, following additional investigative activities, and under the MCP/21E programs and guidelines then in place for environmental assessment and remedial action, the concentrations were determined to: "… not represent an imminent threat to public health or the environment." Furthermore, it was stated in the cover letter associated with the *Phase II Comprehensive Site Assessment, DEP Case No. 2-0678, Acton Plaza, Massachusetts Avenue & Main Street, Acton, Massachusetts* that because of the current and foreseeable conditions and uses of the Site that: "… site conditions meet the requirements of a permanent solution as described in 310 CMR 40.545, and that additional on-site remedial actions are not necessary at this time."

Later studies conducted by the prior owner of the Shopping Plaza prepared by ChemCycle Corporation dated January 18, 1993, ESS (Environmental Science Services) dated August 24, 1994, and MyKroWaters Environmental Services dated February 20, 1996 also included an opinion that the likely source of the chlorinated VOC's was Dud's or other Potentially Responsible Parties (PRPs). At no time up until October of 2002 was Dud's or Kleenit sent a Notice of Responsibility (NOR) from the DEP or Notice of Claim from any other party pursuant to MGLc. 21E. Subsequent assessments that involved additional sub-surface investigations and the collection and analysis of soil and groundwater samples, as well as review of preceding assessment activities and reports, offered conclusions and recommendations that suggested contaminant concentrations were undergoing natural attenuation. No formal response action or remediation was initiated because the contaminants that were detected in the groundwater samples appeared to be naturally attenuating and were below MCP Method 1 cleanup standards.

Phase II & Phase III Report                                                    DEP RTN 2-14526
293-295 Main Street                                                              Duds Dry Cleaners
Acton, Massachusetts                        Page 2 of 37                    December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

As part of the 2002 sub-division activities, SHA collected soil samples below the 293 Main Street space. In the letter prepared by SHA and dated July 2, 2002, SHA indicated that PCE and methyl-tert-butyl-ether (MTBE) were present in the soil located beneath the building slab at the Site. Based on C&C's preliminary and Phase I assessments activities, additional assessment activities were required in accordance with the MCP. Therefore, C&C has performed the Phase II activities that are described in this Phase II report to further define the extent of the contaminated soil and groundwater present at the Site.

## 3.0      GENERAL SITE INFORMATION

The Site is located within a strip mall, which includes the addresses 291-305 Main Street, located on the south side of Main Street (Route 27) and in a commercially zoned area of Acton. The UTM coordinates for the Site are: Zone 19, Northing: 4705261, Easting: 298363; or, 42° 28' 24"-north, 71° 27' 10"-west (42.473454, -71.45291). According to the Acton Assessors Office, the property is depicted on Map F3 as Block 89, is comprised of approximately 12.5 acres of land, and is presently owned by E & A Northeast Limited Partnership, whose agent is Edens & Avant Realty, Inc. with a local office at 21 Court House Street in Boston, Massachusetts. The strip mall building consists of single story masonry structure that is constructed on a slab-on-grade foundation that is surrounded by a paved parking lot. The Site is currently served by municipal water and sewer service and utilities including natural gas and electric. In early 2002 the immediate area including the Site was connected to the municipal sewer service. Prior to the municipal sewer connection, the Site used a septic tank and leaching field located southeast of the Site building. Refer to Figure 2 for the approximate location of the former septic system.

The Site is currently occupied by SuperCuts (293 Main Street) and Duds (295 Main Street). The Duds dry cleaning operation includes counter service, and on-Site cleaning and pressing operations. This operation has existed at the 295 Main Street space for about 40 years, and at the 293 Main Street space from approximately 1980 to 2002. The other spaces that occupy the strip mall are a sandwich and pizza shop, a donut shop, and a liquor store. Middlesex Bank presently occupies the building located to the southwest of the Site.

The Site is generally flat, but a sharp downward embankment (approximately 25 foot vertical drop) is located in the rear of the Site, along the southeastern Site boundary line. This embankment is the approximate property line between the Site and the commercial Shopping Plaza property located at off Massachusetts Avenue (Rt. 111). The general topography of this area is to the south, toward Rt. 111. The building on the western abutting property (the bank building) has a lower foundation than the Site building; there is an approximately three-foot difference in elevation.

The Site is located in a commercial/residential area of Acton that is heavily developed. Beyond the immediate area there are properties that can be classified as residential and wooded uplands. Main Street (Route 27) abuts the Site to the northwest, beyond which are commercial and retail

Phase II & Phase III Report                                                                              DEP RTN 2-14526
293-295 Main Street                                                                                            Duds Dry Cleaners
Acton, Massachusetts                            Page 2 of 37                         December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

properties. The Site is abutted to the east by the connecting strip mall that consists of various commercial and retail spaces. The southeastern abutter is a Shopping Plaza that consists of several commercial and retail stores, beyond which is Massachusetts Avenue (Rt. 111). The southwestern abutting property is a commercial/retail building currently occupied by the Middlesex Bank, beyond which is Town House Lane. An Exxon Station is located on the western corner of Main Street and Town House Lane, beyond which is the Raymond J. Grey Junior High School. Refer to Figures 1 and 2 for an overall view of the area.

Surface drainage in the immediate vicinity of the Site is towards the east and southeast. There is a catch basin located approximately 100 feet from the front (west) entrance to the Duds store and the outlet for this catch basin is unknown.

The Site is within the drainage basin of Cole Brook, which is a tributary of the Fort Pond Brook, which feeds into the Assabet River, a tributary to the Concord River. A portion of the open channel for this brook is located greater than 500 feet south-southwest of the Site. The Coles Brook culvert is located approximately 250 feet east of the Site. The culvert flows in a southerly direction and under the property located off Route 111 (Shopping Plaza).

According to information provided by the BWSC Priority Resource Map for the Site, the Site is not located within 500 feet of a Potentially Productive Aquifer, Zone II, Interim Wellhead Protection Area, or surface water supply. The GIS Resource Map is presented as Figure 3. The Town of Acton's Aquifer Protection By-Law does not apply to this Site. The Resource Map also indicates that Areas of Critical Environmental Concern (ACEC), habitats of rare wetland life, and certified vernal pools do not exist within 500 feet of the Site.

The property of the Raymond J. Grey Junior High School is located within 500 west of the Site, however the structure is more than 500 feet from the Site. No other "Institutions", as defined in 310 CMR 40.0006, are known to be located within 500-feet of the Site. No hospitals, nursing homes, or other "institutions" as defined in 310 CMR 40.0006 are known to be located within 500 feet of the Site.

## 4.0    SITE HISTORY

According to available information, the Site has been improved by the strip mall since the early 1960s. Prior to the construction of the strip mall, a single-family residence occupied a portion of the Site.

Reportedly, a restaurant and printer were two of the former occupants of the space at 293 Main Street. According to personnel of Duds, the former printer, which was formally located in the 295 Main Street space, regularly used PCE, as well as sometimes borrowed PCE from Duds, for cleaning printing equipment. This was reaffirmed by Kleenit personnel and reported to have

---

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 3 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

occurred during the period 1974 to 1979. The printing business was identified as 'Concepts Unlimited'. Duds has occupied the 293 Main Street space from approximately 1980 to 2002. The 295 Main Street space has been occupied by Duds since the 1960s.

## 4.1   Ownership and Use

The property at which the Site is located is owned by E & A Northeast Limited Partnership, and is managed by Edens & Avant Realty, Inc.. The Site that this RTN addresses consists of 293 and 295 Main Street, and are currently leased by Supercuts and Duds, respectively. Supercuts is a hair salon that is owned by the Supercut's franchise. Duds is owned by Kleenit, Inc., which performs on-Site dry-cleaning and pressing services. Duds currently uses hydrocarbon-based cleaning products that are utilized in a new closed-loop "Green" dry cleaning machine that was installed in March 2005.

## 4.2   Release History and Response Actions

According to Kleenit, over the years several minor, sudden, and accidental spills of PCE occurred at the Site between 1960 and 1983. According to former Duds' employees recollections, the spills of PCE, that occurred at the Site from Duds' operations that were released as a result of machine malfunctions or accidental overflow during PCE deliveries , puddled on the concrete slab and likely migrated to the soil and groundwater underlying the Site.   Some accidents occurred in the late 1960's and early 1970s (1970/71) and others occurred in the late 1970s (1978).   For example, a specific incident recalled by a former Duds employee involved a feather comforter exploding and clogging the button and lint trap. As a result, PCE liquid and PCE sludge material was released to the concrete floor at the Site during the late 1970s.  The majority of the sludge material was cleaned-up, however much of the liquid PCE escaped through cracks in  the concrete floor.  Based on the evaluation activities it appears the releases of PCE to the subsurface at the Site were mainly due to sudden and accidental spills which occurred during the former dry-cleaning processes between 1960 and 1983,when the 21 E regulations became effective and required more stringent transportation, use, storage and disposal of PCE and associated hazardous wastes. Given the extent, nature, and locations of the release detected at 293 and 295 Mains Street, it is also possible that the PCE used by Concepts Unlimited could have accidentally been spilled and contributed to the PCE release during the period from 1974 to 1979 when PCE was borrowed from Duds and used to clean printing presses at the 293 location.  The depths and location of the PCE concentrations correlate with the historical releases in the 1970's recalled by current and former Duds and Kleenit personnel.

## 4.3   Oil and Hazardous Material Use and Storage History

The former dry cleaning machines were located in relatively the same area of the Site where the new and current "Green" machine is located.  Refer to Figure 4 for the approximate machine locations. The first generation of machine were Wet - to- Dry machine that used stills to reduce PCE waste byproducts.  The dry cleaning machines were located in relatively the same area of the 295 Main

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                                Page 4 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

Street location. The former dryers that were used in the dry cleaning process were located in the Supercuts space (the 293 Main Street location), mainly in the area of the current office. The drying machines also contained the still-unit that distilled and recycled PCE and also generated the unusable PCE waste product. The next generation of former dry cleaning machines were classified as *Dry-to-Dry Closed-Loop with No Carbon Adsorber*. According to Duds personnel, the latest PCE based machines were the third generation of dry-cleaning machinery located at the Site and were installed in approximately 1990.

Wastes recovered from the dry cleaning operation were stored pending disposal and include solids, sludge and liquid. These materials were placed into heavy plastic 30-gallon capacity drums with secure covers. Waste drums were positioned inside two spill containment trays located in the storage room location behind the dry-cleaning machines. Cannister filters, materials collected by the button trap and sludge from the still were removed from the Site by a licensed waste hauler, Cycle-Solve, of Cranston, Rhode Island. Liquid that has been drained from the separator and the vacuum-trap systems was transported by company personnel to Kleenit's facility in Ayer. The liquid was then treated by a distillation process and the PCE was recovered for reuse. The treated (polished) water was then properly discharged. For an idea of PCE use per year at the Site, Duds used 220 gallons of PCE in 2002, 220 gallons in 2001, and 306 gallons in 2000.

The newest and present "Green" machine installed in 2005 uses a hydrocarbon-based cleaning product, which is stored in 30-gallon steel containers. The container that is used by the "Green" machine is stored on a spill trap with a recovery reservoir. The chemicals used at Duds are stored on a chemical spill tray that is located in the storage room located behind the machine. The waste liquid/material is properly disposed by Cycle-Solve. The generator identification number used for Duds is MAD980669170.


## 5.0    SITE HYDROGEOLOGICAL CHARACTERISTICS

The soil characteristics at the Site mainly consist of a fine to coarse sand with some fine to coarse gravel and little silt. There appears to be a dense organic, silty, and clayey layer located between approximately eight and ten feet bgs at the Site. This layer is located at mainly between eight and nine feet bgs under the building and the field and analytical data indicate that the PCE concentrations are the highest in this layer. Boring and auger refusal varied between approximately eight and 14 feet bgs under the building and approximately 13 and 20 feet bgs outside the building. It appears that competent rock (boulders and/or bedrock) varies between 11.5 and 20 feet bgs at the Site. The underlying bedrock is expected to be associated with members of the *Nashoba Formation* (Geologic Map of Massachusetts, E-An Zen, editor, 1983) consisting of the metamorphic rocks schist and gneiss.

Based on the groundwater elevation data presented in the ChemCycle Corporation letter dated January 18, 1993 for Samuels & Associates for the Acton Plaza, the groundwater flows generally to the southeast, toward the steep slope and the Shopping Plaza. A copy of the Summary of Groundwater Characteristics, for Acton Plaza and dated December 29 and 31, 1992 is included as Appendix C. It appears that the Coles Brook culvert that is located approximately 250 feet

Phase II & Phase III Report                                                                DEP RTN 2-14526
293-295 Main Street                                                                        Duds Dry Cleaners
Acton, Massachusetts                        Page 5 of 37                                    December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

southeast of the Site and the steep decline located on the southern Site boundary have an influence on the groundwater flow direction. Based on available data, the depth to groundwater at the Site ranges from approximately 13.5 to 17.5 feet bgs at the Site. The depth to groundwater at the Shopping Plaza ranges between 2.5 to 5.5 feet bgs.

## 6.0    SITE ASSESSMENT ACTIVITIES – POST 1995

### 6.1    SHA Soil & Groundwater Evaluation – 1998

SHA prepared a Level II Environmental Assessment for Acton Plaza dated June 1998 for Acton Ventures/Samuels & Associates, the former owner of the Plaza. SHA installed nine soil borings and completed seven of the borings as monitoring wells. Based on PID readings and field observations SHA submitted six soil samples (MW-1/S-5, MW-2/S-4, MW-3/S-4, MW-4/S-4, MW-7/S-3, and B-2/S-2) to a laboratory for analysis for VOCs by EPH Method 8260. According to the report, the analytical soil data indicated that the samples were below the applicable Reportable Concentrations (RCs) as promulgated in the MCP. SHA also collected six groundwater samples from the newly installed wells, excluding MW-4 (the well was dry). According to the report, the analytical groundwater data indicated that the samples were below the RCGW-2 criteria.

Although the soil data was below the RCs, concentrations of PCE were present above the laboratory detection limits (DLs) in the soil sample MW-2/S-4 at 0.1 ppm. Except for well MW-5, PCE concentrations were present above the laboratory DLs in the wells. Wells MW-2 and MW-6 had the highest concentrations that were 2,200 parts per billion (ppb) and 2,100 ppb, respectively. A summary of the analytical data is presented on Table 1 and a copy of the boring logs prepared by SHA are included as Appendix D.

The assessment also included groundwater data obtained from a letter report dated January 18, 1993 entitled Groundwater Monitoring Results, December 1992, Acton Plaza prepared by ChemCycle Corp that included data collected from 1989 to 1993 and from the upgradient and downgradient properties. The groundwater data indicated that PCE concentrations were present in the majority of the wells, although below the applicable RCs. The data also indicated that MTBE appears to be migrating on to the Site from an upgradient source. An Exxon Station is located directly upgradient of the Site and has reported releases have been addressed under the RTNs 2-0011588 and 2-0000134. A Response Action Outcome (RAO) Statement has been submitted to the DEP for both of the Exxon RTNs.

---

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                           Page 6 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

6.2    SHA Soil & Groundwater Evaluation - 2002

On June 13, 2002 SHA advanced six soil borings (SH-1 through SH-5; SH-4 had two advancement attempts, SH-4A and SH-4B) in the 293 Main Street space in an effort to investigate the PCE concentrations in the soil and groundwater under the Site building. The boring locations are depicted on Figure 4. Due to the depth of groundwater and the difficult drilling conditions, SHA completed two borings (SH-2 and SH-4B) as vapor sampling wells. SHA also submitted six soil samples to a laboratory for analysis for VOCs. The analytical data indicated that PCE concentrations were present in the samples above the laboratory DLs, and were above the soil RCs in all the samples except for SH-4B. A summary of the analytical data is presented on Table 2 and a copy of the boring logs that were prepared by SHA are included as Appendix D.

6.3    C&C Soil & Groundwater Evaluation – October 2002

In an effort to further evaluate the groundwater quality at the Site C&C collected groundwater samples from three wells (MW-2, MW-5, and MW-6) that were previously installed by others on October 10, 2002. Several of the wells previously installed were either destroyed, dry, or not located. The samples were collected in accordance with DEP protocol by purging three times the well volume using a peristaltic pump and designated polyethylene tubing. Then a designated bailer was used to retrieve the groundwater sample that was then transferred into a pre-cleaned appropriate glassware. The samples were kept cool and submitted to GeoLabs, Inc. of Braintree, MA for analysis for VOC's by EPA method 8260 under a chain of custody.

The analytical results indicated that concentrations of PCE, trichloroethene (TCE) and MTBE were present above the laboratory DLs in wells MW-2 and MW-6. These wells are located downgradient of the dry-cleaning machines and soil boring SH-2. The highest concentration of PCE was present in well MW-2, which is the closest well to SH-2. The analytical data from MW-5 indicated that VOCs were not present above the laboratory DLs. This well is located upgradient or crossgradient of Duds. A summary of the analytical data is presented on Table 1 and the laboratory report has been previously submitted to the DEP in the Phase I report dated October 29, 2003.

6.4    C&C Indoor Air Evaluation – October 2002

On October 9, 2002, C&C collected four soil gas samples from below the concrete slab in the 293 Main Street space. C&C installed three soil gas points (CC-1, CC-2, CC-3; sample designation S1, S2, and S3, respectively) using a hand-held rotary hammer to create a hole into the concrete slab, which is approximately four-inches deep, and then advanced a boring below the slab to create a void space. A silicone tube was cemented in place at each location. C&C used vapor well SH-2 (sample

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                    Page 7 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:   Coler & Colantonio, Inc.

S4), that was previously installed by SHA, as one of the soil gas sampling points. A Summa canister was attached to each sample point and a sample was collected using a previously calibrated 8-hour regulator. The soil gas point locations are depicted on Figure 4.

Prior to and during the majority of the sampling procedure, the area was cross-ventilated. Dry-cleaning operations had ceased approximately three hours prior to the start of the sampling. The samples were submitted to GeoLabs for VOC analyzes by EPA method TO14A.

The analytical results indicated that PCE, toluene, and meta and para-xylenes were present above the laboratory DLs in each of the sub-slab air samples collected. The data indicated that sample S-1 (CC-1) which is the downgradient location of SH-2 and the dry-cleaning machines, and is the closest to the rear wall of the store, also had concentrations of ortho-xylenes present above the laboratory's DLs. In sample S-2 (CC-2), which is located nearest to well SH-2, TCE was also detected above the laboratory's DLs. In sample S-3 (CC-3), which is located nearest to the front wall of the store, freon-12 was also detected above the laboratories DLs. Sample S-4 (SH-2) had concentrations of 1,3,5 methylbenzene, 1,1,1 trichloroethane, ortho-xylenes, and TCE detected above the laboratory's DLs. This sample was collected within a vapor well that extended to approximately 10 ½ feet below the slab surface. This sample potentially drew from a greater vertical range of soils, including soils in the capillary zone, or depths in proximity to the water table, which would be the reason that the sample had the highest concentrations of VOCs. A summary of the analytical soil gas data is presented on Table 3. The laboratory reports have been previously submitted to the DEP in the Phase I.

### 6.4.1    *Indoor Air Quality Assessment and Risk Characterization*

C&C retained the services of Risk Management Incorporated (RMI) of Acton, Massachusetts to evaluate the indoor air quality and perform a risk characterization for the 293 Main Street space. On January 15, 2003, RMI issued a letter report addressed to Kleenit and entitled Indoor Air, Soil and Groundwater Quality Assessment "Take Back Area", Kleenit, Inc., d/b/a Dud's Cleaners and Launderers 293 Main Street, Acton, MA 01720. As described above, C&C collected air samples via Summa canisters from beneath the building slab at four locations; and groundwater samples from three monitoring wells. RMI used the analytical results to conduct their Indoor Air Quality (IAQ) Assessment study, which is attached to this report.

For the IAQ aspect of the RMI study, information gathered on the physical layout of the facility and information in previous reports about subsurface conditions was used in the formulation of a conceptual model and for input into an updated Johnson & Ettinger *Model For Subsurface Vapor Intrusion Into Buildings*. Pertinent information includes slab thickness, size of the indoor space, laboratory results, soil types and thickness.

Phase II & Phase III Report                                                      DEP RTN 2-14526
293-295 Main Street                                                              Duds Dry Cleaners
Acton, Massachusetts                        Page 8 of 37                         December 12, 2005

**Prepared By:   Coler & Colantonio, Inc.**

For Risk Characterization, the physical conceptual model and established toxicity values for specific concentrations and established data on cancer risk are used and detailed in the attached RMI report. Non-cancer and cancer risks of harm to human health from indoor air exposures to the identified contaminants were evaluated based on established methodologies and widely used guidance. The non-cancer risks or 'Hazard Indices' (HIs) and cancer risks, or 'Excess Lifetime Cancer Risks' (ELCRs) were calculated.

RMI found that:

> "The cumulative receptor risk human health findings for the Indoor Air Quality Assessment for the potential indoor air inhalation exposures to VOC's detected in soil gas beneath the floor slab of the "take back" area located at 293 Main Street indicate a condition of "No Significant Risk" of harm to human health ...". Furthermore, "No cumulative receptor Total Site Risk HI or ELCR values for subchronic, chronic or lifetime exposures exceed the MCP Risk Limits..."

RMI concluded that:

> "Based on the risk assessment conducted using the soil gas analytical collected from beneath the floor slab of the Back Room and Main Area of the "take back" area at 293 Main Street, current (i.e., existing) soil and/or groundwater conditions beneath the slab pose "No Significant Risk" of harm to the health of the building occupants via inhalation of OHM-impacted indoor air."

> "Further, the current risk finding of "No Significant Risk" for inhalation of indoor air at 293 Main Street combined with a), the groundwater analytical data collected by C&C from Monitoring Wells MW-2, MW-6, and MW-5 and more recently, CC-5 and CC-6 (see Figure 4 for the monitoring locations)...which do not indicate the presence of VOCs in particular Tetrachloroethylene at concentrations above the MCP Method 1 GW-2 Groundwater Standards in groundwater within 30 ft. upgradient or inside 293 Main Street, and b) with no apparent ongoing release(s) of Tetrachloroethylene to the subsurface soils below the floor slab in this "take back" area, a condition of "No Significant Risk" of harm to human health via this vapor migration and indoor air inhalation pathway and route of exposure is also expected to exist under future foreseeable site activities and uses."

## 6.5    C&C Soil & Groundwater Evaluation - November 2002

On November 26, 2002, C&C observed the advancement of three borings (CC-4, CC-5, and CC-6) with a track mounted GeoProbe unit at the Site. Except for CC-4, the borings were advanced within the 293 Main Street space in an effort to evaluate the soil and groundwater quality under the Site building. Borings CC-4, CC-5, and CC-6 were completed as monitoring wells. A groundwater

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                      Page 9 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:   Coler & Colantonio, Inc.**

monitoring well was installed in each of the completed borings. The wells are constructed of #10-slot and solid 1-inch I.D. schedule 40 PVC and the annulus around each well was back-filled with silica filter sand, bentonite chips, and protected by a flush mounted raodbox and associated cement. A description of the well construction and soil characteristics are presented on the soil boring logs included as Appendix E.

C&C collected continuous soil samples and screened them for total organic vapors (TOVs) using a photo-ionization detector (PID) and the DEP headspace method. Based on the PID results and field observations, C&C submitted three soil samples (CC-4/S-3, CC-5, and CC-6) to GeoLabs for analyses for VOCs.

On December 2, 2002, C&C collected groundwater samples from the newly installed monitoring wells. C&C collected groundwater samples in accordance with DEP protocol as previously described which were submitted to GeoLabs for VOC analysis. The analytical data indicates that PCE and MTBE concentrations are present above the laboratory DLs, and are above the applicable Method 1 cleanup standards in well CC-4. A summary of the analytical data is presented on Table 1 and laboratory report has been previously submitted to the DEP in the Phase I .Report dated October 29, 2003.

### 6.6   C&C Soil & Groundwater Evaluation - September 2003

On September 24, 2003 C&C sampled six wells at the Site (MW-2, MW-5, MW-6, CC-4, CC-5, and CC-6). C&C collected groundwater samples in accordance with DEP protocol as previously described and submitted the samples to GeoLabs for analysis for VOCs. Except for well MW-5, PCE concentrations were present above the laboratory DLs, and above the Method 1 cleanup standards in CC-4. A summary of the analytical data is presented on Table 1 and laboratory report has been previously submitted to the DEP in the Phase I report dated October 29, 2003. Compared to the results from the October 2, 2002 sampling (before wells CC-4, CC-5 and CC-6 were installed), MTBE concentrations have decreased in samples from MW-2 and MW-6. PCE concentrations have increased in samples from MW-6 but decreased in samples from MW-2.

### 6.7   Additional Assessment Activities-March and April 2005

In an effort to further evaluate the extent of soil and groundwater contamination, C&C observed TDS, Inc. (TDS) of Sterling, Massachusetts advance additional soil borings and complete two of them as groundwater monitoring wells on March 9, 2005. Seven borings were advanced (B-101 through B-107) at the Site using a direct-push Geoprobe unit and hand-tools. The Geoprobe unit was used to advance borings B-106 through B-105. Borings B-101 and B-102 were completed as groundwater wells CC-101 and CC-102, respectively. TDS used hand-tools to advance three of the

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                          Page 10 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

soil borings inside the Site building in the location of the dry cleaner machine (B-105), the former distiller (B-106), and adjacent to the chemical storage area (B-107). Please note that these inside borings were advanced during the upgrade of the dry cleaning machines from the "Dry – to – Dry" machine to the new "Green" machine. C&C collected continuous soil samples from each boring and screened them for TOVs using a PID calibrated to an isobutylene reference and DEP headspace method. Based on the PID readings and field observations, C&C collected eight soil samples and submitted them to GeoLabs for laboratory analysis for VOCs. In an effort to evaluate the extent of contamination observed in boring B-106, C&C collected two samples at 0-2.5 feet bgs and 5-7.5 feet bgs. The analytical data indicated that PCE is present above the Method 1 S-1/GW-2 and GW-3 cleanup standard in soil samples B-106/S-1 (0-2.5') and B-106/S-3 (5'-7.5') at concentrations of 797 parts per million (ppm) and 37.6 ppm, respectively. A summary of the analytical soil data is presented on Table 2 and the boring and well locations are depicted on Figure 4.

On March 15, 2005, C&C collected groundwater samples from the two newly installed wells (CC-101 and CC-102), three on-Site wells (MW-2, MW-6, and CC-4), and two off-Site wells (MW-7 and W-3). C&C collected groundwater samples in accordance with DEP protocol as previously described and submitted the samples to GeoLabs for VOC analysis. Please note that C&C attempted to sample wells MW-3, however this well was dry. A summary of the analytical data is presented on Table 1 and the laboratory report is included in Appendix F.

In an effort to collect groundwater samples from under the Site building, C&C attempted to sample the wells located in the Supercuts space. However, the space was renovated and the floor is now covered with linoleum. Well CC-5 was not located and well CC-6 was not sampled. C&C also attempted to sample wells SHA –2 and SH-4A, however these wells were also dry. In addition, C&C located the off-Site well KOW-7. However, this well was damaged and run-off water from the roof drains and parking lot infiltrated the well. Due to snow cover, C&C could not locate the other downgradient wells.

The groundwater analytical data indicated that there are PCE concentrations present in the groundwater located at wells MW-102, MW-2, MW-6, CC-4, MW-7, and W-3 above the laboratory DLs. However, only CC-4 is above the applicable Method 1 cleanup standards. Concentrations of cis 1,2 – dichlorethene (cis 1,2 – DCE) and vinyl chloride were present above the laboratory DLs in well MW-101, albeit below the applicable Method 1 cleanup standards. Please note that the laboratory DL for vinyl chloride is greater than the applicable Method 1 GW-2 cleanup standard in well CC-5. Therefore, at this time, the vinyl chloride concentration in sample CC-5 is considered to be above the applicable Method GW-2 cleanup standards. Further note that the previous groundwater data collected in December 2002 for well CC-5 indicates that concentrations of vinyl chloride were not present about the laboratory DL, which was below the Method 1 GW-2 cleanup standards. A summary of the analytical data is presented on Table 1 and the laboratory report is included as Appendix F.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                    Page 11 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

During a Site visit on April 20, 2005, C&C located well MW-1, which is located downgradient of the Site in the parking lot of the western abutting property, which is the bank. Therefore, in an effort to further evaluate the downgradient groundwater quality, C&C collected groundwater samples from MW-1, as well as MW-3, on April 21, 2005. C&C collected groundwater samples in accordance with DEP protocol as previously described and submitted the samples to GeoLabs for VOC analysis. The analytical data indicated that concentrations of cis 1,2 – DCE, PCE, and TCE are present in well MW-1 above the laboratory DLs, although below the applicable Method 1 cleanup standards. Concentrations of cis 1,2 – DCE are also present in well MW-3 above the laboratory DLs, albeit below the applicable Method 1 cleanup standards. A summary of the analytical data is presented on Table 1 and the laboratory report is included as Appendix F.

In an effort to further evaluate the extent of soil and groundwater contamination, C&C observed Zebra Environmental Drilling (Zebra) of Albany, New York advance additional soil borings on October 11, 2005. Five borings were advanced (B-201 through B-205) at the Site using a mobile direct-push Geoprobe unit and an ATV mounted Geoprobe unit. The mobile Geoprobe unit was used to advance borings B-201 through B-204, which are located in the Supercuts (B-201) and the Duds space (B-202, B-203, and B-204). Please note the due to the new renovations at the Site a more powerful Geoprobe unit cannot access the inside spaces, therefore the drilling capabilities are very limited. Only hand-tool and the mobile unit could be used inside the spaces. Furthermore, wells could not be installed by these units due to refusals. Boring B-205 was advanced outside the building in the driveway located between Supercuts and the western abutting property (the bank). It should be noted that several underground utilities are located in the driveway, which include a natural gas line and a water main. C&C contacted the Acton Water Department in an effort to locate the water main. However, the Water Dept.'s records do not accurately mark the location of the main. Furthermore the water main is constructed out of concrete, so the main can not be traced.

C&C collected continuous soil samples from each boring and screened them for TOVs using a PID calibrated to an isobutylene reference and DEP headspace method. Based on the PID readings and field observations, C&C collected six soil samples and submitted them to Alpha Analytical Labs (Alpha) of Westboro, Massachusetts for laboratory analysis for VOCs. In an effort to evaluate the vertical extent of contamination observed in boring B-202, C&C collected two samples at 2-3 feet bgs and 9-9.5 feet bgs. The analytical data indicated that PCE concentrations are present above the laboratory DLs in the samples, and above the applicable Method 1 cleanup standard in soil samples B-201/S-4 (7-8'), B-202/S-4 (9-9.5'), B-203/S-3 (8.5-9'), and B-204/S-3 (8-9'), which are 60 ppm, 370 ppm, 420 ppm, and 63 ppm, respectively. Please note that the laboratory DLs for vinyl chloride in these samples are greater than the applicable Method 1 cleanup standard. Therefore, the vinyl chloride concentrations in these samples are considered to be above the applicable Method 1 cleanup standard at this time. A summary of the analytical soil data is presented on Table 2 and the boring locations are depicted on Figure 4. The laboratory report is included as Appendix F. It should be noted that it appeared that the highest PID readings, strongest odors, and highest PCE concentrations are located on the organic, silty, clayey layer that is located approximately between eight to ten feet bgs. The PID readings and odor above and below this layer are significantly lower.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 12 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

**7.0**        **NATURE AND EXTENT OF CONTAMINATION**

### 7.1    Source Evaluation

According to Kleenit and the evaluation activities, it appears the releases of PCE to the subsurface at the Site were mainly due to the former dry-cleaning processes, older machinery and practices, and accidental spills, that have occurred in the past.  The location, nature and extent of the contaminants found at the Site are consistent with the reported historical release events recalled by Duds and Kleenit personnel. The depth and degradation products detected at the Site are also consistent with older and multiple PCE releases. A new "Green" machine that only uses a hydrocarbon-based cleaning product, not PCE, has replaced the former dry cleaning machines.  The hydrocarbon-based cleaners and other chemicals used at Duds are stored on chemical spill control trays and the waste liquid/material is properly disposed off-Site.

### 7.2    Extent of Contaminated Soils

In order to delineate the extent of the soil contamination at the Site, C&C has evaluated all the soil borings and the analytical soil data.  B-106 has the highest PCE concentration at the Site at the depth of 0-2.5 feet bgs, which is 797 ppm.  It is the opinion of C&C that sample B-106 (0-2.5') is a Hot Spot in accordance with 310 CMR 40.0006.  The analytical data from B-106 indicates that the PCE concentrations decrease to 37.5 ppm at the depth of 5-7.5 feet bgs.  The soil data collected at the intervals of zero to three feet bgs do not indicate that higher PCE concentrations are present at the other locations at the Site.  Sample B-202, that is located approximately 12 feet from and downgradient of boring B-106, indicates that the soil at 2-3 feet bgs has PCE concentrations of 4.5 ppm.  Based on the data, it appears that the sources of the PCE were accidental releases from the former distiller and/or accidental spills have occurred in the vicinity of the former and old distiller. Refer to Figure 5 for the approximate extent of the Hot Spot soil contamination.

The majority of the samples submitted for analyses had concentrations of PCE above the laboratory DLs, however only the samples collected under the building are above the Method 1 cleanup standards.  Samples SH-2 / S-3, CC-5, B-106/ S-1, B-106/ S-3, B-201/S-4, B-202/S-4, B-203/S-3, B-204/S-3 have PCE concentrations that are above the Method 1 cleanup standards.  Except for B-106/S-1, these samples were collected approximately between six and 9.5 feet bgs. This interval appears to consist of an organic, silty, and clay layer.  It appears that above and below this layer the PID readings, odors, and analytical data are significantly lower.  It is the opinion of C&C that the PCE is accumulating and migrating along this layer.  Therefore, based on the soil data, it appears that the extent of the majority of the soil contamination is located approximately six to ten feet bgs and is bounded by borings CC-6, B-105, B-103, B-101, and B-205, except for B-106.  Refer to Figure 5 for the approximate extent of the soil contamination.

Phase II & Phase III Report                                                      DEP RTN 2-14526
293-295 Main Street                                                              Duds Dry Cleaners
Acton, Massachusetts                          Page 13 of 37                       December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

### 7.3    Extent of Contaminated Groundwater

The analytical data indicates that only well CC-4 exceeds the Method GW-2 cleanup standards at the Site. Please note that the analytical data for well CC-5 has laboratory DLs that are above the Method GW-2 cleanup standards for vinyl chloride, therefore is consisted to exceed the Method GW-2 cleanup standards for vinyl chloride.   However, due to the fact that vinyl chloride concentrations were not detected above the laboratory DL in 2002, which was below the Method 1 GW-2 cleanup standards, and that the VOC concentrations have been decreasing at the Site, it is C&C's opinion that the vinyl chloride concentrations in well CC-5 are below the Method 1 GW-2 cleanup standards. The present of the degradation by-products of PCE is again consistent with older historic PCE releases typically found at older dry cleaning establishments. Well CC-4 is screened at the interface of the bedrock and the overburden groundwater table.  Therefore, it is the opinion of C&C that this well represents the general groundwater quality underlying the Site. Based on the historic groundwater data that have been collected during different seasons of the year, the PCE concentrations appear to be decreasing at the Site.  CC-4 has been decreasing from 8,570 ppb in 2002 to 3,370 ppb in 2005.  It appears that the PCE in the groundwater is naturally attenuating.

Due to the difficult drilling conditions at the Site, monitoring wells have not been recently installed in the building, although several attempts have been made.  Based on the soil data and the concentrations of PCE in well CC-4, which is located downgradient of the "release" area, C&C has assumed that the extent of the groundwater contamination that is above the Method 1 GW-2 cleanup standards is located approximately between borings SH-3, B-201, B-204, B-107 and well CC-4.  Although the groundwater samples collected from CC-5 in 2002 and 2003 were below the Method 1 GW-2 cleanup standards, C&C has taken a conservative approach to the groundwater delineation and has considered the groundwater in this area to be above the Method 1 GW-2 cleanup standards, however below the Method 1 GW-3 cleanup standards. Refer to Figure 5 for the approximate extend of the groundwater contamination.

The groundwater sample collected from CC-101 does have concentrations of vinyl chloride and cis 1,2 DCE present above the laboratory DLs, although below the applicable Method 1 cleanup standards.  Furthermore, wells MW-1 and MW-3 also have concentrations of cis 1,2 DCE present above the laboratory DLs, albeit below the applicable Method 1 cleanup standards.  It appears that these concentrations may be associated with the former septic system.

## 8.0     METHOD 1 RISK ASSESSMENT

The following section discusses the DEP Method 1 cleanup standards for the subject property and the Site.

---

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 14 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

8.1    Groundwater Categories

The classifications for groundwater are listed at 310 CMR 40.0932. Groundwater is categorized based upon its current and/or future use as drinking water (GW-1), its potential to act as a source of volatile material to indoor air (GW-2), and its potential to discharge material to surface water (GW-3). Groundwater may be, at the same time, GW-1, GW-2 and GW-3 as these exposures are not mutually exclusive.

The Site is not located in a PPA, within a current drinking water source area, or a potential drinking water source area as defined in the MCP. Several monitoring well are located within 30 feet of the building and the depth to groundwater is less than fifteen feet bgs, therefore the groundwater at these locations is classified as category GW-2. Groundwater at the entire Site is classified as GW-3, based upon its potential to discharge to surface water.

8.2    Soil Categories

The criteria for determining which soil category or categories are applicable to the Site are identified in Section 310 CMR 40.0933(4)(c) of the MCP. Soil at a given site is classified as S-1, S-2 or S-3, based upon the potential for exposure to the impacted soils. Category S-1 is associated with the highest potential for exposure and Category S-3 is associated with the lowest potential for exposure.

Specific factors to be considered when categorizing soil(s) at a site include: 1) the type of receptor present at the site; 2) the frequency of use; 3) the intensity of use, and 4) the accessibility of the soil. Generally, receptors at a site are identified as either a child or an adult. Both frequency and intensity of use are classified as either "high" or "low". Finally, soil accessibility is described as "accessible", "potentially accessible" or "isolated".

The majority of the Site is paved or covered by the Site building.  The contaminated soil that is located between zero and three feet bgs is located under the Site building that is supported by a four to five inch concrete slab; therefore this soil is considered "isolated". The contaminated soil located outside the footprint of the building is located greater than three bgs and is covered by a paved surface, therefore this soil is considered "potential accessible".  Adults are present at the Site at a high frequency and at a low intensity. Children may be present at the Site at a low frequency and a low intensity. Based on these receptor characteristics, soil at the Site meets the Method 1 S-3 classification as outlined in 310 CMR 40.0933(7).

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                          Page 15 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

8.3    Receptor Type

Both children and adults are considered potential receptors at the Site due to the commercial and retail businesses that are located at the strip mall. Trespassers and utility workers may also be potential receptors at the Site.

### 8.3.1    *Frequency of Use*

Adults work at the Site and may also perform subsurface construction and utility work at the Site for short periods of time. Children may visit the Site for a minimal time period. Therefore, adults are considered to have a "high" frequency of use at the Site and children are considered to have a "low" frequency of use at the Site.

### 8.3.2    *Intensity of Use*

The identified receptors' intensity of use at the Site is considered "low", as normal Site activities do not have the potential to disturb soil or result in the direct contact with the impacted soil and/or groundwater. The majority of the Site is either covered by buildings supported by a concrete slab or pavement. Current or foreseeable Site activities have a "low" potential to disturb the soil or access the groundwater. However, if construction and utility works performed subsurface activities at the Site, then the intensity of use at the Site would be considered "high", but for a short period of time.

### 8.3.3    *Accessibility*

Soil impacted by the release at the Site is characterized as "potentially accessible" subsurface soil as it is located at a depth of three-15 feet bgs or is covered with asphalt pavement. The contaminated soil located under the under the building is located less than three feet bgs, however it is considered to be "isolated". Based on these site-specific characteristics, soil at the Site is classified as S-3.

8.4    Method 1 Standards

The groundwater at the Site is classified as GW-2 and GW-3 and soil is classified as S-3/GW-2/3. Soil cleanup objectives are partially based on groundwater categories. However, since institutional controls (Activity and Use Limitations) are required if residual soil contamination does not satisfy S-1 standard, then the S-1 soil criteria currently needs to be evaluated. Since the groundwater at the Site is classified as GW-2/GW-3, the soil at the Site would be compared to the S-1/GW-2/GW-3 Method 1 Cleanup Standards. If an Activity and Use Limitation is placed on the property at some time in the future then theS-2 and/or S-3 standards would need to be evaluated.

Phase II & Phase III Report                                          DEP RTN 2-14526
293-295 Main Street                                                  Duds Dry Cleaners
Acton, Massachusetts                    Page 16 of 37              December 12, 2005

**Prepared By:    Coler & Colantonio, Inc.**

## 8.5    Environmental Fate and Transport

### 8.5.1    *Characteristics Of Compounds Of Concern*

The compounds of concern at the Site are CVOCs (PCE, TCE, vinyl chloride). Adsorption (to organic matter and soil particles), diffusion, dispersion, oxidation and biological degradation will affect the migration and breakdown of CVOCs in the subsurface environment. In general, the physical/chemical processes of adsorption, dispersion and diffusion will retard the migration of CVOC contamination and reduce concentrations significantly as migration occurs. Oxidation and biodegradation can breakdown CVOCs in the environment.

### 8.5.2    *Exposure Assessment*

The analytical data indicates that the contamination (constituents above applicable Method 1 cleanup standards) at exposure points is limited to the groundwater and areas of subsurface soils. The groundwater data suggests that the degree of contamination in monitoring wells is generally degrading. The Site building is currently occupied by workers and patrons that visit the commercial and retail spaces. There are four potential exposure pathways: 1) Groundwater - impact to indoor air, where the water table is less than 15 feet bgs, 2) Soil – construction and utility workers at the Site, 3) Indoor air, and 4) Surface water. Existing and potential exposure pathways are identified and characterized in this section. The pathways reviewed include groundwater, surface water, soil, and soil gas.

### 8.5.3    *Migration Pathways*

The concrete slab associated with the building and the asphalt pavement restricts access to the contaminated soil at the Site. Therefore, direct exposure to these contaminants is not likely via soil. The Site is not located within a PAA, Interim Wellhead Protection Area, EPA Designated Sole Source Aquifer, Zone II, Zone A area, or within 500 feet of a private water supply well. Therefore, direct exposure to these contaminants is not likely via groundwater.

Based on the results of soil and groundwater sample analyses, PCE, TCE, cis 1,2 – DCE, and vinyl chloride have impacted the soil and groundwater located at the Site. Based on RMT's Risk Characterization performed for the indoor air present in the 293 Main Street space, the contamination, including the recent soil data, is not anticipated to pose a Significant Risk to the indoor air present in the 295 Main Street space. However, a Method 3 Risk Characterization will be performed to evaluate the indoor air quality at 295 Main Street. Based on the data collected to date, these releases have not posed a Significant Risk, and are not anticipated to pose a Significant Risk, to the surface water.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 17 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:   Coler & Colantonio, Inc.**

### 8.5.4    Soil Pathway

The Site is zoned for commercial use.  Access to the contaminated soil, under current Site conditions, is restricted by the slab-on-grade concrete slab and by pavement outside of and around the building. The potential for exposure to the soil contamination is determined to be low.

### 8.5.5    Groundwater Pathway

The groundwater table fluctuates between approximately 10 and 16.5 bgs at the Site and flows in a southeastern direction.  Based on the analytical data, the field observations, and the source of the release, the groundwater appears to be the main potential migration pathway of the contaminants.  However, groundwater is not utilized as a drinking water source and the accessibility to the groundwater is restricted due to the concrete slab and pavement, which covers the majority of the Site.  The analytical groundwater data collected by C&C indicate that concentrations of PCE are present above the applicable Method 1 cleanup standards at the Site.  The historical groundwater data indicate that these concentrations have been decreasing.

The analytical soil data indicate that PCE concentrations exceed the applicable Method 1 cleanup standards.  Although the Site is occupied by adults and children, the majority of the Site is covered by a concrete slab and pavement.  Therefore, contact through dermal exposure is not anticipated.  However, construction and utility workers maybe exposed to dermal contact for short periods of time during subsurface work activities. No gardening for human consumptive purposes is occurring on the Site.  Therefore, no potential food chain pathway exists for human consumption.

### 8.5.6    Air Pathway

The Site is zoned for commercial use.  The contaminated soil is isolated by the building, which is supported by a four to five inch concrete floor, and the exterior pavement.  Access to contaminated groundwater is isolated by the building slab and soil, and the depth to groundwater is less than 15 feet bgs.   Therefore, the groundwater classification was determined to be GW-2.  Based on the RMI's risk characterization, the indoor air in the 293 Main Street space poses "No Significant Risk" of harm to the health of the building occupants via inhalation.  Although the potential for exposure to contaminants in the airspace within the 295 Main Street space is not anticipated to pose a Significant Risk to human health, a Method 3 Risk Characterization will be performed as part of the future response actions

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 18 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

### 8.5.7  *Surface Water Pathway*

The Coles Brook culvert is located approximately 250 feet east of the Site. The culvert flows in a southerly direction and under the Shopping Plaza (off Route 111). The analytical groundwater data indicates that wells located between the Site and the culvert are below the Method 1 GW-3 cleanup standards. Therefore, the concentrations of PCE, as well as the other CVOCs, in the groundwater are below the Method 1 GW-3 cleanup standards that protect surface water.

### 8.6  Human Exposure Potential

Potential human receptors at the Site include workers, visitors, and trespassers. The soil and groundwater contamination is located primarily under the concrete slab of the building and the paved parking lot, which restricts humans from direct exposure. Direct human exposure is not anticipated except during possible future construction or utility activities.

The Site is not located within 500 feet of an approved Zone II, Interim Wellhead Protection Area, or private drinking water well. The Site, and the abutting properties, are connected to municipal water. Therefore, human exposure to contaminated groundwater is not expected to occur, except during possible future construction or utility activities. Based on available soil and groundwater analytical results, the contamination on the Site is not anticipated to impact residential properties, agricultural areas, or consumptive gardening areas. The potential for human exposure to contamination on the Site is determined to be low.

### 8.7  Environmental Exposure Potential

According to the DEP's BWSC Site Scoring Map, the Site is located in a non-potential drinking water source area. In addition, ACECs, fish or shellfish habitats are not located within 500 feet. No Species of Special Concern, Threatened Species, or Endangered Species are known to be located at or near the Site. No wild or domestic animals are known to reside at the Site. The majority of the Site is covered by the Site building and pavement. Therefore, minimal vegetation is located at the Site. However, C&C did not observe stressed vegetation at or in the vicinity of the Site. Based on C&C's observations, research, and the laboratory data, the potential for environmental exposure is low.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                    Page 19 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

### 8.8    Exposure Point Concentrations

The concentration of a chemical constituent in a medium to which an individual is exposed is termed the exposure point concentration (EPC). As described in 310 CMR 40.0926 of the MCP, "the objective (of the EPC) shall be to identify a conservative estimate of the arithmetic mean concentration which represents the average concentration contacted by a receptor at the exposure point over the period of exposure". The EPC should be conservative (health protective) and representative of concentrations that may be encountered at the Site. EPC have been evaluated for three separate soil exposure points; less than three feet bgs, 3 to 15 feet bgs, and greater than 15 feet bgs. Sample B-106/S-1 (0-2.5') is a Hot Spot in accordance with 310 CMR 40.0006. Response actions are necessary to achieve a condition of No Significant Risk in this location. Therefore, this sample is not included in the EPCs for the less than three feet bgs evaluation. The EPCs for PCE in soil located less than three feet bg and greater than 15 feet bgs are below the Method 1 S-1/GW-2/GW-3 cleanup standards. However, the EPCs for PCE in soil located between three to 15 feet bgs are above the Method 1 S-1/GW-2/GW-3 cleanup standards, although below the Method 1 S-3/GW-2/GW-3 cleanup standards. The groundwater data indicate the PCE concentrations are above the Method 1 GW-2 cleanup standards in well CC-4. This is the only well that is above the applicable Method 1 cleanup standards. The data indicates that the concentrations of PCE appear to be decreasing in the groundwater at the Site. The soil sample and well location are depicted on Figure 4 and a summary of the analytical data for each soil exposure is presented as Tables 4, 5, and 6. Based on the analytical data and the comparison to applicable Method 1 cleanup standards, a condition of No Significant Risk to human health, public welfare and the environmental has not been achieved at the Site.

### 8.9    Conclusion of Method 1 Risk Characterization

Concentrations of PCE exceed applicable Method 1 soil and groundwater cleanup standards at the Site. The soil located at B-106/S-1 at the depth of zero to five feet bgs is considered a Hot Spot and the EPCs for the soil located at three to 15 feet bgs at the Site are greater than the applicable Method 1 cleanup standards. Therefore, these soils could pose a risk to human health and safety. In addition, the groundwater contamination at the Site poses a risk based on the Method 1 Risk Characterization. Accordingly, a condition of No Significant Risk does not exist at the property and a Permanent Solution has not been achieved at this time and additional response actions are necessary at the Site. Remedial activities, supported by a Method 3 Risk Assessment, will be performed at the Site to achieve a condition of No Significant Risk.

## 9.0    QUALITY ASSURANCE - QUALITY CONTROL

All intrusive (subsurface investigations) activities, including: soil borings, and groundwater monitoring well installation, were conducted in accordance with the appropriate MA DEP Active

Policies: *Standard Reference for Monitoring Wells* WSC #310-91 (July 1994) and *Small Diameter Driven Well Supplement* WSC #310-91 (March 1999). Soil sample collection for laboratory analysis of VOCs was completed in accordance with *Preservation Techniques for Volatile Organic Compound Soil Sample Analysis*, WSC#99-415 (April 1999). All sample collection by C&C was completed in accordance with applicable protocols. Field calibration of instrumentation was completed in accordance with manufactures guidelines and the DEP's screening headspace method (the PID was calibrated to an isobutylene reference). All laboratory analysis was performed using the MA DEP accepted methodology.

Laboratory analysis was conducted with an active Quality Assurance/Quality Control program to ensure the production of high quality, valid data. This program closely follows the guidance provided by *Interim Guidelines and Specifications for Preparing Quality Assurance Plans*, USEPA QAMS-005/80 (1980) and *Test Methods for Evaluating Solid Waste*, USEPA, SW-846. The complete Quality Assurance/Quality Control package is located with the applicable analytical data located in Appendix F. Based on our review of data, it is the opinion of C&C that the data collected and submitted by C&C and analyzed by Alpha is usable and reproducible for the intended purposes to achieve "Presumptive Certainty" for the intended purpose of the data. Although C&C was not present for the soil samples collected by SHA in 2002,our review of documentation and conversations with applicable parties indicate that data collection was performed in accordance with the minimal DEP field QC methodologies for the intended purpose. In addition, the samples were submitted to Alpha for analyses, which is an accredited laboratory. Therefore, it is the opinion of C&C that the soil data collected by SHA is usable and reproducible for the purposes to achieve "Presumptive Certainty" in accordance with the MCP. The analytical data collected by SHA in 1998 and submitted to Eastern Analytical, Inc. of Concord, New Hampshire, as well as the other analytical data collected by others in the past is not considered usable for closure samples due to the year the samples were collected and the typical sampling methodologies of that time. C&C cannot achieve "Presumptive Certainty" and has used this data only to identify groundwater and soil trends that have assisted in the delineation of the Phase II activities, not for the applicable Method 1 Risk Assessment conclusions.

All samples utilized for the determination of a condition of No Significant Risk were completed as per DEP and US Environmental Protection Agency (US EPA) approved accepted methods. Review of laboratory analytical data has determined that surrogate recoveries were within all the quality control limits for their respective methods. Analytical data has met the Presumptive Certainty status of Alpha for all applicable questions.

Based on our review of data usability it is the opinion of C&C that the data collected and submitted by C&C and analyzed by Alpha is usable and reproducible for the intended purposes and achieves Presumptive Certainty for the respective intended purposes.

This document has been prepared for assessment purposes and does not attempt to document that a condition of No Significant Risk exists at the Site. Sampling has been conducted and will continue to be conducted before a condition of No Significant Risk can be properly documented at the Site.

## 10.0    CONCLUSIONS

For many years Duds operated a retail dry cleaning operation that occupied both spaces located at 293-295 Main Street. In 2002, the space was subdivided to reduce the area leased by Duds in order to reduce costs and to accommodate a new tenant in the 293 Main Street space. On behalf of the current landlord/property owner, SHA evaluated the subsurface conditions at the Site to determine if a release of oil and/or hazardous materials exists in the 293 Main Street space. As a result of this evaluation, tetrachloroethylene (PCE) was identified in soil samples obtained from below this portion of the concrete slab on July 2, 2002. On behalf of Kleenit, C&C performed confirmatory soil sampling activities that confirmed the exceedences of the PCE concentrations at the Site. Therefore, the release of PCE was notified to the DEP and the DEP assigned Release Tracking Number (RTN) 2-14526 on October 29, 2002 for this release.

C&C was retained by Kleenit in 2002 to address the release of PCE at the Site. In order to delineate the extent of the soil contamination at the Site, C&C has conducted soil test borings and evaluated the analytical soil data. The majority of the samples submitted for analyses had concentrations of PCE above the laboratory DLs, however only the samples collected under the building are above the Method 1 cleanup standards. Samples SH-2 / S-3, CC-5, B-106/ S-1, B-106/ S-3, B-201/S-4, B-202/S-4, B-203/S-3, B-204/S-3 have PCE concentrations that are above the Method 1 cleanup standards. Except for B-106/S-1 (0-2.5'), these samples were collected approximately between six and 9.5 feet bgs. This interval appears to consist of an organic, silty, and clayey layer. It appears that above and below this layer the PID readings, odors, and analytical data are significantly lower. Therefore, it is the opinion of C&C the PCE is accumulating and migrating along this layer and it appears that the extent of the majority of the soil contamination is located approximately six to ten feet bgs and is bounded by borings CC-6, B-105, B-103, B-101, and B-205. Refer to Figure 5 for the approximate extent of the soil contamination.

Sample B-106/S-1 (0-2.5') is located under the former distiller and has PCE concentrations of 797 ppm. The PCE soil concentrations appear to reduce at the depth of 5-7.5 feet bgs in B-106/S-3 at concentrations of 37.6 ppm. Based on this data, the contaminated soil present in the vicinity of B-106 between the depths of zero to five feet bgs is considered a Hot Spot in accordance with 310 CMR 40.0006 of the MCP. Refer to Figure 4 for the approximate location of boring B-106.

The analytical groundwater data indicates that only well CC-4 exceeds the Method 1 GW-2 cleanup standards at the Site. Well CC-4 is screened at the intersection of the bedrock and the overburden groundwater table. Therefore, it is the opinion of C&C that this well represents the general groundwater quality underlying the Site. Based on the historic data, the PCE concentrations appear

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                          Page 22 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

to be decreasing at the Site. CC-4 has been reduced from 8,570 ppb in 2002 to 3,370 ppb in 2005. It appears that the PCE in the groundwater is naturally attenuating.

Based on C&C's evaluation, as well as recollections of a former employee of Kleenit, it appears the releases of PCE to the subsurface at the Site were mainly due to sudden and accidental spills which occurred during the former dry-cleaning processes between 1960 and 1983. The reported historic releases, nature, extent and location of PCE and its degradation products found at the Site and comprehensive site assessment data are consistent with these types of releases. The former dry cleaning machines have been replaced by a new "Green" machine that uses a hydrocarbon-based cleaning product instead of PCE. The chemicals used at Duds are stored on chemical spill control trays and the waste liquid/material is properly disposed off-Site.

Based on the Phase II assessment, a Condition of No Significant Risk does not exist at the Site, and additional Response Actions are necessary in order to achieve a Response Action Outcome as described in 310 CMR 40.1000. In addition, the findings of the Phase II do not warrant rescoring of the Site's Tier II Classification. C&C has also notified the Acton's Board of Selectmen and Board of Health in accordance with the MCP. Copies of these letters are included as Appendix G. The following is the Phase III- Identification, Evaluation and Selection of Comprehensive Remedial Action Alternative Report in accordance with the MCP.

## 11.0     PHASE III - IDENTIFICATION, EVALUATION AND SELECTION OF COMPREHENSIVE REMEDIAL ACTION ALTERNATIVE

### 11.1  Remedial Strategy

Based on the Phase II activities, the contaminated soil that exceeds the applicable Method 1 cleanup standards is mainly located in the vicinity of boring B-106. The soil located between zero and three feet bgs in B-106 is considered to be a "Hot Spot" as defined in the MCP. The soil located in the vicinity of borings B-106, B202, and B-203, and between the depths of approximately 8 to 10 feet bgs, have PCE concentrations above the applicable Method 1 cleanup standards. It is the opinion of C&C that the remediation of the soil located in the vicinity of boring B-106, at the interval of zero to three feet, will reduce the PCE concentrations at this location of the Site below the applicable Method 1 cleanup standards. C&C anticipates that the selected Remedial Alternative, accompanied by a Method 3 Risk assessment and an AUL, will achieve a condition of No Significant Risk at the Site and a Permanent Solution can be achieve in accordance with the 310 CMR 40.0000.

C&C has evaluated five Remedial Alternatives in accordance with to 310 CMR 40.0857(2) of the MCP. The selected Remedial Alternative will pose No Significant Risk of harm to health, safety, public welfare or the environment, and will be likely to result in the achievement of a Class A RAO as provided in 310 CMR 40.1000.

11.2  Site Specific Risk Assessment

If Method 1 cleanup standards cannot be achieved, then a site-specific Method 3 risk assessment will be conducted at the Site to determine when a condition of "No Significant Risk" exists at the Site. Based on the current data, most of the feasible Phase III alternatives will require a Method 3 Risk Assessment.  In an effort to evaluate the feasibility to reduce the soil and groundwater concentrations below the applicable Method 3 cleanup standards, to determine applicable Method 3 cleanup standards for this release, and to determine if an AUL can be avoided, C&C is currently preparing a Method 3 Risk Assessment. The result of the Method 3 Risk Assessment will also be used to determine the extent of the response actions performed at the Site.

The risk assessment will be conducted in accordance with the *Guidance for Disposal Site Risk Characterization and Related Phase II Activities - In Support of the Massachusetts Contingency Plan* as published by the MADEP Office of Research and Standards.

The risk characterization will characterize separately the risks to human health, public welfare, the environment, and public safety.  The human health risk characterization will be conducted in accordance with MCP requirements for Method 3 Risk Characterizations (310 CMR 40.0993). Public welfare risks will be assessed following the criteria outlined in 310 CMR 40.0994.  The risk of harm to the environment will be characterized in accordance with the requirements of 310 CMR 40.0095.  Safety risks will be characterized based on the criteria presented in 310 CMR 40.0960.

The risk assessment will include a characterization of risk of harm to the environment and will meet the requirements of a Stage I Environmental Screening, if necessary.  The screening will describe Site conditions and the extent of contamination with respect to ecological concerns, identify potential environmental receptors, and compare concentrations of contaminants to applicable and suitably analogous environmental standards and to concentrations known to be without deleterious environmental impacts.  The assessment will determine whether Site conditions demonstrate a condition of apparent significant environmental harm and if a Stage II Environmental Risk Characterization is required.

## 12.0    REMEDIAL ACTION ALTERNATIVES

12.1  Alternative 1 – Excavation of the "Hot Spot"

In an effort to remove soils in the "Hot Spot" area located in the vicinity of B-106 and the PCE-contaminated soil present at B-202 and B-203 that pose a Significant Risk, C&C recommends excavating and properly disposing the PCE-contaminated soil. The contamination is anticipated to consist of an approximate 15 x 15 square foot area and extends to a depth of approximately nine

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                    Page 24 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

feet bgs in the area presently occupied by Duds. Please note that the elevated PCE concentrations are located at various depths within this area, approximately between zero and five feet bgs at boring B-106 and approximately between eight and ten feet bgs between borings B-202 and B-203. Due to the location of the contaminated soil, several precautionary steps should be performed. Refer to Figure 6 for the approximate limits of the excavation associated with the "Hot Spot" area.

To mitigate dust and potential vapors that may be emitted during the construction and excavation activities, a temporary wall consisting of 6-millimeter polyethylene sheeting (6 mil poly) between the workspace and the occupied floor space can be installed. In an effort to exhaust the dust or potential vapors that maybe created during the excavation activities, a temporary ventilation system should also be installed. To access the contaminated soil, the concrete floor will be removed and the cement will be disposed off-Site as construction debris or properly disposed as hazardous materials. C&C anticipates that the concrete floor is not impacted by the release. If the concrete is impacted, then the concrete will be properly disposed. Non-contaminated soils and concrete will be stockpiled and reused as fill or disposed as construction debris. Once contaminated soil is accessible, a vactor-truck will be used to excavate the contaminated soil. Shoring will be used to prevent the excavation from caving-in. Based on the soil data to date, C&C anticipates approximately 75 to 100 cubic yards of contaminated soil will need to be excavated to reduce the soil concentrations below the Method S-3/GW-2 & GW-3 cleanup standards in the "Hot Spot" area. Groundwater is located at least 14-15 feet bgs, therefore groundwater is not anticipated to be encountered during these excavation activities.

The contaminated soil will be transferred from the vactor-truck to a layer of 6-mil poly, which will be staged outside the Site building. The stockpiled soil will then be transferred to a lined roll-off dumpster for disposal. Please note that the PCE-contaminated soil is a RCRA hazardous waste, and therefore must be properly disposed as such. The contaminated soil will be properly transported under a Hazardous Waste manifest and disposed at the appropriate out of state disposal facility.

In an effort to delineate the limits of the excavation, C&C will collect several soil samples during the excavation activities and screen them for TOVs using a PID calibrated to an isobutylene reference and the DEP headspace method. Based on the laboratory results from boring B-106/S-3 (5-7.5 feet), C&C anticipates removing the soil to approximately eight feet bgs. Once the limits of the excavation have been defined, using field observations and PID readings, C&C will collect a soil sample from each sidewall and bottom of the excavation and submit them to a state qualified laboratory for analyses for VOCs by EPA Method 8260.

The excavation will remain open until the laboratory results are evaluated. Expedited laboratory results may be used to minimize the time the excavation remains open. If the analytical results are favorable, and the EPCs as promulgated in the MCP are below the applicable Method 1 or Method 3 cleanup standards for all the soil within the disposal site, then the excavation will be backfilled with crushed-stone. The excavation will be capped with a double layer of 6-mil poly and protected and sealed with at least four inches of concrete. Please note, if there are gaps between the new

Phase II & Phase III Report                                                                  DEP RTN 2-14526
293-295 Main Street                                                                          Duds Dry Cleaners
Acton, Massachusetts                          Page 25 of 37                          December 12, 2005

Prepared By: Coler & Colantonio, Inc.

concrete floor and the old concrete floor, then a sealant will be applied to prevent potential vapors from migrating.

The soil excavation and associated activities, soil disposal, and renovations are anticipate to be completed within 2 to 3 weeks. The contaminated soil will be properly characterized for disposal parameters and will be transported to and disposed at an approved disposal facility.

Since residual PCE contamination in the soil will remain at the Site, and the EPCs are anticipated to be above the Method 1 S-1/GW-2 & GW-3 cleanup standards and will not be reduced to background. Based on the analytical data, C&C will evaluate the potential Response Action Outcome (RAO) options, which may require a Method 3 Risk Assessment and AUL if necessary.

*Advantages*

- immediate removal of PCE
- removal of "source" soil
- expense is reasonable
- mitigates potential VOC vapors

*Disadvantages*

- intrusive approach
- elevated residual PCE concentrations may remain at the Site
- disrupts business – business closure for a limited period of time
- AUL may be required

### 12.1.1 *Alternative 2 – Excavate Most PCE Soil Contamination Below Method 1 S-1/GW-2/GW-3 Cleanup*

In an effort to remove the PCE soil contamination below the Method 1 S-1/GW-2 & GW-3 cleanup standards and to avoid an AUL, C&C anticipates that the soil located between borings B-201, B-204, B-106, CC-1, and SH-3 should be excavated. Refer to Figure 6 for the approximate limits of the excavation associated this Alternative.

At this time, C&C anticipates that the soil excavation would reduce PCE concentrations in the soil below the Method 1 S-1/GW-2 & GW-3 cleanup standards will consist of an approximately 45' x 35' area that will extend to at least 10' bgs, which is approximately 600 cubic yards of soil. The

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                Page 26 of 37

**Prepared By:  Coler & Colantonio, Inc.**

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

soil excavation activities will be performed in the same manner as *Alternative 1*, however at a much greater scale. In order to access the PCE contaminated soil in the Duds and the Supercuts space, demolition of the interior (non-supporting) walls will be necessary. C&C will request the services of a structural engineer to properly evaluate the proposed activities and confirm that the structural integrity of the Site building can support such a great excavation. If the building cannot support these excavation activities, then C&C will implement the structural engineers recommendations to ensure the integrity of the Site building.

In an effort to delineate the limits of the excavation, C&C will collect several soil samples during the excavation activities and screen them for TOVs using a PID calibrated to an isobutylene reference and the DEP headspace method. Once the limits of the excavation have been defined, using field observations and PID readings, C&C will collect a soil sample from each sidewall and bottom of the excavation and submit them to a state qualified laboratory for analyses for VOCs by EPA Method 8260.

The excavation will remain open until the laboratory results are evaluated. If the analytical results are favorable, and the EPCs are below the applicable Method 1 cleanup standards for all the soil within the disposal site, then the excavation will be backfilled with crushed-stone. The excavation will be capped with a double layer of 6-mil poly and protected and sealed with at least four inches of concrete. If there are gaps between the new concrete floor and the old concrete floor, then a sealant will be applied to prevent potential vapors from migrating.

It is anticipated that it will take a minimum of 2 to 2 .5 months to remove all the contaminated soil from such a large excavation. During these activities, the rear portions of the business occupying the two spaces will be disrupted throughout the day, and may have to be closed for an extended amount of time. The soil will be characterized for disposal parameters and disposed off-Site at the appropriate disposal facility.

*Advantages*

- immediate removal of PCE
- removal of all contaminated soil to meet Method 1 S-1 cleanup standards
- mitigate potential VOC vapors
- No AUL may be necessary

*Disadvantages*

- extremely expense vs. marginal benefits
- intrusive approach in both spaces
- disrupts both businesses – business closure for an extended period of time

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 27 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

## 12.2  Alternative 3  - Vapor Extraction System

In an effort to reduce the PCE concentrations in the soil between borings B-106, SH-2, and CC-5, a vapor extraction system (VES) can be installed.  The vertical extent of the soil contamination appears to be mainly located below the concrete floor to approximately 10' bgs.  The "Hot Spot" area consists of an approximate eight by eight foot area, which is in the vicinity of boring B-106. However, the extent of the PCE soil contamination appears to cover an area of at least 35' x 45'. Therefore, the VES should be installed in an area sufficient to remediate the 35' x 45' area.  Also note that a pilot test may be performed at the Site to increase the efficiency of the system and to verify the subsurface characteristics will be appropriate for the system.   Refer to Figure 6 for the approximate location of this VES system and associated piping.

The VES consists of a 230 VAC, single phase 5 HP TEFC motor that is gauged at 100 cfm @ 6" of mercury.  The size of the VES occupies an area of approximately eight by six feet.  Therefore, the VES can be staged in the back of the Site.   The VES will remediate the VOCs from the contaminated soil by drawing the vapors out of the soil and through PVC piping, which will be screened within the contaminated zone (approximately 3 to 4 feet bgs), through granulated activated carbon (GAC), or a comparable air stripping medium, and then the clean vapors will be discharged outside of the Site building.  The PVC piping will either be installed horizontally within a trenching and PVC network, or above ground surface self-standing PVC network.  The range of influent from the screened PVC piping is anticipated to cover an area of an approximately 15 to 20 feet diameter. Therefore, the VES can remediate the 35' x 45' contaminated area.

C&C will monitor the influent and effluent air discharge using a PID calibrated to an isobutylene reference on a regular basis.   If the PID reading from the effluent is above the applicable background concentrations, then C&C may need to recharge the GAC system or add another vessel. C&C will also use a qualified driller to collect soil samples in the vicinity of B-106 to monitor the effectiveness of the VES.  The soil samples will be screened for TOVs and also be submitted to a state qualified laboratory for analyses for VOCs.  Based on the analytical data, C&C will evaluate the effectiveness of the VES and determine the time frame that the system will run.

The installation of the VES system is anticipated to take 2 to 3 days to complete.  It is anticipated that the system will be active for approximately 6 to 9 months, or more.  If soil characteristics are too dense and have low porosity, then the effectiveness of the system may be limited and therefore the system may require 12-24 months of operation to reduce the PCE concentrations below the applicable cleanup standards.  Once the soil concentrations have been reduced to the applicable cleanup standards, then the system will be decommissioned.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts                              Page 28 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

*Advantages*

- System is on-Site and operable
- effective in treatment of PCE in soil
- may be easily modified and adjusted
- expense is reasonable (assuming a 6-9 month operation period)
- minimal intrusion

*Disadvantages*

- regular operation, maintenance, monitoring,  laboratory analyses, carbon disposal and associated costs (up to $25,000 per year)
- installation of recovery wells and trenching activities may be intrusive to the Site and may interfere with business operations
- effectiveness of system to reduce concentrations below Method 1 Standards may be questionable or may require an AUL
- may reduce the PCE concentrations to below the Method 1 cleanup standards within 1 to 5 years
- success and effectiveness of the system may depend on subsurface soil conditions ( dense or low porosity soils will not work well)

## 12.3   Alternative 4 - Oxidizer Injections of Entire Contaminated Area

In an effort to reduce the PCE concentrations in the soil, a remedial additive may be injected into the subsurface.  The remedial additive must be applied to the subsurface and have direct contact with the contaminated soil.  Regenesis, Inc. of Wakefield, Massachusetts manufactures a product called RegenOx©, which is an alkaline oxidant which eliminates  PCE, and other compounds, without the violent reaction of other oxidizers.  RegenOx© is applied in a two-step process, consisting of a RegenOx© Activator injection and then a RegenOx© Oxidizer injection.  The RegenOx© Activator injection consists of a viscous gel, which is injected into the subsurface using either a direct-push unit or hand-tools and a low-pressure pump.  Prior to the RegenOx© Activator injections, the gel must be pre-heated using a hot bath to allow the product to flow into the subsurface easier.  Once the RegenOx© Activator is injected, then the RegenOx© Oxidizer will be immediately injected.  The RegenOx© Oxidizer consists of a white powder, which is mixed with water prior to injection.  Please note that a significant amount of water is necessary to inject the RegenOx© Oxidizer.  The rate of injection will be dependent upon the permeability of soil, and will be controlled to prevent spillage or migration along the ground surface.  In an effort to reduce the PCE concentrations below the applicable Method 1 cleanup standards, Regenesis recommends three applications.  It is anticipated that approximately 4,000 pounds of RegenOx© Activator and

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 29 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

RegenOx[©] Oxidizer will be injected on the initial application, and 3,000 pounds for each of the other two applications. The total water used for the injection activities would be approximately 5,000-6,000 gallons. The injections will be installed in a grid pattern (approximately 15 foot centers) and cover an approximate 45 x 35 foot area. The injections are a relatively non-intrusive remedial option, however holes will be drilled through the concrete floor of the occupied space and some repair will be necessary to the floor Refer to Figure 6 for the approximate location of the injections.

C&C will collect groundwater samples from wells located upgradient, downgradient, and within the application area and submit the samples to a qualified laboratory for bioremedial additives in accordance with 310 CMR 40.0046 of the MCP.. In addition, C&C will perform the necessary field parameters, which will include ORP, pH, dissolve oxygen, and the samples will also be analyzed for iron to verify that the degradation process is occurring. These samples will be collected prior to the injection and three months after the injection. Post-injection soil samples will also need to be collected in an effort to evaluate the soil quality.

This in-situ process oxidizes any material that come into contact with it. Therefore, microbes in the immediate vicinity may be destroyed. However, depending on the permeability of the subsurface, the microbes may begin to grow back at a fairly quick rate.

The initial injection activities are anticipated to take 1 to 2 days. The remedial additive immediately reacts once applied and is anticipated to complete its reaction within a month. Therefore, in an effort to check the effectiveness of the injection, C&C will collect soil samples using hand tools and will evaluate them for chlorinated solvent concentrations via PID. If the PID readings remain high, an additional remedial additive application will be performed. However, if PID readings are favorable, then C&C will use a qualified driller to collect soil samples to verify the soil quality. The soil samples will be screened for TOVs and also submitted to a state qualified laboratory for analyses for VOCs.

If the soil data is not favorable, then additional injections will be administered. This injection round should also take 1 to 2 days. C&C will then re-evaluate the soil quality one-month later and collect confirmation samples using the previously described protocol. Please note that Regenesis anticipates that at least two injection rounds are anticipated to reduce the chlorinated solvent concentrations in the soil.

Also note that this remedial additive is a new technology and Regenesis has only utilized this additive on a couple of Sites. Therefore, the effectiveness of this additive is not thoroughly known in natural conditions. In addition, the amount of water used to inject the additive is rather excessive. The water will disperse the remedial additive throughout the unsaturated zone and may exacerbate the PCE plume in the groundwater. Furthermore, C&C is concerned about the infiltration of the subsurface with this amount of water and also that the porosity of the subsurface may not be able to adsorb the amount of RegenOx recommended.

Phase II & Phase III Report                                                      DEP RTN 2-14526
293-295 Main Street                                                              Duds Dry Cleaners
Acton, Massachusetts                     Page 30 of 37                           December 12, 2005

Prepared By:  Coler & Colantonio, Inc.

*Advantages*

- effective in treatment of PCE
- may reduce the PCE concentrations within 4 to 6 weeks
- effective in removing residual soil contamination at low concentrations
- relatively non-intrusive measure minimizing Site and business disturbance

*Disadvantages*

- may require multiple applications primarily due to rapid reaction and limited porosity of the subsurface
- strong potential for microbial inhibition after injection due to strong oxidation and high heat
- may mobilize metals and also create oxidation
- more expensive than the VES system
- excessive amount of water used, may exacerbate the PCE plume
- may require an AUL

### *12.4*  Alternative 5 – Oxidation of "Hot Spot" Area

It an effort to target the "Hot Spot" with the RegenOx injections, it is anticipated that approximately 300 pounds of RegenOx© Activator and RegenOx© Oxidizer will be injected on the initial application, and 300 pounds for each additional application. The total water used for the injection activities would be 1,000 – 1,200 gallons. The injections will be installed in a grid pattern (approximately 7-10 foot centers) and cover an approximate 10 x 10 foot area. Refer to Figure 6 for the approximate location of the injections associated with the "Hot Spot" area.

Since the injections will be targeting the "Hot Spot" area, soil concentrations are anticipated to be above the Method 1 S-1/GW-2 & GW-3 cleanup standards and will not be reduced to background. Based on the analytical data, C&C will evaluate the potential RAO options, which are anticipated to include an AUL and a Method 3 Risk Assessment. Therefore, residual PCE contamination in the soil will likely remain at the Site.

*Advantages*

- effective reduction of PCE concentrations

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 31 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

- may reduce the PCE concentrations within 4 to 6 weeks
- effective in removing Hot Spot soil contamination
- non-intrusive measure minimizing Site disturbance
- less expensive than full RegenOx injections

*Disadvantages*

- may require multiple applications primarily due to rapid reaction
- strong potential for microbial inhibition after injection due to strong oxidation and high heat
- may mobilize metals and also create oxidation
- water used may exacerbate the PCE plume
- AUL will likely be required

## 12.5   Alternative Options

### 12.5.1  *Monitored Natural Attenuation*

Monitored natural attenuation (MNA) is a passive and non-intrusive remedial alternative. However, the degradation of the PCE is very slow and may exceed 20 years to be reduced below the applicable Method 1 cleanup standards. Therefore, it is not an option in accordance with the remedial goals. Due to the extensive time, the monitoring, annual compliance reports, and compliance fees will be moderately expensive. MNA will most-likely result in an AUL and a Class C RAO (Temporary Solution).

## 13.0     ALTERNATIVE COMPARISON AND EVALUATION

The initial screening of remedial alternatives has identified five remedial alternatives using three technologies to be compared and evaluated. The five remedial alternatives are considered to be viable technologies and could result in achieving a condition of No Significant Risk. The primary comparison will be based on remedial efficacy, estimated cost, the disruption to the Site and future operations, the timeframe for completion, and other non-quantifiable considerations.

Preliminary engineering, and operation and maintenance cost estimates have been developed for each of the five remedial alternatives. Each alternative has also been evaluated as to the expected timeframe to conduct the fieldwork associated with the startup of each remedial effort, the implementation of a monitoring program, and the necessary response actions and reports to prepare

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 32 of 37

**Prepared By:  Coler & Colantonio, Inc.**

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

an RAO, if conditions are favorable. A summary of anticipated costs for materials, installation, operations and management, monitoring, and expected timeframes for each alternative is provided below.

Cost Summary and Timeframe for Installation of Remediation Alternatives

| Alternative | Engineering Cost Estimate | Timeframe (Installation) | Timeframe (Reduce Concentrations below the applicable Method 1 Cleanup Standards) |
|---|---|---|---|
| Soil Excavation (Hot Spot) | $100,000 – $125,000 | 2 Weeks | 4 to 8 months |
| Soil Excavation (All PCE-contaminated Soil) | $550,000 – $650,000 | 2 to 2 ½ Months | 8 to 12 Months |
| VES | $55,000 – $75,000 (6 –9 months) | 2-3 Days | 12 to 18 months |
| Oxidation Injections (all PCE-contamination) | $75,000 – $100,000 (three applications) | 1-2 Days (per application) | 18 to 24 months |
| Oxidation Injections (target Hot Spot) | $45,000 – $50,000 (one application) | 1-2 Days (per application) | 12 to 18 months |
| MNA | $200,000 – $300,000 | Not Applicable | 20 to 30 years |

## 14.0     ALTERNATIVE SELECTION

Based on the initial screening of potential remedial options, in conjunction with our current understanding of soil and groundwater contaminant concentrations, and the closure strategy, the most effective and reliable Alternative for the Site is to excavate the "Hot Spot". In an effort to reduce the soil volume, as well as determine the applicable Method 3 cleanup standards, C&C is currently preparing a Method 3 Risk Assessment. Subsequent to the excavation activities, C&C will evaluate the soil and groundwater data and compare the concentrations to the target Method 3 concentrations. Based on the results of the data and the Method 3 Risk Assessment, C&C will

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts
Page 33 of 37
DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005
Prepared By:  Coler & Colantonio, Inc.

determine if an AUL will be required to achieve a condition of No Significant Risk in accordance with the MCP.

The selection of the preferred remedial alternative; the " Hot Spot" Soil excavation is justified by several factors including the following: (1) the selected technology is proven to be most-effective, (2) the elevated PCE contaminated soil will be removed, eliminating the "Hot Spot", (3) the excavation process is fairly standard and reliable, (4) the "source" soil will be removed, (5) the process produces no by-product waste streams, and (6) the technology can be implemented for a similar cost compared to some of the other remedial alternatives.

The excavation of the "Hot Spot" soil is anticipated to reduce the PCE concentration below the applicable Method 1 cleanup standards. However, if the analytical data indicate that the soil and/or groundwater are above the applicable Method 1 cleanup standards, then an AUL may be placed on the soil concentrations that exceed the Method 1 cleanup standards and that define the disposal site boundary. A Method 3 Risk Assessment is anticipated to be performed in an effort to evaluate the potential exposures to human and environmental receptors under all current and foreseeable Site activities and uses. If the Method 3 Risk Assessment indicates that the risk does exist at the Site and a condition of No Significant Risk is not achieved, then the implementation of an additional Remedial Alternative may be required to achieve a Conditions of No Significant Risk and not require an AUL to be placed on the Site.

## 15.0    SCHEDULE OF PHASE IV ACTIVITIES

Although several parties are involved concerning the Site and the remedial activities, the implementation of the proposed remedial actions are anticipated to be performed under the following schedule:

| | |
|---|---|
| Phase IV - Remedy Implementation Plan | Summer/Fall 2006 |
| Implementation of Phase IV Activities | Spring/Summer 2007 |
| Phase IV Completion Statement | Subsequent to Phase IV Activities |
| Phase V – Operation, Maintenance, and/or Monitoring Plan or RAO Statement | 6 months subsequent to Phase IV Completion Statement |

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 34 of 37

**Prepared By:  Coler & Colantonio, Inc.**

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

C&C has notified the Acton's Board of Selectmen and Board of Health in accordance with the MCP. Copies of these letters are included as Appendix G.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 35 of 37

Prepared By:  Coler & Colantonio, Inc.

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**16.0    STATEMENT OF LIMITATIONS**

The observations described in this report were made under the conditions and dates stated herein. The conclusions presented in the report were based solely upon the services described herein, and not on scientific tasks or procedures beyond the scope of described services or the time and budgetary constraints imposed by the Client. The work described in this report was carried out in accordance with the Terms & Conditions of Engagement.

In preparing this report, Coler & Colantonio, Inc. (C&C, Inc.) has relied on certain information provided by federal, state, local officials and other parties referenced herein, and on information contained in the files of federal, state and/or local agencies available to C&C, Inc. at the time of the investigation. C&C, Inc. did not attempt to independently verify the accuracy or completeness of all information received during the course of this project. C&C, Inc. is not responsible for the accuracy of information provided by others.

In the event that the Client obtains information on environmental or hazardous waste issues at the site not contained in this report, such information should be brought to the attention of C&C, Inc. forthwith. C&C, Inc. will evaluate such information and, on the basis of this evaluation, may modify the conclusions stated in this report.

Observations were made of the site and of structures on the site only on those dates as indicated within this report. Where access to portions of the site was unavailable or limited, C&C, Inc. renders no opinion as to the presence of hazardous material or oil, or to the presence of indirect evidence relating to hazardous material or oil, in that portion of the site.

The conclusions contained in this report are based in part upon the data obtained from a limited number of soil and/or groundwater samples obtained from the site. The nature and extent of variations between these samples may not become evident without further exploration. If variations or other latent conditions then appear evident, it will be necessary to reevaluate the conclusions of this report.

Where quantitative laboratory testing was performed as part of the site assessment, such analyses have been conducted by an independent laboratory. C&C, Inc. has relied upon the quality and assurance of the independent laboratory to provide reliable data.

Chemical analyses have been performed for specific parameters during the course of this investigation, as described in the text. However, it should be noted that additional chemical constituents not searched for during the current study may be present in soil and/or groundwater at the site.

The conclusions and recommendations contained in this report are based in part upon various types of chemical data and are contingent upon their validity. These data have been reviewed and interpretations made in the report. Moreover, it should be noted that variations in the types and concentrations of contaminants and variations in their flow paths may occur due to seasonal water table fluctuations, past disposal practices, the passage of time, and other factors. Should additional chemical data become available

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 36 of 37

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005

**Prepared By:  Coler & Colantonio, Inc.**

in the future, these data should be reviewed by C&C, Inc. and the conclusions and recommendations presented herein modified accordingly.


Coler & Colantonio, Inc. recommends that groundwater sampling be completed quarterly for one year to evaluate if groundwater continues to meet all criteria such that a Condition of No Significant Risk can be achieved.

Phase II & Phase III Report
293-295 Main Street
Acton, Massachusetts

Page 37 of 37

Prepared By:   Coler & Colantonio, Inc.

DEP RTN 2-14526
Duds Dry Cleaners
December 12, 2005