# PHASE IV – REMEDY IMPLEMENTATION REPORT

**Duds Dry Cleaners**
**293-295 Main Street**
**Acton, Massachusetts**

**RTN 2-14526**

February 6, 2007

*Prepared for:*

Kleenit, Inc.
44 Park Street
Ayer, Massachusetts 01432

*Prepared by:*

Coler & Colantonio, Inc.
101 Accord Park Drive
Norwell, Massachusetts 02061-1685
(781)-982-5400

Prepared By:

Glen A. Cote
Project Scientist

Reviewed By:

Mark A. Germano, LSP
Division Manager –
Environmental Services

Project # 11-1079.01

# PHASE IV – REMEDY IMPLEMENTATION PLAN

## TABLE OF CONTENTS

1.0  INTRODUCTION ...............................................................................1
2.0  GENERAL SITE INFORMATION ....................................................2
3.0  BACKGROUND ..................................................................................3
4.0  SUMMARY OF PHASE II – COMPREHENSIVE SITE
     ASSESSMENT .....................................................................................4
  4.1    Nature and Extent of Contamination ..........................................6
    4.1.1    Extent of Contaminated Soils .............................................7
    4.1.2    Extent of Contaminated Groundwater ................................7
5.0  SUMMARY OF PHASE III – FEASIBILITY PLAN ......................8
6.0  PHASE IV – REMEDY IMPLEMENTATION PLAN ....................8
  6.1    Site Potentially Responsible Party and Contacts .......................9
  6.2    Goals of the Remedial Action Plan ............................................9
  6.3    Design and Implementation ......................................................10
7.0  FINAL INSPECTION REPORT AND PHASE IV
     COMPLETION STATEMENT .........................................................12
8.0  STATUS AND MONITORING REPORTS ....................................12
9.0  SCHEDULE ........................................................................................12
10.0 HEALTH AND SAFETY PLAN ......................................................13
11.0 FEES ...................................................................................................13
12.0 NOTIFICATIONS .............................................................................13

FIGURES
   Figure 1 – Site Locus
   Figure 2 – Site Plan
   Figure 3 – Detailed Site Plan
   Figure 4 – Extent of Soil and Groundwater Contamination
   Figure 5 – Extent of Contaminated Soil Excavation

TABLES
   Table 1 - Summary of Analytical Soil Data
   Table 2 - Summary of Analytical Groundwater Data
   Table 3 - Summary of Analytical Soil Gas Data

APPENDIX
   Appendix A – Transmittal Form:
                     BWSC – 108
   Appendix B -  Health and Safety Plan
   Appendix C -  Public Notification Letters

# PHASE IV
# REMEDY IMPLEMENTATION PLAN

## 1.0 INTRODUCTION

On behalf of Kleenit, Inc. of Ayer, Massachusetts, Coler & Colantonio, Inc. (C&C) of Norwell, Massachusetts is submitting this Phase IV – Remedy Implementation Plan (RIP) in accordance with 310 CMR 40.0870 of the Massachusetts Contingency Plan (MCP) to the Massachusetts Department of Environmental Protection (DEP) regarding the historic release of chlorinated volatile organic compounds (CVOCs) that occurred at the property located at 293-295 Main Street in Acton, Massachusetts (the "Site"). A Site Locus and Site Plan are included as Figures 1 and 2, respectively, and the original Bureau of Waste Site Cleanup (BWSC) Comprehensive Response Action Transmittal Form (BWSC-108) is included as Appendix A.

For many years Duds Dry Cleaners (Duds) operated a retail dry cleaning operation that occupied both spaces located at 293-295 Main Street (the "Site"). In 2002, the space was subdivided to reduce the area leased by Duds and to accommodate a new additional tenant in the 293 Main Street space. The then and present landlord/property owner, E&A Northeast Limited Partnership (E&A), retained Sanborn, Head & Associates, Inc., (SHA) of Westford, Massachusetts for environmental consulting services to evaluate the subsurface conditions at the 293 Main Street portion of the Site building and to determine if any release of oil and/or hazardous material (OHMs) associated with the former use of this area was present in the soil and groundwater under the space before a new tenant occupied the space. As a result of this evaluation performed by SHA on behalf of the landlord, tetrachloroethylene (PCE) was identified in soil samples obtained from below this portion of the concrete slab on July 2, 2002. Therefore, on behalf of Kleenit, C&C further evaluated SHA's findings to determine if the PCE release was reportable and if the release required further assessment and/or response actions in accordance with the MCP. Based on C&C's evaluation, the release of PCE was determined to be a 120 day reportable release condition per 310 CMR 40.0315 of the MCP. Therefore, on October 29, 2002, C&C notified the DEP and the DEP assigned Release Tracking Number (RTN) 2-14526 for this release.

In an effort to determine if the PCE concentrations posed a risk to future occupants in the 293 Main Street space or required any response actions, Kleenit retained C&C in 2002. C&C performed several assessment activities at the Site that included evaluating the soil, groundwater, and soil gas at the Site. Based on the evaluation activities, C&C submitted a Phase I – Environmental Site Assessment Report (Phase I) and a Tier Classification dated October 29, 2003 to the DEP. Based on the Phase I Report, the Site was classified as a Tier II disposal site. As part of the Phase I activities, an indoor air risk assessment was performed inside the Site building. According to the Phase I Report, there is No Significant Risk of harm to human health regarding the potential migration of vapors emitting from the VOCs present under the concrete floor at the Site. However, PCE

concentrations are present in the soil and groundwater at the Site above the applicable Method 1 cleanup standards that apply to the Site, and a Permanent Solution has not yet been achieved for the Site in accordance with the MCP.

## 2.0  GENERAL SITE INFORMATION

The Site is located within a strip mall, which includes the addresses 291-305 Main Street, located on the south side of Main Street (Route 27) and in a commercially zoned area of Acton. The UTM coordinates for the Site are: Zone 19, Northing: 4705261, Easting: 298363; or 42° 28' 24"-north, 71° 27' 10"-west (42.473454, -71.45291). According to the Acton Assessors Office, the property is depicted on Map F3 as Block 89, is comprised of approximately 12.5 acres of land, and is presently owned by E & A Northeast Limited Partnership, whose agent is Edens & Avant Realty, Inc. with a local office at 21 Court House Street in Boston, Massachusetts. The strip mall building consists of a single story masonry structure that is constructed on a slab-on-grade foundation that is surrounded by a paved parking lot. The Site is currently served by municipal water and sewer service and utilities including natural gas and electric. This area of Acton was connected to the municipal sewer services in 2002. Prior to the municipal sewer connection, the Site used a septic tank and leaching field located southeast of the Site building. Refer to Figures 2 and 3 for the approximate location of the former septic system.

SuperCuts (293 Main Street) and Duds (295 Main Street) currently occupy the Site. The Duds dry cleaning operations include counter services, and on-Site cleaning and pressing operations. This operation has existed at the 295 Main Street space for about 40 years, and at the 293 Main Street space from approximately 1980 to 2002. The other commercial stores that occupy the strip mall are a sandwich and pizza shop, a donut shop, and a liquor store.

The Site is generally flat, but a sharp downward embankment (approximately 25 foot vertical drop) is located in the rear of the Site, along the southeastern Site boundary line. This embankment is the approximate property line between the Site and the commercial Shopping Plaza property located off Massachusetts Avenue (Rt. 111). The general topography of this area is to the south, toward Rt. 111. The building on the southwestern abutting property (Middlesex Bank) has a lower foundation than the Site building; there is an approximately three-foot difference in elevation.

The Site is located in a commercial/residential area of Acton that is heavily developed. Beyond the immediate area there are properties that can be classified as residential and wooded uplands. Main Street (Route 27) abuts the Site to the northwest, beyond which are commercial and retail properties. The Site is abutted to the east by the connecting strip mall that consists of various commercial and retail spaces. The southeastern abutter is a Shopping Plaza that consists of several commercial and retail stores, beyond which is Massachusetts Avenue (Rt. 111). The southwestern abutting property is a

commercial/retail building currently occupied by the Middlesex Bank, beyond which is Town House Lane. An Exxon Station is located on the western corner of Main Street and Town House Lane. West of Main Street, behind the buildings that abut the street, is the Raymond J. Grey Junior High School. Refer to Figures 1 and 2 for an overall view of the area.

Surface drainage in the immediate vicinity of the Site is towards the east and southeast. There is a catch basin located approximately 100 feet from the front (west) entrance to the Duds store and the outlet for this catch basin is unknown.

The Site is within the drainage basin of Cole Brook, which is a tributary of the Fort Pond Brook, which feeds into the Assabet River, which is a tributary to the Concord River. A portion of the open channel for this brook is located greater than 500 feet south-southwest of the Site. The Coles Brook culvert is located approximately 250 feet east of the Site. The culvert flows in a southerly direction and under the property located off Route 111 (Shopping Plaza).

According to information provided by the BWSC Priority Resource Map for the Site, the Site is not located within 500 feet of a Potentially Productive Aquifer, Zone II, Interim Wellhead Protection Area, or surface water supply. The Town of Acton's Aquifer Protection By-Law does not apply to this Site. The Resource Map also indicates that Areas of Critical Environmental Concern (ACEC), habitats of rare wetland life, and certified vernal pools do not exist within 500 feet of the Site.

The property of the Raymond J. Grey Junior High School is located within 500 west of the Site, however the structure is more than 500 feet from the Site. No other "Institutions", as defined in 310 CMR 40.0006, are known to be located within 500-feet of the Site. No hospitals, nursing homes, or other "institutions" as defined in 310 CMR 40.0006 are known to be located within 500 feet of the Site.

## 3.0   BACKGROUND

The Site includes the building spaces located at 293 Main Street (now occupied by Supercuts) and 295 Main Street (Duds). The two spaces were both occupied by Duds until they were sub-divided in 2002. According to a Phase I Environmental Site Assessment dated September 19, 1989 and prepared by Kurz Associates, Inc. of Bridgewater, Massachusetts, for the prior owner of the "Shopping Plaza" located on the corner block of Main Street (Rt. 27) and Massachusetts Avenue (Rt. 111), it was determined that a limited release of hazardous materials, particularly chlorinated solvents including PCE, had impacted the area including the Site.
These chlorinated compounds found by Kurz were detected in the samples of groundwater collected from four monitoring wells installed by Kurz. However, following additional investigative activities, and under the MCP/21E programs and guidelines then in place for environmental assessment and remedial action, the

concentrations were determined to: "... not represent an imminent threat to public health or the environment." Furthermore, it was stated in the cover letter associated with the *Phase II Comprehensive Site Assessment, DEP Case No. 2-0678, Acton Plaza, Massachusetts Avenue & Main Street, Acton, Massachusetts* that because of the current and foreseeable conditions and uses of the Site that: "... site conditions meet the requirements of a permanent solution as described in 310 CMR 40.545, and that additional on-site remedial actions are not necessary at this time."

Later studies conducted by the prior owner of the Shopping Plaza performed by ChemCycle Corporation in 1993, ESS (Environmental Science Services) in 1994, and MyKroWaters Environmental Services in 1996 also concluded that the likely source of the chlorinated VOC's was Duds or other Potentially Responsible Parties (PRPs). At no time up until October of 2002 was Duds or Kleenit sent a Notice of Responsibility (NOR) from the DEP or Notice of Claim from any other party pursuant to MGLc. 21E. Subsequent assessments that involved additional sub-surface investigations and the collection and analysis of soil and groundwater samples, as well as review of preceding assessment activities and reports, offered conclusions and recommendations that suggested contaminant concentrations were undergoing natural attenuation. No formal response action or remediation was initiated because the contaminants that were detected in the groundwater samples appeared to be naturally attenuating and were below MCP Method 1 cleanup standards at the time.

As part of the 2002 sub-division activities, SHA collected soil samples below the 293 Main Street space. In the letter prepared by SHA and dated July 2, 2002, SHA indicated that PCE and methyl-tert-butyl-ether (MTBE) were present in the soil located beneath the building slab at the Site. Based on C&C's preliminary and Phase I assessments activities, additional assessment activities were required in accordance with the MCP. Therefore, C&C performed the Phase II – Comprehensive Site Assessment (Phase II – CSA) activities that are described in the Phase II - CSA report to further define the extent of the contaminated soil and groundwater present at the Site.

## 4.0    SUMMARY OF PHASE II – COMPREHENSIVE SITE ASSESSMENT

SHA installed nine soil borings and completed seven of the borings as monitoring wells (MW-1 through MW-7) in 1998 and advanced six soil borings (SH-1 through SH-5) in the 293 Main Street space in an effort to investigate the PCE concentrations in the soil and groundwater under the Site building in 2002. Due to the depth of groundwater and the difficult drilling conditions inside the Site building, SHA completed two borings

(SH-2 and SH-4B) as vapor sampling wells. The analytical data indicated that PCE concentrations are present in the soil and groundwater located at the Site. A summary of the analytical data is presented on Tables 1 and 2.

In an effort to further evaluate the groundwater quality at the Site C&C collected groundwater samples from three previously installed wells (MW-2, MW-5, and MW-6) in October 2002. The analytical results indicated that concentrations of PCE, trichloroethene (TCE) and MTBE were present above the laboratory detection limits (DLs) in wells MW-2 and MW-6. These wells are located within 30 feet of the Site building and downgradient of the dry-cleaning machines. The analytical data from MW-5 indicated that VOCs were not present above the laboratory DLs. A summary of the analytical data is presented on Table 2.

In an effort to evaluate the indoor air in the 293 Main Street space, C&C collected four soil gas samples (CC-1, CC-2, CC-3) from below the concrete slab using SUMMA canisters in October 2002. The analytical results indicated that PCE, toluene, and meta- and para-xylenes were present above the laboratory DLs in each of the sub-slab air samples collected. A summary of the analytical soil gas data is presented on Table 3. In order to evaluate the soil gas data, C&C retained the services of Risk Management, Inc. (RMI) of Acton, Massachusetts to evaluate the indoor air issue by performing an Indoor Air Quality (IAQ) Assessment study. RMI concluded that based on the existing conditions, the soil and/or groundwater beneath the slab pose "No Significant Risk" of harm to the health of the building occupants via inhalation of OHM-impacted indoor air and the cumulative receptor Total Site Risk HI or ELCR values for subchronic, chronic or lifetime exposures do not exceed the MCP Risk Limits.

In 2002, C&C managed the advancement of three borings (CC-4, CC-5, and CC-6), which were completed as monitoring wells, at the Site. C&C collected soil and groundwater samples and submitted them for VOCs analyses. The soil data indicated that PCE concentrations are present in the samples and are above the applicable Method 1 cleanup standards in soil sample CC-5. The analytical groundwater data indicated that PCE and MTBE concentrations are present above the laboratory DLs, and are above the applicable Method 1 cleanup standards in well CC-4. A summary of the analytical soil and groundwater data is presented on Tables 1 and 2.

In September 2003, C&C sampled six wells at the Site (MW-2, MW-5, MW-6, CC-4, CC-5, and CC-6). The data indicated that PCE concentrations were present above the laboratory DLs (except for CC-5), and above the applicable Method 1 cleanup standards in CC-4. A summary of the analytical groundwater data is presented on Table 2.

In an effort to further evaluate the extent of soil and groundwater contamination, C&C managed the advancement of seven soil borings (B-101 through B-107) and the completion of two monitoring wells (CC-101 and CC-102) in March 2005. Borings were advanced near the dry cleaner machine (B-105), the former distiller (B-106), and adjacent to the chemical storage area (B-107). Please note that these inside borings were advanced during the upgrade of the dry cleaning machines from the "Dry – to – Dry"

machine to the new "Green" machine. Based on the PID readings and field observations, C&C collected soil samples and submitted them for VOC analyses. The analytical data indicated that PCE was present above the Method 1 S-1/GW-2 and GW-3 cleanup standard in soil samples B-106/S-1 (0-2.5') and B-106/S-3 (5'-7.5') at concentrations of 797 parts per million (ppm) and 37.6 ppm, respectively. A summary of the analytical soil data is presented on Table 1 and the boring and well locations are depicted on Figure 3.

C&C also collected groundwater samples from the two newly installed wells (CC-101 and CC-102), three on-Site wells (MW-2, MW-6, and CC-4), and two off-Site wells (MW-7 and W-3) and analyzed them for VOC analyses. The groundwater analytical data indicated that PCE concentrations were present in the groundwater located at wells MW-102, MW-2, MW-6, CC-4, MW-7, and W-3 above the laboratory DLs and only the PCE concentrations for well CC-4 were above the applicable Method 1 cleanup standards. A summary of the analytical data is presented on Table 2.

To further evaluate the downgradient groundwater quality, C&C collected groundwater samples from MW-1 and MW-3 in April 2005 and submitted them for VOC analyses. The analytical data indicated that concentrations of cis 1,2 – dichloroethylene (DCE), PCE, and TCE were present in well MW-1 above the laboratory DLs, although below the applicable Method 1 cleanup standards. Concentrations of cis 1,2 –DCE were also present in well MW-3 above the laboratory DLs, albeit below the applicable Method 1 cleanup standards. A summary of the analytical data is presented on Table 1.

In October 2005, C&C managed the advancement of five borings (B-201 through B-205) at the Site. Borings B-201 through B-204 were advanced inside the Site building to delineate the extent of soil contamination; B-201 was advanced in Supercuts (293 Main Street) and B-202, B-203, and B-204 were advanced in Duds (295 Main Street). Boring B-205 was advanced outside the building in the driveway located between Supercuts and the western abutting property (Middlesex Bank). C&C collected six soil samples and submitted them for VOC analyses. The analytical data indicated that PCE concentrations were present above the laboratory DLs in the samples, and above the applicable Method 1 cleanup standard in soil samples B-201/S-4 (7-8'), B-202/S-4 (9-9.5'), B-203/S-3 (8.5-9'), and B-204/S-3 (8-9'). A summary of the analytical data is presented on Table 1.

### 4.1 NATURE AND EXTENT OF CONTAMINATION

According to Kleenit and the evaluation activities, it appears the releases of PCE to the subsurface at the Site were mainly due to the former dry-cleaning processes, older machinery and practices, and accidental spills that have occurred in the past. The location, nature and extent of the contaminants found at the Site are consistent with the reported historical release events recalled by Duds and Kleenit personnel. The depth and degradation products detected at the Site are also consistent with older and multiple PCE releases. A new "Green" machine that only uses a hydrocarbon-based cleaning product, not PCE, has replaced the former dry cleaning machines. The hydrocarbon-based cleaners and other chemicals used at Duds are stored on chemical spill control trays and the waste liquid/material is properly disposed off-Site.

*4.1.1   Extent of Contaminated Soils*

The Phase II – CSA indicates that the contaminated soil is mainly located under the building in the vicinity of the former distiller and former dry cleaning machine. Samples SH-2 / S-3, CC-5, B-106/ S-1, B-106/ S-3, B-201/S-4, B-202/S-4, B-203/S-3, B-204/S-3 have PCE concentrations that are above the applicable Method 1 cleanup standards. Except for B-106/S-1, these samples were collected between approximately 6.0 and 9.5-feet bgs. This interval appears to consist of an organic, silty, and clay layer. It appears that above and below this layer the PID readings, odors, and analytical data are significantly lower. It is the opinion of C&C that the PCE is accumulating and migrating along this layer. Therefore, based on the soil data, it appears that the extent of the majority of the soil contamination is located approximately six to ten feet bgs and is bounded by borings CC-6, B-105, B-103A, B-101, and B-205. Refer to Figure 4 for the approximate extent of the soil contamination above the applicable Method 1 S-1/GW-2 and GW-3 cleanup standards.

*4.1.2   Extent of Contaminated Groundwater*

The Phase II - CSA indicated that only well CC-4 exceeds the applicable Method 1 GW-2 cleanup standards at the Site. However, based on the new MCP standards implemented on April 3, 2006, the monitoring wells that have PCE concentrations that exceed the new applicable Method 1 GW-2 cleanup standards are MW-2, MW-6, MW-7, CC-4, CC-5, and CC-102. Therefore, the extent of groundwater that exceeds the applicable Method 1 GW-2 cleanup standards is bounded by wells CC-6 and MW-3, and soil borings B-205 and B-103A.

Monitoring well MW-7 is located downgradient of the Site and adjacent to the "Shopping Plaza" located off of Route 111. These groundwater concentrations will be evaluated as part a Risk Characterization Assessment prepared in accordance with 310 CMR 40.09000. The presence of the PCE daughter breakdown by-products in the groundwater indicate that the release originated from an older historic PCE release typically found at older dry cleaning establishments. Based on the historic groundwater data, the PCE and daughter breakdown by-product concentrations appear to be decreasing naturally.

Based on the Phase II- CSA, a condition of No Significant Risk does not exist at the Site, and additional Response Actions are necessary in order to achieve a Response Action Outcome (RAO) as described in 310 CMR 40.1000. In addition, the findings of the Phase II-CSA do not warrant rescoring of the Site's Tier II Classification. C&C has also notified the Acton's Board of Selectmen and Board of Health in accordance with the MCP.

## 5.0   SUMMARY OF PHASE III – FEASIBILITY PLAN

Based on the initial screening of potential remedial options performed in the Phase III, our current understanding of soil and groundwater contaminant concentrations, and the closure strategy, the most effective and reliable Alternative for the Site is to excavate the "Hot Spot" (B-106). The selection of the preferred remedial alternative; the " Hot Spot" Soil excavation is justified by several factors including the following: (1) the selected technology is proven to be most-effective, (2) the elevated PCE contaminated soil will be removed, eliminating the "Hot Spot", (3) the excavation process is fairly standard and reliable, (4) the "source" soil will be removed, (5) the process produces no by-product waste streams, and (6) the technology can be implemented for a similar cost compared to some of the other remedial alternatives

The excavation of the "Hot Spot" soil is anticipated to reduce the PCE concentration below the applicable Method 1 cleanup standards. However, if the analytical data indicate that the soil and/or groundwater are above the applicable Method 1 cleanup standards, an AUL may be placed on the soil concentrations that exceed the Method 1 cleanup standards and that define the disposal site boundary. The Method 3 Risk Characterization Assessment will evaluate the potential exposures to human and environmental receptors under all current and foreseeable Site activities and uses and determine target cleanup standards with and without an AUL. If a condition of No Significant Risk is not achieved, then the implementation of an additional Remedial Alternative may be required to achieve a Permanent or Temporary Solution.

## 6.0   PHASE IV – REMEDY IMPLEMENTATION PLAN

The Phase II – CSA indicates that the contaminated soil is mainly located under the building in the vicinity of the former distiller and former dry cleaning machine; between borings SH-2, CC-5, B-106, B-201, B-202, B-203, B-204. The extent of groundwater contamination above the applicable Method 1 GW-2 cleanup standards is located approximately between monitoring wells CC-6 and MW-3, and soil borings B-205 and B-103A. The groundwater data indicates that PCE concentrations are above the applicable Method 1 GW-2 cleanup standards at well MW-7, which is located downgradient of the Site and adjacent to the "Shopping Plaza". These groundwater concentrations will be evaluated as part a Risk Characterization Assessment prepared in accordance with 310 CMR 40.0900.

Based on the downward trend of the PCE data and daughter breakdown by-products over the past several years, it appears that the PCE contamination is naturally attenuating. It is the opinion of C&C that the implementation of the Phase IV activities to remove the significantly impacted soil and will further reduce the groundwater concentrations and a Permanent Solution will be achieved.

6.1    SITE POTENTIALLY RESPONSIBLE PARTY AND CONTACTS

Pursuant to the Massachusetts Contingency Plan (310 CMR 40.0424), Kleenit, Inc. d/b/a Duds Cleaners is the Potential Responsibly Parties conducting this Phase IV - RIP.

The contact information is as follows:

>   Kleenit, Inc. d/b/a Dud's Cleaners
>   Frank Murphy, President
>   44 Park Street
>   Ayer, Massachusetts 01432
>   Telephone Number: (978) 772-3391

The Licensed Site Professional for the Site is identified as:

>   Mr. Mark A. Germano, LSP # 9996
>   Division Manager
>   Coler & Colantonio, Inc
>   101 Accord Park Drive
>   Norwell, MA 02061
>   Telephone Number: (781) 982-5429

6.2    GOALS OF THE REMEDIAL ACTION PLAN

The goal of the Remedial Action Plan will be to achieve a Permanent Solution and Class A RAO at the Site by reducing the concentrations of PCE and daughter breakdown byproducts in the soil and the groundwater to achieve No Significant Risk based on a Method 3 Risk Characterization Assessment. In an effort to achieve this goal, the contaminated soil located in the "Hot Spot" area will be excavated and properly disposed off-Site. Soil excavation will directly remove the "source" area of the PCE within a two to three week period. In an effort to determine the applicable Method 3 cleanup standard targets and to reduce the soil volumes, C&C is currently preparing a Method 3 Risk Characterization Assessment evaluation. Subsequent to the excavation activities, C&C will evaluate the soil and groundwater data and compare the concentrations to the target Method 3 cleanup standard concentrations. Based on the results of the analytical data and the Method 3 Risk Characterization Assessment performed subsequent to the contaminated soil excavation activities, C&C will determine if an AUL, or other response actions, will be required to achieve a condition of No Significant Risk in accordance with the MCP.

6.3    DESIGN AND IMPLEMENTATION

The contaminated soil located in the "Hot Spot" area (B-106) and in the vicinity of B-202 and B-203 will be excavated and properly disposed off-Site. The excavation will consists of an approximate 15 x 15 square foot area, and the vertical extent will be between five to ten feet bgs. Based on the most recent analytical data, the PCE concentrations above the applicable Method 1 cleanup standards are located at various

depths within this area and C&C anticipates that the vertical extents will vary between approximately zero and five feet bgs in the vicinity of boring B-106 and between approximately eight and ten feet bgs in the vicinity of borings B-202 and B-203. Refer to Figure 5 for the approximate horizontal extents of the soil excavation. The excavation will be performed in the Duds space, during typically daily operation, and adjacent to the new "Green" dry cleaning machine.

Due to the location of the contaminated soil, several precautionary steps will be performed. To mitigate dust and potential vapors that may be emitted during the construction and excavation activities, a temporary wall consisting of 6-millimeter polyethylene sheeting (6 mil poly) between the workspace and the occupied floor space will be installed. If dust, noticeable olfactory vapors, or PID elevated readings that exceed background concentrations are created during the excavation activities, then a temporary ventilation system may be installed to minimize fugitive dust and vapors. The ventilation system will consist of a temporary construction-grade air transfer unit that will be discharge outside of the Site building.

To access the contaminated soil, the concrete floor will be saw-cut and then removed. C&C anticipates that the concrete floor is not impacted by the release, however if the concrete is impacted, then the concrete will be properly disposed in accordance with federal, state, and local regulations. Non-contaminated soils will be stockpiled and may be re-used as backfill material. If the concrete rubble is less than the six –inches, then this may be used as backfill material as promulgated in the Guide to Regulations for Using or Processing Asphalt, Brick and Concrete Rubble dated March 1, 1993, and Revised February 2000, or disposed as construction debris. Once contaminated soil is accessible, a vactor-unit, that is connected directly into a lined 20 cubic yard roll-off dumpster, will be used to excavate the contaminated soil. Hydraulic shoring will be used within the excavation in accordance with federal and state regulations to prevent caving-in. Based on the soil data to date, C&C anticipates approximately 75 to 100 cubic yards of contaminated soil will need to be excavated to reduce the soil concentrations below the Method S-1/GW-2 & GW-3 cleanup standards in the "Hot Spot" area. C&C does not anticipate that the soil excavation will undermine the "Green" dry cleaning machine. Furthermore, the interior walls of the Site building are not supporting walls. Therefore, the interior walls may be undermined if the soil concentrations are above the Method 3 cleanup standards. If the undermining may pose a danger to construction work, on-Site personnel, or jeopardize the integrity of the Site building, then the horizontal excavation will be halted and the excavation activities will be re-evaluated. It does not appear that utility lines (i.e., plumbing, electrical, gas, etc.) will be compromised or encountered during the excavation activities. However, if it appears that the utilities may be impacted then C&C will further evaluate the excavation activities. The PCE-contaminated soil is a RCRA hazardous waste, and therefore must be properly disposed as such. The contaminated soil will be properly transported under a federal and state Hazardous Waste Manifest and disposed at the appropriate out–of-state disposal facility and in accordance with the federal, state, and local regulations. Groundwater is located at least 14-15 feet bgs, and therefore is not anticipated to be encountered during these excavation activities.

In an effort to delineate the limits of the excavation, C&C will collect several soil samples during the excavation activities and screen them for TOVs using a PID calibrated to an isobutylene reference and the DEP headspace method. Based on the laboratory results from boring B-106/S-3 (5-7.5 feet), C&C anticipates removing the soil to approximately eight feet bgs. Once the limits of the excavation have been defined, C&C will collect a soil sample from each sidewall and bottom of the excavation and submit them to a state qualified laboratory for analyses for VOCs by EPA Method 8260 to confirm the limits of the soil excavation.

C&C anticipates that the excavation activities will be performed and completed within a two to three week period. At the end of each workday, the excavation will be properly secured by a layer a 6-mil poly layer and a plywood, or comparable material, cover. The contaminated soil will be properly stockpiled on and covered with 6-mil poly and/or be contained within the roll-off dumpsters on a daily basis. The stockpile/dumpster area will be and secured with caution tape. "Clean" stockpiled soil and construction debris will also be properly covered and secured on-Site. C&C anticipates that contaminated soil and other construction debris will be transferred off-Site within a month of disposal characterization.

The excavation will remain open and properly secured, as mentioned-above, until the laboratory results are evaluated. Expedited laboratory results may be used to minimize the time the excavation remains open. If the analytical results are favorable, and the exposure point concentrations (EPCs) as promulgated in the MCP are below the applicable Method 3 cleanup standards for the soil within the disposal site, then the excavation will be backfilled with crushed-stone to grade. The excavation will be capped with a double layer of 6-mil poly and protected and sealed with at least four inches of concrete. A sealant will be applied to the gaps between the new concrete floor and the old concrete floor to prevent potential vapors from migrating into the occupied space. Furthermore, if walls, utilities, or other on-Site materials are compromised during the Phase IV activities then they will be properly repaired.

If deemed necessary at the time of the Phase IV activities, C&C may install a passive sub-slab depressurization system (SSDS) within the excavation. The passive SSDS will be installed under the double-layer of 6-mil poly and will consist of perforated PVC pipe that will vent outside the building. Based on the Method 3 Risk Characterization, addition runs of PVC piping may be installed within the Site building.

Once the Phase IV activities have been completed, C&C will collect groundwater samples from the applicable monitoring wells and analyze them for VOCs. Based on the groundwater data, C&C will determine if additional response actions, consisting of the application either a bio-accelerates or chemical oxidizers, are necessary to achieve a condition of No Significant Risk. If the groundwater data is favorable, then C&C will monitor the groundwater in accordance with the MCP.

## 7.0  FINAL INSPECTION REPORT AND PHASE IV COMPLETION STATEMENT

A Final Inspection Report will be performed to ensure that the Comprehensive Remedial Action has been competed in accordance with this plan and any appropriate modifications. The Final Inspection Report will follow the initial implementation and operation once it is established that the Comprehensive Remedial Action is meeting projected design standards. The report will document any modifications or adjustments necessary to optimize the performance of remedial actions.

## 8.0  STATUS AND MONITORING REPORTS

A Status and Monitoring Report will be submitted to the DEP in accordance with 310 CMR 40.0892. The report will include a summary of the excavation activities, any additional response actions performed or that may be performed, analytical soil and groundwater data, and the name, license number, signature and seal of the LSP.

## 9.0  SCHEDULE

C&C anticipates that the excavation activities will be performed in the Summer of 2007 and the soil excavation, associated activities, and renovations can be completed within two to three weeks. The contaminated soil will be properly characterized for disposal and will be transported to and disposed at an approved disposal facility. Once the contaminated soil is approved, it will be transported off-Site. C&C anticipates the contaminated soil, and other contaminated media, will be transported off-Site under the appropriate federal and/or state Hazardous Waste Manifest within a month of generation. The soil will be removed within 120 days of generation in accordance with 310 CMR 40.0034.

C&C will collect groundwater samples for the applicable monitoring wells and if the soil and groundwater analytical data is favorable and meets the requirements determined in the Method 3 Risk Characterization Assessment, C&C anticipates that a Response Action Outcome (RAO) Statement can be submitted to the DEP approximately a 1 to 1.5 years subsequent to the completion of the Phase IV activities.

## 10.0  HEALTH AND SAFETY PLAN

C&C has prepared a Site specific Health and Safety Plan (HASP) in accordance with 310 CMR 40.0847 (e), which is included as Appendix B.

## 11.0 FEES

This Site has been Tier Classified as a Tier II Site. Therefore, no permit fees are required. However, the Annual Compliance Fee is $2,000.

## 12.0 NOTIFICATIONS

In accordance with Subpart N (Public Involvement) of the MCP, Town of Acton Board of Health and the Town of Acton Office of Selectmen will be notified prior to any field activities involving the implementation of the Phase IV - Remedial Actions. Copies of these letters are included as Appendix C.