UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2004-10351-RBC

KLEENIT, INC., )
         Plaintiff )
vs. )
 )
UTICA NATIONAL INSURANCE GROUP, and )
TRAVELERS PROPERTY AND CASUALTY, )
         Defendants )

### EXPERT WITNESS REPORT OF ROBERT M. CATALDO

I, Robert M. Cataldo, herby depose and state the following:

 1. I am a Licensed Site Professional (LSP) who has prepared the Expert Witness Report, dated December 6, 2007. My resume has been included as Attachment A of this document.

 2. The data and other information considered by me in forming my opinion are set forth in Attachment B of this document.

 3. My qualifications as an expert witness, including a list of my publications are included in Attachment A of this document.

 4. My compensation paid for the development of my opinion is $150/hour and the compensation paid for my testimony is $175/hour.

 5. I have not testified or been deposed as an Expert within the preceding four years.

Signed this 6th day of December, 2007 under the pains and penalties of perjury,

_____
Robert M. Cataldo, PG, LSP

## EXPERT WITNESS REPORT

**CURRICULUM VITAE**

Copy of CV is included as Attachment A.

**PURPOSE OF REPORT**

I have been retained by the Utica National Insurance Group and the Travelers Indemnity Company to review documents related to environmental conditions at the Duds Dry Cleaners facility located at 293-295 Main Street in Acton, Massachusetts and to render an opinion on the most feasible manner to achieve compliance with requirements for site environmental cleanup as specified in the Massachusetts Contingency Plan (MCP) (310 CMR 40.000).

**DOCUMENTS RELIED ON TO PREPARE THIS REPORT**

During preparation of the opinions in this report, I have relied on information provided in the documents listed in Attachment B.

**SITE AND HISTORICAL CONDITIONS**

According to the Phase I report prepared by Kurz Associates, Inc. in September 1989 (1, page 16) and supported by subsequent reports, contaminants associated with a dry cleaning operation have been detected in the groundwater and soil beneath and outside of the building located at 293-295 Main Street in Acton, Massachusetts. The source of these contaminants, which include tetrachloroethene (PCE) and its breakdown products, is reported to be the former Duds Dry Cleaners, Inc. (Duds), which has operated at the site since early 1960s to the present. There is also mention that "PCE used by Concepts Unlimited [who occupied 293 Main Street] could have accidentally been spilled and contributed to the PCE release…" (2, page 4).

<u>General Site Setting</u>

The address of the site is 293-295 Main Street in Acton, Massachusetts. The site is located within a building that is part of a strip mall that consists of addresses from 291 through 305 Main Street. Duds Cleaners is a commercial cleaning business which has been in operation at the site since approximately 1962. The primary chemical used in the dry cleaning process at the site was tetrachloroethene, also known as perchloroethene (PCE). According to reports (1, page 16) and site personnel (2, page 4) there have been a number of spills and leaks of PCE within the building associated with normal dry cleaning operations.

The building in which Duds is currently located is a single story building with concrete floors and no basement. Observations in the building indicate that there are no floor drains. A septic system is located behind the building but is no longer in use. Duds

was connected to the local sanitary sewer system in 2002. Potable water for the building is supplied by the local municipal water system. There are no wells used for drinking water purposes in the vicinity of the site.

The 293-295 Main Street property is a flat, mostly paved area. The property is located in a shopping center with a number of retail stores. Nearby property uses include commercial and residential. On the back side of the shopping center buildings, the ground surface slopes toward the commercial buildings located at 381-403 Massachusetts Avenue, which adjoins the Main Street property. The Massachusetts Avenue property is also flat and mostly paved. The ground surface near Duds is approximately 10 feet higher than the Massachusetts Avenue property.

**Site History**

According to information contained in several reports including the Phase II/Phase III report prepared by Coler & Colantonio, Inc. (C&C), dated December 12, 2005 (2, page 3), the site was occupied by a single-family residence until approximately 1960 when a strip mall was constructed. Information pertaining to the approximate dates of occupation for the two portions of the building is listed below.

It is not clear who occupied the 293 Main Street portion of the building from 1962 to 1974. From 1974 until 1979 there are references that Concepts Unlimited occupied the space. Concepts Unlimited reportedly used printing inks and PCE in their operations. Duds occupied the space from 1980 until 2002. Since 2002, this portion of the building has been occupied by SuperCuts Hair Salon (SuperCuts).

The 295 Main Street portion of the building has been occupied by Duds since the 1960s and appears to have been the only occupant.

**Local Geology and Hydrogeology**

Soil at the site consists of mostly fine to coarse sand with intermittent layers of silty clay or silty sand. Depth to bedrock varies from approximately 5 to 20 feet on the Main Street property, and 10 to 20 feet on the Massachusetts Avenue property.

The results of the investigations completed at the site suggest that groundwater flows to the east and southeast, from the Main Street property toward the Massachusetts Avenue property. This conclusion is based on water level data collected from shallow wells which are screened above the bedrock surface. Only three of the wells at the site are screened in bedrock. On the Main Street property, the depth to groundwater is approximately 15 feet below the ground surface while on the Massachusetts Avenue property it varies from 3 to 5 feet.

**ENVIRONMENTAL ISSUES PERTAINING TO THE SITE**

**Regulatory Classifications**

The Massachusetts Contingency Plan (MCP) is the state environmental regulation which governs the cleanup of sites where releases of hazardous materials have taken place. The MCP specifies the steps to be followed to establish cleanup criteria for environmental media including soil, groundwater, and indoor air. The MCP specifies three possible groundwater classifications for a site, GW-1, GW-2, and GW-3. A GW-1 classification applies at locations where groundwater is used or may potentially be used as drinking water. A GW-2 classification applies in locations where volatile contaminants potentially could move from groundwater into the air in buildings which are inhabited. A GW-3 classification applies in locations where contaminants in groundwater may discharge to surface water including rivers, lakes, and wetlands. It is possible that groundwater at a site can have more than one classification.

The MCP specifies three possible soil classifications, S-1, S-2, and S-3. An S-1 classification applies to accessible soil 0 to 3 feet. An S-2 classification applies to potentially accessible unpaved soil located at a depth between 3 and 15 feet or paved soil from 0 to 15 feet. An S-3 classification applies to isolated sub-surface soils located at a depth greater than 15 feet or under a permanent structure.

Based on the available information with regards to the site, including the 2005 Phase II report prepared by C&C, the groundwater classifications that apply to the site are GW-2 and GW-3, and the soil classifications that apply to impacted soil are S-3/GW-2/3. The assumption for this classification is that impacted soils of concern are located beneath the slab of the 293-295 Main Street building (S-3), but that vapors in the groundwater have the potential to represent an indoor hazard (GW-2). By default, all waters within Massachusetts are classified as GW-3.

With regards to the GW-2 classification, it should be noted that C&C retained Risk Management Incorporated (RMI) in 2002 "…to evaluate the indoor air quality and perform a risk characterization for the 293 Main Street space" (2, page 8). In summary, RMI concluded that the soil and/or groundwater conditions beneath the slab pose "No Significant Risk of harm to the health of the building occupants via inhalation of OHM-impacted indoor air." (2, page 9). Based on this finding of no risk to indoor occupants, it is possible to consider that the GW-2 classification may not be warranted for the portion of the site around and beneath the 293 Main Street portion of the building.

It should be noted that there were revisions to the MCP in April 2006 in which some of the S-3/GW-2 and S-3/GW-3 Method 1 standards changed. These changes include the S-3/GW-2 and S-3/GW-3 clean-up standards related to PCE.

**Previous Investigations and Studies**

In 1988 and 1989, environmental investigations were initiated by Con-Test and Kurz (1), respectively, at 291-295 Main Street and 381-403 Massachusetts Avenue. The investigations included installing soil borings and monitoring wells. Soil and groundwater samples were collected and submitted for laboratory analyses. The investigations concluded that soil and groundwater at the properties had been impacted by a release of volatile organic compounds (VOCs), including PCE, methyl tertiary butyl ether (MTBE) and toluene. Based on the results of these investigations, Kurz notified the Massachusetts Department of Environmental Protection (MADEP) that a release of hazardous materials had taken place in a letter, dated September 19. 1989.

Between 1990 and 2005, a series of additional investigations were performed to determine the concentration and distribution of PCE and other contaminants in soil, groundwater, and soil gas. Approximately 50 soil borings, 20 monitoring wells, and four soil gas monitoring points were installed on the two properties. The results of these investigations indicate that the highest concentration of PCE in soil (797 milligrams-per-kilogram or mg/kg) was detected beneath Duds. The highest concentration of PCE measured in soil from a location which is not beneath the building is 51 mg/kg. Concentrations of PCE in soil greater than laboratory analytical detection limits were not measured in any location greater than 20 feet from the building.

The highest concentration of PCE in groundwater (8,570 micrograms-per-liter or ug/l) was observed in a monitoring well installed immediately downgradient (in the direction of groundwater flow) from Duds. Concentrations of PCE were observed to decline towards the 381-403 Massachusetts Avenue property, which is considered to be hydraulically downgradient to the Duds Cleaners building. Concentrations of PCE in groundwater on the Massachusetts Avenue property ranged from 1,190 ug/l in 1989 to 248 ug/l in 2005.

In 2002, soil gas samples were collected from four soil gas monitoring points installed beneath the floor of the Duds Cleaners building. Soil gas consists of air present in soil pore spaces above the elevation of the groundwater. The highest concentration of PCE measured in soil gas was 41.3 micrograms-per-cubic meter ($ug/M^3$). Data from the sampling program were used to complete an evaluation of risks to human health associated with breathing indoor air. The evaluation found that there were no unacceptable risks associated with exposure to indoor air. No risk evaluation was performed at that time for the building located on the Massachusetts Avenue property.

**Contaminants of Concern**

The primary contaminants of concern (COCs) are tetrachloroethene (also known as perchloroethene or PCE) and its daughter products (including vinyl chloride). These contaminants are known to be associated with dry cleaning operations. Secondary COCs, including the gasoline-related constituents MTBE, benzene and toluene were

also detected at the site.  However, based on the information presented in the documents included in Attachment B, it is believed that the source of the gasoline-related compounds is from an off-site source and/or is residual from normal vehicular usage of the site and surrounding area and not from the current or former operations conducted in the 293 or 296 Main Street building.  Therefore, the only COCs that will be addressed in this document are the PCE and other dry cleaning-related constituents.

**Timing of the Release**

Based on information presented by former workers at the site, "accidental" PCE releases have occurred at the site as early as the late 1960s and continued through the late 1970s (2, page 4, December 12, 2005).  It was also noted in the Kurz 1989 report (1, page 16) that "The historical practice of disposing of contaminated water from dry cleaning processes to the rear of the parking lot (and ultimately to the dry well in the vegetated bank)…", which would suggest that these contaminants were intentionally dumped or discharge at the rear of the building.

Over the years, the dry cleaning operations have been updated and equipment replaced.  This equipment is reported to utilize less cleaning fluid and is more environmentally safe.  Based on the information contained in the documents included in Attachment B, there have been no reports of additional releases to the environmental since 1988/1989, when Con-Test and Kurz performed the initial site investigations.  The absence of any additional reported releases and the fact that the equipment has continually been upgraded to limit or restrict a release of fluid to the environment suggests that the date of the release(s) is sometime before 1988.

**Regulatory Status of the Site**

The first reported evidence of PCE in the environmental was reported by Con-Test in 1988 and Kurz in 1989 (1).  In September 1989, Kurz reported the results of its investigation to the MADEP, and on January 3, 1990, the MADEP issued a Notice of Deficiency requesting more information regarding Case #2-0660 for the release at the site.  Based on the waiver request and additional information submitted by Kurz, the MADEP approved the work and issued Case #2-0678 for the site.  Based on the current and foreseeable conditions and uses at the site, Kurz concluded that "…site conditions meet the requirements of a permanent solution….and that additional on-site remedial actions are not necessary at this time."  According to the current MADEP database, there was no noted final determination for this site.

Later studies by ChemCycle Corporation in 1993, Environmental Science Services in 1994, and MyKroWaters Environmental Services in 1996 also detected the presence of PCE in the environment, but did not identify the need for any additional assessment or remedial activities

In 2002, Sanborn, Head & Associates (SHA) conducted a limited assessment detected a concentration of 160 milligrams-per-Kilogram (mg/Kg) of PCE in one soil sample

collected from beneath the build slab in the 293 Main Street portion of the building.  In a letter, dated October 24, 2002, C&C informed the MADEP that concentrations in excess of the RCS-1 reporting concentration had been detected.  In response this notification, the MADEP issued RTN 2-14526.

The site is currently listed as having a status of Tier 2 and being in Phase IV of the MCP process.

**DISCUSSION**

There are several points to consider regarding the information pertaining to this site.

The first identification of a release to the site was noted in 1988/1989; however, based on the results of several investigations, Kurz concluded in 1990 that "…site conditions meet the requirements of a permanent solution….and that additional on-site remedial actions are not necessary at this time" (2, page 2).  It should be noted that neither Con-Test nor Kurz did any indoor air or sub-slab monitoring within the 293-295 Main Street building.

There are no indications that any dry cleaning fluids were released into the environment after soil and groundwater impacts were identified in 1988/1989.  This statement is based on the fact that there has not been any reports of additional releases after 1988 and that over the years, newer, more environmental-friendly "Green" equipment has been installed at the site.  Therefore, there is no reason to suspect that the concentrations of groundwater and soil impacts detected in 1988/1989 have increased due to additional releases to the environment.  In fact, it is reported in several documents that contaminant concentrations are undergoing natural attenuation (2, page 14).

The subsequent assessment performed by SHA that lead to the reporting condition in October 2002 was based on the presence of a sub-slab concentration of PCE that exceeded the RCS-1 reporting threshold.  Based on the absence of additional releases, it would seem likely that the concentrations detected beneath the building slab and in the environment in 2002 were related to pre-1988 spills and releases.

It as been noted that based on the historic groundwater data at the site "…the PCE concentrations appear to be decreasing…" and that "It appears that the PCE in the groundwater is naturally attenuating" (2, page 14).  I would agree with these statements based on my understanding of the environmental conditions at the site, the nature of the COCs present and the fact that no additional releases have been reported.  Therefore, if concentrations at the site represented a condition of No Significant Risk in 1990 and natural attenuation is ongoing, there is no reason to believe that remedial actions would be required.

Based on the information reviewed, it is possible to demonstrate that the listed site classification S-3/GW-2/3 might be changed to include only S-3/GW-3.  The use of only

the S-3/GW-3 classification is based on the Indoor Air Quality (IAQ) assessment conducted by RMI that a condition of No Significant Risk of harm to human health exists via this vapor migration and indoor air inhalation pathway currently and under future foreseeable site activities and uses.  Under 40.096(2), site-specific methods can be developed.  If this is the case, then the sub-slab PCE concentrations are below the current MCP clean-up standards for S-3/GW-3.

**OPINION**

It is my opinion that COCs present at the site are representative of older, pre-1988 spills and releases, and do not reflect recent or ongoing threats to the environment. Therefore, the question might be raised as to why any additional environmental work or reporting was necessary after the early 1990s.  It is true that the early assessments didn't assess sub-slab conditions; however, the potential for indoor vapors was evaluated as part of the 2003 C&C Phase I and found to represent no significant risk.  If the outcome of a site-specific Method 3 risk assessment presented the same findings, it would have been possible to prepare and submit a Response Action Outcome (RAO) back in 2005.

RMI prepared a risk assessment of the vapor intrusion pathway that focused on 293 Main Street.  It is reasonable to assume that potential risks at 295 Main Street (part of the same building and slab construction as 293 Main Street) are not significantly different from potential risks at the 293 Main Street portion of the building.  The building specific model parameters such as foundation and local soil type are the same for both portions of the building.  The area and volume of the 295 Main Street portion of the building appear to be similar to the 293 Main Street portion.  Soil gas samples were collected under the 293 Main Street portion of the building, but the resulting concentrations in soil gas are expected to be representative of the soil gas concentrations beneath the 295 Main Street portion of the building.

The guidance for the Johnson and Ettinger model (USEPA, 2004) states that an average concentration beneath a building is the best representation of concentrations beneath a foundation.  The soil gas samples collected beneath the 293 Main Street portion of the building were collected within the groundwater plume and within 20 feet of the soil sample with the highest tetrachloroethene concentration.  Only a limited portion of the 295 Main Street portion of the building is located over the groundwater plume and soil affected by the release.  Therefore, it is likely that, if soil gas samples were collected and analyzed and used to evaluate potential risks from vapor intrusion at the 295 Main Street portion of the building, the potential risks would not be significantly different from those calculated for the 293 Main Street portion of the building

It has been noted that a condition of No Significant Risk has not been demonstrated on the Massachusetts Avenue property.  Therefore, it is recommended that risk characterization for this building be incorporated into the Method 3 risk assessment recommended above.

It should be noted that regardless of the findings of the Method 3 risk assessment, it is probable that an Activity and Use Limitation (AUL) will be required for the site because residual soil impacts exceed the S-1 soil standards.

It is my opinion that it has not been demonstrated that remedial measures are needed for the site.  Therefore, the remedial measures mentioned in the C&C Phase II/III report (2) and Phase IV report (4) are not considered reasonable based on the concentrations or location of COCs present and the site.  In any event, if remedial measure were required, a more reasonable and less intrusive remedial strategy would be the installation of a small, sub-slab vapor extraction system.  This type of system has already been suggested by C&C (4, page 13), albeit as a secondary measure in the event the primary remediation measure of excavation does not achieve the desired results.

## RECOMMENDED ACTIONS

Based on this evaluation a condition of No Significant Risk exists at the Duds Cleaners site. As discussed previously, when a condition of No Significant Risk exists, no remedial action is required in order to achieve a Permanent Solution and complete the requirements for a RAO. The MCP does require that whenever concentrations of soil at a site exceed an unrestricted residential exposure scenario, an AUL must be implemented to restrict future residential use. The steps required to submit an RAO include the following:

- Performance of a Method 3 risk characterization for the Massachusetts Avenue property;
- Location and sampling of selected existing monitoring wells; and,
- Preparation of a Phase II Modification report, an Activity and Use Limitation document and a Response Action Outcome statement.

The estimated cost to complete this scope of work is as follow:

- Planning & Project Management ............................................................. $4,500
- Massachusetts Avenue Investigation
    - Soil Gas Investigation ..................................................................... $4,100
    - Risk Characterization ..................................................................... $8,000
- Site Reconnaissance and Well Location ................................................... $2,000
- Groundwater Investigation ....................................................................... $4,500
- Phase II Modifications ............................................................................. $7,500
- Activity and Use Limitations .................................................................... $4,500
- <u>Response Action Outcome ................................................................... $9,000</u>
  **Total .................................................................................................. $44,100**

The above estimate assumes that monitoring wells are still accessible.

**DOCUMENTS NOTED IN THIS OPINION**:

(1) Kurz Associates, Inc. Phase I Site Investigation, dated September 11, 1989.

(2) Coler & Colantonio, Inc. Phase II – Comprehensive Site Assessment & Phase III – Identification, Evaluation and Selection of Comprehensive Remedial Action Alternatives, dated December 12, 2005.

(3) Kurz Associates, Inc. letter to the Emergency Response Section of the Massachusetts Department of Environmental Protection dated September 19, 1989.

(4) Coler & Colantonia, Inc. Phase IV – Remedy Implementation Report, dated February 6, 2007.

**ATTACHMENT A**

**CV – ROBERT CATALDO**

**ROBERT M. CATALDO, PG, LSP**
22 Parkwood Drive
Pepperell, Massachusetts  01463
(978) 433-5404 Home/(508) 864-4515 Mobile

---

## WORK EXPERIENCE

**ENSR/Fugro/IEP**        **Vice President/Senior Hydrogeologist**        **1989-Present**

Currently part of the newly-created Project Management Department, which is responsible for ENSR's initiative for standardization of project management, SOPs, and other company protocols and procedures.

Manager of the Petroleum and Property Services department.  Responsible for the oversight, management and sales goals for over 50 technical, financial and administrative personnel in three offices.  Annual sales revenues of ~$7 million.

Program Manager, 7-Eleven National Alliance form 1989 until 2005.  Responsible for over 50 technical, financial and administrative personnel located in 10 offices throughout the eastern and mid-western regions.  Annual sales revenues of $8 million and cumulative revenues of ~ $100 million.

**Areas of Operation**:   Eastern, Mid-Western, Southern United States, Caribbean, Italy and the Philippines.

**O.H. Materials, Corp.**             **Hydrogeologist**             **1987-1989**

Project Manager, hazardous waste assessment and remediation of petroleum, chemicals, metals, PCBs and solid waste.  Emergency responder/supervisor for petroleum and chemical releases.

**Areas of operation:** New England, New York, New Jersey, Pennsylvania and Michigan

**Chevron USA, Inc**             **Petroleum Geologist/Geophysicist 1981-1986**

Development and exploration geologist, and geophysicist for offshore and onshore oil and gas reserves.

**Areas of Operation:** Offshore Louisiana and Texas, and Onshore Texas

**Syracuse University**             **Teaching Assistant**             **1978-1980**

# EDUCATION

**University of Massachusetts, Lowell**                                          **2006-Present**

    Coursework towards PhD in Geology/Marine Sciences

**University of Southwestern Louisiana**                                          **1981-1982**

    Post-Master Coursework in Geophysics

**Syracuse University**                                                           **1978-1980**

    Master of Science – Geology.  Thesis: Longshore Transport of Sediments along the New Jersey Coastline

**Brooklyn College**                                                              **1973-1978**

    Post-Bachelor coursework - Geology
    Bachelor of Arts - Economics

**Staten Island Community College**                                               **1971-1973**

    Associate of Science

# LICENSES/CERTIFICATIONS

    Massachusetts Licensed Site Professional #9635
    Wisconsin Professional Geologist #257-013
    Pennsylvania Professional Geologist #2360-G
    Delaware Professional Geologist #S4-0000948
    New Hampshire Professional Geologist #PG 597
    Arkansas Professional Geologist #820

# PUBLICATIONS

Wagner, K.J. and R. Cataldo. 1997. Achieving multiple compliance objectives through a storm water pollution prevention plan.  Massachusetts Environment, Spring 1997.

Overcoming MTBE Myths, Cataldo, R., LSP and Moyer, E., PhD, PE, Environmental Protection, May 2001, pages 24 - 27,

Remediation of Releases Containing MTBE at Gas Station Sites, Cataldo, R., PG, LSP and Moyer, E., PhD, PE, Contaminated Soil, Sediment & Water, Spring 2001, pages 87-90.

Remediation of Releases Containing MTBE at Gasoline Station Sites – ENSR International's Experience, Cataldo, R., PG, LSP, MTBE Remediation Handbook, edited by Moyer, E. and Kostecki, P. 2003

Geophysics as a Risk Management Tool for Environmental Due Diligence: Japitana, Jesse and Cataldo, Robert, PG, LSP, Indiana NEWs, Air & Waste Management Association, January 2006, pages 12-13.

**ATTACHMENT B**

**LIST OF REVIEWED DOCUMENTS**

**ATTACHMENT B**
**ACTION, MASSACHUSETTS REFERENCE LIST**

January 4, 1989. Con-Test, Inc. "Environmental Site Assessment Conducted at 291-295 Main Street and 381-403 Mass Avenue Acton, MA for Samuels & Associates."

September 11, 1989. Kurz Associates, Inc. "Phase I Site Investigation Acton Plaza Massachusetts Avenue & Main Street, Acton, MA."

September 19, 1989. Kurz Associates, Inc. "Re: Hazardous Materials Release Acton Plaza Mass. Ave. & Main St. Acton, MA."

September 27, 1989. Kurz Associates, Inc. "Waiver Considerations."

June 1998. Sanborn, Head & Associates. "Level II Environmental Assessment Acton Plaza."

January 3, 1990. Massachusetts Executive Office of Environmental Affairs. "Waiver Application, First Notice of Deficiency- Acton Plaza Mass Ave. & Main Street."

April 10, 1990. Kurz Associates, Inc. "Additional Phase I Investigations, RTN 2-0678, Acton Plaza, Acton, MA."

May 2, 1990. Kurz. Associates, Inc. "Laboratory Results- Acton Plaza (DEP Case No. 2-0678) Mass. Ave. & Main St. Acton, MA."

May 7, 1990. Kurz Associates, Inc. "Original Laboratory Data- Acton Plaza (DEP Case No. 2-0678) Mass. Ave. & Main St. Acton, MA."

May 25, 1990. Kurz Associates, Inc. "Septic Tank Inspection- Acton Plaza (DEP Case No. 2-0678) Mass. Ave. & Main St. Acton, MA."

December 20, 1990. Kurz Associates, Inc. "Phase II Comprehensive Site Assessment- Acton Plaza (DEP Case No. 2-0678) Mass. Ave. & Main St. Acton, MA."

March 29, 1991. Kurz Associates, Inc. "Groundwater Monitoring- Acton Plaza (DEP Case No. 2-0678) Mass. Ave. & Main St. Acton, MA."

April 2, 1992. ChemCycle Corporation. "Re: Analytical Results of the Septic System Sample Collected on February 27, 1992, Acton Plaza, Acton, MA."

April 6, 1992. ChemCycle Corporation. "Re: Groundwater Monitoring Results February 27, 1992, Acton Plaza, Acton, MA DEP Case No. 2-0678."

January 18, 1993. ChemCycle Corporation. "Re: Groundwater Monitoring Results December 1992, Acton Plaza, Acton, MA DEP Case No. 2-0678."

July 2, 2002. Sanborn, Head & Associates. "Summary of Data from Interior Sampling Dud's Cleaners, Main Street, Acton."

August 13, 2002. Sanborn, Head & Associates. "Recommended Work Plan Dud's Cleaners, Main Street, Acton."

October 24, 2002. Coler & Colantonio, Inc. "Release Notification- 293 Main St. Acton, MA."

November 2, 2002. Coler & Colantonio, Inc. "Assessment Services at Dud's Cleaners."

December 20, 2002. Risk Management, Inc. "Groundwater Quality Assessment—'Take Back Area' Kleenit, Inc. d/b/a Duds Cleaners & Launderers."

March 9, 2005. Coler & Colantonio, Inc. "Memorandum—Cost for additional assessment activities, Duds Cleaners."

December 30, 2003. Massachusetts Department of Environmental Protection. "Notice of Responsibility 120-Day Notification M.G.L. C. 21E, 310 CMR 40.0000. RTN 2-14526."

February 20, 2003. Coler & Colantonio, Inc. "Final Assessment Report: Limited Subsurface Investigation and Indoor Air Quality Investigation- 293 Main Street (Dud's Dry Cleaners) Acton, MA."

April 30, 2003. The RETEC Group, Inc. "File Review Summary- 293 Main Street, Acton, MA."

September 2, 2003. Massachusetts Department of Environmental Protection. "Re: Reminder Submittal Deadline Approaching."

October 29, 2003. Coler & Colantonio, Inc. "Phase I ESA Report & Tier Classification Submittal."

December 12, 2005. Coler & Colantonio, Inc. "Phase II- Comprehensive Site Assessment & Phase III – Identification, Evaluation and selection of Comprehensive Remedial Action Alternatives, Duds Dry Cleaners 293-295 Main Street Acton, MA RTN 2-14526."

February 6, 2007. Coler & Colantonio, Inc. "Remedy Implementation Report."