# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 2004-10351-RBC**

| | | |
|---|---|---|
| **KLEENIT, INC.,** | | ) |
| | **Plaintiff** | ) |
| **vs.** | | ) |
| | | ) |
| **UTICA NATIONAL INSURANCE GROUP, and** | | ) |
| **TRAVELERS PROPERTY AND CASUALTY,** | | ) |
| | **Defendants** | ) |

## EXPERT WITNESS REPORT OF ROBERT M. CATALDO

I, Robert M. Cataldo, herby depose and state the following:

1.      I am a Licensed Site Professional (LSP) who has prepared the Expert Witness Report, dated December 6, 2007.  My resume has been included as Attachment A of this document.

2.      The data and other information considered by me in forming my opinion are set forth in Attachment B of this document.

3.      My qualifications as an expert witness, including a list of my publications are included in Attachment A of this document.

4.      My compensation paid for the development of my opinion is $150/hour and the compensation paid for my testimony is $175/hour.

5.      I have not testified or been deposed as an Expert within the preceding four years.

Signed this 6th day of December, 2007 under the pains and penalties of perjury,


_____
Robert M. Cataldo, PG, LSP

## EXPERT WITNESS REPORT

## CURRICULUM VITAE

Copy of CV is included as Attachment A.

## PURPOSE OF REPORT

I have been retained by the Utica National Insurance Company to review documents related to environmental conditions at the Care Cleaners (now Kleenit) facility located at 28 Central Square in Chelmsford, Massachusetts and to render an opinion on the most feasible manner to achieve compliance with requirements for site environmental cleanup as specified in the Massachusetts Contingency Plan (MCP) (310 CMR 40.000).

## DOCUMENTS RELIED ON TO PREPARE THIS REPORT

During preparation of the opinions in this report, I have relied on information provided in the documents listed in Attachment B.

## SITE AND HISTORICAL CONDITIONS

As part of a town-wide assessment of potential contamination, the Massachusetts Department of Environmental Protection (MADEP) contracted Wehren Engineering (Wehren) to sample several septic systems and NPDES outfalls in the Central Square area of Chelmsford, Massachusetts. In 1989, samples collected from the septic system at the Care Cleaners facility (the Site) were found to contain concentrations of volatile organic compounds (VOCs). The VOCS detected included the dry cleaning-related compound tetrachloroethene, which is also known as perchloroethene (PCE). In response to the reported detection of VOCs, the MADEP issued a Notice of responsibility (NOR) letter, dated December 8, 1989 to Care Cleaners. Based on information contained in the Clean Soils Environmental, LTD. (CSE) reports (1), at some point (presumably in 1989) the septic system was pumped, crushed and backfilled, and the site was connected to town sewer (1, page 1 & 2, page 3). Additional assessment work was performed at the site in 1990 and 1992, including the advancement of borings and installation of monitoring wells.

### General Site Setting

The address of the facility is 28 Central Square in Chelmsford, Massachusetts. Care Cleaners (which is now owned by Kleenit, Inc.) operates within a building that is part of a shopping area in the center of Chelmsford. A commercial cleaning business has been in operation at the Site since approximately 1960 (2, page 3). The primary chemical used in the dry cleaning process at the site was PCE. According to several reports, PCE was released to the environment either through the septic system and/or through the rear door of the Care Cleaners facility (3, pages 2 & 3). An addition has been added

to the rear of the building so that the former location of the rear door is under the floor of the building.

The building in which Care Cleaners is currently located is a single story building with concrete floors and no basement.  A septic system was located behind (west) of the building but was taken out of service in 1989 when the Care Cleaners building was hooked up to municipal sewer (2, page 3 & 3, page 2).  In September and November 2001, the cesspool and surrounding PCE-impacted soil were removed and disposed of off-site (3, pages 2 & 3).  Potable water for the building is supplied by the local municipal water system.  There are no wells used for drinking water purposes in the immediate vicinity of the site; however, Turnpike Road Supply Wells are located approximately 0.6 miles east of the site. It is not known if the Site is situated within the Turnpike Road Wells Zone II recharge area; however, the Site appears to be outside of the states wellfield study area (4, page 2).

The 28 Central Square property is a relatively flat, mostly paved area.  The property is located in a shopping area which is shared with a gasoline station.  Nearby property uses include several other commercial properties, a former day care center, another gasoline station, a dry cleaner facility and some residences.  Beaver Brook, which flows to the east, is located west and north of the Site.

## Site History

According to information reviewed, the Site was occupied by a "...1 story residential home..." until sometime around 1960 (1, page 3).  In April 1960, Russell Munro built the existing structure for use as a dry cleaning facility (1, page 2 & 2, page 3).  The Site has been operated for over 40 years as a commercial dry cleaning facility.

## Local Geology and Hydrogeology

Soil at the site generally consists of fine to coarse sand and gravel interbedded with a silty, fine sand.  The silt content of the soil generally increases with depth below a depth of 5 to 10 feet. Probe refusal was encountered at approximately 20 feet (5, page 14). Hydraulic conductivity is a measure of the ability of soil to transmit groundwater flow. Hydraulic conductivities measured on composite samples collected at depths between 5 and 22 feet ranged between a value of $1.3 \times 10^{-4}$ centimeters per second (cm/s), which represents a moderate value, to a value of $5 \times 10^{-8}$ cm/s, which represents a very low value.

Groundwater at the site flows generally to the north and northeast toward Beaver Brook, which flows to the north and east at a distance of about 60 feet from the Care Cleaners building.  Perched water was encountered at a depth of approximately 2 to 3 feet, and groundwater was encountered at a depth of approximately 20 feet, in the vicinity of bedrock.  Groundwater velocity is considered to be approximately 1.3 to 1.6 ft/day or approximately 500 ft/yr (2, page 8) in soils with higher conductivities. However, according to DAI (5, page 20), the advection velocity calculated from the soil sample

from boring MW-13 was 0.76 ft/day or approximately 280 ft/yr.  Based on well clusters installed around the Site, the vertical gradient is considered to be upward (2, page 8).

## ENVIRONMENTAL ISSUES PERTAINING TO THE SITE

### Regulatory Classifications

The Massachusetts Contingency Plan (MCP) is the state environmental regulation which governs the cleanup of sites where releases of hazardous materials have taken place.  The MCP specifies the steps to be followed to establish cleanup criteria for environmental media including soil, groundwater, and indoor air.  The MCP specifies three possible groundwater classifications for a site, GW-1, GW-2, and GW-3.  A GW-1 classification applies at locations where groundwater is used or may potentially be used as drinking water.  A GW-2 classification applies in locations where volatile contaminants potentially could move from groundwater into the air in buildings which are inhabited.  A GW-3 classification applies in locations where contaminants in groundwater may discharge to surface water including rivers, lakes, and wetlands.  It is possible that groundwater at a site can have more than one classification.

The MCP specifies three possible soil classifications, S-1, S-2, and S-3.  An S-1 classification applies to accessible soil 0 to 3 feet.  An S-2 classification applies to potentially accessible unpaved soil located at a depth between 3 and 15 feet or paved soil from 0 to 15 feet.  An S-3 classification applies to isolated sub-surface soils located at a depth greater than 15 feet or under a permanent structure.

Based on the available information with regards to the site, including the 2004 Phase II report prepared by DAI, the groundwater classifications that apply to the site are GW-1, GW-2 and GW-3, and the soil classifications that apply to impacted soil are S-2 and S-3.  The criteria for the groundwater classifications are based on the fact that the Site is in a potential groundwater recharge area (GW-1) and the depth to impacted groundwater is less than 15 feet and within 30 feet of an occupied structure (GW-2).  By default, all waters within Massachusetts are classified as GW-3.  The criteria for the soil impacts are based on the fact that impacted soil is potentially accessible above 15 feet (S-2) and are located under a permanent structure (S-3).

### Regulatory History of the Site

Care Cleaners was originally contacted by the MADEP in a NOR letter, dated December 8, 1989.  The NOR was in response to a MADEP town-wide study conducted in June 1989 that detected contaminant concentrations in the on-site septic system and NPDES outfall.  The presence of contaminants, including PCE, was confirmed by an investigation conducted by CSE in 1989 (1).

In a letter from the MADEP, dated December 8, 1997, the Site was issued Tier IC permit #137426 under the Release Tracking Number (RTN) 302739.

In a Memorandum for the Record letter from the MADEP, dated December 11, 2000 (4), the MADEP outlined the results of additional groundwater sampling in the vicinity of the Turnpike Road Wells conducted by the MADEP Site Recovery Group between March and November 2000.  Based on the findings and a history of volatile organic compound (VOC) release(s) to soil, groundwater and surface water, the MADEP concluded that a condition of Substantial Release Migration (SRM) existed at several sites including the Care Cleaners facility.  The MADEP notified for Potentially Responsible Parties (PRPs) and recommended that a NOR/Immediate Response Action (IRA) be conducted (4, page 7).

In a Memorandum for the Record letter from the MADEP, dated January 2001 (6), the MADEP issued a second notice, which outlined the information contained in the December 11, 2000 letter and reiterated the SRM/IRA actions that needed to be taken at the Care Cleaners (now Kleenit, Inc.) facility.  In addition to the soil, groundwater and surface water impacts, the MADEP also indentified the presence of impacts to indoor air above the MCP GW-2 standards at the 34 Central Square facility, which previously operated as a daycare center (6, page 6).

In a letter from the MADEP, dated January 28, 2001, the Site was issued an NOR/IRA for the SRM under RTN 3-20316.  In the letter, the MADEP outlined a deadline for a response from Kleenit, Inc.

In response to the second Memorandum for the Record, Kleenit, Inc. contracted DAI, who submitted an IRA Plan, dated February 15, 2001.  In summary, the IRA Plan outlined a strategy and timetable to remove the cesspool and impacted soil, and conduct additional assessment activities.

In a letter, dated June 19, 2001, the MADEP indicated that it had received an IRA Status report for the 34 Central Square site, which confirmed the presence of chlorinated VOCs in indoor air and stated that this condition constituted a Critical Exposure Pathway (CEP).  The MADEP required that Kleenit, Inc. submit a modified IRA Plan and timetable to mitigate the CEP.

On August 28, 2002, the MADEP received the Tier IC Permit Extension application for the Site (8, page 2).   The existing permit extension was scheduled to expire on December 1, 2002.

In a letter, dated November 27, 2002, the MADEP issued a Memorandum: Technical Review for Permit Extension.  According to this letter, the applicant (Kleenit, Inc.) submitted, and (presumably) was granted a Minor Permit Modification on January 23, 2002 that allowed RTN 3-20316 for the SRM to be linked to RTN 3-2739.  The letter states that the IRA Plan Modification had been received by the MADEP on May 24, 2002 and outlined the use of Hydrogen Release Compound (HRC) to address the CEP at 34 Central Square in addition to on-Site areas.   The letter also stated that the application of HRC had not yet been performed due to access issues; however, it was expected to be completed by February 2003. In addition, the letter stated that Phase II,

Phase III and Phase IV "…have yet to be submitted to the Department to date." (8, page 2). The letter indicates that the MADEP approved the Tier IC Permit Extension; however, it also recommended that a Notice of Non-Compliance (NOC) with Interim Deadlines should be issued to ensure compliance with the MCP.

In a letter, dated January 8, 2003, the MADEP issued an Application for Financial Inability Status to the Munro Family Trust, based on the Trust's assertion of financial inability to conduct additional response actions at the Site. The MADEP requested that the Trust apply for a Financial Inability Status.

In a letter, dated November 8, 2005, DAI submitted an additional request for a Tier IC Permit extension. The purpose of the extension request was to have more time to implement the necessary response actions required by the MCP to achieve a condition of No Significant Risk.

In a letter, dated January 10, 2006, the MADEP issued an Acceptance of Financial Inability Assertion to Kleenit, Inc. The MADEP stated that the Financial Inability status would expire on August 2, 2006.

## Regulatory Status of the Site

Regarding RTN 3-2739 for the original release notification, according to the MADEP Reportable Release Lookup website, the Care Cleaners site is listed as having a notification date of January 15, 1990. It is listed as having a compliance status of Tier IC and is currently in Phase IV of the MCP.

Regarding RTN 3-20316 for the SRM, according to the MADEP website, the Care Cleaners site is listed as having a notification date of January 26, 2001. It is listed as having a compliance status as "Closed" as of January 23, 2002. This coincides with the request for Minor Permit Modification request and linkage of the two RTNs submitted for the site as discussed above.

As mentioned above, the Site was issued a Tier IC Permit extension that was scheduled to expire on December 1, 2002. However, the site was also granted an Acceptance of Financial Inability Assertion, which was scheduled to expire on August 2, 2006. (10, page 1)

ENSR has not been made aware any additional regulatory determinations and/or tier extensions being requested or granted after August 2006 or is it clear if the site is still under a status of Financial Inability. Therefore, the current regulatory status of the site is unknown.

## Previous Investigations and Studies

The first reported investigation activities performed at the site included installation of four monitoring wells at the Care Cleaners facility in October 1990. During this field

work, groundwater samples were collected from the wells for laboratory analysis. PCE was detected in three of the four samples collected. Additional field work was performed in March 1992 to install an additional four wells and to collect groundwater, soil, and surface water samples. Between 1992 and 2001, groundwater monitoring was performed approximately every two years.  The results of this monitoring showed that PCE was detected in groundwater at concentrations above regulatory levels at locations near and downgradient (in the direction of groundwater flow) from the Care Cleaners building.

In September of 2001, soil around the former septic system location was excavated and disposed of at a permitted waste management facility.  As part of the same operation, soil was excavated from beneath the floor in the rear of the building. This part of the building is the location where an addition had been previously constructed. Soil samples collected from the side walls of the excavations indicated that concentrations of PCE in soils exceeded regulatory levels.

Between 2001 and 2004, additional investigation activities performed included installation of seven new monitoring wells, including three within the Care Cleaners building itself. Soil and groundwater samples were collected from these new wells to determine the concentration and distribution of PCE and other contaminants in soil and groundwater. In addition to a total of 15 monitoring wells installed on the Care Cleaners property, additional wells have been installed by others as part of the investigations of other properties. Groundwater samples have been collected from an estimated 26 wells on the Care Cleaners property and properties located nearby to the north and east. These additional properties are located downgradient from the 28 Central Square property. Soil samples have been collected from 13 locations on the Care Cleaners property.

The results of these investigations indicate that the highest concentration of PCE in soil (1,410 milligrams-per-kilogram or mg/kg) was detected in the sidewalls of the excavation located beneath the back of the building at depth of approximately 5 feet. Concentrations of PCE in soil in exceedence of regulatory levels were also detected in other locations beneath the floor of the building.

The highest concentration of PCE in groundwater (48,000 micrograms-per-liter or ug/l) was measured in a monitoring well installed inside the Care Cleaners building in 2002 before excavation was performed in that area. Except for two wells installed to depths of 30 and 35 feet, wells were screened at depths between five and 22 feet. The maximum concentration of PCE detected downgradient from the Care Cleaners property was 432 ug/l measured in a well located approximately 80 feet northeast of the 28 Central Square property line.

In 1992, 1997, 1999 and 2004; surface water samples were collected from Beaver Brook. The maximum concentration of PCE measured in surface water was 33 ug/L measured in 1992. No concentration of PCE in exceedence of detection limits has been measured since that time.

## Contaminants of Concern

The primary contaminants of concern (COCs) are PCE and its daughter products (including vinyl chloride).  These contaminants are known to be associated with dry cleaning operations.  Secondary COCs, including the gasoline-related constituents MTBE, benzene and toluene were also detected at the site.  However, based on the information presented in the documents included in Attachment B, it is believed that the sources of the gasoline-related compounds are from other operations and/or is residual from normal vehicular usage of the site and surrounding area and not from the current or former operations conducted at the 28 Central Square facility.  Therefore, the only COCs that will be addressed in this document are the PCE and other dry cleaning-related constituents.

## Timing of the Release

Based on absence of any additional information related to additional releases at the site after 1989, the timing of the release must have been prior to 1989.

## Nearby Drinking Water Receptors

The Chelmsford Turnpike Road Supply Wells are located approximately 0.6 miles east of and downriver from the Site.  According to information presented in the MADEP Memorandums for the Record in December 2000 and January 2001, CVOCs have been detected in water samples collected from the wells as early as 1979.  However, no CVOCs were detected in water samples collected in 2000 and to date, VOC concentrations have not been detected above Federal and State Safe Drinking Water standards.

MADEP installed nine driven wellpoints within a 500 foot radius of the Turnpike Road Supply Wells in 2000 as part of an investigation of potential contaminants in the area. Four surface water samples and one sump water sample were also collected.  Results of the investigation identified concentrations of several VOCs and CVOCs in the groundwater collected from several of the wellpoints, three of the four surface water samples and the sump sample.  Based on the findings of this investigation, the MADEP identified four sites that were referred the MADEP's Risk Reduction group for further review.  The sites include Care Cleaners (28 Central Square), Paramount Cleaners, Inc and Purity Supreme, Inc. (20 Boston Road), the Gulf gasoline station (7 Acton Road), and the Mobil gasoline station (30 Central Square).

## Nearby Indoor Air Receptors

As part of 2001 Memorandum for the Record, the MADEP noted that impacts to the indoor air at 34 Central Square (4).  The Memorandum also stated that the site had been used as a daycare center since approximately 1998.  It should be noted that the daycare center is reportedly no longer in operations at this facility (11, page 1-1).  The

source was considered to be the groundwater sump located in the basement. Results of initial indoor samples detected VOCs and CVOCs and the MADEP issued notices to four PRPs.

In November 2004, Camp Dresser & McKee, Inc. (CDM) submitted a modified Phase IV Remedy Implementation Plan (RIP) to address the indoor air issues at 34 Central Square. CDM submitted this report on behalf of the Mobil gasoline station located at 30 Central Square. In September 2005, CDM issued a As-Built Construction and Final Inspection Report summarizing the remedial actions taken to address indoor air impacts at 34 Central Square. These actions included the removal of the current indoor air system, the closure of the groundwater sump, and the partial filling of the basement with a waterproof membrane and concrete. Subsequent indoor air samples collected in May and October 2005, and February 2006 did not detected the presence of any CVOCs inside the building and that concentrations of contaminants in the groundwater had decreased. Subsequent indoor air sampling was not performed by CDM "…based on the lack of evidence of a potential vapor migration pathway…" (12, page 2-2)

## Other Potential Responsible Parties within the Area

As mentioned above, the MADEP identified at least three additional potential sources for the VOCs detected in Beaver Brook and the Turnpike Road Wells. Both the Mobil and Gulf gasoline stations have been identified as having gasoline releases, and it is possible that some CVOCs are associated with those sites. Based on information contained in the Haley & Aldrich IRA Status Report/Modified IRA Plan, dated May 2001, "…at least some of the chlorinated VOCs detected in the groundwater [at the 20 Boston Road site] have originated from the Paramount Cleaners facility" and "The results of the assessment activities conducted to date suggest that the current of former operations at the Paramount Cleaners facility are likely a contributing source of chlorinated VOCs detected in the groundwater in the area." (9, page 6). It should be noted that the Paramount Cleaners facility is located approximately 0.1 mile east of and downriver of the Care Cleaners site.

As mentioned above, assessment and remediation measures have been taken at the 34 Central Square site on behalf of Mobil.

In addition to the potential sources identified in the MADEP Memorandums, the Central Square area is itself a heavily trafficked area, stormwater running into Beaver Brook.

## DISCUSSION

The first identification of a release to the Site was noted in 1989 and there have been no identified releases of PCE since that time.  Originally, the source of the on-Site PCE was considered to be the cesspool; however, later assessments concluded that at a portion of the PCE was released immediately outside the rear door of the facility.  In late 2001, the cesspool and much of the adjacent impacted soil were removed from the site. Due to structural issues, some residual impacted soil was left.  However, based on the information reviewed, it would appear that a significant volume of the original source material had been removed from the Site.

Assessment work conducted by the MADEP identified the presence of VOCs and CVOCs in Beaver Brook surface water samples, and wellpoint and drinking water wells samples collected in and at the Turnpike Road Supply Wells.  The MADEP identified several sources (including the Care Cleaners site) of the VOCs and CVOCs Concentrations of CVOCs and VOCs were not detected above Federal or State Safe Drinking Water standards in any of the MADEP sampling events.  Supply wells samples collected by the Chelmsford Water Department in February 2000 did not detected CVOCs in the Turnpike Road Wells.

Concentrations of elevated VOCs and CVOCs were detected in indoor air samples collected from the 34 Central Square facility.  The MADEP considered this situation to represent a SRM and a CEP, and issued new RTNs to several PRPs (including Kleenit, Inc.) to conduct an IRA to address the situation.  However, since that time, steps have been taken by Mobil to remedy the situation and as of May 2007, no additional indoor air issues related to VOCs or CVOCs migrating on-site exist.

Under the MCP, cleanup criteria for contaminants in groundwater, soil, or indoor air are established based on an evaluation of risks to human health and the environment.  This evaluation, known as a risk characterization, can be completed using one or more of three methods; Method 1, Method 2, or Method 3. Method 1 characterizations are completed by comparing concentrations of contaminants in soil or groundwater to cleanup criteria tabulated in the MCP.  Method 2 characterizations are completed by recalculating the Method 1 criteria following procedures specified in the MCP. Method 3 characterizations are completed by calculating site-specific risks using site data and toxicological evaluation procedures specified by MADEP, the United States Environmental Protection Agency (EPA), or other organizations.

If all contaminated media at a site meet cleanup criteria established by a risk characterization, a condition of No Significant Risk is said to exist.  If media do not meet cleanup criteria and a condition of No Significant Risk does not exist, it is necessary to perform a remedial action if it is feasible.  The goal of that remedial action is to attain a condition of No Significant Risk.  If this goal is met, a Permanent Solution has been achieved.

Achievement of a Permanent Solution is documented by submitting a Response Action Outcome (RAO) statement to MADEP.  There are three types of RAO; Class A, Class B, and Class C.  A Class A RAO is accomplished if a condition of No Significant Risk is attained following implementation of a remedial action.  A Class B RAO is achieved if a condition of No Significant Risk is reached without implementation of a remedial action.  A Class C RAO is attained if a condition of No Significant Risk has not been achieved but a Temporary Solution has been implemented.  In order for a Temporary Solution to be achieved, it is necessary to demonstrate that a condition of No Substantial Hazard exists at the site.  A No Substantial Hazard evaluation compares concentrations of COC at a site with cleanup criteria which are less stringent than those required for a condition of No Significant Risk.  Risks which pose No Substantial Hazard represent acceptable risks under current conditions.  A No Substantial Hazard evaluation is performed by completing a risk characterization using similar methods to those used in a No Significant Risk evaluation.

Concentrations of PCE in groundwater at the site exceed Method 1 GW-1 and GW-2 cleanup criteria published in the MCP. Concentrations of PCE in soil exceed S-1, S-2, and S-3 standards for all groundwater classifications.  Based on these facts, a condition of No Significant Risk does not exist at the site and a remedial action may be required.

The MCP specifies that remedial actions implemented at a site are required to achieve a Permanent Solution if it is feasible.  If it is not feasible to achieve a condition of No Significant Risk, a Temporary Solution should be achieved.  A feasibility evaluation includes a determination whether or not it is technically possible to achieve all relevant cleanup criteria.  Based on experience at sites similar to the Chelmsford site, it is established that achievement of GW-1 cleanup criteria may not be possible.  This conclusion is based on evaluation of three factors, including the following:

- The possible presence of residual NAPL in the pore spaces of the soil at the Site

- The variability of on-site and off-site soil

- The elevated concentrations of PCE measured in groundwater at the site compared to the stringent GW-1 standards.

NAPL is the pure form of a chemical before it is absorbed by soil or dissolved in groundwater.  NAPL can provide a continuing source of contamination to groundwater, because it can persist in the subsurface for decades, slowly dissolving into groundwater.  The NAPL form of PCE is a DNAPL, which is heavier than water and tends to sink, spreading throughout the soil column.  It is a rule of thumb in the environmental field that NAPL may be found at a site if concentrations of a contaminant in groundwater are more than 1 to 10 percent of the solubility of the contaminant in water.  The maximum concentration of PCE measured in groundwater at the Site is 48,000 ug/L.  This represents more than 30 percent of the solubility of PCE in water, which is 150,000 ug/L.  This provides evidence of the possible presence of PCE NAPL in the subsurface.

Ex situ remedial actions, those performed by physically removing the contamination such as NAPL pumping and excavation into the water table, are not generally effective because these liquids form discrete pools and ganglia that typically do not respond to pumping. Likewise, excavation will not be a feasible remedial action at the Chelmsford site because of the wide distribution of dissolved PCE, the shallow depth to groundwater, and the presence of permanent structures.

In-situ remedial actions are those performed by treating subsurface contamination in place. Typical in situ remedial actions include air sparging/soil vapor extraction (AS/SVE), enhanced bioremediation, and chemical oxidation. Each of these options involves the introduction of fluids, air, or remedial additives, to the source area to destroy or otherwise remove contamination from the subsurface.

As discussed previously, soil at the site varies significantly with depth. Shallow soil consists of sand which has a relatively high hydraulic conductivity. Deeper soils consist of siltier materials that have a low hydraulic conductivity. It is more feasible to distribute additives required to implement in-situ treatment technologies to soil with high permeability values. Soil with lower permeability both limits the ability to force additives into the soil and inhibits thorough distribution of additives.

Even when NAPL is not present at a site and where all soil is of appropriate hydraulic conductivity, in-situ remedial technologies typically reduce concentrations of contaminants in soil and groundwater by a factor of 2 or 3 and in the best cases by a factor of 10. In order to achieve GW-1 groundwater cleanup criteria at the site, it will be necessary to reduce concentrations by a factor of more than 1,000.

Typical in-situ technologies are discussed below.

AS/SVE for remediation of PCE involves the injection of air below the water table to strip contamination from groundwater and subsequent the extraction of vapors from above the water table. AS/SVE is generally not effective in silty soils like those present in deeper soils at the site, due to the difficulty of distributing air uniformly through the source area. To remediate PCE by AS/SVE, direct contact between sparged air and virtually all source material, including DNAPL is necessary. This is not possible at the site.

Likewise, in-situ chemical oxidation requires direct contact between injected oxidant and aqueous-phase contamination. Chemical oxidation is infeasible at the site because obtaining thorough distribution through the low-permeability soils is not possible and because NAPL is resistant to chemical oxidation, because it is not in the aqueous phase. Chemical oxidants are highly reactive and thus do not persist in the subsurface nearly as long as NAPL and thus cannot be used to remediate the site.

Enhanced bioremediation of PCE involves the injection of a food source for microbes to stimulate the biodegradation of PCE. Like other in-situ technologies, enhanced

bioremediation requires that good distribution of injected fluids be achieved, although not to the extent required by in-situ chemical oxidation or AS/SVE. Like chemical oxidation, bioremediation occurs in the aqueous phase, which means that bioremediation must continue until NAPL has fully dissolved. However, bioremediation additives do not persist for more than a few years, and thus cannot complete the remediation of the site, because NAPL dissolves over the course of decades. This, enhanced bioremediation of the site is considered infeasible.

Moreover, the stringent cleanup criteria for the site require a greater than 99.9% reduction in contaminant concentration, which is a treatment objective that cannot realistically be anticipated under the best circumstances, regardless of technology. The combination of DNAPL, low-permeability soils, and stringent groundwater cleanup standards make it infeasible to remediate the site using any technology. Similar sites are typical of those sites where it has been determined that it is technically impracticable to complete remediation. Such technical impracticability determinations have been made by USEPA and other agencies without consideration of costs, where the best efforts of large corporations or the federal government have been inadequate to achieve cleanup. Where DNAPL, low-permeability soils, and stringent cleanup criteria exist, there is no feasible engineering approach to achieving a Permanent Solution at the site.

## OPINION

It is my opinion that COCs present at the Care Cleaners site are representative of older spills and releases, and do not reflect recent or ongoing threats to the environment. In addition, the majority of the suspected sources of the on-Site PCE (cesspool and impacted soil) have been removed. Therefore, the Site no longer represents a significant continuing source of CVOCs either to itself or downgradient receptors. This includes Beaver Brook, the Turnpike Road Supply Wells (which had never been shown to contain CVOCs above Federal or State Drinking Water standards even before the on-Site source was removed) or the 34 Central Square facility.

The presence of at least one additional source of CVOCs (Paramount Cleaners) and several other VOC sources, combined with the urban environment associated with Central Square and surrounding areas would make it difficult to focus remedial activities solely on the Site-related CVOC contaminants. This is based on the fact that any remedial alternative would also have to address the gasoline-related contamination in the groundwater and soil, and the ongoing impacts from normal urban use of the properties in and around Central Square. In addition, it is probable that any remedial measures (including the introduction of HRC as proposed by DAI) would not reduce VOC or CVOC concentrations to below GW-1 standards.

It is my opinion that the current conditions at the Care Cleaners site do not represent an ongoing risk to on-site or off-site human and/or environmental receptors. It is also my opinion that additional remedial measures to address on-site or off-site groundwater or soil impacts would not achieve any significant additional benefits to potential human or

environmental receptors nor would it be feasible, either by economic or engineering means, to attempt to reduce COCs to below GW-1 standards.

## RECOMMENDED ACTIONS

Based on the information reviewed and the evaluation presented above, the following items are recommended:

- Conduct a Method 3 Risk Evaluation of the Care Cleaners building and downgradient buildings to determine if any unacceptable risks, including those associated with inhalation of indoor air, are present. Based on the findings, additional actions may be required.

- Conduct several additional rounds of groundwater sampling from some of the on-Site monitoring wells and surface water locations to identify a baseline and determine if natural attenuation is ongoing.

- Based on the findings of the additional monitoring, consider the application of an RAO C for the Site.

The estimated cost to complete this scope of work is as follow:

- Planning & Project Management ............................................................. $5,300
- Method 3 Risk Assessment
  - o Soil Gas Investigation .................................................... $10,500
  - o Risk Characterization.................................................... $20,000
- Site Reconnaissance and Well Location .................................... $1,500
- Groundwater Monitoring .......................................................... $9,000
- Activity and Use Limitations.................................................... $5,400
- Response Action Outcome...................................................... $10,500
  - **Total.............................................................................. $62,200**

**DOCUMENTS NOTED IN THIS OPINION**:

(1)     Clean Soils Environmental, LTD., Site Investigation Relative to Chapter 21E, dated January 31, 1990.

(2)     Ground Water Consultants, Inc., Phase II Limited Comprehensive Site Investigation, dated May 29, 1992.

(3)     D'Amore Associates, Inc., Immediate Response Action Status Report and IRA Plan Modification, dated May 20, 2002.

(4)     Massachusetts Department of Environmental Protection, Memorandum for the Record, dated December 11, 2000.

(5)     D'Amore Associates, Inc., Immediate Response Action Status Report, Phase II Comprehensive Site Assessment and Phase III Focused Feasibility Study, dated June 15, 2004.

(6)     Massachusetts Department of Environmental Protection, Memorandum for the Record, dated January 2001.

(7)     D'Amore Associates, Inc., Immediate Response Action Status Report, dated May 23, 2003.

(8)     Massachusetts Department of Environmental Protection, Memorandum: Technical Review for Permit Extension, dated November 27, 2002.

(9)     Haley & Aldrich, Inc., Immediate Response Action Status Report No 1/Modified IRA Plan, dated May 2001.

(10)    Massachusetts Department of Environmental Protection, Acceptance of Financial Inability Assertion, dated January 10, 2006.

(11)    Camp Dresser & McGee, Inc., Inspection and Monitoring report to Maintain Remedy Operation Status, dated May 2006.

(12)    Camp Dresser & McGee, Inc., Inspection and Monitoring Report to Maintain Remedy Operation Status, dated May 2007.

**ATTACHMENT A**

**CV – ROBERT CATALDO**

**ROBERT M. CATALDO, PG, LSP**
**22 Parkwood Drive**
**Pepperell, Massachusetts  01463**
**(978) 433-5404 Home/(508) 864-4515 Mobile**

---

### WORK EXPERIENCE

**ENSR/Fugro/IEP        Vice President/Senior Hydrogeologist        1989-Present**

Currently part of the newly-created Project Management Department, which is responsible for ENSR's initiative for standardization of project management, SOPs, and other company protocols and procedures.

Manager of the Petroleum and Property Services department.  Responsible for the oversight, management and sales goals for over 50 technical, financial and administrative personnel in three offices.  Annual sales revenues of ~$7 million.

Program Manager, 7-Eleven National Alliance form 1989 until 2005.  Responsible for over 50 technical, financial and administrative personnel located in 10 offices throughout the eastern and mid-western regions.   Annual sales revenues of $8 million and cumulative revenues of ~ $100 million.

**Areas of Operation**:   Eastern, Mid-Western, Southern United States, Caribbean, Italy and the Philippines.

**O.H. Materials, Corp.            Hydrogeologist                 1987-1989**

Project Manager, hazardous waste assessment and remediation of petroleum, chemicals, metals, PCBs and solid waste.  Emergency responder/supervisor for petroleum and chemical releases.

**Areas of operation:** New England, New York, New Jersey, Pennsylvania and Michigan

**Chevron USA, Inc            Petroleum Geologist/Geophysicist 1981-1986**

Development and exploration geologist, and geophysicist for offshore and onshore oil and gas reserves.

**Areas of Operation:** Offshore Louisiana and Texas, and Onshore Texas

**Syracuse University            Teaching Assistant            1978-1980**

## EDUCATION

**University of Massachusetts, Lowell**                              **2006-Present**

    Coursework towards PhD in Geology/Marine Sciences

**University of Southwestern Louisiana**                              **1981-1982**

    Post-Master Coursework in Geophysics

**Syracuse University**                              **1978-1980**

    Master of Science – Geology.  Thesis: Longshore Transport of Sediments along the New Jersey Coastline

**Brooklyn College**                              **1973-1978**

    Post-Bachelor coursework - Geology
    Bachelor of Arts - Economics

**Staten Island Community College**                              **1971-1973**

    Associate of Science

## LICENSES/CERTIFICATIONS

Massachusetts Licensed Site Professional #9635
Wisconsin Professional Geologist #257-013
Pennsylvania Professional Geologist #2360-G
Delaware Professional Geologist #S4-0000948
New Hampshire Professional Geologist #PG 597
Arkansas Professional Geologist #820

## PUBLICATIONS

Wagner, K.J. and R. Cataldo. 1997. Achieving multiple compliance objectives through a storm water pollution prevention plan.  Massachusetts Environment, Spring 1997.

Overcoming MTBE Myths, Cataldo, R., LSP and Moyer, E., PhD, PE, Environmental Protection, May 2001, pages 24 - 27,

Remediation of Releases Containing MTBE at Gas Station Sites, Cataldo, R., PG, LSP and Moyer, E., PhD, PE, Contaminated Soil, Sediment & Water, Spring 2001, pages 87-90.

Remediation of Releases Containing MTBE at Gasoline Station Sites – ENSR International's Experience, Cataldo, R., PG, LSP, MTBE Remediation Handbook, edited by Moyer, E. and Kostecki, P. 2003

Geophysics as a Risk Management Tool for Environmental Due Diligence: Japitana, Jesse and Cataldo, Robert, PG, LSP, Indiana NEWs, Air & Waste Management Association, January 2006, pages 12-13.

**ATTACHMENT B**

**LIST OF REVIEWED DOCUMENTS**

**ATTACHMENT B**
**CHELMSFORD, MASSACHUSETTS REFERENCE LIST**

January 31, 1990. Clean Soils Environmental, LTD. "Re: Site Investigation Relative to Chapter 21E (28 Central Square, Chelmsford, MA)."

May 29, 1992. Ground Water Consultants, Inc. "Phase II Limited Comprehensive Site Investigation: Care Cleaners, 28 Central Square Chelmsford, MA."

May 20, 1996. GZA Environmental. "Re: Results of Supplemental Explorations Paramount Properties, Chelmsford MA."

November 21, 1997. Massachusetts Department of Environmental Protection. "Memorandum: Technical Review for Permit Application: Chelmsford- Almont Plaza, 2-28 Alpine Lane RTN 3-14176."

December 8, 1997. Commonwealth of Massachusetts. "Tier IC Permit Care Cleaners 28 Central Square, Chelmsford MA RTN #3-2739."

December 8, 1999. Rizzo Associates, Inc. "Re: Phase II Comprehensive Site Assessment and Response Action Outcome Statement: 2-28 Alpine Lane Chelmsford, MA RTN: 3-14176."

December 15, 1999. Rizzo Associates, Inc. "Phase III Remedial Action Alternatives Evaluation."

December 11, 2000. Massachusetts Department of Environmental Protection. "Memorandum for the Record: Town of Chelmsford, Turnpike Road Supply Well Site Discovery File."

January 2001. Massachusetts Department of Environmental Protection. "Memorandum for the Record: Chelmsford – Turnpike Road Wellfield Executive Summary of Site Discovery Actions."

January 28, 2001. Massachusetts Department of Environmental Protection. "Release Notification, Notice of Responsibility, Notice of Need to Conduct IRA; Designation of Interim Deadlines- Care Cleaners, Inc.28 Central Square RTN:2-20316."

June 19, 2001. Massachusetts Department of Environmental Protection. "Notice of Need to Conduct Immediate Response Actions; Interim Deadline M.G.G c21E & CMR 40 0000- 28 Central Square Chelmsford RTN #3-20316."

May 2001. Haley & Aldrich, Inc. "Immediate Response Action (IRA) Status Report No. 1, Modified IRA Plan: Paramount Cleaners Site, 20 Boston Post Road, Chelmsford MA RTN 3-20242."

January 16, 2002. D'Amore Associates, Inc. "Supplemental Field Investigation Report for 28 Central Square, Chelmsford RTN 3-20316 and 3-2739."

May 2002. Haley & Aldrich, Inc. Immediate Response Action (IRA) Status Report No. 3, Modified IRA Plan: Paramount Cleaners Site, 20 Boston Post Road, Chelmsford, MA RTN 3-20242."

May 20, 2002. D'Amore Associates, Inc. "Immediate Response Action Status Report and IRA Plan Modifications for 28 Central Square, Chelmsford, RTN 3-20316 and 3-2739."

August 27, 2002. D'Amore Associates, Inc. "Request for Tier IC Permit Extension Kleenit, Inc. RTN #3-20316."

September 25, 2002. Rubin and Rudman LLP. "Notice of Claim, Demand for Defense/Coverage 28 Central Square, Chelmsford, MA."

November 2002. Haley & Aldrich, Inc. "Immediate Response Action (IRA) Status Report No. 4: Paramount Cleaners Site, 20 Boston Post Road, Chelmsford MA RTN 3-20242."

November 26, 2002. D'Amore Associates, Inc. "IRA Status Report: Care Cleaners 28 Central Square, Chelmsford MA. RTN 3-2729."

November 27, 2002. Massachusetts Department of Environmental Protection. "Memorandum: Technical Review for Permit Extension: Care Cleaners 28 Central Square, Chelmsford, MA RTN 3-2739."

January 8, 2003. Massachusetts Department of Environmental Protection. "Re: Application for Financial Inability Status: Care Cleaners 28 Central Square Chelmsford, MA  RTN 3-20316 and 3-2739."

May 23, 2003. D'Amore Associates, Inc. "Immediate Response Action Status Report for 28 Central Square, Chelmsford, MA RTN 3-2729 and Related RTN #3-20316."

December 16, 2003. D'Amore Associates, Inc. "Immediate Response Action for 28 Central Square, Chelmsford, MA RTN 3-2729 and Related RTN #3-20316."

June 15, 2004. D'Amore Associates, Inc. "Immediate Response Action Status Report, Phase II Comprehensive Site Assessment and Phase III Focused Feasibility Study for 28 Central Square, Chelmsford, MA RTN 3-2729 and Related RTN #3-20316."

November 2004. Camp, Dresser, and McKee, Inc. "Phase V Inspection and Monitoring Report, Modified Phase IV Remedy Implementation Plan for 30 Central Square, Chelmsford, MA RTN 3-2747."

November 22, 2004. D'Amore Associates, Inc. "IRA Status Report: Care Cleaners 28 Central Square, Chelmsford MA. RTN 3-2729."

February 1, 2005. D'Amore Associates, Inc. "Indoor Air Monitoring- Care Cleaners 28 Central Square, Chelmsford MA. RTN 3-2729 and 3-20316."

June 7, 2005. "IRA Status Report: Care Cleaners 28 Central Square, Chelmsford MA. RTN 3-2729."

September 2005. Camp, Dresser, and McKee, Inc. "Modified Phase IV Completion Statement, As Built Construction and Final Inspection Report for 30 Central Square, Chelmsford, MA RTN 3-2747."

November 7, 2005. D'Amore Associates, Inc. "Cost Estimate for Phase III Focused Feasibility Study."

November 8 2005. D'Amore Associates, Inc. "Request for Tier IC Permit Extension for 28 Central Square, Chelmsford, MA RTN 3-2729 and Related RTN #3-20316, Permit No.137426, Permit No.1374267."

January 10, 2006. Massachusetts Department of Environmental Protection. "Acceptance of Financial Inability Assertion, Care Cleaners 28 Central Square, Chelmsford MA. RTN 3-2729 and 3-20316."

January 20, 2006. D'Amore Associates, Inc. "Phase IV Remedy Implementation Plan for 28 Central Square, Chelmsford, MA RTN 3-2729 and Related RTN #3-20316."

May 2006. Camp, Dresser and McKee, Inc. "Inspection and Monitoring Report to Maintain Remedy Operation Status for 30 Central Square, Chelmsford, MA RTN 3-274."

November 2006. Camp, Dresser and McKee, Inc. "Inspection and Monitoring Report to Maintain Remedy Operation Status for 30 Central Square, Chelmsford, MA RTN 3-274."

November 27, 2006. D'Amore Associates, Inc. "Immediate Response Action Completion Report and Phase IV Status Report for 28 Central Square, Chelmsford, MA RTN 3-2729 and 3-20316."

February 20, 2007. The RETEC Group, Inc. "Review of Remedial Approaches 28 Central Square, Chelmsford, MA (RTN 3-2729 and 3-20316)."

March 28, 2007. D'Amore Associates, Inc. "Cover Letter for CRA Remedial Monitoring Report."

April 30, 2007. D'Amore Associates, Inc. "Six-Month Phase IV Status Report for 28 Central Square, Chelmsford, MA RTN 3-2729 and 3-20316."

May 2007. Camp, Dresser and McKee, Inc. "Inspection and Monitoring Report to Maintain Remedy Operation Status for 30 Central Square, Chelmsford, MA RTN 3-274."

c